UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE PEOPLE OF THE STATE OF NEW YORK, By LETITIA JAMES, Attorney General of the State of New York, <br><br> Plaintiff, <br><br> -against- <br><br> DIOCESE OF BUFFALO, RICHARD J. MALONE, EDWARD M. GROSZ, and EDWARD B. SCHARFENBERGER, in his capacity as Apostolic Administrator for the Diocese of Buffalo, <br><br> Defendants. | Case No. 21-cv-00189 (RA) <br><br> [State Court Index No. 452354/2020] |

**MEMORANDUM OF LAW IN SUPPORT OF THE NEW YORK STATE
ATTORNEY GENERAL'S MOTION TO REMAND THIS ACTION TO STATE COURT**

PRELIMINARY STATEMENT ................................................................................. 1

STATEMENT OF RELEVANT FACTS ................................................................... 3

STANDARD OF REVIEW ....................................................................................... 8

ARGUMENT ............................................................................................................ 8

I.      THE ATTORNEY GENERAL'S ACTION SHOULD BE REMANDED BECAUSE
        IT IS AN ACTION TO ENFORCE HER POLICE AND REGULATORY POWER. ...... 8

        A.      The "Police-Power" Exception to Removal .......................................... 9

        B.      The AG Enforcement Action Will Ensure the Proper Administration of the
                Diocesan Corporation and Protect the Public and Children. ............... 10

        C.      The AG Enforcement Action Will Not Adjudicate Private Rights ..... 12

        D.      The Diocesan Corporation's Police-Power Argument Does Not Invoke
                Federal-Question Jurisdiction. .............................................................. 14

        E.      The General Removal Statute Does Not Render the Police-Power Exception
                Meaningless. ......................................................................................... 15

II.     SECTION 1334(C) REQUIRES THIS COURT TO ABSTAIN FROM HEARING
        THE ATTORNEY GENERAL'S CLAIMS. ................................................. 16

III.    IF THE COURT DETERMINES THAT ABSTENTION IS NOT MANDATORY,
        IT SHOULD REMAND UNDER SECTIONS 1334 AND 1452 PURSUANT TO
        EQUITABLE PRINCIPLES OF COMITY AND EFFICIENCY. .................. 19

CONCLUSION ....................................................................................................... 21

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Chao v. Hospital Staffing Services, Inc.*,
   270 F.3d 374 (6th Cir. 2001) ................................................................13

*Chu v. Chinese-Am. Planning Council Home Attendant Program, Inc.*,
   194 F. Supp. 3d 221 (S.D.N.Y. 2016)....................................................14

*Commodity Futures Trading Comm'n v. AVCO Fin. Corp.*,
   979 F. Supp. 232 (S.D.N.Y. 1997).........................................................10

*Equal Employment Opportunity Comm'n v. Le Bar Bat, Inc.*,
   274 B.R. 66 (S.D.N.Y. 2002)..................................................................10

*Hosanna-Tabor Evangelical Lutheran Church & School v. E.E.O.C.*,
   565 U.S. 171 (2012)................................................................................14

*In re Abrams*,
   148 Misc. 2d 825 (N.Y. Sup. Ct. N.Y. Co. 1990)....................................3

*In re AOG Entertainment, Inc.*,
   569 B.R. 563 (Bankr. S.D.N.Y. 2017).....................................................16

*In re Cody, Inc.*,
   281 B.R. 182 (S.D.N.Y. 2002).................................................................20

*In re Gen. Motors LLC Ignition Switch Litig.*,
   69 F. Supp. 3d 404 (S.D.N.Y. 2014)........................................................9

*In re Go West Enter., Inc.*,
   387 B.R. 435 (Bankr. S.D.N.Y. 2008).....................................................10

*In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*,
   488 F.3d 112 (2d Cir. 2007)..................................................................8, 9

*In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*,
   522 F. Supp. 557 (S.D.N.Y. 2007)...........................................................15

*In re Nortel Networks, Inc.*,
   669 F.3d 128 (3d Cir. 2011)....................................................................13

*In re Queen Elizabeth Realty Corp.*,
   502 B.R. 17 (Bankr. S.D.N.Y. 2013).......................................................13

*In re Residential Capital LLC ("In re ResCap"),*
    488 B.R. 565 (Bankr. S.D.N.Y. 2013) ............................................................19, 20

*In re River Center Holdings, LLC,*
    288 B.R. 59 (Bankr. S.D.N.Y. 2003) .........................................................................21

*In re Universal Life Church, Inc.,*
    128 F.3d 1294 (9th Cir. 1997) ..................................................................................10

*Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church,*
    344 U.S. 94 (1952) ....................................................................................................14

*MHS Capital v. Goggin,*
    No. 16-cv-1794, 2016 WL 3522198 (S.D.N.Y. June 13, 2016) ...............................18

*Midocean Partners IV, L.P. v. Baker,*
    No. 20-cv-6013, 2020 WL 6801916 (S.D.N.Y. 2020) .............................................18

*Our Lady of Guadalupe School v. Morrissey-Berru,*
    140 S. Ct. 2049 (2020) ..............................................................................................14

*Parmalat Capital Fin. Corp. v. Bank of Am.,*
    671 F.3d 261 (2d Cir. 2012) ...............................................................................16, 17

*People v. Grasso,*
    54 A.D.3d 180 (1st Dep't 2008) .............................................................................3, 4

*Sealink Funding Ltd. v. Bear Stearns & Co. Inc.,*
    2012 WL 4794450 (S.D.N.Y. 2012) ........................................................................20

*S.E.C. v. Towers Fin. Corp.,*
    205 B.R. 27 (S.D.N.Y. 1997) ..............................................................................10, 12

*Serbian Eastern Orthodox Diocese for the U.S. & Canada v. Milivojevich,*
    426 U.S. 696 (1976) ..................................................................................................14

*Tilton v. MBIA, Inc.,*
    620 B.R. 707 (S.D.N.Y. 2020) ..................................................................................20

*Wisconsin v. Yoder,*
    406 U.S. 205 (1972) ..................................................................................................14

**FEDERAL STATUTES**

11 U.S.C.
    § 362 ....................................................................................................................7, 9, 12

28 U.S.C.
    § 1334 ................................................................................................................. *passim*

§ 1441 ..................................................................................................................... 15

§ 1452 .............................................................................................................. *passim*

**STATE STATUTES**

EPTL
§§ 8-1.4(a), (m) ............................................................................................... 3

N-PCL
§ 112(a)(1) ........................................................................................................ 4
§ 720 .................................................................................................................. 4

RCL
§ 2-b(1) .............................................................................................................. 4

**OTHER**

Centers for Disease Control and Prevention, *Preventing Child Abuse*
https://www.cdc.gov/violenceprevention/childabuseandneglect/childsexualabuse.html .......... 5

Office of Children and Family Services, *Child Protective Services*
https://ocfs.ny.gov/programs/cps ................................................................... 6

## PRELIMINARY STATEMENT

Plaintiff the Attorney General of the State of New York brought this action (the "AG Enforcement Action") in New York State Supreme Court on November 23, 2020, pursuant to her authority as the State's chief law enforcement officer and primary regulator of charitable organizations chartered in the State.  The Attorney General's 216-page Complaint, comprised of over 750 paragraphs of factual and legal allegations, asserts exclusively state statutory claims pursuant to New York's Not-for-Profit Corporation Law ("N-PCL"), Estates, Powers and Trusts Law ("EPTL"), and Religious Corporations Law ("RCL") against the Diocese of Buffalo (the "Diocesan Corporation"), its chief administrator and two of its former principals.[1]  The Complaint specifically highlights the Diocesan Corporation's failure to meaningfully follow policies and procedures that the Corporation adopted to provide accountability and transparency concerning the administration, investigation, and adjudication of complaints of clergy sexual abuse.  In addition, the Complaint alleges claims that the Diocesan Corporation's former leaders breached their secular fiduciary duties.  The Complaint seeks exclusively injunctive relief from the Diocesan Corporation to ensure that it properly addresses sexual abuse allegations through policies and procedures that, by their purpose, content, design, and application, are secular in nature.  No pecuniary relief is sought against the Diocesan Corporation.

On January 9, 2021, the Diocesan Corporation removed this action to the Southern District of New York on the ground that the action relates to the Diocesan Corporation's pending bankruptcy in the Western District of New York.  Removal was improper, and the AG Enforcement Action should be remanded for three reasons.

---

[1] The Attorney General named Bishop Edward B. Scharfenberger as a defendant solely in his capacity as the Apostolic Administrator of the Diocesan Corporation at the time the Complaint was filed.  Bishop Michael William Fisher has since been installed and replaced Apostolic Administrator Scharfenberger.  The Attorney General intends to substitute Bishop Fisher as a defendant for Apostolic Administrator Scharfenberger.

First, federal law bars removal of any state action related to a bankruptcy if the state action, like this one, was brought by a governmental unit in the exercise of its police power and regulatory function.  28 U.S.C. 1452(a).  This "police-power exception" from removal plainly applies here.  The AG Enforcement Action is brought in the exercise of the Attorney General's regulatory oversight of the Diocesan Corporation to address the institution's non-compliance with its secular legal obligations governing the administration and management of sexual abuse allegations against diocesan employees.  The Attorney General's action also seeks prospective injunctive relief to ensure that the Diocesan Corporation takes appropriate action to protect against the risk of clergy sexual abuse and to properly remediate past abuse.  Notwithstanding Defendant's assertion in its removal notice of the First Amendment to challenge the Attorney General's exercise of her authority, a constitutional defense does not overcome the procedural protection of the police-power exception.  Importantly, in its bankruptcy proceeding, the Diocesan Corporation has represented that it has not sought a stay of the AG Enforcement Action based on its current view that the action is one to enforce the Attorney General's police and regulatory power.

Second, independent of the Attorney General's police and regulatory role, section 1334(c)(2) of title 28 requires this Court to abstain from hearing the claims at issue in this action.  Abstention is mandatory where, as here, a state action implicates exclusively state-law claims that can be adequately reviewed by the state court, and the sole basis for federal jurisdiction is the action's "relation to" a pending bankruptcy.  The AG Enforcement Action can be adjudicated independently of the bankruptcy because the claims implicate principles of state regulatory oversight that can be adequately considered by the New York State court.  Further, the

equitable remedies that the Attorney General seeks will not affect the Diocesan Corporation's financial reorganization.

Third, even if the circumstances and claims at issue did not mandate abstention, equitable principles of efficiency and comity weigh in favor of remand.  Sections 1334 and 1452 of title 28 both direct this Court to consider whether the case should be heard in its original state forum even if a basis for federal review exists, by examining: the actual effect, if any, that resolution of this action by a state court would have on the bankruptcy estate; the degree to which state law controls the action; and any unnecessary intrusion on the sovereign interests of a state court counterpart.

Each of these considerations indicates remand, and removal would run directly counter to basic principles of comity.  The Attorney General should not be prevented from asserting core state regulatory claims that are expressly provided by New York law in the forum that she has selected where, as here, those claims arise entirely outside of federal law and pose no risk to the efficient administration of a related bankruptcy.  For all of these reasons, the Court should remand this action.

## STATEMENT OF RELEVANT FACTS

**The Attorney General's Regulatory and Police Power over Charitable Organizations**

In the EPTL, N-PCL, and RCL, New York codified the Attorney General's authority over nonprofit and religious corporations.  *See, e.g.*, *In re Abrams*, 148 Misc. 2d 825, 829 (N.Y. Sup. Ct. N.Y. Co. 1990).  Under the EPTL, "[t]he attorney general may institute appropriate proceedings . . . to secure the proper administration of any . . . [charitable] corporation."  EPTL §§ 8-1.4(a), (m); *see In re Abrams*, 148 Misc. 2d at 828.  The N-PCL is a comprehensive statutory scheme that empowers the Attorney General to carry out the significant state interest of ensuring the proper management of nonprofits.  *People v. Grasso*, 54 A.D.3d 180, 191 (1st Dep't

3

2008).  Similarly, the RCL subjects the secular functions of religious corporations to the Attorney General's oversight by, among other things, authorizing her to: compel a defendant to account for his or her conduct in a religious corporation; seek relief against a director, officer, or fiduciary as a result of their breaches of fiduciary duties; and restrain religious corporations from engaging in "unauthorized activities."  RCL § 2-b(1); N-PCL §§ 112(a)(1), 720(a)-(b).  These tools are consistent with the Attorney General's role "'as the State's chief law enforcement officer,'" who is empowered "'to police not-for-profit corporations.'"  *Grasso*, 54 A.D.3d at 204.

**The AG Enforcement Action**

On November 23, 2020, the Attorney General filed the Complaint against the Diocesan Corporation, former Bishop Richard J. Malone, and former Auxiliary Bishop Edward M. Grosz ("Defendants").  The Complaint asserts four state-law claims: the first, against the Diocesan Corporation, to secure the proper administration of a charitable organization pursuant to the EPTL; the second, against the Diocesan Corporation to enjoin unauthorized activities pursuant to the N-PCL; the third, against former Bishop Malone and former Auxiliary Bishop Grosz for their breaches of statutory fiduciary duties pursuant to the N-PCL; and the fourth, against former Bishop Malone and former Auxiliary Bishop Grosz for their failures to properly administer a charitable organization pursuant to the EPTL.  The Complaint requests injunctive relief against the Diocesan Corporation to mandate independent oversight of an appropriate remedial and compliance plan.  Dkt. No. 1, Ex. A, Compl. ¶ 4.

The claims in the Complaint revolve around Defendants' failure to comply with secular standards of care as mandated by New York law.  In addition to independent, secular fiduciary duties, the Diocesan Corporation's own policies and procedures for addressing clergy sexual abuse serve as another appropriate benchmark to evaluate Defendants' conduct.  In the early 2000s, almost immediately after *The Boston Globe* published a series of articles that detailed

extensive abuse by numerous priests in the Archdiocese of Boston and a pattern of priest reassignments to conceal the scope of the abuse, the U.S. Conference of Catholic Bishops ("USCCB") developed policies and procedures known as the *Charter for the Protection of Children and Young People* ("*Charter*").  *Id.* ¶ 28.  Soon after the USCCB approved the *Charter* in June 2002, the USCCB, with the approval of the Vatican, decreed the *Essential Norms for Diocesan/Eparchial Policies Dealing with Allegations of Sexual Abuse of Minors by Priests or Deacons* ("*Essential Norms*").  The *Essential Norms* establish binding procedures for responding to allegations of the sexual abuse of minors.  *Id.* ¶ 29.  With these reforms, the U.S. bishops publicly committed "to implementing 'policies that [would] ensure the full protection of . . . children and young people and . . . bring an end to sexual abuse in the church.'"  *Id.* ¶ 5 (ellipses in original).

The Diocesan Corporation's own pre-*Charter* policies and procedures, entitled *Policy and Procedures for the Protection of Children, Young People and Vulnerable Adults* ("*Diocesan Policies and Procedures*"), were revised to incorporate the *Charter* and *Essential Norms*.[2]  *Id.* ¶ 29.

The Policies mandate, among other things, the process for reviewing, evaluating, and investigating allegations of the sexual abuse of minors, which are a significant public policy concern and a recognized responsibility of government.  Sexual abuse is recognized as a public health problem by the Centers for Disease Control and Prevention, requiring governmental and private response.[3]  New York State has undertaken proactive efforts to respond to child sexual

---

[2] The *Charter*, *Essential Norms*, and *Diocesan Policies and Procedures* are collectively referred to as the "Policies."
[3] Centers for Disease Control and Prevention, Preventing Child Sexual Abuse, at
https://www.cdc.gov/violenceprevention/childabuseandneglect/childsexualabuse.html (last reviewed Feb. 22, 2021).

abuse, including creation of the New York State Central Register of Child Abuse and Maltreatment.[4]

The Complaint demonstrates Defendants' failures to meet their obligations to protect minors from sexual abuse through twenty-five illustrative case histories drawn from the Diocese Corporation's business records. These case histories allege sexual abuse of minors and vulnerable adults by diocesan priests that include acts of rape, oral sex, and even holding a gun to the head of an alleged victim in connection with sexual abuse. *See, e.g.*, *id.* ¶¶ 133, 237, 339. Despite the nature of the alleged sexual abuse, Defendants' practice included the treatment of accused priests as "unassignable" and the disregard of secular fiduciary duties and the Policies by failing to:

- investigate or conduct timely, independent, sufficient, or reasonable internal investigations into allegations of the sexual abuse of minors;

- seek or reasonably document the assessments of allegations by its lay board established to assist the Diocesan Corporation's evaluation of sexual abuse claims;

- refer or timely refer certain priests to the Vatican authority with oversight of the adjudication of claims of clergy sexual abuse of minors;

- inquire into violations of the Policies;

- adequately monitor priests they believed had sexually abused minors;

- consider the risk that such priests could commit acts of abuse;

- prepare accurate business records regarding accused priests; and

- train personnel who had violated the Policies or applicable secular standards of care.

---

[4] Office of Children and Family Services, Child Protective Services, https://ocfs.ny.gov/programs/cps/ (last visited Feb. 18, 2021).

The Attorney General also alleges that after the public and the media exposed alleged mishandling of sexual abuse allegations, in 2018 and 2019 the Diocesan Corporation misled its beneficiaries in an attempt to reassure them that it had adhered to its Policies and best practices. *Id.* ¶¶ 106-13.

**The Diocesan Corporation's Bankruptcy**

Before the Attorney General commenced the AG Enforcement Action, the Diocesan Corporation, in February 2020, filed a voluntary petition for bankruptcy in the Western District of New York principally because it has received hundreds of private claims alleging sexual abuse. Compl. ¶ 2. The Diocesan Corporation emphasized that its bankruptcy filing was not intended to shield it from sexual abuse victims or any mishandling of sexual abuse allegations:

> The Diocese does not seek Chapter 11 relief to shirk or avoid responsibility for any past misconduct by clergy or for any decisions made by Diocesan authorities when addressing that misconduct. The Diocese does not seek bankruptcy relief to hide the truth . . . . The Diocesan Apostolic Administrator, The Most Reverend Edward B. Scharfenberger has acknowledged past shortcomings by the Diocese . . . .

Decl. of Emily Stern ("Stern Decl."), Ex. A (Aff. of Charles Mendolera, ¶ 10 (Feb. 28, 2020), Dkt. No. 7, *In re The Diocese of Buffalo, N.Y.*, Case No. 20-10322 (Bankr. W.D.N.Y.)).

In the year since the Diocese Corporation sought bankruptcy protection, it has not taken any action to stay the Attorney General's investigation or the AG Enforcement Action under the automatic-stay provision of the Bankruptcy Code, 11 U.S.C. § 362.[5] At a recent bankruptcy hearing, when the court asked whether the Diocesan Corporation intended to seek a stay of the

---

[5] 11 U.S.C. § 362(a) provides, in relevant part: "[A bankruptcy] petition . . . operates as a stay, applicable to all entities, of— (1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the [bankruptcy] case . . . , or to recover a claim against the debtor that arose before the commencement of the [bankruptcy] case . . . ." As discussed *infra*, the automatic-stay provision is subject to certain exceptions, including actions "by a governmental unit . . . to enforce [its] . . . police and regulatory power." *Id.* § 362(b)(4).

AG Enforcement Action, the Diocesan Corporation represented that it had no present intention to do so, explaining its view that the AG Enforcement Action is a regulatory and police action not subject to the automatic stay.  *See* Stern Decl., Ex. B (Transcript to Proceedings held on February 10, 2021 before the Hon. Carl L. Bucki), at 53:2-15.

**Notice of Removal**

On January 9, 2021, the Diocesan Corporation filed the Notice of Removal, removing the AG Enforcement Action to the Southern District of New York on the sole jurisdictional ground that the action relates to the Diocesan Corporation's bankruptcy.  Dkt. No. 1.  The Notice of Removal claims that the police-power exception does not apply to the AG Enforcement Action. Dkt. No. 1.

## STANDARD OF REVIEW

The removing party, here the Diocesan Corporation, bears the burden of establishing that it properly removed the AG Enforcement Action.  *See In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 488 F.3d 112, 124 (2d Cir. 2007).  Courts must review only the "jurisdictional facts" in the Notice of Removal and "'resolv[e] any doubts against removability.'"  *Id.* (alteration in original and citation omitted).  Courts also strictly apply statutory removal procedures.  *Id.*

## ARGUMENT

### I.   THE ATTORNEY GENERAL'S ACTION SHOULD BE REMANDED BECAUSE IT IS AN ACTION TO ENFORCE HER POLICE AND REGULATORY POWER.

The removal of the AG Enforcement Action is precluded by the police-power exception: an express statutory exemption that bars the removal of actions brought in state court "by a governmental unit to enforce such governmental unit's police or regulatory power."  28 U.S.C. § 1452(a).

### A.      The "Police-Power" Exception to Removal

The Second Circuit has recognized that the "public purpose" or "pecuniary purpose" tests may apply when courts determine the applicability of the police-power exception in 28 U.S.C. § 1452(a).  *In re MTBE*, 488 F.3d at 133.  Under the public-purpose test, cases fall under the police-power exception if the "government seeks to 'effectuate public policy,'" rather than "'adjudicate private rights.'"  *Id.* (quoting *Lockyer v. Mirant Corp.*, 398 F.3d 1098, 1108 (9th Cir. 2005).  Similarly, the pecuniary-purpose analysis allows a government action to remain in state court when the lawsuit primarily relates to "matters of safety and welfare," rather than "the government's pecuniary interest in the debtor's property."  *Id.*  In applying these tests to government actions, courts consider the purpose of the laws being enforced and the nature of monetary relief, if any, sought by the state.  *In re Gen. Motors LLC Ignition Switch Litig.*, 69 F. Supp. 3d 404, 411-13 (S.D.N.Y. 2014).

These tests and factors are also applied when courts analyze a separate police-power exception, 11 U.S.C. § 362(b)(4), which mirrors the police-power exception at issue in the instant motion.  That separate § 362 police-power exception exempts a government action from the automatic stay of litigation against a debtor after the debtor files for bankruptcy.[6]  Thus, cases construing the § 362 exception from the automatic-stay provision for police and regulatory actions by a governmental unit, 11 U.S.C. § 362(b)(4), provide useful guidance in analyzing the removal of the AG Enforcement Action.  *In re MTBE*, 488 F.3d at 132-33.

In these cases, actions by regulators, like the Attorney General, to enforce the laws under their mandate are routinely found to serve a public purpose and are exempt from the automatic-

---

[6] 11 U.S.C. § 362(b)(4) provides: "The filing of a [bankruptcy] petition . . . does not operate as a stay . . . of the commencement or continuation of an action or proceeding by a governmental unit . . . to enforce such governmental unit's . . . police and regulatory power . . . ."

stay provision.  For example, SEC enforcement actions have not been stayed because the actions

enjoin offenders from violating securities law, deter securities law violations, and protect the

public from fraud.  *See, e.g.*, *S.E.C. v. Towers Fin. Corp.*, 205 B.R. 27 (S.D.N.Y. 1997).  Other

decisions note that enforcement actions effectuate the public policy implemented by the

regulator's statutory authority.  *Commodity Futures Trading Comm'n v. AVCO Fin. Corp.*, 979

F. Supp. 232, 235 (S.D.N.Y. 1997); *Equal Employment Opportunity Comm'n v. Le Bar Bat, Inc.*,

274 B.R. 66 (S.D.N.Y. 2002); *see also In re Go West Enter., Inc.*, 387 B.R. 435, 438 (Bankr.

S.D.N.Y. 2008) ("There can be no dispute that 'Where a governmental unit is suing a debtor to

prevent or stop violation of fraud, environmental protection, safety, or similar police or

regulatory laws, or attempting to fix damages for violation of such a law, the action or

proceeding is not stayed under the automatic stay.'" (quoting *Midlantic Nat'l Bank v. New Jersey

Dep't of Environmental Protection*, 474 U.S. 494, 504 (1986))).  IRS administrative actions to

revoke the tax-exempt status of religious corporations have been considered regulatory actions

because they "promote[] public welfare by assuring the public and potential donors that

contributions will be used for legitimate charitable purposes."  *In re Universal Life Church, Inc.*,

128 F.3d 1294, 1297 (9th Cir. 1997).

    **B.**    **The AG Enforcement Action Will Ensure the Proper Administration of the Diocesan Corporation and Protect the Public and Children.**

The Diocesan Corporation cannot meet its burden of establishing a proper removal.  The

relevant tests and factors dictate remand of the AG Enforcement Action pursuant to the police-

power provision of 28 U.S.C. § 1452(a).

There can be no reasonable dispute that in this action, the Attorney General, as the

primary regulator of charitable organizations, is exercising her regulatory and police power.  The

AG Enforcement Action seeks to further the public's significant interest in ensuring the proper

10

administration of the Diocesan Corporation, as a charitable entity operating in New York, and in

protecting the Diocesan Corporation's charitable beneficiaries.  Regulation and protection are

necessary here because of the public health risk of child sexual abuse.  Further, as the Complaint

alleges, the Diocesan Corporation, including its former leadership, has failed to adequately

address the non-ecclesiastical matter of  clergy sexual abuse—a problem of crisis proportions.

The Complaint alleges that Defendants did not even follow the very policies and procedures they

adopted to "'ensure the full protection of . . . children and young people and . . . bring an end to

sexual abuse in the church.'"  Compl. ¶ 5 (ellipses in original).  In breach of their legal

obligations and fiduciary duties, the Complaint alleges multiple failures to, among other things,

timely investigate and evaluate serious allegations of sexual abuse and decline to refer over two

dozen priests to the Vatican for adjudication.  According to the Diocesan Corporation, these

priests were "diocesan priests with substantiated allegations of abuse of a minor."  *Id.* ¶ 82.

Instead of referring these priests to the Vatican, many of them were treated as "unassignable"

and shielded, often for several years, from any public disclosure of the true reasons for their

status.  *Id.* ¶¶ 75-88.  Defendants further breached their secular fiduciary duties by, among other

things, disregarding specific risks of sexual abuse.  *See, e.g.*, *id.* ¶¶ 94-99.

On the basis of these allegations, the Attorney General seeks injunctive relief on behalf of

the People of the State of New York to ensure the Diocesan Corporation adheres to secular

fiduciary duties and its own policies and procedures.  This relief will prospectively protect

minors, vulnerable adults, the Diocesan Corporation's 600,000 beneficiaries, and countless other

charitable beneficiaries of the Diocesan Corporation, from the risk of clergy sexual abuse or the

harm caused by concealment of such conduct.  Thus, the AG Enforcement action serves a

"matter of safety and welfare" and advances a public purpose.

And almost as important, the AG Enforcement Action serves as a deterrent to other fiduciaries.  In matters as serious as the sexual abuse of minors, fiduciaries who improperly administer charitable organizations, engage in unauthorized activities, or breach their statutory N-PCL fiduciary duties will be held accountable.  *See, e.g.*, *Towers Fin. Corp.*, 205 B.R. 27 (recognizing the deterrence value of an enforcement action).

Indeed, the Diocesan Corporation's bankruptcy counsel has acknowledged that in the three months since the AG Enforcement Action was filed, the Diocesan Corporation has not sought to invoke the automatic-stay provision of the Bankruptcy Code against the AG Enforcement Action.  In response to questions from Chief Judge Carl L. Bucki, of the bankruptcy court for the Western District of New York, about the application of the police-power exception to the automatic stay, at a February 10, 2021 hearing, counsel for the Diocesan Corporation, candidly stated:

> I will tell you that our initial review, we believe we do not have a stay violation and that's why [the Court hasn't] had anything brought before [it]. . . .  [O]ur initial analysis, which we've obviously reviewed with [the Diocesan Corporation], . . . is that [the AG Enforcement Action does] not implicate the automatic stay.

Stern Decl., Ex. B at 53:2-15.  Even though counsel reserved the right to further consider the issue, the admission that the Diocesan Corporation has considered the issue, determined no stay applied, and since taken no action, speaks volumes.

### C.     The AG Enforcement Action Will Not Adjudicate Private Rights.

The Diocesan Corporation argues in its Notice of Removal that the police-power exception does not apply because the AG Enforcement Action "seeks to 'adjudicate private rights.'"  Dkt. No. 1 ¶ 9.  In support of this argument, the Diocesan Corporation relies on a Third and Sixth Circuit decision, which analyzed the separate § 362 police-power exception discussed above.  11 U.S.C. § 362(b)(4).

Yet a review of the two decisions demonstrates the weakness of the Diocesan Corporation's private-rights argument.  In *Chao v. Hospital Staffing Services, Inc.*, 270 F.3d 374 (6th Cir. 2001), after a debtor filed for bankruptcy, the U.S. Secretary of Labor brought an action in federal court (not in the debtor's bankruptcy court), to direct the bankruptcy trustee to preserve certain assets for the debtor's employees who had not been paid in accordance with federal law. The district court allowed the action to proceed under the § 362 police-power exception to the automatic stay, reasoning that the Secretary's action sought to enforce federal labor standards. The Sixth Circuit, however, reversed and held that under the "peculiar circumstances" of the case, *id.* 382, the Secretary's action should not have been allowed to proceed under the § 362 police-power exception because, rather than generally protect workers throughout the economy, the action sought to elevate the private rights of unpaid employees over other creditors.  *Id.* at 393.  Similarly, in *In re Nortel Networks, Inc*, 669 F.3d 128 (3d Cir. 2011), the Third Circuit held that the § 362 police-power exception to the automatic stay did not apply to non-governmental parties participating in a foreign proceeding which sought to determine the private pension rights of the debtor's employees.  *Id.* at 142.  Unlike these cases, the AG Enforcement Action aims to protect broad segments of the public.

Still, in support of the private-rights argument, the Notice of Removal appears to contend that, through this action, the Attorney General attempts to adjudicate private rights because portions of the Complaint state that "'[t]he Diocesan Corporation was harmed.'"  Dkt. No. 1 ¶ 9. But crucial language is omitted from the quotes, namely, that "[t]he Diocesan Corporation was harmed . . . because, among other things, it: (a) *exposed beneficiaries to unnecessary risks of sexual abuse . . . .*"  *See, e.g.*, Compl. ¶¶ 740, 746, 752, 758 (emphasis added).  This again demonstrates that an important purpose of the Attorney General's action is to protect the public,

13

not settle the claims the Diocesan Corporation has against its current or former fiduciaries because of their mishandling of sexual abuse allegations.

### D. The Diocesan Corporation's Police-Power Argument Does Not Invoke Federal-Question Jurisdiction.

There is no basis for federal-question jurisdiction in this matter because of the well-pleaded complaint rule.  According to this doctrine, a federal court may exercise its federal-question jurisdiction "'only when a federal question is presented on the face of the plaintiff's properly pleaded complaint.'"  *Chu v. Chinese-Am. Planning Council Home Attendant Program, Inc.*, 194 F. Supp. 3d 221, 226 (S.D.N.Y. 2016) (citation omitted).  No federal question is raised on the face of the Attorney General's Complaint.

In an attempt to circumvent the well-pleaded complaint rule, the Diocesan Corporation maintains that the police-power exception is inapplicable because the AG Enforcement Action infringes upon the Diocesan Corporation's First Amendment rights.  Dkt. No. 1.  But none of the cases that the Diocesan Corporation cites in its Notice of Removal support this position.[7]  All concern the First Amendment, but none are in the context of a bankruptcy or application of the police-power exception.  And none of the cases support the proposition that a constitutional defense to the state's exercise of its police powers renders inapplicable the police-power exception.  In any event, the Diocesan Corporation's First Amendment defense does not create federal subject-matter jurisdiction to establish a basis for removal.  If the Diocesan Corporation seeks to assert a constitutional defense, it can do so in state court.

---

[7] *Wisconsin v. Yoder*, 406 U.S. 205 (1972); *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church*, 344 U.S. 94 (1952); *Hosanna-Tabor Evangelical Lutheran Church & School v. E.E.O.C.*, 565 U.S. 171 (2012); *Our Lady of Guadalupe School v. Morrissey-Berru*, 140 S. Ct. 2049 (2020); *Serbian Eastern Orthodox Diocese for the United States of America & Canada v. Milivojevich*, 426 U.S. 696 (1976).

E.      **The General Removal Statute Does Not Render the Police-Power Exception Meaningless.**

In the Notice of Removal, the Diocesan Corporation claims that, despite the police-power exception, because this Court has original jurisdiction of cases "related to" a bankruptcy case under 28 U.S.C. § 1334(b), the AG Enforcement Action may still be removed under the general removal statute, 28 U.S.C. § 1441(a). Dkt. No. 1 ¶ 7. Statutes authorizing the removal of actions generally are found in title 28 chapter 89, between § 1441 and § 1453, beginning with the general removal statute at 28 U.S.C. § 1441(a). Section 1441(a) provides, in part: "Except as otherwise expressly provided by Act of Congress, [cases over which federal courts] . . . have original jurisdiction may be removed . . . ." Later in chapter 89, § 1452(a)—an express "Act of Congress"—then bars removal of cases where federal jurisdiction over the case is based on 28 U.S.C. § 1334(b) if the case involves a civil action by which a governmental unit seeks to exercise its police and regulatory power. But the Diocesan Corporation maintains that it properly removed the AG Enforcement Action by removing under the general removal statute (§ 1441(a)), which provides no police-power exception, rather than § 1452(a).

This result is not supported by the statutory framework for bankruptcy-related removal nor by the one case cited by the Diocesan Corporation, *In re Queen Elizabeth Realty Corp.*, 502 B.R. 17 (Bankr. S.D.N.Y. 2013). The statutory framework evidences Congress's intent that the police-power exception apply to cases "related to" bankruptcy cases, like the AG Enforcement Action, because § 1452(a) expressly allows the removal of bankruptcy-related cases *except for* police and regulatory actions. The reading advanced by the Diocesan Corporation would render the police-power exception meaningless because debtors could simply remove all police and regulatory actions by invoking the general removal statute. This result would undo the very purpose of § 1452(a). *See In re Methyl Tertiary Butyl Ether Prod. Liab. Litig*, 522 F. Supp. 557,

567 & n. 66 (S.D.N.Y. 2007).  Thus, the Court should reject this interpretation and remand the

AG Enforcement Action pursuant to the police-power exception.

## II.        SECTION 1334(C) REQUIRES THIS COURT TO ABSTAIN FROM HEARING THE ATTORNEY GENERAL'S CLAIMS.

The Judicial Code expressly requires a district court to abstain from hearing cases, like

this one, that originate in state court, assert exclusively state law claims, and bear only one

connection to the federal courts through "relation to" a pending bankruptcy.  Section 1334(c) of

title 28 provides:

> Upon timely motion of a party in a proceeding based upon a State law claim or State law cause of action, related to a case under title 11 but not arising under title 11 or arising in a case under title 11, with respect to which an action could not have been commenced in a court of the United States absent jurisdiction under this section, the district court shall abstain from hearing such proceeding if an action is commenced, and can be timely adjudicated, in a State forum of appropriate jurisdiction.

28 U.S.C. § 1334(c)(2).  This instruction ensures more than procedural clarity: "Federal courts

abstain out of deference to the paramount interests of another sovereign, and the concern is with

principles of comity and federalism."  *In re AOG Entertainment, Inc.*, 569 B.R. 563, 573 (Bankr.

S.D.N.Y. 2017) (quoting *Quackenbush* v. *Allstate Ins. Co.*, 517 U.S. 706, 723 (1996)); *see also*

*Parmalat Capital Fin. Corp.* v. *Bank of Am.*, 671 F.3d 261, 266 (2d Cir. 2012) (emphasizing the

deference owed to state courts in deciding state law issues where state cases present minimal

effect on a federal bankruptcy action or the administration of underlying bankruptcy estates).

Section 1334(c)'s standard requires remand here.  There can be no question that the

Attorney General's claims arise exclusively under state law and seek to apply well-established

standards for the regulation of religious corporations in New York: each of the Complaint's four

causes of action is based in the N-PCL, EPTL, or RCL.  No claim in this action arises under

federal law, and the Diocesan Corporation has not asserted otherwise.  *See* Dkt. No. 1 ¶ 7

(asserting original but not exclusive federal jurisdiction through "relation to" bankruptcy); *id.* ¶ 8 (asserting removability through section 1452's provision for bankruptcy-related removal).  If the Diocesan Corporation chooses to challenge the scope of the Attorney General's authority, even if by claiming that the First Amendment of the federal constitution precludes any state court examination of its liability for the institutional failures, section 1334(c) requires that it make those arguments to the state court.

The only assessment permitted by section 1334(c)—whether state court adjudication will provide adequate review following abstention—also directs remand in this case.  The Second Circuit uses four factors to evaluate the adequacy of state court review: (1) the backlog of the state court's calendar relative to the federal court's calendar; (2) the complexity of the issues presented and the respective expertise of each forum; (3) the status of the title 11 bankruptcy proceeding to which the state law claims are related; and (4) the delay, if any, of the administration or liquidation of the estate as a result of the state court proceeding.  *Parmalat Capital*, 671 F.3d at 266.  These factors are "meant to guide courts' analyses with respect to the ultimate balance, struck by Congress, between, on the one hand, creating a federal forum for purely state law cases which, due to delay, might impinge upon the federal interest in the administration of a bankruptcy estate, and, on the other, ensuring that purely state law cases remain in state courts when they would not significantly affect that federal interest."  *Id.* at 269.

Each of the factors for adequate state adjudication supports abstention in this case.  The Diocesan Corporation does not complain of a state court delay or backlog in its Notice of Removal, and indeed had asked for and received a significant stipulated extension of its time to respond to the Complaint in state court before removing this action.  The Attorney General has also timely sought abstention through this motion and her claims implicate core principles of

state regulatory oversight.  As discussed above, she commenced this action pursuant to her statutory authority as a civil regulator of not-for-profit religious corporations.  Following a two-year investigation, the Attorney General alleged, in a highly particularized pleading, substantial violations of New York laws governing charities by the Diocesan Corporation and two of its most senior former fiduciaries.  The claims to be heard are based on exclusively state law standards in the N-PCL and EPTL about which a state forum will have greater expertise, and the appropriate place to assess any assertion by the Diocesan Corporation that the Attorney General's claims represent a purported unlawful exercise of authority is in New York State Supreme Court.

Importantly, no claim in the Complaint arises under the Bankruptcy Code or in the Diocesan Corporation's bankruptcy case, and there is no reason why a state court proceeding would impair the Diocesan Corporation's ongoing financial reorganization.  The Attorney General's claims against the Diocesan Corporation seek exclusively equitable relief, in the form of future protections to ensure compliance with long-standing policies and procedures that will not impact the administration of financial claims by individual victims that are based in past abuse.  *Compare Midocean Partners IV, L.P.* v. *Baker*, 20-cv-6013, 2020 WL 6801916 (S.D.N.Y. 2020) (remanding action asserting exclusively state law contract-based claims which existed independent of non-party's bankruptcy and could not affect the administration of the cited bankruptcy estate); *MHS Capital* v. *Goggin*, 16-cv-1794, 2016 WL 3522198 (S.D.N.Y. June 13, 2016) (ruling that action "related to" pending bankruptcy should return to state court where plaintiffs immediately requested remand, action alleged exclusively state law claims, no other basis for federal jurisdiction exists, and "nothing suggests that the matter would not be timely adjudicated in state court").  In fact, the Diocesan Corporation itself has declared that its

decision to pursue a financial reorganization should not be conflated with the issues that form the basis for this action, stating in one of its first submissions to the bankruptcy court that its petition does not seek to "avoid responsibility for any past misconduct by clergy or for any decisions made by Diocesan authorities when addressing that misconduct." Stern Decl., Ex. A ¶ 10.

## III.   IF THE COURT DETERMINES THAT ABSTENTION IS NOT MANDATORY, IT SHOULD REMAND UNDER SECTIONS 1334 AND 1452 PURSUANT TO EQUITABLE PRINCIPLES OF COMITY AND EFFICIENCY.

Even if the Court were not required to abstain from hearing this case by section 1334, the nature of the claims at issue and their context warrant restoring the case to its original state forum. Not all cases properly removed to federal court under sections 1334 and 1452 must remain in federal court—federal jurisdiction over cases that are merely bankruptcy-related is not exclusive. Sections 1334(c)(1) and 1452(b) prescribe permissive abstention or discretionary remand where, as here, equitable considerations weigh entirely in favor of state court review. *See In re Residential Capital LLC ("In re ResCap")*, 488 B.R. 565, 574 (Bankr. S.D.N.Y. 2013).

Many of the same factors that test the adequacy of a state forum for purposes of mandatory abstention also guide discretionary remand. Both sections 1334 and 1452 direct a district court to consider context, efficiency, and comity in deciding whether it *should* retain a bankruptcy-related matter that is not expressly excluded from removal. "Courts in this district consider several factors when determining whether to permissively abstain from a case pursuant to section 1334(c)(1), including: (1) the effect on the efficient administration of the bankruptcy estate; (2) the extent to which issues of state law predominate; (3) the difficulty or unsettled nature of the applicable state law; (4) comity; (5) the degree of relatedness or remoteness of the proceeding to the main bankruptcy case; (6) the existence of the right to a jury trial; and (7) prejudice to the involuntarily removed defendants." *In re ResCap*, 488 B.R. at 577; *see also*

19

*Tilton* v. *MBIA, Inc.*, 620 B.R. 707, 716-17 (S.D.N.Y. 2020) (Pauley, J.) (equating permissive abstention under section 1334(c)(1) with equitable remand under section 1452(b)) ("The two inquiries are essentially the same and are often analyzed together.").

As discussed above, state law issues overwhelmingly predominate here: the Attorney General's lawsuit seeks to apply basic principles of institutional and fiduciary responsibility in New York nonprofit law to the Diocesan Corporation and two of its former leaders. The claims asserted arise from the Attorney General's established statutory oversight role and, through their goal of ensuring meaningful protection from future child abuse, embody exactly the type of public safety measures that federal law identifies as inappropriate for removal from state court. No claim in the Complaint involves federal law generally, or bankruptcy law in particular, and no part of the relief sought by this action would impact the settlement of creditor claims against a reorganized Diocesan Corporation estate. *Compare In re ResCap*, 488 B.R. at 577-78. The claims that the Diocesan Corporation seeks to remove from state court are "of a quintessential state law character and the appropriate administrative and state judicial authorities should decide them." *In re Cody, Inc.*, 281 B.R. 182, 186 (S.D.N.Y. 2002) (affirming bankruptcy court decision to abstain from review of Debtor challenge to state property tax obligations on the basis of a religious corporation exemption). "Comity considerations favor remand as well, because it is well-settled that comity considerations dictate that federal courts should be hesitant to exercise jurisdiction when state issues substantially predominate." *Sealink Funding Ltd.* v. *Bear Stearns & Co. Inc.*, 2012 WL 4794450, at *4 (S.D.N.Y. 2012) (Swain, J.) (declining to recognize "related to" jurisdiction over state law fraud claims against defendant financial entities and noting that defendants' unasserted indemnification claim in third-party debtor bankruptcy would be too attenuated and tangential to warrant discretionary review); *In re River Center Holdings,*

20

*LLC*, 288 B.R. 59, 70 (Bankr. S.D.N.Y. 2003) (noting that "comity focuses on the state's interest in developing its law and applying its law to its citizens" and is an especially significant factor where a strong state or local interest exists in regulating the matter in controversy because the action involves issues of New York public policy or New York public interest).

The question of whether the Diocesan Corporation met its obligations as a regulated corporation when it responded to widespread allegations of sexual abuse is not a financial issue: it does not represent the type of question so linked to a bankruptcy court's effective operation that it warrants removal from state review.  Even if the Court determines that it is not barred from hearing the case, it should nonetheless exercise the discretion contemplated by sections 1334 and 1452 and remand the matter for hearing and determination in the forum to which the Attorney General brought her claims.

## **CONCLUSION**

For all of the above reasons, the Attorney General respectfully requests that this action be remanded to New York State Supreme Court.

Dated:          New York, New York
               February 22, 2021

                                        LETITIA JAMES
                                        Attorney General of the State of New York

                              By:   s/ Emily Stern
                                        James Sheehan
                                        Emily Stern
                                        Daniel Roque
                                        Catherine Suvari
                                        emily.stern@ag.ny.gov
                                        28 Liberty Street
                                        New York, New York 10005
                                        (212) 416-6241