UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE PEOPLE OF THE STATE OF NEW YORK, By LETITIA JAMES, Attorney General of the State of New York, <br><br>         Plaintiff, <br><br>    -against- <br><br> DIOCESE OF BUFFALO, RICHARD J. MALONE, EDWARD M. GROSZ, and EDWARD B. SCHARFENBERGER, in his capacity as Apostolic Administrator for the Diocese of Buffalo, <br><br>         Defendants. | Case No. 21-cv-00189 (RA) <br><br> [State Court Index No. 453354/2020] <br><br> **DECLARATION OF EMILY STERN IN SUPPORT OF MOTION TO REMAND TO STATE COURT** |

Emily Stern, pursuant to penalty of perjury under 28 U.S.C. § 1746, does hereby state the following:

1.    I am an attorney in the Office of the New York State Attorney General and counsel to Plaintiff in this action. I submit this declaration in support of the New York State Attorney General's motion to remand this action to state court.

2.    Attached as Exhibit A is a true and correct copy of the Affidavit of Charles Mendolera Regarding the Diocese's Assets and Operations and in Support of the Chapter 11 Petition and First Day Pleadings, filed in *In re The Diocese of Buffalo, N.Y.*, Case No. 20-10322 (Bankr. W.D.N.Y.), Docket No. 7.

3.    Attached as Exhibit B is a true and correct copy of the transcript to proceedings held on February 10, 2021 before the Honorable Carl L. Bucki in *In re The Diocese of Buffalo, N.Y.*, Case No. 20-10322 (Bankr. W.D.N.Y.).

Dated:   February 22, 2021
         New York, New York

                                LETITIA JAMES
                                Attorney General of the State of New York

                          By:   s/ Emily Stern
                                Emily Stern
                                28 Liberty Street
                                New York, New York 10005
                                emily.stern@ag.ny.gov
                                Tel. (212) 416-6241

Exhibit A

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| The Diocese of Buffalo, N.Y., | ) | Case No. 20-[10322] |
| | ) | |
| | ) | Chapter 11 |
| Debtor. | ) | |
| | ) | |

**AFFIDAVIT OF CHARLES MENDOLERA REGARDING THE
DIOCESE'S ASSETS AND OPERATIONS AND IN SUPPORT OF
THE CHAPTER 11 PETITION AND FIRST DAY PLEADINGS**

STATE OF NEW YORK      )
COUNTY OF ERIE          )  ss.:

Charles Mendolera, being duly sworn, deposes and states as follows:

1.      I am the Executive Director of Financial Administration ("Executive Director") for The Diocese of Buffalo, N.Y. (the "Diocese"). I have worked in the Diocese's finance department since 2004. Prior to being appointed as Executive Director in April 2019, I served as the Diocese's Controller and before that as Director of Accounting. I am familiar with the assets, liabilities and sources of income for the Diocese.

2.      I make this Affidavit based upon: (a) my personal knowledge of certain facts stated herein, (b) information supplied to me by others associated with the Diocese, (c) my review of relevant documents, and (d) upon my experience and knowledge of Diocesan operations. If I were called to testify, I would testify to the facts as set forth herein. I am authorized by the Diocese to submit this Affidavit.

3.      On February 28, 2020 (the "Petition Date"), the Diocese will file a voluntary petition under chapter 11 of title 11 of the United States Code (11 U.S.C. § 101 *et seq.*, the "Bankruptcy Code") commencing its chapter 11 reorganization case (this "Chapter 11 Case").

3501438.2

4.      Contemporaneously with the petition, the Diocese will also be filing a number of motions and applications seeking various types of relief on an expedited basis (collectively the "First Day Motions").  The First Day Motions seek relief aimed at facilitating a smooth transition into this Chapter 11 Case, permitting the Diocese to continue its mission by maintaining employee compensation, maintaining the goodwill and morale of the employees, parishioners, clerics and others who rely on the programs and services provided by the Diocese and preserving and maintaining the property available to satisfy the Diocese's creditors.  I have reviewed each of the First Day Motions and am familiar with their contents.  I respectfully submit that all of the First Day Motions are vital to the Diocese's reorganization efforts and expedited approval of the First Day Motions is important to the Diocese's successful reorganization.

## OPERATIONS

5.      The Diocese, through its central administrative offices (a) provides **operational support** to the Catholic parishes, schools and certain other Catholic entities that operate within the territory of the Diocese (each, an "Other Catholic Entity" or "OCE"); (b) conducts school operations through which it provides parish schools with financial and educational support; (c) provides comprehensive risk management services to the OCEs; (d) administers a lay pension trust and a priest pension trust (collectively, the "Pension Trusts") for the benefit of certain employees and priests of the OCEs; and (e) provides administrative support for St. Joseph Investment Fund, Inc. ("SJIF").

a.  **Operational Support**.  The Diocese provides operational and functional support to the OCEs in the areas of finance, building & properties, legal, human resources,

stewardship and communications, canonical tribunal, schools, evangelization and catechesis, pastoral services and clergy services.

        b. ***School Operations***.   The Diocese provides financial support to Catholic elementary and high schools operating within the territory of the Diocese.

        c. ***Risk Management***.   The Diocese maintains and manages a risk management program for itself and a large number of OCEs, inclusive of property, liability, Workers' Compensation, short-term disability, etc.  The Diocese also administers a medical self-insurance program which provides coverage to employees of the Diocese and certain other participating OCEs.  The risk management and health insurance programs are more fully described in the discussion below with respect to the Diocese's Self-Insurance Motion (defined below).

        d. ***Pension Trusts.***  The Diocese sponsors and administers a priest's retirement plan, and contributes to a frozen pension plan for lay employees, each of which are described in greater detail in connection with the discussion of the Diocese's Wages Motion (as defined below).

        e. ***SJIF***.   The Diocese provides administrative support to the St. Joseph Investment Fund, Inc.  SJIF was incorporated as a separate not-for-profit entity in 2006.  The purpose of SJIF is to receive funds from participants (which include the Diocese, parishes and other qualified organizations) that are pooled and collectively invested.   All funds of the participants are separately accounted for by SJIF.  A board of directors oversees the operation of SJIF and an investment committee of the board is responsible for adopting an investment policy and reviewing performance.  The Diocese provides personnel to assist SJIF with accounting and administrative functions.

3501438.2

## REVENUE AND EXPENSES

6.      The Diocese is a not-for-profit Religious Corporation under New York State law. For the past several years, the Diocese's expenses have exceeded its revenue.  Gross revenue for the fiscal year ending on August 31, 2019 ("2018/2019") was approximately $13.1 million while expenses before taking into account certain non-recurring activity were approximately $18.1 million.  Gross revenue for the fiscal year ending on August 31, 2018 ("2017/2018") was approximately $18.1 million and expenses before taking into account certain non-recurring activity were approximately $19.9 million.  In addition, the Diocese has expended nearly $20 million over the past two fiscal years in connection with voluntary settlement payments to abuse victims as part of its Independent Reconciliation and Compensation Program.

7.      The primary source of revenue used by the Diocese to support its operations comes from parish assessments.  The Diocese assesses parishes an annual amount based primarily on historical parish offeratory.  Assessments are due on a monthly basis.  Assessments are collected for general Diocesan purposes and also for the purposes of supporting elementary education and priest retirement obligations.  Additional sources of operating funds include (i) revenue from the annual Fund for the Faith appeal which is run in conjunction with Catholic Charities, (ii) contributions and bequests from the faithful, and (iii) realized investment gains.

## FINANCIAL UNCERTAINTY

8.      On January 28, 2019, the New York State Legislature passed the Child Victims Act (A.2683/S.2440) (the "CVA").  New York's Governor signed the legislation on February 14, 2019. This legislation modified the statute of limitations and created a one-year "window" during which victims of child sex abuse whose claim may have been time-barred may commence a timely civil

- 4 -

3501438.2

action.  In addition, the CVA extends the statute of limitations for claims that were not time-barred on its date of passage, permitting such child victims to commence timely civil actions until they reach 55 years of age.

9.     From the opening of the CVA window on August 14, 2019 through the Petition Date, approximately 250 lawsuits have been filed against the Diocese by plaintiffs who are seeking damages as a result of alleged abuse.  In addition, demand letters and or notices have been received from other claimants who have not yet commenced lawsuits against the Diocese.  The Diocese anticipates that in excess of 400 individuals may assert abuse claims for which they may seek to hold the Diocese responsible.  The Diocese may have insurance coverage for some of the CVA claims it will face.

## PURPOSE AND GOALS OF THE CHAPTER 11 FILING

10.     The Diocese does not seek Chapter 11 relief to shirk or avoid responsibility for any past misconduct by clergy or for any decisions made by Diocesan authorities when addressing that misconduct.  The Diocese does not seek bankruptcy relief to hide the truth or deny any person a day in court.  In fact, the Diocese is committed to pursuing the truth and has never prohibited any person from telling his/her story or speaking his/her truth in public.  The Diocese has publicly disclosed perpetrators.  The Diocese has made and requires criminal referrals to be made for all credible allegations of sexual abuse.  The Diocesan Apostolic Administrator, The Most Reverend Edward B. Scharfenberger has acknowledged past shortcomings by the Diocese and have attempted to offer aid and comfort to victims of abuse.  The Diocese has established standards for the training and background assessment of all employees, clerics and volunteers who will likely interact with children and young people.

- 5 -

3501438.2

11.     The Diocese has commenced this Chapter 11 Case in order to (a) provide an orderly claims administration process that will ensure a more equitable distribution of funds to creditors, including victims of abuse; and (b) bring about a reorganization of the Diocese that will ensure that the mission of the Diocese may continue to be fulfilled in service of the Catholic faith.

## FIRST DAY MOTIONS

12.     To further the Diocesan mission and continue operations, the Diocese respectfully requests that the following First Day Motions be granted.[1]

### I.     Motion for Entry of an Order Authorizing the Diocese to File Portions of Schedule F, the Master Creditor Mailing Matrix, and Other Pleadings and Documents Under Seal (the "Motion to File Under Seal")

13.     Many of the unsecured creditors in this Chapter 11 Case are individuals whose claims against the Diocese are premised on allegations of sexual abuse ("Abuse Claimants"). Some Abuse Claimants have filed tort claims against the Diocese following the passage of New York's Child Victims Act (the "CVA Plaintiffs").  Many, but not all, of the CVA Plaintiffs have elected to file their litigation claims against the Diocese pseudonymously, with their real identity to be revealed only to the defendants in the course of litigation and with the understanding that their identities would not be publicly disclosed.  Other Abuse Claimants are non-litigants who contacted the Diocese pre-petition, either with or without the assistance of counsel, and asserted claims of abuse by Diocesan employees or agents with the understanding that the Diocese would protect their identities and keep their claims confidential.  The Diocese has previously entered into out-of-court settlements with some of those Abuse Claimants where the Diocese agreed to keep

---

[1]  Capitalized terms used but not defined in this affidavit have the meanings ascribed to them in the respective First Day Motions.

the Abuse Claimant's name confidential but did not require the Abuse Claimant to keep the settlement confidential.

14.     In light of the sensitive nature of the claims of the CVA Plaintiffs and other Abuse Claimants, to avoid causing unnecessary additional anguish or embarrassment, and to encourage such individuals to feel safe and secure in advancing their claims without fear of retribution or reprisal, the Diocese submits that it would be inappropriate and potentially harmful to require the public disclosure of identifying information relating to individuals who have, either informally, formally, or through filing a lawsuit, notified the Diocese of allegations of abuse by clergy members or other persons employed by Catholic entities or otherwise subject to Diocesan supervision.

15.     The Diocese has been operating under confidentiality restrictions for some time, and believes that it is imperative that the decision to come forward and identify oneself as an Abuse Claimant be left to the individuals in question, and that such accommodations can be made without adversely affecting the rights of any other parties in interest.

16.     The Diocese respectfully requests permission to protect the identities of CVA Plaintiffs and other Abuse Claimants while providing them notice of this Chapter 11 Case and notice of such events and motions as is required by the Bankruptcy Code and applicable Bankruptcy Rules. The Diocese further seeks to share names and contact information for CVA Plaintiffs and other Abuse Claimants with the Court and Bankruptcy Clerk under seal. It is proposed that CVA Plaintiffs and those Abuse Claimants currently represented by counsel be given notices in the Diocese's Chapter 11 Case only through their respective counsel. The Diocese, through this Motion, seeks leave of the Court to serve notice of this Chapter 11 Case, and other

3501438.2

requisite notices, directly on Abuse Claimants who have advised the Diocese of potential claims but have not yet identified counsel, without disclosing those Abuse Claimants' names or addresses to other parties.

> **II.** **Motion for Entry of Interim and Final Orders (A) Authorizing the Use of Cash Collateral, and (B) Granting Adequate Protection (the "Cash Collateral Motion")**

17.     As of the Petition Date, the Diocese is indebted to M&T pursuant to the following transactions and documents:

> (i)     On April 1, 2013, the Diocese executed and delivered to M&T that certain Letter of Credit Agreement, pursuant to which the Diocese agreed to reimburse M&T for any payment made by M&T under a letter of credit issued for the benefit of the Diocese (the "LOC Agreement").

> (ii)    Pursuant to the LOC Agreement, M&T issued to the New York State Worker's Compensation Board (the "WCB") a letter of credit in the amount of approximately $4.8 million (the "Letter of Credit") to secure the Diocese's obligations under its self-insured worker's compensation program. The WCB has made no attempt to draw upon the Letter of Credit and, upon information and belief, there exists no cause for the WCB to do so.

> (iii)   To secure any obligations to M&T that might arise under the LOC Agreement if and when WCB were to draw upon the Letter of Credit, the Diocese (a) deposited approximately $5.1 million in securities into a blocked account (the "Blocked Account") held at M&T pursuant to a Securities Account Control Agreement dated October 11, 2019 (the "SACA"), and (b) granted to M&T a security interest in the securities in the Blocked Account as well as any other property of the Diocese in the possession or control of M&T pursuant to a Security Agreement dated October 11, 2019 (the "Security Agreement" and together with the LOC Agreement, the Letter of Credit, and the SACA, the "Prepetition Secured Debt Documents"). The securities held in the Blocked Account, as well as any cash or other collateral subject to M&T's lien under the Prepetition Secured Debt Documents, are collectively referred to in this Motion as the "Prepetition Collateral."

3501438.2

18.     The Diocese seeks to use cash (other than cash or securities held in the Blocked Account) existing on or after the Petition Date that may be part of the Prepetition Collateral (the "Cash Collateral").

19.     The Diocese has consulted with M&T regarding its continued use of Cash Collateral and M&T supports the relief requested in the Motion.

20.     The Diocese has an urgent need to use Cash Collateral.  Pursuant to the Security Agreement with M&T, the Prepetition Collateral includes, among other things, cash held by the Diocese in several accounts at M&T, including, without limitation, the Diocese's primary operating account (the "Operating Account"), as well as a segregated account for the payment of medical claims under the Diocese's self-insured health plan (the "Catholic Partnership Health Account").

21.     As described more fully in the Diocese's Cash Management Motion (defined below), the Diocese relies upon its Operating Account to collect accounts receivable which are then used to fund other accounts within the Diocese's cash management system from which disbursements for payroll, vendor and utility payments, and other ordinary course expenses are made.  The Diocese also relies upon the cash in the Catholic Partnership Health Account to pay self-insured medical claims.  The Diocese does not have sufficient unencumbered cash in its cash management accounts held at other institutions to fund its business operations and pay operating expenses.  Accordingly, absent the ability to use Cash Collateral, the Diocese would not be able to pay wages, utility charges, medical claims, and other critical operating expenses.

22.     In order to adequately protect any interest M&T may have in the Cash Collateral, the Diocese proposes to grant M&T, to the extent of any diminution in the value of its interest in

the Prepetition Collateral, and effective as of the Petition Date, perfected replacement security interests in, and valid, binding, enforceable and perfected liens (the "Rollover Liens"), on all of the Diocese's cash, deposit accounts, and investment property in the possession of, or subject to the control of, M&T, and all proceeds of the foregoing, whether in existence on the Petition Date or thereafter created, acquired or arising (collectively, the "Postpetition Collateral") provided, however, that the Postpetition Collateral shall not include, and the Rollover Liens shall not attach to, any funds or property held by the Diocese (i) for the purpose of administering its self-insurance or charitable gift annuity programs, (ii) which represent trust fund taxes or employee payroll deductions, or (iii) which are endowed funds or subject to donor restrictions on use.

23.     Because M&T's claim against the Diocese is contingent upon the WCB drawing down the Letter of Credit, and because the value of the Blocked Account is already in excess of M&T's potential exposure under the Letter of Credit, the Diocese submits that the proposed Rollover Liens more than adequately protect M&T's interest (if any) in the Cash Collateral.

24.     The Diocese submits that, for the reasons set forth herein and in the Motion, immediate access to Cash Collateral is necessary to allow the Diocese to continue to operate and to preserve the value of the Diocese's estate for the benefit of all parties in interest.  Moreover, M&T as the sole party with an interest in Cash Collateral has consented to such use.

**III.     Motion for Entry of Interim and Final Orders Authorizing the Diocese to (A) Pay Prepetition Compensation and Reimbursable Employee Expenses, (B) Pay and Honor Medical and Other Benefits and (C) Continue Employee Benefit Programs (the "Wages Motion")**

25.     The Diocese respectfully requests that the Court enter interim and final orders authorizing, but not directing, the Diocese to (a) pay prepetition compensation, reimbursable business expenses, benefit plans, deductions and payroll taxes, all as described herein, (b) pay and

3501438.2

honor medical and other benefit plans, on a post-petition basis, and (c) continue employee benefit programs.

26.     The Diocese's employees are essential to the administration of the Diocese's Chapter 11 Case, preservation of assets and continuation of the Diocese's mission.  In addition to providing religious guidance and facilitating religious services and activities in the Diocese, the Diocese's employees also provide other critical functions including, without limitation, finance, human resources, risk management, informational technology, legal, catholic education, evangelization and catechesis, stewardship and communications, pastoral and clergy services, canonical tribunal, archives and building and grounds maintenance.  Without these employees, the Diocese would be unable to provide these services to individuals of the Roman Catholic faith, parishes and schools within the Diocese and would also be unable to provide necessary support for a plan of reorganization to benefit all creditors.

27.     The Diocese currently (i) employs 138 full-time employees including both non-clergy employees and active priests, and 51 part-time employees (collectively, the "Employees"); (ii) provides direct payments and benefits to 152 retired priests (the "Retired Clergy") and (iii) provides a stipend and benefits to 16 current seminarians (the "Seminarians").  Sixty (60) of the full-time Employees are salaried and 78 are paid on an hourly basis.  Two of the part-time Employees are salaried, and 49 are paid on an hourly basis.  The Diocese also employs 59 per diem employees paid on an hourly basis (the "Temporary Workers").  The Diocese has one Employee entitled to commissions as the Director of Camp Turner.[2]

---

[2] The Director of Camp Turner is entitled to a commission for facility rentals in the amount of 25% of the gross paid rental receipts above the minimum annual rental receipts of $32,000, subject to certain conditions.

3501438.2

28.     The vast majority of the Employees, Retired Clergy, Seminarians and Temporary Workers rely exclusively on the compensation and benefits they receive from the Diocese to provide for their daily living expenses and these Employees, Retired Clergy, Seminarians and Temporary Workers would be exposed to significant financial difficulties if the Diocese were not permitted to continue paying such compensation and benefits in the ordinary course of its business.

29.     To minimize the personal hardship that the Employees, Retired Clergy, Seminarians and Temporary Workers would suffer if prepetition obligations are not paid when due or as expected, and to maintain morale and stability in the Diocese during this critical time, the Diocese seeks authorization to (a) pay and honor, in its sole discretion, certain prepetition claims for the following items, each as described below: Compensation, Reimbursable Business Expenses and Benefit Plans, together with all other benefits that the Diocese has historically provided to its Employees, Retired Clergy, Seminarians and Temporary Workers in the ordinary course of business (collectively, the "Employee Wages and Benefits"), (b) pay all administrative costs associated with Employee Wages and Benefits, (c) continue to pay and provide the Employee Wages and Benefits in the ordinary course of business on and following the Petition Date, and (d) withhold (as applicable) and remit Deductions and Payroll Taxes as described below.

30.     ***Compensation***.     The Diocese's Central Administrative Office non-clergy Employees and Temporary Workers are paid bi-weekly in arrears, through the end of the prior week.  There are 4 days of wages earned by these Employees and Temporary Workers prior to the Petition Date that constitute prepetition wages which are due to be paid on March 12, 2020.  Based upon historical data, the average bi-weekly aggregate payroll for the Diocese's Central Administrative Office non-clergy Employees and Temporary Workers is approximately $228,000,

3501438.2

including applicable taxes and deductions.  The Diocese estimates that $91,200 in prepetition payment obligations to non-clergy Employees and Temporary Workers has accrued prior to the Petition Date and remains unpaid.

31.    The Diocese's active clergy Employees (the "Active Priests"), are paid monthly in arrears.  Based upon historical data, the average monthly aggregate payroll for the Active Priests is approximately $110,000 including applicable taxes and deductions.  The Diocese estimates that $110,000 in prepetition payment obligations to Active Priests has accrued prior to the Petition Date and remains unpaid.

32.    Retired Clergy receive monthly payments of approximately $166,000 per month, inclusive of applicable taxes and deductions.  The Diocese estimates that $166,000 in prepetition payment obligations to Retired Clergy has accrued prior to the Petition Date and remains unpaid.

33.    Seminarians average monthly aggregate stipends total approximately $2,500, with no applicable taxes or deductions.  The Diocese estimates that no prepetition stipends to Seminarians remains unpaid as of the Petition Date.

34.    The Diocese estimates that total prepetition unpaid compensation for Employees (including Active Priests), Retired Clergy and Temporary Workers as of the Petition Date totals $367,200 (the "Unpaid Compensation").  The Diocese believes that it does not owe any Employee, Temporary Worker or Seminarian a prepetition amount in excess of the $13,650 cap on priority claim amounts imposed by section 507(a)(4) of the Bankruptcy Code.  Accordingly, the Diocese is not seeking authority to pay any amount over the $13,650 cap to any Employee, Temporary Worker or Seminarian.

3501438.2

35.     Items of Unpaid Compensation were due and owing on the Petition Date because, among other things:

> a.  the Chapter 11 Case was filed during the Diocese's regular payroll periods;
>
> b.  some checks issued to Employees, Retired Clergy, Seminarians and Temporary Workers prior to the Petition Date may not have been presented for payment or cleared the banking system and, accordingly, have not been honored and paid as of the Petition Date; and
>
> c.  Employees, Retired Clergy, Seminarians and Temporary Workers have not yet been paid all their salaries and wages for services performed prior to the Petition Date because the Diocese pays payroll in arrears.

36.     ***Reimbursable Business Expenses***.  Prior to the Petition Date and in the ordinary course of business the Diocese has reimbursed Employees for certain reasonable and customary expenses incurred on behalf of the Diocese ("Business Expenses").  As of the Petition Date, the Diocese's unpaid Business Expenses for Employees total less than $25,000.  In addition, it is possible that certain Employees may have incurred prepetition Business Expenses for which they have not yet submitted requests for reimbursement and will submit such requests to the Diocese after the Petition Date.

37.     The Business Expenses are incurred by Employees on the Diocese's behalf and with the understanding that they will be reimbursed.  Accordingly, to avoid harming Employees who may have incurred Business Expenses, by this Motion the Diocese requests the authority, to be exercised in its sole discretion, to: (a) continue paying Business Expenses in accordance with

prepetition practices; (b) modify their prepetition policies relating thereto as they deem appropriate; and (c) pay all Business Expenses that relate to the prepetition period.

38. **_Benefit Plans_**.   The Diocese provides eligible Employees and their eligible dependents with various employee benefits as follows (collectively, the "Benefit Plans"):

a. _Medical Plan: Employees_.   The Diocese's health coverage is provided through an independent self-insured health plan (the "Self-Insured Health Plan") for its eligible Employees, as set forth in greater detail in the Diocese's Self-Insurance Motion (defined below). The Diocese pays approximately $98,000 monthly in advance to the Self-Insured Health Plan.  As of the Petition Date, no payments are owed by the Diocese under the Self-Insured Health Plan.

b. _Medical Plan: Active Priests._   Employees who are Active Priests are separately insured through Blue Cross Community Blue, and the Diocese pays approximately $155,000 per month to Blue Cross to cover these premiums for Active Priests.  As of the Petition Date the Diocese believes that there are no premium payments owed to Blue Cross for insurance coverage for Active Priests.

c. _Medical Plan: Retired Clergy_. Retired Clergy are insured through Aetna Silver Script and Supplement Medical Benefit Plan.  Retired Clergy are also reimbursed for Medicare supplement premiums.  The Diocese pays approximately $53,000 per month to Aetna to cover these premiums.  Further, Medicare reimbursement obligations for Retired Clergy are paid monthly and total approximately $22,000 per month, including supplemental pension payments. As of the Petition Date, the Diocese believes that there are no premium payments owed to Aetna. The Diocese anticipates that $22,232 in payments are outstanding for Medicare reimbursements and supplemental pension payments to Retired Clergy as of the Petition Date.

- 15 -

d.      *Dental Plans*.  The Diocese provides dental coverage through Pro-Dental for its eligible Employees. Pro-Dental is paid by the Diocese in arrears based on claims processed, and the estimated amount owed by the Diocese as of the Petition Date is $20,000.  The Diocese pays the entire amount of these monthly premiums for single employees, and for family coverage, $25.00 per month is collected from participating Employees through payroll deductions.

e.      *Vision Plan*. The Diocese sponsors a vision plan for its eligible Employees through VSP Vision.  The entire amount of their monthly premium, approximately $8 per month for a single employee and $21 for family coverage, is paid by participating Employees through payroll deductions.  As of the Petition Date, no vision insurance premiums are owed to VSP Vision by the Diocese.

f.      *Paid Time Off ("PTO")*.  The Diocese provides PTO to its Employees, the amount and accrual rate of which is based generally on an Employee's length of service and level within the Diocese's organization.   Ordinarily, when an Employee elects to take PTO, that Employee is paid his or her regular hourly or salaried rate.  Employees are paid for unused PTO when they cease employment with the Diocese.  The Diocese estimates that its Employees have accrued no greater than $450,000 of accrued but unused PTO as of January 15, 2020.  This amount, however, is not a current cash payment obligation, as Employees are only entitled to cash payment for accrued and unused PTO when employment is terminated.  Any such payout of PTO to a terminated Employee would be subject to the cap imposed by section 507(a)(4) of the Bankruptcy Code for any pre-petition portion of this payment.  Moreover, the Diocese anticipates that its Employees will utilize any accrued PTO in the ordinary course of business, which will not create any cash flow requirements beyond the Diocese's normal payroll obligations.

- 16 -

3501438.2

g.      *New York State Short-Term Disability Insurance*. The Diocese provides short-term disability benefits for all of its Employees as required by New York State law through ShelterPoint Life Insurance Co. The Diocese pays approximately $300,000 in premiums to ShelterPoint Life Insurance Co. each year, in quarterly installments. As of the Petition Date, the Diocese is current with respect to its payment obligations for short-term disability benefits.

h.      *Life Insurance*.   The Diocese sponsors basic life insurance for its eligible Employees. Employees working more than 28 hours per week are eligible for this benefit, which is paid by the Diocese.  Eligible Employees receive life insurance benefits of 1.5x their annual salary, rounded up to the nearest $1,000, with a maximum benefit of $150,000. The Diocese pays Renaissance Life Insurance approximately $1,510 per month, in advance, for this benefit. As of the Petition Date, the Diocese is current with respect to its payment obligations to Renaissance Life Insurance.

i.      *Long-Term Disability Insurance*. The Diocese sponsors long-term disability benefits covering those Employees working more than 28 hours per week. The Diocese pays approximately $1,167.24 per month, in advance, to Northwestern Mutual Life for this benefit. As of the Petition Date, the Diocese is current with respect to its long-term disability insurance premium payments to Northwestern Mutual Life.

j.      *Supplemental Life Insurance and Long-Term Care Insurance*. The Diocese sponsors supplemental life insurance and long-term care insurance for current and former Bishops through Security Mutual Life Insurance Company of New York.  Only three (3) current and former Bishops receive this benefit. The Diocese pays a total of approximately $10,000 annually, in quarterly increments, in advance, to Security Mutual Life Insurance Company of New York for

3501438.2

this benefit.  As of the Petition Date, no supplemental life insurance or long-term care insurance premium is owed to Security Mutual Life Insurance Company of New York by the Diocese.

       k.    *Paid Family Leave.* The Diocese pays paid family leave premiums for its Employees.  This is paid on a quarterly basis to ShelterPoint Life Insurance Co., as administrator for the Diocese's paid family leave program.  The approximate annual premium is $200,000, paid quarterly. The Diocese does not have any outstanding obligations for paid family leave premiums as of the Petition Date.

       l.    *Flexible Spending Plans.* The Diocese sponsors flexible spending plans (medical/dental and dependent care) for its Employees. P&A Group, Inc. manages the flexible spending plan and charges the Diocese an administrative fee of $189 per month. The Diocese pays the administrative fees on a monthly basis. As of the Petition Date, approximately $47,222 is owed to P&A Group, Inc. for withholdings and administrative fees under the Flexible Spending Plans.

       m.    *Health Reimbursement Account.*  P&A Group, Inc. manages the Diocese's Health Reimbursement Account and charges the Diocese an administrative fee of $166.50 per month for non-clergy Employees, $390.00 per month for Retired Clergy and $40.50 per month for Seminarians.  The Diocese's monthly contribution to the Health Reimbursement Account on behalf of Employees, Retired Clergy and Seminarians is approximately $5,000. As of the Petition Date, no administrative fees are outstanding to P&A Group, Inc. and approximately $5,000 is owed to P&A Group, Inc. for the Diocese's contributions under the Health Reimbursement Account.

       n.    *403(b) Plan.* The Diocese also offers non-clergy Employees the opportunity to participate in a defined contribution qualified retirement plan under section 403(b) of the Internal Revenue Code.  The Diocese makes a core contribution of between 2% and 6% based on

- 18 -

3501438.2

the age and length of service for each non-clergy Employee, with a further matching contribution of 100% for Employees with 5 or more years of service. AIG Retirement Services administers the plan, and charges a quarterly fee of $20,000, paid in arrears on April 1. As of the pay period end date of February 22, 2020, the Diocese's core contributions and employer matches under the 403(b) Plan were current, however quarterly fees remained outstanding in the amount of approximately $6,600.

        o.    *Retirement Plans*. The Diocese sponsors and administers a Priests Retirement Plan, the Retirement Plan for Secular Priests of the Diocese of Buffalo, New York (Priest Plan) (the "Priest Plan"), a multi-employer, non-qualified defined benefit pension plan covering all priests incardinated in the Diocese of Buffalo. The Diocese also contributes to a defined benefit pension plan for lay employees, the Diocese of Buffalo New York Retirement Plan (Lay Plan) (the "Lay Plan") that was frozen as of January 1, 2016. Upon freezing the Lay Plan, each participant's annual accrued benefit at the normal retirement date would remain the same as it was as of December 31, 2015, except for participants not vested at that time, for which vesting service will continue to be credited beyond January 1, 2016. Contributions to the Lay Plan will continue at a reduced rate until the plan is fully funded. Each of the Priest Plan and the Lay Plan are managed by independent boards of trustees. Plan assets for the Priest Plan and the Lay Plan are invested in separate investment trusts. The Diocese makes contributions to the Priest Plan on a quarterly basis, and as of the Petition Date approximately $700,000 is outstanding for this contribution. The Diocese makes contributions to the Lay Plan on a monthly basis in the amount of approximately $61,300. The Diocese submits this monthly contribution amount, along with the

3501438.2

collected contributions of other Lay Plan participants, to the Lay Plan. As of the Petition Date, no amounts are outstanding for the Diocese's contributions to the Lay Plan.

39. *Workers' Compensation.* The Diocese provides workers' compensation benefits ("Workers' Compensation Benefits") to all of its Employees and Temporary Workers. These benefits are covered primarily under the Diocese's self-insured workers' compensation insurance program, which is administered by USI Insurance Services, LLC, for the first $600,000 per occurrence with respect to any workers compensation claims. This benefit is also addressed in the Self-Insurance Motion, filed contemporaneously herewith. USI Insurance Services charges $742.50 per claim for indemnification and $160 per claim for medical benefits as an administration fee for each self-insured claim, paid monthly in arrears. The Diocese anticipates that approximately $3,000 in obligations to USI Services, LLC is owed as of the Petition Date.

40. Excess workers compensation coverage is provided by Star Insurance Company. The annual workers' compensation premium paid to Star Insurance Company is approximately $130,000 and was paid annually in July for the Diocese's 2019-2020 fiscal year. The Diocese does not believe there are any outstanding payments due to Start Insurance Company for excess workers compensation coverage premiums.

41. Failure to maintain workers compensation insurance could result in the institution of administrative or legal proceedings against the Diocese and its officers. By this Motion, the Diocese seeks authority to continue paying and/or contesting in good faith, as appropriate in the Diocese's business judgment, all amounts related to workers' compensation claims that arose prior to the Petition Date, including, without limitation, any payments to insurers required as a result of

such claims and wage loss makeup obligations, as they become due in the ordinary course of the Diocese's business.

42.     ***Deductions***. During each applicable pay period, the Diocese routinely withholds certain amounts from Employees' pay that the Diocese is required to transmit to third parties. Some examples of such withholding include HRA and FSA contributions, 403(b) contributions, United Way donations, child support payments, wage garnishments, and other pre-tax and after-tax deductions payable pursuant to certain of the benefit plans discussed herein (such as an Employee's share of health care benefits and insurance premiums, legally-ordered deductions, fees and assessments and miscellaneous deductions) (collectively, the "Deductions").

43.     The Diocese forwards the Deductions to the appropriate third-party recipients.  On average, the Diocese deducts approximately $24,000 in non-tax items from its non-clergy Employees' paychecks each bi-weekly pay period and an additional $4,000 in non-tax items from Active Priests' monthly paychecks. Retired Clergy's monthly Deductions are approximately $55,000.  Due to the commencement of the Chapter 11 Case, however, certain Deductions that were deducted from Employees', Active Priests' and Retired Clergy payments may not have been forwarded to the appropriate third-party recipients prior to the Petition Date.

44.     ***Payroll Taxes***. Further, the Diocese is required by law to withhold from its Employees' wages amounts related to federal and state income taxes and Social Security and Medicare taxes for remittance to the appropriate federal or state taxing authority (collectively the "Withheld Amounts").  On average, the Diocese pays approximately $24,800 in payroll taxes, including deductions from its non-clergy Employees' paychecks and employer contributions, for each bi-weekly pay period and an additional $17,000 for Active Priests for each monthly payroll.

3501438.2

Approximately $14,000 in payroll taxes, including deductions from Retired Clergy monthly payments and Diocese contributions, is paid for Retired Clergy. The Diocese must match from its own funds Social Security and Medicare taxes (collectively, the "Employer Payroll Taxes" and, together with the Withheld Amounts, the "Payroll Taxes"). The Diocese believes that accrued but unpaid Payroll Taxes as of the Petition Date totals $56,000.

45.     The Diocese believes that the Deductions and Payroll Taxes, to the extent that they remain in the Diocese's possession, constitute monies held in trust and therefore are not property of the Diocese's bankruptcy estate. Accordingly, by this Motion the Diocese seeks authorization, but not direction, to forward any unpaid Deductions and Payroll Taxes to the appropriate third-party recipients and taxing authorities and to continue to forward the Deductions and Payroll Taxes to the appropriate third-party recipients and taxing authorities on a post-petition basis, in the ordinary course of business, as routinely done prior to the Petition Date.

46.     In order to retain Employees and Temporary Workers and support Retired Clergy and Seminarians in furtherance of the Diocese's mission, the Diocese must have authority to pay or otherwise satisfy the Employee Wages and Benefits as summarized above. The amounts requested to be paid pursuant to this Motion are reasonable compared with the importance and necessity of the Diocese's payments to Employees, Retired Clergy, Seminarians and Temporary Workers and the harm that these individuals and the Diocese would likely suffer if these amounts are not paid.

47.     The Diocese's books and records indicate that in no instance should the amount owing to any Employee on account of the Employee Wages and Benefits as of the Petition Date exceed the sum of $13,650, which amount is allowable as a priority claim under sections 507(a)(4)

3501438.2

and 507(a)(5) of the Bankruptcy Code.  Moreover, the Diocese only seeks authority to make payments to Employees up to the combined statutory maximum of $13,650 on account of wages and compensation earned within 180 days before the date of the filing of a petition, allowed as a priority claim under section 507(a)(4) and contributions to employee benefit plans allowed as a priority claim under section 507(a)(5).

48.     As part of the relief requested in the Wages Motion, the Diocese also seeks authority to pay the Deductions and Payroll Taxes to the appropriate third-party recipients and taxing authorities.  Indeed, certain of these amounts are not property of the Diocese's estate because they have been withheld from  paychecks on another party's behalf.  *See* 11 U.S.C. § 541(b).  The Deductions principally represent earnings which Employees, Retired Clergy, Seminarians and Temporary Workers have designated for deduction from Employee paychecks and payment to third-party recipients.  The failure to pay the Deductions could result in significant hardship.  It is even possible that garnishments from wages result in funds that are not the Diocese's property, but rather must be withheld from paychecks for payment to third parties.  Moreover, if the Diocese cannot remit these amounts, Employees, Retired Clergy, Seminarians and Temporary Workers may face legal action due to the Diocese's failure to make these payments.  Additionally, the failure to pay Payroll Taxes may subject the Diocese and its officers to federal or state liability.

49.     Based upon the foregoing, the Diocese respectfully requests that the Court enter an Order authorizing the Diocese to pay or otherwise satisfy, in the ordinary course of business, the Employee Wages and Benefits.  Such relief is justified because the failure to pay any such amounts will likely disrupt the services that the Employees, Retired Clergy, Seminarians and Temporary

3501438.2

Workers provide to the Diocese and ultimately, the Diocese's ability to successfully administer its Chapter 11 Case.

IV.   **Motion for Entry of Interim and Final Orders (I) Authorizing the Continued Maintenance of the Diocese's Self-Insurance Programs; and (II) Authorizing the Payment of Prepetition Obligations in Respect Thereof (the "Self-Insurance Motion")**

50.   The Diocese requests that the Court enter interim and final orders allowing the Diocese to continue to maintain its self-insurance program for property, casualty, workers' compensation and both general and automobile liability risks (the "SIP") and its self-insured health program (the "SIHP", and, collectively with SIP, the "Self-Insurance Programs"). The Diocese also seeks entry of an order authorizing, but not directing, the Diocese in its discretion, to pay any prepetition claims, premiums, defense costs, obligations and administrative costs related to the Self-Insurance Programs, and authorizing banks to honor checks and other withdrawals, whether for pre- or postpetition periods, for amounts representing payments or reimbursement of claims payable under the Self-Insurance Programs. To the extent coverage may be available under the Self-Insurance Programs' policies for claims made pursuant to the New York Child Victims Act (the "CVA"), the Diocese is not seeking authority to pay such claims at this time. The Diocese proposes to address all CVA claims, as well as any insurance coverage which may be available to cover them, in connection with its plan of reorganization.

51.   An order granting the requested relief is necessary to minimize unnecessary disruption to the Diocese and other participants in the Self-Insurance Programs and to continue the insurance coverage funded with their premium payments. The Diocese is not requesting the assumption or rejection of any executory contracts in connection with this Motion.

52.     ***The Self-Insurance Program***.  The Diocese has implemented the SIP as a means of ensuring that the Diocese and certain Other Catholic Entities (collectively, the "SIP Participants") have adequate insurance protection at a reasonable price by spreading risk among a large number of participants and leveraging their collective buying power to secure excess coverage at favorable rates.

53.     Under the SIP, the Diocese coordinates and administers a self-insurance program providing coverage and risk management services for itself and each of the SIP Participants.  The SIP currently provides self-insurance coverage, subject to applicable excess policies, for (i) direct and indirect property loss, business interruption and equipment breakdown (ii) general liability claims, including personal injury, employee benefits, sexual misconduct, employment practices, directors and officers, school board legal liability, cyber liability, errors and omissions, as well as automobile liability, and (iii) workers' compensation.

54.     The SIP utilizes third party insurance brokers to assist the Diocese in purchasing appropriate excess coverage and administer various risk management programs.  The SIP also utilizes third party claims administrators to oversee the administration and payment of workers' compensation claims in compliance with New York State statutes.

55.     The Diocese funds the SIP primarily by billing each SIP Participant a ratable portion of the projected overall cost of administering the program and paying claims, using allocation methodologies which take into account numerous different ratable exposure bases.  The Diocese strives to achieve a consistent and fair allocation of premium costs among the SIP Participants.  For fiscal year 2019-2020, the Diocese has budgeted approximately $7.4 million in

3501438.2

premium revenue related to the SIP.  This premium revenue is used to pay administrative costs of the program, to pay claims for losses, and to pay premiums for excess coverage.

56.     Under the SIP, the Diocese is responsible for paying all claims for losses by any SIP Participant, up to the point of available excess coverage.  The Diocese has a $100 million excess policy with Travelers which provides coverage for property and business interruption losses in excess of the $500,000 Diocesan self-insured retention ("SIR") on a per occurrence basis.  For general and automotive liability, the Diocese is responsible for paying claims of up to the $250,000 per occurrence SIR, with $14.75 million of excess coverage provided through National Catholic Risk Retention Group and an additional $25 million through W.R. Berkley.  The Diocese also pays the first $600,000 per occurrence with respect to any workers compensation claims.  Claims above the $600,000 SIR are paid by an excess insurance carrier, currently Star Insurance Co.  If there are surplus SIP Funds remaining at the end of a fiscal year after payment of all costs and expenses related to the program, such surplus funds are deposited by the Diocese into a segregated reserve account and used to offset future obligations under the program.

57.     The Diocese employs two full-time claims professionals with a combined sixty years of insurance claims handling experience who establish the case-specific reserves for each claim as well as calculate the reserves necessary to satisfy unknown claims that may have been incurred but not yet reported in accordance with standard insurance industry practice.  As of the Petition Date, the SIP program had established case-specific reserves in the amount of approximately $350,000 for property damage claims, $2,850,000 for non-CVA general liability claims, and $7,200,000 for workers compensation claims.  Reserves for workers compensation claims are either held directly by the New York Workers Compensation Board or held in an

investment account at Wilmington Trust (a subsidiary of M&T Bank) to collateralize a letter of credit issued by M&T Bank in favor of the Workers Compensation Board.  All other program reserves are invested in the St. Joseph Investment Fund.

58.     The SIP provides a practical, cost-effective way to manage risk for the SIP Participants under a single, comprehensive insurance program.  If the SIP is not continued, the Diocese, together with each of the SIP Participants, will be forced to purchase separate insurance policies covering each entity and their respective properties.  Upon information and belief, each of the Diocese and the other SIP Participants would incur substantially higher costs to obtain their own individualized insurance (with or without a retention or deductible) than what they are currently assessed under the SIP.  Moreover, without the broad collective risk profile provided by the SIP, certain types of coverage and available coverage limits may simply not be available on an individualized basis or on commercially reasonable terms.

59.     The Diocese seeks to continue to maintain the SIP for itself and on the behalf of the SIP Participants and to pay claims under the SIP in accordance with past practice and in the ordinary course of business.  The Diocese believes that the maintenance of the SIP is in the best interest of the estate and its creditors.

60.     ***The Self-Insured Health Program***.  The Diocese also coordinates and administers the SIHP, which provides voluntary self-insured medical coverage for Diocesan employees, employees other Catholic entities, and their dependents (the Diocese, together with such other participating employers, the "SIHP Participants").  The SIHP currently provides health insurance coverage for approximately 408 individuals.

61.     The SIHP utilizes a third-party administrator to assist the Diocese in processing claims and establishing appropriate financial contributions for the SIHP Participants and their employees.   Independent Health Association, Inc. ("Independent Health") serves as the administrator.  Independent Health administers SIHP coverage through First Choice, a self-funded, tailored-network plan available for large group employers in Western New York.

62.     As the administrator for the SIHP, Independent Health evaluates reimbursement claims submitted by healthcare providers, determines the appropriate amounts owed, and coordinates payment of claims.  Independent Health bills the amount of any allowed claims and a per-capita administrative fee to the SIHP on a bi-weekly basis.  The dollar value of claims payable to Independent Health in any given billing cycle varies depending upon the medical services utilized from time to time by SIHP beneficiaries.   The administrative fee paid to Independent Health is, on average, approximately $15,000 per month.

63.     Each of the SIHP Participants pays premiums to cover the costs of providing coverage for its respective employees and their dependents under the SIHP.  SIHP premiums are paid on a per-head basis and are calculated based upon the prior year's claim experience.  In the event the SIHP experiences claims in excess of those budgeted, all SIHP Participants are required to contribute additional funds on a ratable basis to ensure the program remains fully funded.  All funds related to the SIHP are maintained by the Diocese in a separate segregated account at M&T Bank and are used to pay claims and other costs of administration.

64.     In the event a SIHP beneficiary requires extraordinary levels of medical care, the SIHP maintains a stop-loss policy with HM Insurance Group, Inc. ("HM"), which provides coverage for claims of any individual in excess of $175,000 per year.  Premiums for the stop-loss

3501438.2

policy are paid directly to HM.  The Diocese estimates that the ongoing monthly cost associated with maintaining SIHP stop-loss coverage is approximately $19,000.

65.     As of the Petition Date, the Diocese estimates that it has reserves for the SIHP of approximately $1,000,000, which it believes to be sufficient to cover all known and anticipated claims under the program for the current fiscal year.

66.     A majority of the funds used to fund the Self-Insurance Programs are derived from sources other than the Diocese for the purpose of providing risk management services to Other Catholic Entities.  The Diocese believes that it holds these funds in trust for the benefit of such Other Catholic Entities and that they are therefore not property of the Diocese's bankruptcy estate.  However, to the extent such funds could be characterized as estate assets, the Diocese believes the importance of maintaining appropriate insurance coverage for itself and the other participants in the Self-Insurance Programs without interruption justifies the relief sought in this Motion.

67.     For the reasons described above, and in view of the Diocese's need to maintain appropriate risk management programs to support its reorganization efforts and to ensure continued health care coverage for 408 individuals, authorizing the Diocese to continue to maintain the Self-Insurance Programs and to pay claims and other obligations under those programs in the ordinary course of business is in the best interests of all parties in interest in this case.  The continuance of the Self-Insurance Programs is essential to the Diocese's ability to minimize disruption during this Chapter 11 Case and to maximize the value of its estate for the benefit of its creditors.  Thus, the Diocese respectfully requests authorization (but not direction) to fully retain in place the existing Self-Insurance Programs and to honor prepetition obligations related thereto.

3501438.2

**V.      Motion for Interim and Final Orders (A) Authorizing, But Not Directing, the Diocese to (I) Continue Using Existing Bank Accounts, Banking Practices and Business Forms, (II) Maintain Investment Accounts and Practices, and (III) Continue Using Payment Cards, and (B) Granting Limited Relief from the Requirements of Bankruptcy Code Section 345(b) (the "Cash Management Motion")**

68.      The Diocese respectfully requests that the Court enter interim and final orders authorizing the Diocese (i) continue to use, with the same account numbers, its existing Bank Accounts (as defined below), (ii) treat the Bank Accounts as debtor-in-possession accounts; (iii) continue to use, in their present form, all correspondence and business forms (including, without limitation, letterhead, purchase orders and invoices) and other documents relating to its Bank Accounts existing immediately before the Petition Date, without reference to its status as a debtor-in-possession; (iv) maintain its prepetition investment practices, and (v) continue use of certain payment cards.

69.      The Diocese further requests that the Court authorize all banks and institutions at which any of the Bank Accounts are maintained (collectively, the "Banks") to continue to maintain, service and administer the Bank Accounts, including charging any undisputed, outstanding service charges owed to the Banks on the Petition Date, and that each of the Banks be authorized and directed to receive, process, honor, and pay (i) all post-petition checks, drafts, wire transfers and other electronic payment requests (to the extent of funds on deposit) together with (ii) any prepetition checks or payment requests, but solely to the extent they relate to payments or obligations approved by separate order of this Court.

70.      **_Bank Accounts_**.   In the ordinary course of business, the Diocese utilizes the following accounts to receive, hold and distribute funds (collectively, the "Bank Accounts"), each of which is described in more detail below:

- 30 -

3501438.2

| Account name | Depository Institution | Last four digits of account number |
|---|---|---|
| Operating Account | M&T Bank | 1200 |
| Diocesan Purchasing Division Account ("DPD Account") | M&T Bank | 5004 |
| National Collections Account | M&T Bank | 6516 |
| Catholic Partnership Health Account | M&T Bank | 1230 |
| Disbursement Account | HSBC Bank | 9447 |
| Dental Account | HSBC Bank | 7226 |
| Payroll Accounts | HSBC Bank | 4140 and 4174 |
| Charitable Gift Annuities Account ("CGA Payments Account") | Key Bank | 5423 |
| Self-Insurance Fund ("SIP Account") | Bank of America | 2016 |
| HRA Account | M&T Bank | 1539 |
| FSA Account | M&T Bank | 1547 |
| Department Bank Accounts | Various | See Exhibit C |

71.     *Operating Account (xx1200)*.  The Operating Account is the Diocese's primary account and is used to hold most of the Diocese's cash and to transfer funds to other Bank Accounts as necessary.

72.     *DPD Account (xx5004)*.  The DPD Account is used by the Diocese's purchasing division to procure goods and services on a collective basis for the Diocese and other Catholic institutions.  By consolidating its purchasing efforts with parishes, schools and other entities, the Diocese leverages the buying power of all participants to obtain better pricing and other terms offered by vendors for volume purchases.  Among other things, the Diocese uses funds in the DPD Account to purchase audio-visual equipment, cafeteria and kitchen supplies, apparel and vestments, office supplies and equipment, and various other church ware and religious goods, and then bills each parish, school or other purchaser for their respective portion of the purchase price.

73.     *National Collections Account (xx6516)*.  The National Collections Account is used by the Diocese to hold monies collected from second offertory collections or other appeals for the purpose of supporting national Catholic initiatives and which are payable by the Diocese to the

3501438.2

United States Conference of Catholic Bishops.  The Code of Canon Law mandates the fundamental principle regarding donor intent.  The canonical principle stipulates that "offerings given by the faithful for a certain purpose can be applied only for that same purpose." *See* Canon 1284 § 3.

74.    *Catholic Partnership Health Account (xx1230).*  The Catholic Partnership Health Account holds segregated funds collected from participants in the Diocese's Self-Insurance Health Care Plan ("SIHP") and used to pay health insurance claims, administrative costs, stop-loss premiums and other costs related to providing the SIHP.

75.    *Disbursement Account (xx9447).*  The Disbursement Account is used to pay the Diocese's accounts payable to vendors and service providers for goods and services procured outside of the purchasing department.

76.    *Dental Account (xx7226).*  The Dental Account is used to fund claims for dental insurance coverage for the Diocese's employees and retired priests.

77.    *Payroll Accounts (xx4140 and xx4174).*  The Payroll Accounts are used to fund payroll, benefits, and other payments to employees of the Diocese and retired priests.

78.    *CGA Payments Account (xx5423).*  The CGA Payments Account is part of the Diocese's charitable gift annuity program, which is described in greater detail below.  From time to time, and in accordance with the requirements of the annuity program, the Diocese liquidates securities held in the CGA Investment Account (defined below).  The proceeds of such liquidation are deposited into to the CGA Payments Account and used to make payments to annuitants.

79.    *SIP Account (xx2016).*  The SIP Account is used in connection with the Diocese's self-insurance program ("SIP") to pay covered property, casualty, workers compensation, automobile and general liability claims, as well as to make payments to carriers for the Diocese's

3501438.2

excess insurance policies.  The Diocese has by separate motion requested authorization to continue the SIP in the ordinary course of business and seeks to continue the use of this account in connection with that request.

80.     *HRA Account (xx 1539)*.  The HRA Account is used to fund contributions to health reimbursement accounts for Diocesan employees who are enrolled in the high deductible health plan.

81.     *FSA Account (xx1547)*.  The FSA Account is funded entirely through employee contributions via payroll deduction and is used to fund those employees' flexible spending accounts.

82.     *Department Bank Accounts*.  The Diocese maintains a number of low-balance accounts which are utilized by various departments within the Diocese for specific purposes related to their respective departmental functions.  A full list of these accounts is attached hereto as ***Exhibit C***.

83.     ***Investment Accounts***.  In addition to its Bank Accounts, the Diocese maintains the following investment accounts in the ordinary course of its business (collectively, the "Investment Accounts"):

84.     *St. Joseph Investment Fund, Inc.*  The Diocese's non-cash investments are held primarily in an account with St. Joseph Investment Fund, Inc. ("SJIF").  SJIF is a not-for-profit corporation formed in 2006 to maintain pooled investments on behalf of the Diocese and various separately incorporated Catholic entities in conformity with Canon Law and the New York State Prudent Management of Institutional Funds Act.  SJIF's affairs are governed by its Certificate of Incorporation and By-laws.  As SJIF is a separate and distinct legal entity, the debts and liabilities

of SJIF lie solely with SJIF and are not guaranteed or payable by the Roman Catholic Church, the Diocese or any other person or entity.  Similarly, the debts and liabilities of the Roman Catholic Church and the Diocese are solely their own and are not guaranteed or payable by SJIF.

85.     SJIF's purpose is to maximize investment returns through economies of scale and to provide participants with the opportunity to invest in harmony with the teaching and beliefs of the Roman Catholic Church.  SJIF provides for administration and protection of temporal goods, as required by Canon Law.  SJIF is exempted from certain federal and state securities laws pursuant to the Philanthropy Protection Act of 1995.  *See, e.g.*, 15 U.S.C. §§ 77c(a)(4), 78c(a)(12)(A)(v), 80a-3(c)(10), 80a-3a.

86.     The participants in SJIF include: the Diocese, parishes, cemeteries, and other Catholic entities.  As of December 31, 2019, SJIF had approximately $147 million in total assets under management, the majority of which constitute investments by entities other than the Diocese. Of the approximately $21.8 million in Diocesan funds under management, approximately $9.6 million is specifically designated for the payment of retired priest medical benefits, for seminarian programs, and to support the Diocese's obligations under its self-insurance program, and approximately $12.1 million is unrestricted and available for use at the discretion of the Diocese.

87.     SJIF manages both a short-term fund which seeks to provide current income while maintaining liquidity and which invests primarily in investment grade short term debt securities and high quality money market instruments, as well as a long-term fund which seeks to provide a blend of capital growth and current income by investing assets in a blend of equity securities, fixed income securities, institutional commingled mutual funds, and hedge funds of funds, with the goal of achieving the following allocation targets:

3501438.2

| Asset Class | Target % | Permissible Ranges | Target Benchmark |
|---|---|---|---|
| **Equity** | **47%** | **37 - 57%** | |
| Domestic Large Cap | 17% | 12 - 22% | S&P 500 |
| Domestic Small Cap | 7% | 4 - 10% | S&P 600 |
| International Equities | 23% | 17 - 29% | Various non-US equity market benchmarks |
| **Fixed** | **26%** | **10 - 35%** | |
| Domestic Core | 13% | 8 - 25% | Barclays Aggregate |
| Emerging Market | 3% | 0 - 6% | Local Currency Sovereign EM Debt |
| Global Multi-Sector | 5% | 0 - 8% | S&P/Citigroup WGBI |
| Absolute Return | 5% | 0 - 8% | Barclays Aggregate |
| **Alternatives** | **17%** | **12 - 22%** | |
| REITs | 3.5% | 0 - 7% | FTSE NAREIT Equity REIT |
| Natural Resource Equity | 3.5% | 0 - 7% | S&P Global Natural Resources |
| Hedge Fund of Funds | 10% | 7 - 13% | HFRI Hedge Fund of Funds Index |
| **Multi-Asset Managers** | **10%** | **5 - 15%** | |
| Global Asset Allocation | 10% | 5 - 15% | 50%/50% Global Stocks/Bonds |

88.     SJIF is managed by its board of directors, and investment oversight activities are delegated to the board's investment committee.  The current members of the board, together with information regarding their qualifications, are as follows (*members of the investment committee are denoted in bold*):

- **Jennifer C. Balbach**, Chair; Partner, Summer Street Capital Partners, LLC; BA, Psychology, Harvard College, Cambridge, MA; MBA, Tuck School of Business at Dartmouth. Ms. Balbach has been a manager of a private equity fund for 19 years and serves on 4 other boards in the Buffalo area.

- **David P. Bauer**; National Fuel Gas Supply Corporation; BA, Accounting, Boston College, Boston, MA. Mr. Bauer has been employed by National Fuel for ten years and is a member of its Retirement Committee, which oversees the trust investments of National Fuel's various retirement benefit plans. Previously employed as a Senior Manager at PricewaterhouseCoopers. He serves on 2 other boards in the Buffalo area.

- Patrick Bohen; Advisor and member of the Leadership Group at Dopkins Wealth Management in Buffalo, NY. He is also a board member of the Leadership Council of The Massachusetts General Hospital Cancer Center. He has a BA in International Relations from Canisius College and over 20 years in the investment and financial

- 35 -

industry. Additionally, he is an active volunteer in the community and serves on another outside investment board.

- <u>Eileen C. Crotty</u>; Chief Financial Officer of Hodgson Russ LLP, B.S. Accounting from Canisius College. She formerly served on the Audit Committee of The Diocese of Buffalo, N.Y. She currently serves on the Canisius College Council on Accountancy, of which she was past chair.

- **Andrew W. Dorn Jr.**; Partner, Energy Solutions Consortium, LLC.; BS State University of New York at Buffalo; MBA, Canisius College, Buffalo, New York. Past President and CEO of the Greater Buffalo Savings Bank and the Jamestown Savings Bank. Currently, a Director of Financial Institutions, Inc. and the Western New York Foundation. Past Chair of D'Youville College and member of the investment committees of Sisters of Charity Hospital in Buffalo, NY; D'Youville College, St. Joseph's Collegiate Institute and the Northern Chautauqua Community Foundation.

- **Carrie B. Frank**; Healthcare Executive; B.S., Accounting from Canisius College, Buffalo, NY. Mrs. Frank held leadership positions in various healthcare delivery and financial capacities in her 36-year professional career. Former Vice President at Excellus Health Plan and CFO and COO of Buffalo General and Kaleida Health. Mrs. Frank currently serves on several volunteer boards and on two other investment committees.

- <u>Sister Dorothy Mueller</u>; Copywriter and Donor Relations Coordinator for Our Lady of Victory Homes of Charity, is a member of the Stella Niagara Franciscans; BS in Education from Rosary Hill/Daemen College; MS in Education from Xavier University, Cincinnati, Ohio; Sister was an educator, served her religious community as Finance Director for 20 years and Provincial Minister for 8 years. She currently serves as a member of the Board of Directors for Daemen College and chairs its Audit Committee.

- **Edward P. Schneider**; Executive Director, University at Buffalo Foundation, Inc. (1976-Present); B.S., Accounting, Canisius College, Buffalo NY, 1974; MBA, State University of New York at Buffalo, 1980; currently director of 2 community not-for-profit organizations and investment committee member for 4 other organizations.

- **Edward F. Walsh, Jr.**; President and Chief Operating Officer, Walsh Duffield Companies, Inc.; BA (American Studies) Williams College, Williamstown, MA, 1976; Mr. Walsh has been employed in the insurance industry since 1977. Mr. Walsh is currently a director or trustee of 7 community human service organizations and foundations.

3501438.2

- **Lee C. Wortham**; Chief Operating Officer, Barrantys, LLC; BS Canisius College, Buffalo, NY; MBA, New York Institute of Technology, Westbury, NY. Mr. Wortham has over 35 years of experience in the financial services industry. Mr. Wortham is Chairman of the Roswell Park Alliance Foundation, Vice Chairman of Evans Bancorp, Inc., serves on the Board of the Patrick P. Lee Foundation and is a member of the Canisius College Board of Trustees where he is Chair of the Investment Committee.

89.    SJIF retains multiple investment managers to provide investment advice as to appropriate investments and to manage various portfolios of securities. The investment managers are selected by the Investment Committee and approved by the Board of Directors.  All investment managers are registered with the Securities and Exchange Commission as "investment advisers" pursuant to the Investment Advisers Act of 1940. The performance of investment managers is reviewed and evaluated quarterly.

90.    NEPC, LLC ("NEPC") has been engaged as an independent consultant to provide consultant services with respect to investment policy development and risk control, asset allocation strategy, investment manager searches, and investment performance analysis. NEPC consultants meet quarterly with the Investment Committee to review performance trends and investment market projections.

91.    Custody services for SJIF are provided by US Bank, St. Louis, Missouri for separately managed portfolios.  Custody services for multi-investor funds held by SJIF are provided by various custodians, including Bank of New York Mellon, The Northern Trust Co., Deutsche Bank Trust Co., and Citco.

92.    The Diocese and SJIF have entered into an administrative contract pursuant to which the Diocese supplies SJIF with the services of certain of its employees to assist in

- 37 -

maintaining participant and accounting records relating to the funds, and SJIF reimburses the Diocese for such services.

93.     *CGA Investment Account*.  The Diocese maintains a charitable gift annuity program pursuant to N.Y. Insurance Law § 1110, which allows the Diocese to enter into agreements with donors under which the Diocese receives gifts for the benefit of itself and other Catholic entities in exchange for its agreement to make annuity payments calculated based upon the actuarial projected lifespan of the annuitant.  Gifts received through this program are invested in an account (the "CGA Investment Account") maintained by the Diocese with Christian Brothers Investment Services, Inc. ("CBIS") and are used to fund quarterly payments to the annuitants during their lifetimes.  Upon the death of an annuitant, the remaining corpus of the gift becomes the property of the beneficiary named in the annuity agreement, which can be the Diocese or a parish, school, religious order, or other Catholic entity separate from the Diocese.  As of the Petition Date, all of the gifts in the program other than one are designated for a beneficiary other than the Diocese.

94.     The Diocese holds a permit, issued by the New York State Department of Financial Services ("DFS"), to run its charitable gift annuity program, and it submits annual reports and it submits annual reports and undergoes periodic audits by DFS with respect to the program. Investments in the CBIS Account are overseen by CBIS in consultation with the Diocese, and are made in accordance with the statutory requirements set forth in the N.Y. Insurance Law.

95.     As of the Petition Date, the value of the CGA Investment Account was approximately $434,216 and the Diocese was administering 24 annuity accounts established by 8 individual annuitants.  Annuity payments due under the program amount to approximately $21,273 annually.

- 38 -

96.     *LOC Collateral Account*.  As described more fully in the Diocese's Self-Insurance Motion, the Diocese is self-insured for workers compensation claims.  Like most self-insured organizations, the New York Workers Compensation Board ("WCB") has required that the Diocese post security to cover potential workers compensation liabilities.  The Diocese has fulfilled this requirement in part through an irrevocable standby letter of credit (the "WCB LOC") issued to WCB by M&T Bank on behalf of the Diocese in the amount of approximately $4.8 million.  The Diocese's repayment obligations to M&T Bank under the WCB LOC are collateralized by a restricted securities account (the "LOC Collateral Account") held with Wilmington Trust, N.A (a subsidiary of M&T Bank).  As of the Petition Date the LOC Collateral Account had a market value of approximately 5.1 million.

97.     *DOB Brokerage Account*.  Lastly, the Diocese maintains a brokerage account at M&T Bank (the "DOB Brokerage Account").  The DOB Brokerage Account does not typically maintain a balance but is used to receive and liquidate securities that may be gifted or bequeathed to the Diocese and other Catholic entities in the Buffalo area.

98.     ***Payment Cards***.  The Diocese uses the following types of payment cards:

99.     *Prepaid Visa Cards*.  The Diocese utilizes 25 PEX Visa Prepaid Cards to manage business expenses for the Diocese and its employees.  Those cards are issued through Fifth Third Bank, N.A., and The Bancorp Bank.  The PEX Visa Prepaid Cards function similarly to a debit card.  The Diocese maintains a deposit in the amount of approximately $40,000 with Fifth Third Bank and any purchases made with the PEX Visa Prepaid Cards are deducted from the amount on deposit.  Periodically, the Diocese will replenish the deposit from its Operating Account.

3501438.2

100.   *Gas Cards*.   The Diocese has six Exxon Mobile Gas Cards which are used to purchase fuel for Diocesan vehicles and employees.   On average, the Diocese incurs less than $1,000 per month in fuel charges and the balance on the Exxon Mobile Gas Cards are paid in full at the end of each billing cycle in the ordinary course of business and generally costs the Diocese less than $1,000 a month.

101.   **Business Forms**.   In the ordinary course of business, the Diocese uses multiple check types associated with the Bank Accounts.   Additionally, the Diocese uses a variety of correspondence and business forms including, but not limited to, letterhead, purchase orders and invoices.   To minimize the expense and disruption to the Diocese's estate associated with developing and/or purchasing entirely new forms, the delay in conducting business prior to obtaining such forms and the confusion of employees, vendors and suppliers, the Diocese seeks authority to continue to use all correspondence and business forms as they existed immediately prior to the Petition Date, without reference to the Diocese's status as debtor-in-possession.   The Diocese will use its reasonable best efforts to mark "debtor-in-possession" on business forms as soon as reasonably practicable following the Petition Date.

102.   The Diocese respectfully requests that the Court authorize it to continue using its prepetition Bank Accounts rather than closing them and opening new post-petition accounts. Closing the Diocese's Bank Accounts would cause disruption to the Diocese's operations and fulfillment of its mission.   As described above, the Diocese's maintains a sophisticated system of special purpose Bank Accounts in order to facilitate the orderly collection, management and disbursement of funds in the ordinary course of its business.   If the Diocese were required to open new accounts as of the Petition Date, it would unnecessarily distract the Diocese's key business

3501438.2

office personnel in an office that is already operating at maximum capacity.  In addition, changing accounts would also cause disruptions in essential deposit and automated debit activity, potentially leading to loss of revenue, missed payments or overdraws and therefore causing harm to the Diocese's operations.  As a result, the Diocese respectfully submits it is appropriate to maintain its prepetition Bank Accounts and practices.

103.    The continued use of the existing Bank Accounts will facilitate the Diocese's transition into this chapter 11 case by, among other things, avoiding administrative inefficiencies and expenses and minimizing delays in payment of post-petition debts.  The Diocese respectfully submits that parties in interest will not be harmed by the continued maintenance of its Bank Accounts because, with the assistance of professionals, the Diocese has implemented appropriate mechanisms to ensure that unauthorized payments will not be made on account of obligations incurred prior to the Petition Date.

104.    The Diocese submits that maintaining the existing Bank Accounts will facilitate the Diocese's ability to collect, deposit and account for receipts and pay post-petition bills.  Closing the Bank Accounts would require the Diocese to open new accounts and arrange alternative procedures for electronic and manual transfers to and from the Bank Accounts.  The result would be a disruption of processing payments, and similarly would disrupt wire transfers, payroll obligations, and post-petition obligations to vendors and other creditors.

105.    The Diocese also requests authority to preserve various reporting and accounting mechanisms, such as signatory authorizations and accounting systems central to the maintenance of the Bank Accounts.  The interruption or termination of such reporting and accounting mechanisms would undermine the utility of the Bank Accounts.  In accordance with existing

3501438.2

practices, the Diocese will maintain strict records of all receipts and disbursements from the Bank Accounts during the pendency of this case and will ensure that its records properly distinguish between pre-petition and post-petition transactions and report accordingly to the U.S. Trustee.

106.    The Diocese also respectfully submits that maintenance of the Bank Accounts will avoid delays in payments to administrative creditors, ensure a smooth transition into chapter 11, and facilitate the Diocese's efforts to complete this Chapter 11 Case rapidly and successfully. Thus, the Diocese respectfully requests that its existing Bank Accounts be deemed debtor-in-possession accounts and that the maintenance and continued use of those accounts, in the same manner and with the same account numbers, styles and document forms as those employed during the prepetition period, be authorized subject only to a prohibition against honoring prepetition checks without specific authorization from this Court.

107.    Strict adherence to the U.S. Trustee Guidelines in this Chapter 11 Case would significantly disrupt the ordinary financial operations of the Diocese, reducing efficiencies and causing unnecessary expense, while providing little benefit to creditors.  The Diocese respectfully requests that the Court waive the requirements of the U.S. Trustee Guidelines in this Chapter 11 Case as requested herein.

108.    To minimize expenses and disruption to the Diocese's chapter 11 estate, the Diocese respectfully requests authority to continue to use all correspondence and business forms (including letterhead, purchase orders, envelopes, charitable solicitation material, invoices and the like) as such forms were in existence immediately before the Petition Date, without reference to the Diocese's status as debtor-in-possession.  The Diocese also requests authorization to use the existing check stock without the "debtor-in-possession" label for checks that it manually writes

- 42 -

until such check stock runs out.  As soon as practicable after the Petition Date, the Diocese will include "debtor-in-possession" on the checks it prints electronically.  Upon depletion of the Diocese's check stock and/or business forms stock, the Diocese will obtain new check stock and/or business form stock reflecting its status as a debtor-in-possession.

109.    By virtue of the nature and scope of the Diocese's operations and the number of suppliers of goods and services with whom the Diocese transacts on a regular basis, it is important that the Diocese be permitted to continue to use its existing checks and other business forms without alteration or change, except as requested herein.  Indeed, because it would appear that parties doing business with the Diocese will be aware of the Diocese's status as debtor-in-possession as a result of the widely publicized nature of this Chapter 11 Case as well as the communications and notice of commencement of this Chapter 11 Case the Diocese intends to distribute to such parties, changing business forms is unnecessary and would be unduly burdensome.  Moreover, if the Diocese is required to change its current business forms, the new forms may cause confusion to the Diocesan employees, vendors and donors.  The Diocese also believes that it would be costly and disruptive to cease using all existing forms and to purchase new stationery and business forms.  Accordingly, the Diocese seeks a waiver of the U.S. Trustee Guidelines with respect to the continued use of its business forms and checks.

110.    The Diocese requests further relief from adherence to the U.S. Trustee Guidelines to the extent doing so would require that all receipts and all disbursements of estate funds be by check with a notation representing the reason for the disbursement.  Considering the nature of the Diocese's operations, in certain instances, it may be necessary for the Diocese to conduct transactions by debit, wire or ACH Payments and other similar methods, as discussed above.  The

Diocese maintains accurate records and will be able to properly account for any such transactions. The Diocese, therefore, requests that its Banks be authorized to continue to pay, honor and execute any and all debit instructions, wires and ACH Payments issued and drawn on the Bank Accounts after the Petition Date.

111. In accordance with its contractual arrangements with the Banks, the Diocese incurs periodic service charges and other fees, costs, charges and expenses to the Banks in connection with the maintenance of the Bank Accounts (collectively, the "Service Charges"). Payment of the prepetition Service Charges is in the best interests of the Diocese and all parties in interest in this Chapter 11 Case, as it will prevent any disruption to the Bank Accounts. Further, because the Banks have setoff rights for the Service Charges, payment of prepetition Service Charges should not alter the rights of unsecured creditors in this Chapter 11 Case. Accordingly, by this Motion, the Diocese also seeks authority to pay, at the Diocese's sole discretion, the prepetition Service Charges, if any.

112. The Diocese respectfully requests authority to continue to its prepetition investment practices and to maintain each of its Investment Accounts in the ordinary course of business. By retaining its prepetition investment practices and Investment Accounts, the Diocese will be able to earn reasonable returns on its investments, as contemplated by section 345(a) of the Bankruptcy Code, without incurring the administrative costs and compliance risk associated with converting its holdings to cash or U.S. Government Securities.

113. The Diocese's investment practices with respect to SJIF and the CGA Investment Account are sophisticated and overseen by independent professional outside financial advisors who ensure that a diversified mix of investments is maintained to achieve moderate targeted

growth with minimal exposure to down-side risk in any particular investment.  Moreover, the Diocese is itself a large, financially sophisticated organization that employs a professional accounting staff of fifteen (15) individuals devoted to proper oversight and management of the Diocese's finances.  Moreover, the Diocese has retained Rick Szekelyi of Phoenix Management Services to serve as its financial advisor in this Chapter 11 Case.  Mr. Szekelyi is a certified public accountant and has substantial experience helping companies reorganize through chapter 11 and advising them with respect to the management of their finances.  Accordingly, the Diocese is not seeking to make unnecessarily risky or speculative investments, but merely to deploy its resources consistent with the recommendations of its professional advisors in an organized and diversified manner as most institutions of similar size do in the ordinary course.

114.    The Diocese has approximately $30 million in its Investment Accounts.  The Diocese has a long track record of responsibly investing its funds (both restricted and unrestricted) to achieve reasonable growth with limited risk.  Indeed, the Diocese uses the income generated from its holdings in SJIF to fund portions of its annual budget, and the CGA Investment Account is held and managed for the purpose of creating income to fund the Diocese's obligations to pay annuitants.  If the Diocese were forced to liquidate its current holdings and instead invest in treasury securities or to maintain a collateralized deposit account in strict compliance with section 345(b), it would not be able to obtain a comparable rate of interest or growth, and the reduced income available could force the Diocese to curtail portions of its mission or, with respect to the CGA Investment Account, violate state law which dictates how charitable annuity funds must be invested.  Moreover, the reduction in income inherent in disinvesting from SJIF would negatively affect creditors to the extent SJIF funds may be unrestricted and available to pay creditor claims.

- 45 -

3501438.2

115.    In addition to the problem of replacing a valuable revenue stream, the Diocese respectfully submits that the sheer size of its investments will make it difficult and unnecessarily expensive, if not outright impossible, to obtain a bond or collateral securities to cover the full amount invested in SJIF and/or to find an authorized depository willing to take on such a deposit.

116.    The Diocese submits that each of the custodians for the Diocese's investments in SJIF, and each of the financial institutions with which the other Investment Accounts are held, are large, stable, and financially secure institutions, which, in many cases, are on the U.S. Trustee's list of approved depositories.  Accordingly, the Diocese respectfully submits that there is no reason to believe the institutions with whom the Investment Accounts are held present an unreasonable risk of loss.

117.    As described herein, the Diocese's Investment Accounts represent just a part of the Diocese's sophisticated financial management system, and are critical to the Diocese's ability to continue its ordinary course practices in administering its self-insurance programs and the charitable gift annuity program.  Forcing the Diocese to liquidate the Investment Accounts and set up alternative arrangements would require a substantial amount of time and effort which would distract from the Diocese's ability to focus on its goal of reorganizing and confirming a plan of reorganization.  Moreover, if the Diocese were required to bring the CGA Investment Account and the LOC Collateral Account into strict compliance with section 345(b), the Diocese would be forced to violate its obligations under New York law and to breach its contractual commitments to M&T Bank.

118.    The Diocese respectfully submits that appropriate safeguards are in place which render strict adherence with the investment requirements of section 345(b) unnecessary.  First, the

- 46 -

3501438.2

Diocese is already subject to statutory requirements under New York state laws which mandate the prudent and responsible investment of its funds. Second, the Diocese has engaged the assistance of independent professional outside financial advisors who actively monitor the Diocese's Investment Account portfolios and ensure that a diversified mix of investments is maintained to achieve moderate targeted growth with minimal exposure to down-side risk in any particular investment. Third, the investment guidelines for SJIF and the CGA Investment Account direct that the Diocese's investments are comprised primarily of professionally managed mutual funds and other securities which are widely traded and thus exposed to constant market scrutiny and valuation – reducing the risk of unexpected or severe fluctuations in value and avoiding unduly speculative investments in favor of steady growth over a long-term investment horizon. Fourth, the size and diversification built into the Diocese's portfolios means that any increase or decrease in value of a particular investment is unlikely to have a substantial impact on the overall value of the Diocese's holdings. Because each of the Diocese's Investment Accounts is comprised of a diversified portfolio of securities, the failure of any individual investment should result in minimal adverse effects on the overall value of its investments.

119. As explained in detail above, the Diocese derives many benefits from the continuation of its current investment program. Most notably, the Diocese's investments provide it with a reliable and steady source of income upon which it relies to fund ordinary course operations as well as its obligations under the charitable annuity program. The Diocese also benefits from economies of scale in joining with other investors in SJIF to take advantage of professional advisory services which would be much more expensive in the absence of a pooled investment vehicle like SJIF. Moreover, keeping the Investment Accounts in place benefits the

3501438.2

Diocese benefits by allowing it to remain in compliance with its statutory and contractual obligations.

120.    The Diocese's estate will suffer if it is not allowed to continue its existing investment program.  As noted above, the Diocese will lose out on a valuable source of revenue which it simply will not be able to replicate if forced to comply with the requirements of section 345(b).  Second, it is highly unlikely that the Diocese could even procure a bond or collateral security to cover the significant amount of investments currently held in the Investment Accounts. Even if such security could be obtained, it would almost certainly be at an extraordinary expense to the Diocese's estate and would need to be funded out of unrestricted funds, to the detriment of the Diocese's creditors.

121.    The only realistic way for the Diocese to strictly comply with section 345(b) would be to liquidate the holdings in each of the Investment Accounts, reducing the current investment positions to cash, and then to place such cash into a deposit account with one of the U.S. Trustee's authorized depositories.  The Diocese respectfully submits that doing so would be neither practical nor prudent, and that doing so would put the Diocese at risk of failing to comply with its state law obligations under the New York Prudent Management of Institutional Funds Act and/or section 1110 of the New York Insurance Law to act as a prudent investor of the funds placed under its control, as well as to violate its contractual obligation to M&T Bank to maintain the LOC Collateral Account at Wilmington Trust.

122.    Accordingly, for the reasons set forth herein, the Diocese respectfully requests that it be authorized to continue to maintain its existing Bank Accounts and banking practices, business

3501438.2

forms, Investment Accounts and investment practices, as requested in the Cash Management Motion.

### VI.   Motion for Entry of Interim and Final Orders Authorizing the Diocese to Pay Prepetition Taxes and Regulatory Fees (the "Taxes Motion")

123.   The Diocese seeks authority to pay, in its sole discretion, in the ordinary course of its business and on its normal due dates, all undisputed prepetition sales, gross receipts, utility-users, federal excise and use, and certain other governmental taxes, including any amounts subsequently determined to be owing upon audit (collectively, the "Taxes"), regulatory fees, including, but not limited to, federal, state and local regulatory fees (the "Regulatory Fees"), and permit or other licensing fees (the "Licensing Fees," and together with the Taxes and Regulatory Fees, the "Taxes and Fees") to the respective federal, state and local taxing authorities and other governmental agencies (each a "Taxing Authority" and collectively, the "Taxing Authorities"), including all Taxes and Fees subsequently determined upon audit to be owed for periods prior to the Petition Date.

124.   In the ordinary course of its business, the Diocese is required to pay Taxes and Fees. The Diocese must remit these Taxes and Fees to the various governmental entities of the jurisdictions in which the Diocese conduct business.  The process by which the Diocese remits the Taxes and Fees varies, depending on the nature of liability at issue and the Taxing Authority to which the relevant payment is made.

125.   As of the Petition Date, the Diocese believes that it is current with respect to the payment of Taxes and Fees except that approximately $1,594.00 is owed for certain sales taxes incurred with respect to the Diocese's cafeteria operations and its purchasing division. Additionally, certain Taxes may have accrued prepetition but have not yet come due for payment.

- 49 -

3501438.2

126.    The Diocese pays the Taxes and Fees to the Taxing Authorities on a periodic basis with funds drawn by checks or by means of electronic fund transfers whether sent directly to the Taxing Authorities or sent to a third-party administrator who pays the appropriate Taxing Authorities.  Prior to the Petition Date, certain Taxing Authorities were sent checks or electronic transfers in respect of such obligations that may not have cleared the Diocese's banks or other financial institutions as of the Petition Date.

127.    Certain Taxing Authorities may assert that the Taxes and Fees are so-called "trust fund" taxes that the Diocese is required to collect from third parties and hold in trust for the benefit of such Taxing Authorities.  Even if some of the Taxes and Fees would not ordinarily be considered "trust fund" taxes in a particular jurisdiction, failure to pay the Taxes and Fees may adversely affect the Diocese's good standing in a jurisdiction, potentially impairing its ability to engage in certain transactions and continue to conduct its business.  In addition, some Taxing Authorities may audit the Diocese, if such Taxes and Fees are not timely paid, which would needlessly divert the Diocese's attention from its reorganization efforts.  Finally, to the extent that any Taxes and Fees remain unpaid by the Diocese, the Diocese's directors and officers may be subject to lawsuits or criminal prosecution during the pendency of this Chapter 11 Case.  Any such lawsuit or criminal prosecution (and the ensuing potential liability) would distract the Diocese and its leadership from effectuating the Diocese's reorganization, to the detriment of all parties in interest in this Chapter 11 Case.

128.    Any delay in paying the obligations relating to the Taxes and Fees would be detrimental to the Diocese, its creditors, and its estate.  Indeed, the Diocese's ability to manage and run its operations with as little disruption as possible requires, in part, that it remain in good

3501438.2

standing with the relevant Taxing Authorities.  For the foregoing reasons, the Diocese submits that the relief requested herein is necessary and appropriate and is in the best interests of the Diocese's estate, its creditors, and other parties in interest.

**VII. Motion for Entry of Interim and Final Orders (A) Prohibiting Utility Companies from Altering, Refusing or Discontinuing Service on Account of Prepetition Amounts Due, (B) Determining Adequate Assurance of Payment For Post-Petition Utility Services Under 11 U.S.C. § 366, and (C) Establishing Procedures for Determining Adequate Assurance of Payment (the "Utilities Motion")**

129.    The Diocese respectfully requests that the Court enter interim and final orders, (a) prohibiting those utility companies that provide service to the Diocese (each a "Utility Company" and, collectively, the "Utility Companies") from altering, refusing or discontinuing service on account of prepetition amounts due, (b) determining that the Diocese's furnishing of deposits to Utility Companies, upon their timely request for adequate assurance, in an amount equal to two weeks of the Diocese's estimated average usage as calculated over the past year, constitutes adequate assurance of payment, and (c) establishing a procedure to address assertions by Utility Companies that they are entitled to additional adequate assurance.

130.    The Diocese's ongoing operations require the Diocese to maintain uninterrupted utility services, including electricity, natural gas, telephone, water, waste removal, internet and other services.  Termination of a utility service would cause immediate and irreparable harm to the Diocese's operations and critical reorganization efforts.

131.    The Diocese receives utility services from several different providers for multiple facilities.  These facilities include: the Saint Stanislaus residence at 123 Townsend, Bishop Grosz residence at 125 Townsend, the Archbishop Walsh Academy, Buffalo State Newman Center, Camp Turner, St. Joseph's Cathedral, the Catholic Center, Monsignor Conniff Residence, Bishop

3501438.2

Head Residence, Mother Teresa Home, Newman Center at University at Buffalo, Niagara Catholic School, O'Hara Residence, and St. Gianna Molla Outreach Center. The Diocese is generally current with respect to the payment of its prepetition obligations for all utility services and none of the Utility Companies hold prepetition deposits.

132.   Here, the Diocese proposes to provide each Utility Company, upon request, a cash Deposit equal to two weeks' average historical usage, calculated over the past year, and adequate funds have been budgeted for payment of all post-petition utility services. Based upon the foregoing, the Diocese believes that most, if not all, of the Utility Companies have adequate assurance of payment even *without* the Diocese's proposed Deposit. When the offered Deposit is complemented by the Diocese's ability to pay postpetition invoices through access to cash from continued operations, such assurance of payment significantly alleviates—if not eliminates—any honest concern of nonpayment on the part of the Utility Companies, and is therefore adequate.

133.   The Diocese submits that it satisfies the requirements of section 366 by proposing a Deposit as an acceptable form of adequate assurance of payment. The Diocese has also proposed reasonable procedures that will allow for a Utility Company to submit an Assurance Request and for the scheduling of a hearing thereon. The Diocese anticipates that in conjunction with the Diocese's proposed Deposits, the Diocese will maintain post-petition liquidity, and therefore, the Utility Companies will not suffer any prejudice.

**VIII.    Motion for Entry of Interim and Final Orders Authorizing the Diocese to (I) Honor Prepetition Insurance Premium Financing Agreements and (II) Enter Into New Premium Financing Agreements in the Ordinary Course of Business (the "Insurance Premium Financing Motion")**

- 52 -

3501438.2

134.    The Diocese respectfully requests that the Court enter interim and final orders authorizing the Diocese to (i) honor its prepetition insurance premium financing agreements and (ii) enter into new premium finance agreements in the ordinary course of business.

135.    The Diocese is largely self-insured for most risks.  However, the Diocese does maintain excess insurance policies through a number of third-party insurers (collectively, the "Insurance Policies").  The Insurance Policies are essential to the preservation of the Diocese's business and the proper functioning of its self-insurance program.

136.    It is not always economically advantageous for the Diocese to pay the premiums on all of the Insurance Policies on a lump-sum basis.  Accordingly, in the ordinary course of business, the Diocese finances the premiums on some of their Insurance Policies by entering into premium finance agreements with premium finance companies.

137.    Currently, the Diocese finances excess property insurance premiums pursuant to a premium financing agreement (the "Property Agreement") with BankDirect Capital Finance ("BankDirect").  Pursuant to the terms of the Property Agreement, prior to the Petition Date, the Diocese made a cash down payment to BankDirect in the amount of $50,985.00 and financed the remaining $458,879.00 of premiums covered by the Property Agreement.  In exchange for these financing terms, the Diocese agreed to pay ten monthly installment payments in the amount of $46,727.00 including a total finance charge of $8,391, representing an annual interest rate of 3.97%.  In addition, the Diocese granted BankDirect a security interest in unearned premiums, dividend payments, and all payments on account of loss which result in reduction of any unearned premium.

3501438.2

138.    The Diocese also finances certain excess liability and auto insurance premiums pursuant to a financing agreement ("Package Agreement", together with the Property Agreement, the "Premium Financing Agreements") with BankDirect.  Prior to the Petition Date, the Diocese made a cash down payment to BankDirect in the amount of $81,568.79 and financed the remaining $802,790.65 of premiums covered by the Package Agreement.  In exchange for these financing terms, the Diocese agreed to pay ten monthly installment payments in the amount of $81,568.79 including a total finance charge of $12,897.25, representing an annual interest rate of 3.49%.  In addition, the Diocese granted BankDirect a security interest in unearned premiums, dividend payments, and all payments on account of loss which result in reduction of any unearned premium.

139.    If the Diocese is not able to pay its financing obligations under the Premium Financing Agreements, BankDirect could attempt to seek modification of the automatic stay to terminate the various underlying insurance policies in order to recoup its losses.  If such modification were permitted, the Diocese would then be required to obtain replacement insurance on an expedited basis and at tremendous cost to the Diocese's estate.  If the Diocese was required to obtain replacement insurance and pay a lump-sum premium in advance, this payment would likely be greater than what the Diocese currently pays.  Even if BankDirect was not permitted to terminate the underlying insurance policies, any interruption of payment would have a severe, adverse effect on the Diocese's ability to obtain a new policy or finance premiums in the future.

140.    In view of the importance of maintaining insurance coverage with respect to the Diocese's business activities, its obligations under its self-insurance program and New York law, and the preservation of the Diocese's cash flow and estate by financing the insurance premiums, the Diocese believes it is in the best interests of its estate to authorize the Diocese to honor its

3501438.2

financing obligations under the Premium Financing Agreements. Any other alternative would likely require considerable additional cash expenditures and would ultimately reduce available distributions for unsecured creditors.

141.     In addition, because the Premium Financing Agreements and the Insurance Policies may expire during the course of the Chapter 11 Case, the Diocese seeks authority to renew the Premium Financing Agreements and enter into other similar agreements in connection with the continuation of Insurance Policies in the ordinary course of the Diocese's business, without further Court approval. The Diocese will need continued excess insurance coverage throughout the entire duration of the Chapter 11 Case. The Diocese respectfully submits that renewal of the Premium Financing Agreements falls squarely within the ordinary course of its business, and, but for the constraints of section 364 of the Bankruptcy Code, the Diocese would not need the Court's prior approval to renew these agreements. To reduce the administrative burden, as well as the expense of operating as debtor-in-possession, the Diocese seeks the Court's authority now to renew the Premium Financing Agreements or enter into new insurance financing agreements for the Insurance Policies, if and when necessary.

142.     In light of the importance of maintaining excess insurance coverage and preserving the Diocese's liquidity by financing the insurance premiums, the Diocese believes it is in the best interests of its estate and all stakeholders to honor its prepetition financing obligations, and to renew the Premium Financing Agreements or enter into similar premium financing agreements for the Insurance Policies, as necessary.

3501438.2

IX.     **Motion for Entry of an Order Pursuant to Bankruptcy Rules 1007(c) and 9006(b)(1) Extending Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases and Statements of Financial Affairs (the "Motion to Extend Time to File Schedules")**

143.    The Diocese respectfully requests that the Court enter an order extending the time to file its schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases and statements of financial affairs (collectively, the "Schedules and Statements") through and including March 31, 2020 (an extension of 17 days, for a total of 31 days from the Petition Date), without prejudice to the Diocese's ability to request additional time should it become necessary.

144.    The Diocese anticipates that there will be more than 700 creditors and interested parties involved in this Chapter 11 Case, including over 400 individuals whose claims relate to alleged instances of abuse and whose names and other identifying information will be sought to be filed under seal to protect their privacy.  Given the need for confidentiality, preparing the Schedules and Statements accurately and with sufficient detail and adherence to confidentiality requires significant attention from the Diocese's personnel and advisors.   Further, the Diocese's personnel will be heavily involved with public relations outreach in the days following the Petition Date, to facilitate the stabilization of the Diocese's operations and in support of its mission.

145.    In addition to the reasons set forth above, the Diocese respectfully submits that the complexity of its operations, the limited staff available to perform the required internal review of financial records and affairs, the numerous critical operational and mission stabilization matters that the Diocese's personnel must address in the early days of this Chapter 11 Case, the pressure incident to the commencement of this Chapter 11 Case, and the fact that certain prepetition

3501438.2

invoices may not be received or entered into the Diocese's accounting system prior to the Petition Date provide ample cause justifying the requested extension of the deadline to file the Schedules and Statements.

146.   The Diocese submits that focusing the attention of key personnel on critical operational and chapter 11 compliance issues during the early days of this Chapter 11 Case will help the Diocese make a smoother transition into chapter 11 and, therefore, will ultimately maximize the value of the Diocese's estate for the benefit of creditors and all parties in interest. Consequently, it is in the best interests of the Diocese and its creditors to obtain an extension of the filing deadline set forth under Bankruptcy Rule 1007(c), which would provide the Diocese with a total of 31 days from the Petition Date to file the Schedules and Statements.

### X.   Applications to Appoint Stretto as Notice and Claims Agent and as Administrative Advisor (the "Stretto Applications")

147.   The Diocese is seeking separate orders appointing Stretto[3] as the notice and claims agent for this Chapter 11 Case (the "Claims Agent") and authorizing the retention of Stretto to assist the Diocese as an advisor with respect to certain case management and administrative tasks (the "Administrative Advisor").

148.   The Diocese anticipates that there will be more than 700 creditors or other interested entities to be noticed in these cases, including over 400 individuals whose claims relate to alleged instances of abuse and whose names and other identifying information the Diocese is seeking to maintain under seal out of respect for their privacy.  Utilization of a Claims Agent will relieve the Court and the Diocese of a significant administrative burden, and will also provide a

---

[3]   Stretto is the trade name of Bankruptcy Management Solutions, Inc. and its subsidiaries.

3501438.2

mechanism by which proofs of claim can be filed confidentially and by which any party in interest who wishes to effect notice on all creditors, including those whose names and addresses are filed under seal, may do so without the necessity to disclose any confidential identifying information. Moreover, Stretto's expertise in serving as an Administrative Advisor will assist the Diocese in carrying out its duties and obligations under chapter 11, particularly as it relates to soliciting and tabulating votes with respect to a proposed chapter 11 plan of reorganization.

149.    The Diocese respectfully submits that authorizing the relief requested in the Stretto Applications is in the best interests of the Diocese's estate and all parties in interest, and particularly appropriate in this Chapter 11 Case due to not only the large number of creditors and parties-in-interest involved but also due to the confidential nature of many of the claims and claimants' identities.  Accordingly, the Diocese respectfully requests that the Court approve Stretto as both Claims Agent and Administrative Advisor.

## **CONCLUSION**

150.    For the reasons set forth herein, and in the First Day Motions, the Diocese respectfully requests that the Court grant the relief requested in the First Day Motions and provide such other and further relief as the Court may deem just and proper.

3501438.2

Dated:  February 27, 2020

_____
Charles Mendolera
Executive Director of Financial
Administration

Sworn to before me this
27th day of February 2020.

_____
Notary Public

MAUREEN C. RAZMUS
Notary Public - State of New York
Qualified in Erie Co. No. 01RA6286971
My Commission Expires August 5, 2021

3501438.2

Exhibit B

1                UNITED STATES BANKRUPTCY COURT

2                 WESTERN DISTRICT OF NEW YORK

3

4

5

6

- - - - - - - - - - - - - - -x

7   In Re:                                20-10322(CLB)
                                          Chapter 11
8

    THE DIOCESE OF BUFFALO, NY
9                                         Buffalo, New York
                    Debtor               February 10, 2021
10  - - - - - - - - - - - - - - -x

11

12

13

                     TRANSCRIPT OF PROCEEDINGS
14           BEFORE THE HONORABLE CARL L. BUCKI
                UNITED STATES BANKRUPTCY JUDGE
15

16

17

18

19

20  TRANSCRIBER:        Christi A. Macri, FAPR-RMR-CRR-CSR(CA/NY)
                        Christimacri50@gmail.com
21                      Kenneth B. Keating Federal Building
                        100 State Street
22                      Rochester, New York 14614

23

24

25  (Proceedings recorded by electronic sound recording,
    transcript produced by computer).

2

1                        **A P P E A R A N C E S**

2    BOND SCHOENECK & KING, PLLC
     BY: STEPHEN A. DONATO, ESQ.
3        GRAYSON T. WALTER, ESQ.
         CHARLES J. SULLIVAN, ESQ.
4        BRIAN J. BUTLER, ESQ.
     One Lincoln Center
5    Syracuse, New York 13202-1355
                - and -
6    BLANK ROME, LLP
     BY: JAMES R. MURRAY, ESQ.
7    1825 Eye Street NW
     Washington, D.C. 2006
8    Appearing on behalf of the Diocese of Buffalo

9
     JONES DAY
10   BY: JOHN D. GOETZ, ESQ.
     500 Grant Street, Suite 4500
11   Pittsburgh, Pennsylvania 15219

12
     PACHULSKI STANG ZIEHL & JONES, LLP
13   BY: ILAN D. SCHARF, ESQ.
         BRITTANY MICHAEL, ESQ.
14   780 Third Avenue
     34th Floor
15   New York, New York 10017
                - and -
16   GLEICHENHAUS MARCHESE & WEISHAAR, PC
     BY: SCOTT BOGUCKI, ESQ.
17   43 Court Street
     Suite 930
18   Buffalo, New York 14202
     Appearing on behalf of the Official Committee of Unsecured
19   Creditors

20
     GOLDBERG SEGALLA, LLP
21   BY: JOHN SCHAPP, ESQ.
         ADAM DURST, ESQ.
22   665 Main Street
     Buffalo, New York 14203
23   Appearing on behalf of Employers Insurance Company of Wausau
     and Wausau Underwriters
24
     KEVIN BRUN, Member of the Unsecured Creditors Committee
25

3

**A P P E A R A N C E S**

ELSAESSER ANDERSON, CHTD
BY: FORD ELSAESSER, JR., ESQ.
414 Church Street
Suite 201
Sandpoint, Idaho 83864
             - and -
WOODS OVIATT GILMAN, LLP
BY: TIMOTHY P. LYSTER, ESQ.
1900 Bausch & Lomb Place
Rochester, New York 14604
Appearing on behalf of the Parish Steering Committee


OFFICE OF THE UNITED STATES TRUSTEE
BY: JOSEPH W. ALLEN, ESQ.
Olympic Towers
300 Pearl Street, Suite 401
Buffalo, New York 14202


JEFF ANDERSON & ASSOCIATES, PA
BY: STACEY BENSON, ESQ
366 Jackson Street
Suite 100
St. Paul, Minnesota 55101
             - and -
THE LAW OFFICES OF STEVE BOYD
BY: STEVE BOYD, ESQ.
40 N Forest Road
Buffalo, New York 14221
Appearing on behalf of Certain Personal Injury Creditors


JOHNSON & BELL
BY: GLENN FENCL, ESQ.
33 W. Monroe Street
Suite 2700
Chicago, Illinois 60603
Appearing on behalf of National Catholic Risk Retention Group

4

1                      **A P P E A R A N C E S**

2                         - continued -

3   LIPPES MATHIAS WEXLER FRIEDMAN, LLP
    BY: RAYMOND L. FINK, ESQ.
4        DENNIS C. VACCO, ESQ.
    50 Fountain Plaza
5   Suite 1700
    Buffalo, New York 14202-2216
6   Appearing on behalf of Catholic Charities of Buffalo

7
    LAW OFFICES OF MITCHELL GARABEDIAN
8   BY: MITCHELL GARABEDIAN, ESQ.
        MIRRA L. CAMPBELL, ESQ.
9   100 State Street, 6th Floor
    Boston, Massachusetts 02109
10  Appearing on behalf of Richard Brownell, Gail Holler-Kennedy,
    Carolyn Anderson, Wayne Bortle, et al.
11

12  GIBBONS P.C.
    BY: BRETT S. THEISEN, ESQ.
13  One Gateway Center
    Newark, New Jersey 07102
14  Appearing on behalf of Selective Insurance Company of New York

15
    LIPSITZ GREEN SCIME CAMBRIA
16  BY: RICHARD P. WEISBECK, JR., ESQ.
        AMY C. KELLER, ESQ.
17  42 Delaware Avenue, Suite 120
    Buffalo, New York 14202
18

19
    SCHIFF HARDIN, LLP
20  BY: JOSEPH MARK FISHER, ESQ.
        DANIEL J. SCHUFREIDER, ESQ.
21  233 S. Wacker Drive
    Suite 7100
22  Chicago, Illinois 60606
    Appearing on behalf of Catholic Mutual Relief Society of
23  America

24
    ALSO PRESENT:  Peter Starks, Ruth McAllister and Gary Astridge
25

1                    **P R O C E E D I N G S**

2                         *     *     *

3          **THE COURT:** Good afternoon.  This is Judge Bucki.

4    We are here today in the case of the Diocese of Buffalo, New

5    York.  I welcome everyone.

6               Initially let me remind everyone that local

7    bankruptcy rules prohibit the recording or rebroadcasting of

8    any portion of this afternoon's proceeding.  Although we're

9    hearing the matter remotely, those rules -- that rule

10   continues to apply.

11              And I also ask everyone to identify themselves each

12   time that you speak.  That will assist the court reporter in

13   the event that a transcript should be requested by anyone.

14              Having said that, let's -- initially I'd like to

15   have appearances.  Who do I have on behalf of the Diocese?

16          **MR. DONATO:** Yes, good afternoon, Your Honor.  It's

17   Steve Donato from Bond Schoeneck & King.

18              Just an initial question.  We have, I believe, two

19   motions on, which are the special counsel retention motions.

20   I think there are different appearances.

21              If you're also hearing in the aspects of the motion

22   that we filed, docket entry 831, concerning the sanctions

23   motion, we withdrew that motion, but we do have some

24   information to provide to the Court.

25              There's going to be different appearances, so if

1  the Court would -- I can do the appearances for everyone, but

2  obviously for special counsel it will be different appearances

3  versus any issues on the sanctions motion.

4          **THE COURT:** Why don't you tell me everyone that

5  might be appearing and then we'll -- I'll know to expect them

6  to participate if -- if relevant.

7          **MR. DONATO:** Absolutely, thank you, Your Honor.

8          Okay, so for Bond Schoeneck & King it is Steve

9  Donato, Charles Sullivan, Grayson Walter, and I believe Brian

10 Butler is on the line.

11         We also have Jim Murray, who is our special

12 insurance counsel on the line.

13         From Jones Day I believe we have John Goetz.  This

14 would deal, of course, with the special counsel aspect.

15         We also, I believe, have Dennis Vacco on the line

16 in regard to the special counsel retention issues.

17         So I wanted to make sure that the Court was aware

18 of the appearances.

19         As far as Diocesan representatives, I do not

20 believe there's a Diocesan representative on the line, but I

21 wanted the Court to be aware of all the different appearances.

22 So thank you.

23         **THE COURT:** All right, thank you very much.  Who do

24 I have on behalf of the Committee?

25         **MR. SCHARF:** Good afternoon, Your Honor.

1 Ilan Scharf and Brittany Michaels of Pachulski Stang Ziehl &

2 Jones; and Scott Bogucki of Gleichenhaus Marchese Weishaar

3 will be appearing for the Committee today.

4     In addition, I believe there may be Committee

5 members and various state court counsel representing Committee

6 members on the line as well.

7     **THE COURT:** All right, welcome everyone.  Who do I

8 have on behalf of the Parish Steering Committee?

9     **MR. ELSAESSER:** Good afternoon, Your Honor.  Ford

10 Elsaesser and Tim Lyster for the 161 parishes Buffalo, Diocese

11 of Buffalo.

12     **THE COURT:** All right, thank you.  Do I have anyone

13 from the United States Trustee's Office?

14     **MR. ALLEN:** Yes, Joseph Allen for the U.S. Trustee.

15     **THE COURT:** All right, thank you.  And -- and we did

16 have opposition from Mr. Weisbeck and his firm.  Are they

17 appearing this afternoon?

18     **MR. WEISBECK:** Yes, Your Honor, Richard Weisbeck

19 appearing on behalf of Lipsitz Green.

20     **THE COURT:** All right, thank you.  And then anyone

21 else who is appearing, if you could identify yourself, please?

22     **MR. FINK:** Your Honor, Raymond Fink for Lippes

23 Mathias as well, along with Mr. Vacco.

24     **THE COURT:** All right, thank you very much.

25     **MR. FINK:** Thank you, Your Honor.

1          **MS. KELLER:** Amy Keller, Your Honor, also with

2    Lipsitz Green Scime Cambria firm.

3          **THE COURT:** All right, happy to have you.  Thank you

4    for being here.  Anyone else?

5          **UNIDENTIFIED SPEAKER:** Your Honor --

6          **UNIDENTIFIED SPEAKER:** Good afternoon, Your Honor --

7    sorry.

8          **MR. SCHAPP:** Good afternoon, Your Honor.  I'm sorry.

9    John Schapp and Adam Durst on behalf of Employers Insurance

10   Company of Wausau and Wausau Underwriters with respect to the

11   motion regarding the violation of the automatic stay, which --

12   in line with the response we filed yesterday.

13         **THE COURT:** All right, thank you very much.  And who

14   else do I have?

15         **MR. BRUN:** Your Honor, this is Kevin Brun, survivor

16   and member of the Unsecured Creditors Committee.

17         **THE COURT:** Thank you for being here.  Anyone else?

18         **MR. BOYD:**  Your Honor, Steven Boyd, and my partner

19   Stacy Benson from Jeff Anderson & Associates, representing two

20   committee members who are also on the line, Peter Starks and

21   Ruth McCalister; and another client on the line Gary Astridge.

22         **THE COURT:** All right, thank you very much.  And who

23   else?

24         **MR. GARABEDIAN:** (Speaking over each other ).

25         **MR. FENCL:**  (Speaking over each other).

1          **MR. FENCL:** Glenn Fencl on behalf of National

2   Catholic Risk Retention Group.

3          **THE COURT:** On behalf of National Catholic, who do I

4   have?  Who is it again?

5          **MR. FENCL:** Glenn Fencl.

6          **THE COURT:** All right, thank you.  And then I think

7   Mr. Garabedian, you were talking about the same time. Why

8   don't you note your appearance.

9          **MR. GARABEDIAN:** Thank you, Your Honor.  Attorney

10  Mitchell Garabedian.  With me is attorney Mirra Campbell.  We

11  represent a committee member and state court plaintiffs.

12  Thank you.

13         **THE COURT:** All right, thank you.  Anyone else

14  appearing?

15         **MR. THEISEN:** Yeah, good afternoon, Your Honor.

16  This is Brett Theisen of Gibbons PC for Selective Insurance.

17         **THE COURT:** Thank you.  Anyone else?

18         **MR. FISHER:** Your Honor, Mark Fisher and Dan

19  Schufreider of Schiff Hardin on behalf of Catholic Mutual

20  Relief Society of America.

21         **THE COURT:** Thank you.  Who else do I have?  All

22  right, I think we have everyone.

23         I would ask everyone if you're not speaking, to

24  mute yourself because otherwise we tend to get an echo on the

25  system that sometimes can be annoying to the listeners.

1          With that let's proceed initially with the -- with

2    the motion that the Diocese intends to withdraw regarding the

3    alleged violation of the automatic stay.

4          Let me turn first to whoever at Lipsitz Green is

5    going to speak on that question.  I know you're opposing the

6    withdrawal of the motion and I'll let you speak to that.  The

7    general practice of the Court is that if a motion is

8    withdrawn, there's nothing more to be considered, but you did

9    file papers opposing the withdrawal, so I'll let you start.

10         **MR. WEISBECK:** Your Honor, as I set forth -- this is

11   Richard Weisbeck from Lipsitz Green.  As I set forth in the

12   letter to the Court, we also filed documents and an affidavit

13   in opposition to the motion, so the record's clear.

14         But it's our position that given the fact that the

15   Court in December explicitly held that it would impose no

16   additional stay of actions that were initiated by the 35

17   objecting plaintiffs, which we represent, and the bankrupt

18   Diocese has taken action by making representations in state

19   court that some pending motions in those cases involving very

20   routine procedural issues should not be heard because the

21   Diocese was making a motion to sanction us for allegedly

22   violating the automatic stay, even though the Court explicitly

23   held it was not going to impose any additional stay.  And so

24   that's caused even further delay in our state court actions

25   against non-bankrupt entities and individuals.

1        And the -- the Diocese through its counsel sent us

2   a threatening letter that if we undertook actions like moving

3   forward in the state court actions against non-bankrupt

4   entities and individuals, they were going to make a motion to

5   sanction us for doing so.

6        Obviously, our clients and our firm were not

7   intimidated by the Diocese's effort to further -- as far as my

8   clients are concerned further impair their ability to obtain

9   justice as a result of being child victims of sexual assault

10  by Church officials.

11       And the net effect of everything that the Diocese

12  has done for the past year is to prevent us from moving

13  forward and getting our day in court.

14       They make a motion that we think is meritless

15  because the Court explicitly held that no additional stay was

16  going to be applied to those non-bankrupt entities and

17  individuals.

18       We spent very much -- a considerable amount of time

19  and effort preparing responses, and then they seek to withdraw

20  it without prejudice.  So that means today, tomorrow, the day

21  before the motions are going to be heard in state court, they

22  can refile it, they can claim to the state court judge we're

23  back in Bankruptcy Court, we think the stay applies,

24  et cetera, et cetera.

25       And we think that if they're going to withdraw the

1  motion, it should be with prejudice.  Otherwise, we're going

2  to be subject to the whims of the Diocese in terms of

3  harassing our clients and their efforts to move forward in the

4  state court actions against non-bankrupt entities and

5  individuals.

6          And our clients are just tired of that, Judge.

7  They want their day in court and not Bankruptcy Court.  We

8  didn't ask to go to Bankruptcy Court.  They sued our clients.

9  They dragged us into Bankruptcy Court.

10          So we're going to put an end to this and one of it

11  is we want to stop this harassment and the motion should be

12  withdrawn with prejudice.

13          **THE COURT:** Let me ask this: In the meantime I see

14  on the docket that your office filed a motion, but there's no

15  return date for that motion.

16          **MR. WEISBECK:** Yes, forgive me, Your Honor.  We

17  didn't put in the -- we didn't put in the date, and we're

18  still learning bankruptcy procedure both on the regular rules

19  and the local rules.  And I apologize for that.  We're --

20  we're going to set a date.

21          I believe when we spoke to someone in the District

22  Court Office, there was a suggestion we may be able to agree

23  to a date during this hearing, and to make sure it's served

24  properly on all interested parties.

25          **THE COURT:** Okay.

1          **MR. WEISBECK:** And so we're going to refile that

2    with the appropriate date, Your Honor.

3          **THE COURT:** All right, let me hear from Mr. Donato.

4    You're still looking to withdraw your motion?

5          **MR. DONATO:** Yes, Your Honor.  Thank you.  The

6    reason why we withdrew the motion or sent a letter is that we

7    are going to file an action -- let me start.

8          The action -- the motion before you now, docket

9    831, which again we're withdrawing, seeks relief against 23

10   actions commenced by the Lipsitz firm.  It does not seek

11   relief to stop all of the harassment that the Lipsitz firm has

12   been engaging in.

13          We made a determination that it is more appropriate

14   to complete -- to seek complete injunctive relief, to seek to

15   tamp down the coercion that has been implemented by the

16   Lipsitz firm.

17          We will be filing a motion for a temporary

18   restraining order, preliminary injunction.  We will seek to

19   have that returnable before March 8.  March 8 is the next date

20   that the Lipsitz firm is scheduled to go before the Court in

21   order to pursue severance of the actions and continue to

22   harass the Diocese directly and indirectly.

23          So we are withdrawing the motion, but we're gonna

24   refile the motion.  We're happy to try to set a time for that

25   motion right now if the Court wants to do that.

1           What we're asking, however, is that we have a

2     hearing before March 8 because that is when the Lipsitz firm

3     would then be going back to Justice Chimes to seek a motion to

4     sever.

5           Our thoughts are that we are in the process of

6     preparing the temporary restraining order and preliminary

7     injunction.  It seeks holistic relief in order to completely

8     tamp down the Lipsitz firm.  There is no other victim firm

9     that is doing this.

10          As you are aware, that you approved the parish

11    stipulation or stipulations staying third-party actions.  We

12    have an excellent relationship with the Creditors Committee.

13    It is absolutely abundantly unfair to all of the victims that

14    have agreed to focus their efforts on the Diocesan

15    reorganization rather than scattershot the litigation.

16          But today all we're seeking to confirm is that the

17    motion was withdrawn.  However, I'm advising you that we are

18    refiling a motion.  It will seek a preliminary junction --

19    injunction, temporary restraining order.  I'm sure it will

20    also follow-up on the stay violation.

21          And so the thought would be that we withdraw that

22    motion.  Mr. Lipsitz has already done the work in responding,

23    I guess, based on what they filed.  And we can set a hearing

24    maybe on March 4 or 5, thought being that as long as it's

25    before March 8 because that's the next time that they are

1   scheduled to go back to state court.

2          So that is the reason that we withdrew the -- we

3   withdrew the sanctions motion.  We think it is more

4   appropriate to do it within the confines of the adversary

5   proceeding, and to seek complete relief since they are the

6   only problem that we have in regard to the third-party

7   litigation.  It has been relentless by this firm.

8          **THE COURT:** Can I assume, Mr. Donato, that you have

9   seen Mr. Weisbeck's -- or his firm's motion?  Even though it

10  was not -- no date has yet been set for it?

11         **MR. DONATO:** Sure, I did take a look at it and study

12  it.  There was no return date as you indicated --

13         **THE COURT:** -- on the --

14         **MR. DONATO:** -- some kind of motion to compel.

15         **THE COURT:** Is it fair to say that your anticipated

16  new motion would be the mirror image of Mr. Weisbeck's motion,

17  namely, he's essentially seeking confirmation that he can

18  proceed with state court litigation in some form and you're

19  looking to stop state court -- state court litigation in all

20  forms?

21         **MR. DONATO:** Your Honor, I don't remember the motion

22  to compel to have anything to do with that issue.  I thought

23  the motion to -- by the way, when I got it there was no return

24  date.  Exactly maybe the way you did it, I put it down, okay?

25  If there's no hearing date, I got enough things to worry

1    about.

2              But my memory of reading the motion to compel was

3    that they indicated that they were looking to conduct some

4    discovery, and that they were complaining about the fact that

5    we had not yet provided that discovery.  I don't think there

6    was any -- any aspect of that motion that sought any

7    clarification in regard to their violations of the stay.

8              In fact, you actually set the stage in your

9    decision approving the stipulation staying third-party

10   litigation in which you specifically observed that there could

11   be a stay violation under Section 362, and you specifically --

12   I don't know if you invited, but you observed that maybe it

13   made sense for Lipsitz to secure clarification.

14             As is their custom, you can tell by the way counsel

15   speaks, as is their custom, they don't care about anything.

16   So they just continue to plot ahead, notwithstanding the fact

17   that they were violating the automatic stay.

18             And I don't believe the motion to compel has

19   anything to do with what we're seeking.  So when you say a

20   "mirror," that's the piece that I'm hesitating on.  I made the

21   initial statement, I read the motion, I put it down.  I got

22   enough fires to deal with.

23             When I get a return date, I can properly address

24   it, but that's my memory of reading that motion to compel.

25   It's a discovery motion.  It is not a motion seeking

1   authorization to pursue state court action.

2               **THE COURT:** Okay.  So no stay relief request?

3               **MR. WEISBECK:** May I be heard, Your Honor?

4               **MR. DONATO:** There's no stay --

5               **THE COURT:** Yes, go ahead.

6               **MR. WEISBECK:** All right.  First of all, Judge, the

7   bankrupt Diocese started adversarial proceedings against our

8   clients.

9               Last summer we demanded discovery.  We followed up

10  with that.  Mr. Donato ignored every one of our demands and

11  requests to get documents and deposition dates.  So we filed

12  now a motion in the adversarial proceeding to compel discovery

13  and for other relief.

14              We have not sought any further information --

15  relief concerning our motions to you, Judge, because you

16  explicitly held there is no stay.

17              So contrary to Mr. Donato's statement that Lipsitz

18  Green violated the stay, that's a false statement.  We didn't

19  need any clarification because we are not obtaining possession

20  of property of the bankrupt estate, we're not obtaining

21  property itself, or exercising control over the property.

22              And, therefore, even though Mr. Donato appears to

23  want to argue the motion, it's clear that we didn't violate

24  anything, and that's why they withdrew the motion.

25              But he did say something interesting.  He's going

1   to follow-up with the sanctions motion and he wants to do it

2   again, which will further delay the prosecution against

3   non-bankrupt entities who have no right to a stay.

4              So he wants to do it so that this keeps delaying

5   the state court action.  This is their strategy.  It's very

6   apparent that the Diocese has decided that we're going to do

7   everything we can to impair the pursuit of judgment by child

8   victims of sexual assault committed by Church officials

9   against non-bankrupt entities, and that's what they're doing.

10             He's now decided -- even though he lost, even

11  though the Diocese lost its motion before you in December,

12  they're really going to do it all over again and ask for

13  exactly the same relief on the same grounds that they did when

14  they failed to prevail.

15             And this is now -- we would have had the motions in

16  state court heard in early January or mid-January.  Now they

17  want to argue a motion in March, you'll have to make a

18  decision, they're gonna write to the judge in state court, oh,

19  we're asking for a TRO, we're asking for a preliminary

20  injunction.  They did that last summer and they failed to get

21  it extended and they failed to have evidence to support their

22  motion.

23             So now six months after it expires, in a further

24  effort to frustrate our clients' efforts at justice, they're

25  going into Bankruptcy Court again and asking for the same

1 relief.

2          At some point in time they just have to be told no,

3 stop harassing these child victims.

4          **THE COURT:**  But, on the other hand, I mean, we have

5 no motion on your part for stay relief as of this point.

6          **MR. WEISBECK:** I don't have anything that's stayed,

7 Your Honor.  There's nothing stayed.

8          **THE COURT:** All right.

9          **MR. WEISBECK:** There's no stay --

10         **THE COURT:** Mr. Weisbeck, let me ask you this --

11         **MR. WEISBECK:**  -- against non-bankrupt entities.

12         **THE COURT:** Let me ask you this question: Mr. Donato

13 represented his understanding that your next hearing in state

14 court is set for -- I believe he said March 5 --

15         **MR. DONATO:** March 8.

16         **THE COURT:** Or March 8.

17         **MR. DONATO:** March 8.

18         **THE COURT:** All right.  Is that correct, Mr.

19 Weisbeck?

20         **MR. WEISBECK:** Let me -- I don't have that at my

21 fingertips, but let me check the calendar, Your Honor, if you

22 give me one -- a couple seconds, I'd appreciate that.

23         I believe that's correct.

24         **THE COURT:** All right. I'm going to give you -- I'm

25 not going to decide anything about this dispute between the

1  plaintiffs represented by the Lipsitz firm and the Diocese.

2            What I am going to do is give you a hearing date

3  both on the motion that -- that has been filed by Mr.

4  Weisbeck -- and in all honesty, I did not study that motion.

5  I was aware that it was filed without a return date, and so I

6  appreciate the -- without commenting on the accuracy thereof,

7  I appreciate at least the -- your understanding of the motion.

8            But I think -- I'm looking for a hearing date in

9  the first week of March.  Let me ask about your availability.

10           **MR. DONATO:** We're available on March 4, March 5.

11  We have to obviously prepare the papers, which we need to get

12  filed, et cetera.  So I don't know if March 4 or 5 would work

13  for the other side, Your Honor.

14           **MR. WEISBECK:** We also want time to respond.  We

15  need time to respond as well, Your Honor.

16           **THE COURT:** All right.

17           **MR. DONATO:** It's a hearing date, Mr. Weisbeck.  We

18  would file the motion the week before, give you an

19  opportunity.

20           **THE COURT:** Our bankruptcy rules generally require

21  notice and those rules speak for themselves.  So you would get

22  the -- generally a motion of this type would have to be mailed

23  at least ten days in advance, and I urge you to have due

24  consideration for both sides in anticipating this motion.

25           And I would also add that -- that I'm not

1   necessarily accepting any of the representations you've made

2   on either side.  I'll reserve all of those, but I think that

3   this matter should be considered.  I would suggest March 4

4   at -- at 2 o'clock.

5           **MR. DONATO:** That's okay -- that's okay here, Your

6   Honor.

7           **THE COURT:** Mr. Weisbeck?

8           **MR. WEISBECK:** Yes, Your Honor.

9           **THE COURT:** I'll consider all of the motions that

10  you may wish to make.

11          I will just point out that both in -- I've twice --

12  not directed, there's no direction here, but I pointed out to

13  both sides that you had an opportunity to go and present this

14  whole issue to the Court.  I did that in my decision of

15  December 7; and I also did that in my -- in my decision of --

16  in my written decision on July 2nd in the one instance where I

17  said I was prepared to put the -- to conduct a prompt trial on

18  the question of an extension of the stay that the Diocese

19  might be seeking, and also that I would quickly hear any

20  requests for stay relief, a comfort order so to speak.

21          But what I'll do on both instances is we'll put all

22  of this over until March 4 at 2 o'clock.

23          **MR. DONATO:** Thank you, Your Honor.

24          **THE COURT:** All right, thank you.

25          All right, with that let's now turn to the, I

1   guess, the featured attraction for the day, and that's the

2   application for appointment of counsel.

3          Mr. Donato, I'll let you go first.

4          **MR. DONATO:** Thank you, Your Honor.  As far as the

5   featured attractions, we have two applications pending before

6   Your Honor today:  One is the application to appoint Jones Day

7   as counsel to help for our legal services for the Attorney

8   General action; and also to retain the Lippes Mathias firm --

9   you had me reference Mr. Vacco -- to also assist in regard to

10  the Attorney General litigation.

11         So, first of all, Your Honor, if it's okay, I'd

12  like to address the Jones Day retention first unless you have

13  a preference, if that's okay?

14         **THE COURT:** That's fine.

15         **MR. DONATO:** Before the Court are several documents

16  that we filed.  I just want to make sure the record is clear

17  as far as what we did.

18         So there is an initial motion that was filed at

19  Docket No. 785 on December 22, that also contains a

20  declaration -- obviously application from the debtor; and then

21  a declaration or affirmation from John Goetz, who is the lead

22  counsel at Jones Day, proposed counsel, that's at 785-2; we

23  also filed a supplemental declaration from Mr. Goetz, which is

24  Docket No. 825.

25         In addition to that, we filed a memorandum of law

1 which addressed some of the issues that you raised at the

2 hearing on January 13; and we also filed a supplemental

3 declaration from Bishop Fisher.  So just the record is clear,

4 that's docket 874; the supplemental memorandum of law is

5 docket 875.

6           Now, in response -- and that's just on Jones Day,

7 Your Honor.  And in response to all those documents, we have

8 several responses.  We received a United States Trustee

9 objection under docket 839; and we received a Creditor

10 Committee objection, Docket No. 818.

11           So before the Court is an application to retain

12 Jones Day.  It deals with the lawsuit that was commenced by

13 the Attorney General.  That lawsuit was commenced on January

14 23rd of 2020.  There are four defendants named in the Attorney

15 General suit.  The defendants are the Diocese of Buffalo; the

16 Bishop of the Diocese of Buffalo; and then two former bishops

17 of the Diocese of Buffalo, which is Bishop Malone and

18 Bishop Gross.

19           In regard to Jones Day, the request is to have the

20 Jones Day firm be authorized to act as counsel for two of the

21 four defendants.  I would -- I would call them bereaved

22 defendants, which is the Diocese and, of course, the Bishop

23 for the Diocese.

24           And as Your Honor's aware, recently Bishop Michael

25 Fisher was -- was -- joined the Diocese and he is now the

1  Bishop -- officially the Bishop of the Diocese.

2          So we are requesting that the Court approve the

3  retention of Jones Day to represent those two defendants.  As

4  the Court is aware, the Attorney General's suit seeks

5  injunctive relief for alleged violations of the religious

6  corporation law and New York not-for-profit law.

7          There are concerns that the Attorney General

8  actions impact First Amendment rights.  As part of the

9  supplemental declaration that was filed by John Goetz,

10  Docket No. 825, Mr. Goetz gets into some detail in regard to

11  the potential infringement of the First Amendment rights for

12  the Diocese, including the possibility of the exercise of

13  state control in regard to internal Diocesan (indiscernible).

14          Now, I'll take a step back.  The goal of the

15  Diocese is to settle this litigation.  The goal of the Diocese

16  is to seek a swift resolution, if at all possible.  Once --

17  once counsel is onboard, we intend to discuss with the

18  Attorney General that many of the things the Attorney General

19  requests are already in place.  The protective measures that

20  have been in place for years continue to be.

21          However, we do believe that the -- the gravity of

22  the potential issues before the -- before the Court facing the

23  Diocese warrant the retention of Jones Day to represent, as I

24  said, the Bishop and the Diocese of Buffalo.

25          At present the Attorney General has set some

1   deadlines.  Mr. Goetz was gracious and has sought to extend

2   deadlines, but the deadline at this point to at least respond

3   to the -- to the complaint is fast approaching.  I believe

4   it's the latter part of February, like February 26th.

5             There have been requests and attempts to extend

6   that time, but as I understand it -- and Mr. Goetz is on the

7   phone in case Your Honor has any questions for him, that -- we

8   have not received an agreement to further extend.

9             Again, the goal of the Diocese is to see if there's

10  a way to resolve this matter on an expeditious matter

11  primarily because most of the relief that is sought is already

12  in place.

13            The application before you does seek a

14  *nunc pro tunc* approval back to December 1.  And as set forth

15  in the application and the amended documents that we filed,

16  the proposed compensation -- the standard rates are set forth

17  in the engagement letter in the application.

18            And originally at the request of the Diocese,

19  Jones Day granted the Diocese a 10% discount.  In view of the

20  Creditors Committee objection and -- and discussions between

21  the Bishop and the representative of Jones Day, Jones Day has

22  actually doubled that discount so that now they're offering a

23  20% discount off of their, you know, standard rates.

24            Now, attached as Docket No. 874-1 is the -- the new

25  or latest Jones Day engagement letter.  That is the letter

1   that controls their retention, filed it with Bishop Fisher's

2   declaration.  But I wanted the Court to be aware that that is

3   the -- there are other engagement letters that have actually

4   been filed earlier in the action, but the one that controls is

5   the one that I just referenced, which as I said is

6   Docket No. 874-1.

7          You will see when you review that engagement letter

8   that the 20% discount has been implemented.  So it's expressly

9   provided there.  And a paragraph that the United States

10  Trustee had had some issues with, was formerly referred to as

11  paragraph 4, which was an advance waiver, has been completely

12  deleted.  So that the retention letter does not have any of

13  the advance waiver provisions that the U.S. Trustee did raise

14  and object to.

15         So I'm pleased to report that I believe that the

16  U.S. Trustee concerns in regard to Jones Day retention are

17  resolved because the -- of the modified and amended retention

18  letter.

19         And as you'll see when you have a chance to look at

20  that letter, that letter supersedes all other engagement

21  letters.  So the one at 874-1 is the controlling retention

22  letter.

23         At the hearing on January 13 the Court had set

24  forth several concerns.  Some of those concerns I believe

25  dealt with -- some with Jones Day and some with Lippes

1  Mathias.

2          In studying the notes from the Court hearing, we

3  believe that the Court expressed several concerns in regard to

4  the general Jones Day retention, which is it in the best

5  interest of the Diocese to retain Jones Day.  And you asked

6  for that to be reviewed and report back to you.  You also

7  asked that the scope of the retention be clarified.

8          And in the supplemental declaration of Bishop

9  Fisher, which is Docket No. 874, you will see that Bishop

10 Fisher reiterates that the Diocesan's judgment utilizing its

11 business judgment, that based on the serious issues of

12 potential Attorney General actions to exercise state control

13 over internal church operations and the First Amendment

14 ramifications, that a firm of the caliber and quality of

15 Jones Day is the proper choice.  And Bishop Fisher did sign

16 that declaration and file it and reiterated that, in his

17 opinion, it's in the best interest of the Diocese to -- to

18 move forward with the retention of Jones Day.

19         We did also provide that the scope of the Jones Day

20 retention is limited to the Attorney General suit and

21 everyone's clear about that and everyone's comfortable about

22 that.  So there's not gonna be a situation where Jones Day

23 might be working in other aspects of this overall case.  It's

24 focused on the Attorney General suit.

25         And I thank Mr. Goetz because when we first got

1    involved with the case, we had very, very short deadlines and

2    he got in the middle of this and extended these deadlines out

3    until late February, but at this point those deadlines are

4    approaching.

5            I would -- I wanted to observe -- I believe that

6    the U.S. Trustee objection is resolved.  And the Committee

7    objection, which -- well, was very involved, really asked two

8    questions, which is why retain another law firm?  And I think

9    that Bishop Fisher addressed that in his supplemental

10   declaration.

11           And why incur the additional cost?  I think that

12   was also addressed, but also Jones Day was gracious in

13   offering a total of 20% discount off of their standard rates.

14           Based on this, I respectfully request the Court

15   enter an order -- now it is a 327(a) order because 327(e) --

16   it doesn't -- it doesn't apply because 327(e) does have that

17   provision that talks about being retained as special counsel

18   if you served in some capacity as counsel to the Diocese, you

19   know, before that time.  And with Jones Day, of course, they

20   have not been involved before.

21           So although it's a 327(a) retention, it's really a

22   special counsel retention because the scope is refined and

23   focused to specifically Attorney General issues only; and the

24   other professionals that have been retained in the case will

25   continue their roles, like litigation counsel or restructuring

1   counsel.

2             So at this point I would respectfully request that

3   the Court approve the retention of Jones Day in order to

4   address the Attorney General issues.

5             **THE COURT:** Mr. Donato, you and your partners were

6   very persuasive in -- last April when you made your own

7   application for appointment, and I'm specifically looking at

8   the affidavit of -- let's see here, Charles Sullivan.  And

9   that includes in paragraph 4 -- this is an affidavit that was

10  dated April 6th, 2020, and it includes the following: That

11  your representation -- that your representation would include,

12  and I'm quoting here, taking all necessary actions to protect

13  and preserve the Diocese's estate, including the prosecution

14  of actions on the Diocese's behalf, the defense of any actions

15  commenced against the Diocese.  So you persuaded me back then

16  that your firm was well-positioned to handle a piece of

17  litigation like this.

18            And then I was also persuaded in another

19  application that was submitted by -- by the Connors firm which

20  specifically referenced the investigation by the State

21  Attorney General and asked that they be appointed to handle --

22  be involved in litigation involving that component of the

23  potential litigation against the -- against the Diocese that

24  might be commenced by the State Attorney General.

25            So haven't we already addressed these questions and

1 | provided for adequate representation?

2 | **MR. DONATO:** Well, Your Honor, I don't have the

3 | affidavit that we submitted for our retention.  Our firm is a

4 | full service law firm.

5 | But the client has made a determination that under

6 | the circumstances, it believes that the, you know, the

7 | consequences are so potentially grave, that it has requested

8 | to retain Jones Day.

9 | You know, a client's decision to select its own

10 | counsel, you know, is a cherished and important right.  No

11 | question there are impacts if that client is in Chapter 11.

12 | So I don't disregard that.

13 | But I do believe that in view of the declaration

14 | filed by Bishop Fisher, that the determination made by the

15 | Diocese -- not made by Bond Schoeneck & King -- the

16 | determination made by the Diocese is that under these

17 | circumstances, I guess its asking for an opportunity to have

18 | Jones Day handle this work.

19 | And so could our firm handle the work?  I guess so.

20 | But we haven't been asked to, and that is -- so I would

21 | respectfully request that the determination made by the Bishop

22 | utilizing the business judgment rule would warrant the Court

23 | approving Jones Day for this limited special purpose

24 | retention.

25 | **THE COURT:** We did have opposition filed.  Let me --

1  let me turn first to the U.S. Trustee.

2          Mr. Allen, are your concerns resolved now and do

3  you have other concerns?

4          **MR. ALLEN:** Joseph Allen for the U.S. Trustee.  Your

5  Honor, our concerns have been fully resolved.

6          Before we filed our objection, we actually voiced

7  some disclosure concerns with Jones Day, and those have been

8  resolved with the supplemental declarations.

9          What had remained was our concerns about paragraph

10 4 of the engagement letter, which was the waiver of future

11 conflicts, and that has been resolved now by Jones Day

12 withdrawing that entirely.

13         So as of now we have no -- no objection to

14 Jones Day being approved by the Court.

15         **THE COURT:** Let me ask the Committee.  What is your

16 current position?

17         **MR. SCHARF:** Your Honor, Ilan Scharf, Pachulski

18 Stang Ziehl & Jones, on behalf of the Committee.

19         The Committee continues to oppose the retention of

20 Jones Day as set forth in the application.

21         **THE COURT:** I read your written response -- your

22 written suggestion.  Anything you'd like to add?

23         **MR. ALLEN:** Yes, Your Honor.  I was encouraged to

24 hear Mr. Donato say that the Diocese's objective here is to

25 settle.

1          But, Your Honor, I think you hit the nail on the

2     head with your question at the last hearing as well as your

3     follow-up questions today, which is should the Diocese be

4     hiring another law firm at this point when it has qualified

5     and competent counsel who are available, who have already been

6     retained to represent its client and the Diocese in this

7     capacity in the A.G.'s lawsuit, and the answer is a resounding

8     no, Your Honor.

9          We have to look at the A.G. lawsuit.  The Attorney

10    General's lawsuit was brought because the Diocese failed to

11    live up to its own standards to protect children and the

12    community.  It has rules and (indiscernible) in place that it

13    failed to live up to.

14         And, frankly, that's why we are here, Your Honor,

15    in a Chapter 11 case with hundreds of child victim acts

16    commenced against this Diocese and hundreds more that have

17    been -- that have not been commenced, but are likely to file

18    claims.

19         And, Your Honor, the Diocese failed and that is why

20    the Attorney General brought her lawsuit.  And now the Diocese

21    is looking to avoid that responsibility -- or potentially

22    avoid that responsibility through retention of Jones Day.

23         Jones Day is a large multi-national law firm.

24    Every attorney in this room knows their reputation.  Every

25    attorney in this room knows who they are.  And, frankly, Your

1   Honor, we're not objecting to their qualification.  We have

2   not said one scintilla about objecting to that.

3          Our concern is that if the Diocese retains a law

4   firm at these rates with these -- with this reputation, they

5   are essentially bringing a tank to a negotiation instead of

6   trying to negotiate.  That is the signal they are sending and

7   that signal goes beyond just the Attorney General's lawsuit

8   and reverberates throughout the survivor community that this

9   Diocese is hiring a law firm to fight against child

10  protections.

11         And, Your Honor, as we stated in our papers, you

12  have to look at this complaint in two parts.  There are the

13  allegations, which are awful; and then there is the relief

14  requested, which is injunctive relief, which essentially says

15  the Diocese should live up to its own rules and would like a

16  monitor in place to assure that it is doing so.  Not to direct

17  it to do so, but to assure that it is doing so.

18         And estate resources should not be used to avoid

19  child protection -- child protection measures, even if it's

20  under the guise of constitutional law or First Amendment

21  issues or religious freedom issues, Your Honor.

22         Frankly, the Diocese's relief request -- should be

23  agreeing and negotiating to that relief request without trying

24  to bring in a large multi-national law firm.

25         The question here, Your Honor, at the end of the

1  day under the Bankruptcy Code is whether this retention makes

2  sense for the Diocese and whether this retention makes sense

3  here.

4          And I don't think that it is -- I think that any

5  attorney who has practiced law will know that if you bring

6  another law firm in, there is going to be inefficiency.

7  Jones Day did not represent the Diocese in this matter for the

8  petition.  It will have an institutional learning curve with

9  respect to understanding this Diocese.  It will have a

10 learning curve in getting up to speed.

11         And there have been counsel who have been retained

12 who already have that knowledge, and there will be

13 inefficiency created at substantial cost to this Diocese that

14 appears to be coming right out of the pockets of the assets

15 that are available to fund a creditor recovery.

16         And, therefore, Your Honor, we believe that it

17 would be in the Diocese's best interest as well as the

18 interest of its constituencies, the creditor constituency, to

19 deny the application.

20         That's all I have on that, Your Honor, subject to

21 any questions Your Honor would have.

22         **THE COURT:** So of course -- let me ask a question

23 about standard for review.

24         **MR. ALLEN:** Mm-hmm.

25         **THE COURT:** What is the standard for my review? It's

1 rather clear or at least you make a persuasive argument, I'm

2 not saying clear, but you make a persuasive argument that from

3 the perspective of creditors, that this decision to -- to

4 respond to the State Attorney General's action in the way

5 they're proposing may be costly and -- and -- and expend funds

6 that would otherwise be available to resolve the claims of

7 creditors so that the position of creditors may be or you

8 suggest from the perspective of creditors, this is a bad

9 request.

10          But, on the other hand, the Diocese has other

11 concerns beyond satisfaction of creditors.

12          **MR. ALLEN:** Mm-hmm.

13          **THE COURT:** And they have their own -- other

14 concerns as a Diocese.  They may have -- and I don't know this

15 one way or the other, there may be concerns for the other

16 dioceses that are within the -- under the supervision of the

17 Archdiocese of New York.

18          I don't know that one way or the other, but it may

19 be -- aside from the rights of creditors, there may be an

20 interest of the Diocese -- I'm not saying that there is, but

21 there may be an interest of the Diocese in pressing this in

22 the way they propose.

23          So the question I'm asking you is who is -- what's

24 the standard?  Is the standard strictly one of what's in the

25 best interest of creditors?  Or is it more broadly what's in

1   the best interest of a debtor who may be and hopefully some

2   day will have a confirmed plan and be out of Chapter 11

3   supervision?

4           **MR. ALLEN:** Sure, Your Honor.  I think that it's a

5   difficult question to answer because Section 327 is a little

6   bit (indiscernible) -- is admittedly, (indiscernible) written.

7   The trustee and the debtor may employ counsel, and the

8   restrictions in that -- in Section 327 really pertain to

9   (indiscernible) and disclosures.

10          But I think that there's a couple of different ways

11  to look at this, Your Honor, as a standard.  First might be

12  the business judgment.  As Mr. Donato stated, the Diocese is

13  making this decision in its business judgment, according to

14  Mr. Donato, and business judgment is always subject to review

15  by a court with respect to a Chapter 11 debtor.

16          And, here again, given the -- the fact that

17  long-term counsel for the Diocese has been retained, counsel

18  for the Diocese has represented it prior to and during this

19  Chapter 11 case, has been retained, that institutional

20  knowledge is there, the knowledge regarding the investigation

21  is already in the hands of existing counsel, and there is no

22  reason to bring in another set of attorneys which would create

23  tremendous inefficiency simply to send a signal that we are

24  trying to fight this because we believe that religious

25  freedom -- because we're going to stand on religious freedom

1  and our First Amendment rights and hire a person who has

2  specific experience of that in this context.

3           And, frankly, it's not just the experience.  It is

4  the fact that it is a large multi-national law firm.  They are

5  sending a signal to the Attorney General that they are going

6  to fight this and they're going to have all the resources

7  available to fight this when, frankly, they already have

8  sufficient -- more than sufficient resources to fight this in

9  terms of attorney qualifications and power.

10          So it would fail under a business judgment rule

11  given that the inefficiencies it's ultimately creating and,

12  frankly, the increased cost even with a 20% discount compared

13  to existing counsel.

14          And, Your Honor, to the extent this is being

15  coordinated -- I think Your Honor said something about the

16  Archdiocese of New York, to the extent that this is something

17  that the Cardinal wants or that the New York Conference of

18  Bishops wants, I suspect they could hire Jones Day and go file

19  an amnesty brief.  So with that said, I think again business

20  judgment, it fails.

21          And then, you know, as a practical matter, Your

22  Honor, the question again becomes you have a standard

23  different than business judgment, why are we creating

24  inefficiency and assume costs to the Diocese that has already

25  spent hundreds of thousands of dollars on this investigation

1    in all likelihood to create a situation where they're going to

2    have to spend more than that at higher rates to gain that same

3    set of knowledge as to what happened here and deal with this

4    lawsuit.

5            **MR. DONATO:** Your Honor, may I be heard when

6    appropriate?

7            **THE COURT:** I will.  Just give me -- I'm looking

8    through my notes here.  Bear with me a moment.

9            **MR. DONATO:** Absolutely.

10           **THE COURT:** I am somewhat concerned and I want to

11   hear from the Committee for a moment more.

12           **MR. DONATO:** Sure, of course.

13           **THE COURT:** We have a case of *In Re: Mandel*, which

14   is an old case from 1934, but it's a Second Circuit case that

15   dealt with this question, and it essentially said that the

16   Court -- Bankruptcy Court should not interfere as a general

17   rule, except for very good reason, in the selection of counsel

18   or the right of a debtor to choose -- or a trustee to choose

19   counsel, suggesting that it's a rather high standard for me to

20   go and substitute or reject the business judgment of the

21   trustee.

22           I gather you feel that that -- that that high

23   standard of review can be -- or high standard of review is

24   satisfied in this particular fact pattern?

25           **MR. ALLEN:** I think it is, Your Honor.  My

1    recollection of *Mandel* was that it dealt with a very specific

2    local bankruptcy rule that in fact that it was under the act

3    that essentially said the Court is not bound by what a trustee

4    wants with respect to professional retentions and can overturn

5    it.  You know, and again that was a blanket rule -- that was

6    part of the bankruptcy rules at that time or local bankruptcy

7    rules at the time.

8            Here, Your Honor, again, there's -- there's a

9    reason that courts have to approve applications, and part of

10   that is to avoid inefficiency.  You know, whenever there are

11   co-counsel retained in cases, it's pretty standard language to

12   say counsel, co-counsel or different sets of law firms will

13   undertake best efforts to avoid duplication of services, et

14   cetera.

15           Here the -- and here the Diocese is looking to

16   bring in somebody new, a new law firm, to replace two law

17   firms in a particular matter when those two law firms -- and I

18   think the (indiscernible) -- I mean the Diocese in connection

19   to this investigation for years now, that those two law firms

20   have been involved in these issues, are qualified to -- more

21   than qualified to represent the Diocese in this issue in terms

22   of their skill sets and, frankly, their size and -- and their

23   understanding of the Diocese.

24           And here they're looking to replace them, so they

25   create this inefficiency that no matter what (indiscernible)

1  is paid to law firms avoiding duplication of service, there

2  will be automatic duplication of service because Jones Day

3  will not be able to represent this Diocese without -- if not

4  recreating, reviewing or gaining an understanding of an

5  institution.  And this investigation and the A.G.'s lawsuit

6  and the facts that are alleged in there that the two law firms

7  currently representing the Diocese already have.  So there's

8  just built-in inefficiency.

9         And I think in *Mandel* there was a -- my

10  recollection is *Mandel* there was a rejection of an employment,

11  but I think somebody who was a long-term attorney for the --

12  for the company or for the trust -- for the company.  So I

13  think that that would be a distinguishing factor as well.

14         **THE COURT:** You're correct on the facts.  It's more

15  the *dicta* at the end of the opinion that's troublesome.  And,

16  unfortunately, we don't have much -- much guidance from the

17  text of Section 327(a) from the Bankruptcy Code in terms of

18  what the standard is.

19         Is the standard the best interest of creditors or

20  is it standard of best interest of the estate, (indiscernible)

21  the estate that focuses on life beyond Chapter 11.

22         **MR. ALLEN:** So, Your Honor, I think this fails under

23  either standard and I think that from creditors' perspective,

24  it's clearly not in the best interest of creditors and

25  especially of the survivors.

1          But, you know, which is important, but let's take

2    even I think a higher standard of best interest of the estate

3    as a whole, again, the level of inefficiency that is just

4    built into this is beyond anything that's appropriate to

5    burden this estate with.

6          And, frankly, in addition, Your Honor, the

7    objective here, as the Diocese has stated, is a settlement to

8    essentially -- which should essentially be the Diocese

9    agreeing to live up to its own standards.  To say this is our

10   standard, we agree to live up to our standard and having a

11   monitor of some sort appointed, these are probably the bare

12   minimum that the Diocese should be doing to protect children

13   and the community.

14         And, frankly, in the experience of everybody who

15   has represented childhood abuse survivors -- survivors who

16   have been abused by clergy affiliated with the Catholic

17   Church, the Church's norms and standards are inadequate in the

18   big picture to protect children, and there's far more they

19   could and should be doing.

20         So this is not a case where it's in the best

21   interest of this estate to load up or bear -- and load up for

22   very serious litigation on an issue where the estate should be

23   agreeing with every -- every piece of injunctive relief

24   requested.

25              **THE COURT:** Well, aren't we mixing in really two

1  separate issues?  And I reviewed the State's complaint.  To

2  the extent that the State is looking to exercise -- or to

3  impose additional review or safeguards, shall we say --

4              **MR. ALLEN:** Mm-hmm.

5              **THE COURT:** -- against prospective abuse, that's a

6  policy decision as to whether or not that's good or bad.  Does

7  it interfere with First Amendment rights?  Is it a good policy

8  decision in order to prevent future abuse?  That's a policy

9  question.

10              And is it within the proper review of -- of the

11  Court -- of this Court to decide that policy issue at this

12  time as opposed to whether or not counsel is good or bad.

13              I mean, is there a question in your mind -- I have

14  a sense from your argument that you're even questioning why

15  the Diocese is choosing to oppose the Attorney General's

16  request or demand for greater safeguards.  Is that really the

17  issue?

18              **MR. ALLEN:** Yes, Your Honor.  Yes, Your Honor.

19  The -- and, look, the Committee very seriously questions why

20  this is being presented as -- why the Diocese is going to

21  oppose this in any way, shape or form, and -- but that is not

22  the only issue before the Court .

23              Again, the -- the -- when we're in Bankruptcy

24  Court, unfortunately, we have to boil things down in many

25  instances to dollars and cents.  And the dollars and cents

1  issue here and the question of best interest of this estate,

2  when looking at it through that perspective, boils down to

3  this question of efficiency where there will be something that

4  is going to -- or likely will be at least six figures and

5  possibly seven figures of expense getting to the same point

6  that counsel that have currently been employed are already at.

7  So they're not starting off with the same baseline.

8          And we have again two competent firms.

9  Mr. Donato's firm, as Your Honor pointed out his affidavit,

10 has been retained for these purposes; and in addition, as we

11 showed in our papers, has more than enough expertise in

12 dealing with this type of investigation.

13         **THE COURT:** All right. Before I -- Mr. Donato, I

14 know you want to speak and I'll go back to you, but I want to

15 hear the other objectors first and then give you an

16 opportunity to respond to all of them at once.

17         I know that the Lipsitz Green office filed an

18 objection.  Is there anything you want to say in addition to

19 the comments already made?

20         **MR. WEISBECK:** Thank you, Your Honor.  This is

21 Richard Weisbeck.  At least with respect to the -- the Diocese

22 defending itself in the State action, I would join in

23 everything the attorney for the Creditors Committee stated.

24         And I would just add that the bankrupt Diocese has

25 made representations to you that not only do they want to

1   resolve this claim by the State Attorney General, but most of

2   what the Attorney General is asking for is already in place.

3           And if that's true, then the negotiations to

4   resolve this by basically saying, look, we have most of this

5   in place so we'll stipulate that -- to abide by this, that

6   does not take a law firm charging eight to nine hundred

7   dollars an hour to negotiate.  And that this would be a waste

8   of assets that could be used to compensate the victims of

9   sexual assault committed by former Church officials on

10  children.

11          So from the perspective of wasting assets, we would

12  think that it's -- the application should be denied and the

13  current attorneys should negotiate the settlement which would

14  be easy given that all these remedies supposedly are already

15  in place.

16          Thank you for allowing us to speak on this issue,

17  Your Honor.

18          **THE COURT:** All right. Is there anyone else that

19  wants to speak on this issue in opposition before I turn back

20  to Mr. Donato?

21          All right, Mr. Donato, your turn.

22          **MR. DONATO:** Thank you, Your Honor.  Several

23  observations.  First of all, the right of a client to select

24  counsel of his or her choosing is an extremely important

25  right.

1            As I acknowledged during our discussion, I think

2   that right is impacted if the client is in a Chapter 11.  But

3   I still believe that that concept is something that should

4   prevail in regard to these issues.

5            The Creditors Committee talked about the business

6   judgment and basically questioned the Diocesan's business

7   judgment -- in a very professional manner, but that doesn't do

8   it, okay?  The business judgment standard is a standard that

9   courts will generally recognize a business decision provided

10  that the decision is made on an informed basis in good faith

11  and an honest belief that the actions, you know, proposed are

12  in the best interest of the entity.

13           The supplemental declaration submitted by Bishop

14  Fisher who is now the, you know, the Bishop -- it's not the

15  prior Bishop, this is the new Bishop, has on his own spoken

16  with Jones Day, spoken with us, reviewed alternatives, and

17  made that decision utilizing the business judgment standard.

18           Having an attorney appear today to just say, you

19  know, we don't like that, that doesn't (indiscernible) in a

20  business judgment standard so long as the decision was made on

21  an informed good faith basis and that an honest belief that

22  it's in the best interest of the operations.

23           That -- that's the business judgment standard.

24  There's nothing here to rebut that.  Bishop Fisher is new.  He

25  has spent an inordinate amount of time trying to get up to

1   speed on what's transpired here.  He's going to be named as a

2   defendant in a lawsuit.  He's been, you know, he's been the

3   Bishop for a couple weeks.

4           But it's his judgment, it's the Diocese's judgment.

5   I respectfully submit that the business judgment standard has

6   been met and there's been no challenge.  Someone just saying,

7   like Mr. Weisbeck, you know, Your Honor, it doesn't meet the

8   standard, I mean, that does nothing, okay?

9           There is a good faith, sworn declaration submitted

10  by the Bishop directly in response to some of the concerns

11  that were raised at the hearing on January 13th.  So I start

12  off by saying the right to select counsel is sacrosanct.

13          Could it be any (indiscernible) in a Chapter 11?

14  Yes.  Once it's -- once it's embraced by the business judgment

15  and a thoughtful, you know, process, as I just went through

16  and as set forth in the declaration of Bishop Fisher, I think

17  the business judgment has been satisfied, and I respectfully

18  believe that the Court should honor that business judgment.

19          I heard a lot about costs, okay?  The fact that

20  Jones Day charges more than Bond Schoeneck & King doesn't

21  necessarily mean that Jones Day is going to charge a million

22  dollars in fees.  I heard six figures, seven figures.

23          The goal is to settle.  I appreciate counsel, like

24  Mr. Weisbeck, telling us that we should just go in there and

25  just agree to everything.  And I appreciate Mr. Scharf telling

1   us that as well.

2            The facts are that we are doing a lion's share of

3   all of what the A.G. has asked for.  We think they know it.

4   I'm not gonna get into the A.G. litigation now on this

5   telephone because, first of all, I don't know who is on from

6   the A.G.'s Office.

7            The most important aspect is we're gonna show that

8   the Attorney General -- we're gonna show the Attorney General

9   that our safety protocols have been honored.  Our reviews on

10  an annual basis have been exemplary, okay?  With the utmost

11  respect, I don't understand why this lawsuit was commenced

12  other than maybe a publicity stunt. However, the Bishop

13  exercised his business judgment and selected his counsel of

14  choice.

15           Inefficiencies, let's discuss that.  Mr. Scharf's

16  done a nice job of lighting a fire and getting all people

17  worried about inefficiencies.

18           Okay, first of all, the Connors firm could not

19  represent the Diocese in this matter.  The Connors firm is

20  mentioned in the complaint.  However, the Connors firm has

21  institutional knowledge and already has been working with

22  Jones Day in regard to history, things like that.

23           But remove the Connors firm.  We have people at the

24  Diocese who are working right now hands-on, institutional

25  knowledge to go over the history, to look at all of our

1   reviews.  Our reviews have been exemplary.  There's been no

2   issues since we implemented all of the child protocols,

3   safeties, et cetera.

4           Were there issues?  Of course there were.  I

5   wouldn't be in this case if there weren't.  They don't exist

6   now because we have done the right thing, we are doing the

7   right thing.

8           So bringing in Jones Day, who admittedly charges

9   for -- doesn't mean they're gonna, you know, immediately ramp

10  up legal fees.  They're simply going to be a good advocate,

11  they're going to be armed with the institutional knowledge

12  provided by the client, okay?

13          They will be assisted by Connors because he does

14  have background, he's been representing the Diocese for a long

15  time.  They're working with us obviously just to make sure

16  that the Chapter 11 is, you know, impacted as little as

17  possible.

18          But this light the fire in the theater or whatever

19  this is, that's just a smoke screen.  There are not

20  significant inefficiencies.  Because even if our firm did the

21  work, we would still offer -- our firm has represented the

22  Diocese for many years, but the Connors firm has handled most

23  of these kind of issues.

24          Once we have access to the Connors firm and we have

25  access to the client, which we do -- we have people that have

1   been in the Diocese for years, that work is happening right

2   now.  Whether it's Bond Schoeneck or Jones Day, neither one of

3   us have that institutional knowledge.  We didn't handle that

4   in part of our long-term representation of the Diocese.

5         So the inefficiencies, that's just kind of a, you

6   know, let's get everybody all worried type of stuff.  Look,

7   Jones Day charges more than many firms, but Jones Day does

8   bring a presence to the Attorney General.

9         Does that mean we're gonna litigate?  No.  It means

10  we are serious, we are here to resolve the issues, and as

11  Mr. Goetz put in his declaration, it's in one of the

12  paragraphs, it says we seek to work this out consensually, you

13  know, something like that.  And the Attorney General grabbed

14  onto that and reached out to, oh, you mean you want to

15  possibly do some kind of a resolution?

16        We're cautiously optimistic we're going to get this

17  resolved.  It may not be -- there may be a lot of legal fees,

18  but coming all the way back to my original argument, the right

19  to select counsel is a very , very important right that all

20  clients should have.

21        Business judgment has been exercised, and I

22  respectfully submit that it is in the best interest of the

23  estate that the authorization be provided to Jones Day to act

24  as special counsel for the Diocese and for Bishop Fisher.

25        **THE COURT:** Let me ask you the same question I asked

1   to the Committee counsel.  What -- is it the best interest of

2   creditors or the best interest of the estate and is it

3   different?  Or can it be --

4           **MR. DONATO:** Absolutely.  Sorry, I didn't know

5   you -- I didn't mean to cut you off.

6           Can it be different?  Absolutely.  Best interest of

7   the creditors, that's easy.  I spend $9 on something else and

8   it doesn't go to Mr. Scharf's client, he can argue that's not

9   in the best interest of creditors.  That's not what this is.

10  It's best interest of the estate.

11          There are more than one competing interest in a

12  Chapter 11.  The Diocese has made the decision, it is going to

13  address the terrible things that happened and seek to help the

14  victims, okay?  Mr. Weisbeck doesn't get that, but everybody

15  else in the case gets it.  That's what the Diocese is doing.

16          However, when acting as a bankruptcy judge, I

17  respectfully submit it is not solely a dollars and cents.  If

18  it was, then maybe we should be hiring a law firm that charges

19  $85 an hour to handle this kind of a matter.

20          You got to -- I respectfully submit that there's a

21  balancing test that the Court goes to, a balancing.  You

22  factor in all of the considerations, including the Diocese's

23  interest.  I know a lot of people don't want to do that.

24  We're focused on the victims.

25          But the Diocese does valuable work every day.  It

1   is going to emerge from this Chapter 11.  It is -- will

2   continue to feed the poor and to help the underprivileged,

3   okay?  We take shots left and right, that's what the Diocese

4   does, and that's what it's doing now, and it will continue to

5   do that.

6              I respectfully submit to you it is the best

7   interest of the estate in factoring on the fact that the

8   Diocese is gonna emerge from this Chapter 11 and all the other

9   points that I raised.  It is not simply a dollars and cents

10  situation.

11             Hey, Jones Day will do it for a thousand.  Bond

12  will do it for 400.  Some other firm will do it for $99.  That

13  is not the standard.  I respectfully submit that the business

14  judgment standard should prevail, and based on the best

15  interest of the estate we've established the factors necessary

16  in order for Jones Day to be retained as special counsel.

17             **THE COURT:** Let me ask you one thing that bothers me

18  a little bit, and I did raise this briefly in the -- at the

19  prior conference adjourning this matter, and that's the

20  affidavit from Mr. Goetz.

21             And paragraph 8 says, and I'm paraphrasing here, it

22  says because the action and remedies sought by the Attorney

23  General's complaint demonstrates that the Attorney General,

24  rather than enforcing New York law, seeks to enforce canon

25  law.

1          And, of course, the exception under Section 362(b)

2    from the automatic stay applies to -- to police and regulatory

3    activities.

4          Now, the position set forth in Mr. Goetz's

5    affidavit in paragraph 8, when it says it's not an enforcement

6    of New York law, would suggest that this entire action might

7    be a violation of the automatic stay.  And I am not saying if

8    it is or isn't, but I'm just saying it's suggested.  That's

9    the position that seems to be taken by -- by Mr. Goetz.

10          Having said that, are you not making another

11    business judgment here when you decided that you want to --

12    you've made a business judgment rather than seeking redress on

13    the automatic stay grounds, you decided to go forward and

14    litigate the merits in state court?

15          Is that a business judgment that -- that causes

16    concern about the appointment of counsel?

17          **MR. DONATO:** Well, Your Honor, that's an interesting

18    question.  The paragraph that I think you're referring to is

19    just observing that the A.G. may not actually be seeking to

20    enforce New York law.

21          We have reviewed the police power exception.  Our

22    initial review -- and, by the way, I think I've clarified.  If

23    there is a police power issue or stay violation, that's going

24    to be our firm, it's not going to be Jones Day.

25          We reviewed it.  We're still reviewing it.  There

1   is a possibility that we may make the determination that there

2   is a stay violation.  I will tell you that our initial review,

3   we believe we do not have a stay violation and that's why you

4   haven't had anything brought before you.

5          I do not look at them as completely exclusive.  I

6   definitely believe -- and we're still looking at it, that

7   there is a possibility although I (indiscernible) -- there's

8   some echoing going on, I don't know what happened -- but all

9   I'm saying is that -- that still -- the ability to -- really

10  sorry, there's terrible feedback going on here -- haven't

11  waived any ability to come see you and ask for redress of a

12  stay violation.

13         But our initial analysis, which we've obviously

14  reviewed with our client, is -- is that it is -- the actions

15  do not implicate the automatic stay.  I have not waived that

16  right, and we are still looking at it.  So it is -- it is at

17  least possible, even if Jones Day is retained, that we would

18  come see you and ask you to stop the action.

19         And, frankly, that would probably stop any

20  Jones Day legal fees, but we're not at that point yet.

21         **THE COURT:** All right. Well, let me hear the

22  argument on your other motion involving appointment of Mr.

23  Vacco.

24         **MR. DONATO:** I'm happy to do that.  We really got to

25  do something.  If people can mute their phones?  I'm getting a

1    terrible feedback.  I don't know if Your Honor is getting it

2    at all.

3              **THE COURT:** Let me ask anybody who is not muted,

4    please mute unless you're speaking.

5              **MR. DONATO:** Okay, that's great.  Whatever happened,

6    it just worked out perfectly.

7              Okay, Your Honor, I'm sorry, I am now moving to the

8    Lippes Mathias special counsel, you know, retention.  Just for

9    the record, in regard to Lippes Mathias, we have the original

10   motion that is Docket No. 795; we have one of two declarations

11   filed by Mr. Vacco at 795-3; as I had already indicated, we

12   did file the Bishop Fisher declaration at 874; we filed a

13   supplemental memorandum of law, which primarily addresses the

14   Lippes Mathias retention issues, that's docket 875; Dennis

15   Vacco did file also a supplemental declaration at 876.

16             I believe, however, that there are two objections

17   still outstanding.  That's the United States Trustee objection

18   and the Committee objection.  And cutting through it, the

19   objection is that -- the argument is that the obligation of

20   the Diocese to provide an indemnification is a pre-petition

21   obligation.

22             The actions complained about in the A.G. action are

23   a pre-petition obligation.  It is easy for the objectors to

24   simply say have Bishops Gross and Malone just file a claim

25   when, of course, they're in the middle of a lawsuit and

1  target -- you know, a defendant in a serious lawsuit.

2          We have asked the Court to allow Lippes Mathias to

3  represent Bishops Malone and Gross for several reasons, but

4  one of them is is that there's different relief sought against

5  Bishop Gross and Bishop Malone.  There's actual affirmative

6  monetary recoveries sought against both of the former Bishops

7  under the action.  There are also requests to enjoin them from

8  serving in public roles and not-for-profit roles and things

9  like that.

10         At the outset we set forth in the -- in the Lippes

11 Mathias application their qualifications.  Frankly, Dennis

12 Vacco is a former Attorney General.  I can't think of anybody

13 that's more qualified to work with the Attorney General for

14 Bishop Malone and Bishop Gross.

15         The thing that's absolutely wonderful is attorney

16 Vacco has provided an unbelievable discount in regard to his

17 fees.  They set the partner rate at $325 an hour and associate

18 at $140 to $310, which is about a 35% discount .

19         I believe that that's something that we need to

20 keep in mind when presenting this to the Court.  I'm asking,

21 you know, the parties to be aware of that.

22         The Diocese seeks authority to retain Lippes

23 Mathias to assist the Diocese in seeking to resolve the

24 Attorney General matter.

25         Now, I discussed the objections and they're based

1    on the pre-petition concept of the indemnification as well as

2    the event.  And we -- we filed a supplemental memorandum of

3    law at 875, and we observed that the Diocese has insurance.

4           Of course the Court is aware of that because the

5    Court has already entered an order on April 21, which was a

6    final order authorizing continued maintenance of the Diocese

7    insurance programs and authorizing the payment of pre-petition

8    obligations.  And that order is Docket No. 253.

9           And so we -- we observed that, frankly, based on

10   the order that you entered, which was fully vetted by the

11   Creditors Committee, that -- that, frankly, the Diocese has

12   the authority to retain Lippes Mathias in accordance with its

13   insurance program.  But we, in an abundance of caution, filed

14   the motion to retain.

15          Now, the D and O coverage, there's $14 million

16   coverage.  It has a $250,000 SIR.  At footnote 2 of the

17   supplemental memorandum that we filed, we just -- we outlined

18   the coverage available for side A, side B and side C coverage.

19   And you'll see upon review of that that there's a direct claim

20   by the Bishops, by Bishop Malone and Gross.  There's also a

21   claim side B which is if the Diocese honors the

22   indemnification, that it would receive insurance coverage for

23   it.

24          And it actually also compensates the Diocese for

25   its costs, and we believe that the D and O coverage will

1    actually provide coverage to defray the costs of Jones Day as

2    well.

3                But on Lippes Mathias I'm pointing out to you that

4    in accordance with the insurance program, at paragraph 4 of

5    the approval order, the -- the order specifically says the

6    Diocese is authorized and empowered, but not directed, in its

7    sole discretion to pay any pre-petition claims, premiums,

8    defense costs, obligations, and administrative costs related

9    to the insurance program.

10               The thrust of that authorization is to ensure that

11   those insurance programs remain viable and alive, and so there

12   are costs involved with -- with maintaining the program, like

13   paying an SIR, that we have -- we have received the

14   authorization to do.

15               Now, in the past we have -- the Creditors Committee

16   had asked us to put on notice the retention of special

17   litigation counsel, the Gibson firm and the Chelus firm.

18               We believed that we had the ability based on your

19   order of April 21 to retain Gibson and Chelus law firms

20   because it was all part of the services they were providing

21   under the insurance program.

22               However, at the request of the Creditors Committee,

23   completely fine, and that's why we filed those retention

24   applications; we did the same thing here out of an abundance

25   of caution.

1          But I would respectfully submit that since we have

2     D and O coverage, we have reserves, $11 million or so, you

3     know, in the program which are designed to defray some of

4     these kinds of costs and expenses; Jones Day we believe -- we

5     will also be -- we will be able to receive reimbursement for

6     Jones Day.

7          Frankly, under the circumstances, this is

8     absolutely appropriate to ensure that former Bishops Malone

9     and Gross have legal representation.

10          The issues that were raised by the Committee and

11    the U.S. Trustee primarily dealt with kind of a technical

12    argument that the indemnification is pre-petition and the

13    occurrence is pre-petition.

14          But now based on what we set forth in the

15    memorandum of law and walking through the insurance program,

16    the exposure is going to be a $250,000 SIR.  We have those

17    funds set aside and let's just cut through it.

18          Jones Day is gonna be the lead counsel and, you

19    know, we respectfully submit that at this point it is

20    absolutely appropriate to have Lippes Mathias retained to

21    represent the other two defendants in the Attorney General

22    action.

23          We did file a supplemental affidavit from attorney

24    Vacco.  I believe that it addresses any committee objections

25    concerning disclosure.

1            And I would respectfully submit that under the

2     circumstances, it is most appropriate to allow the Diocese to

3     provide and assist with legal representation to Bishops Gross

4     and Malone, again with the overall approach we are going at

5     this with the hope that we'll be able to work out a resolution

6     in view of the fact that we, frankly, believe the Attorney

7     General either was misinformed because many of the things

8     they've asked for are being done.

9            I respectfully request that Lippes Mathias be

10    authorized to represent Bishop Malone and Bishop Gross.

11          **THE COURT:** Let me ask you a few questions.  I'm

12    interested on this -- the insurance.  Has the insurer on the

13    director and officers liability coverage, has the insurer

14    acknowledged coverage?

15          **MR. DONATO:** It has not.  We submitted a claim.

16    They responded with some questions.  We answered those

17    questions.  They indicated that a coverage letter is coming,

18    but we do not have that yet.

19          **THE COURT:** Under the terms of the policy, is there

20    a requirement to obtain the consent of the designation of

21    counsel by the insurance company?

22          **MR. DONATO:** I believe that under this policy, that

23    the Diocese is authorized to select its own counsel.  I do not

24    know that 100%, but that's what I've been advised.  And I can

25    confirm that.

 1          **THE COURT:** Because, I mean, isn't that a necessary

 2   issue here?  If you're going to select counsel and you're

 3   looking for anything above $250,000 to be paid by the

 4   insurance company, is there a -- have you dotted all the I's

 5   and crossed all the T's in making sure that that's going to

 6   happen?

 7          **MR. DONATO:** I think we have.  I can report back to

 8   confirm, but we've been working with our insurance

 9   representative at the Diocese.

10          **THE COURT:** We have -- right now I have on my docket

11   a Chapter 7 case where a distribution is being funded by a

12   officer and director liability policy where the Chapter 7

13   trustee asserted that there was malpractice by officers and

14   directors -- made that assertion on behalf of the creditors,

15   and obtained a rather substantial settlement on that.

16          Wherein the D and O policy paid for wrongdoing on

17   behalf of -- for the damages resulting from the conduct of the

18   officers and directors, and that in turn funded the

19   distribution by the Chapter 7 trustee.

20          In this instance would it not be in the Diocese's

21   best interest for the trust -- for the Attorney General to

22   accede on her cause of action for an accounting if, indeed,

23   that accounting and the damages appended to it would be

24   financed by the D and O carrier? And how do we protect that

25   possibility, and is it perhaps in the interest of the Diocese

1  to assure that -- to support the Attorney General in that

2  cause of action?

3           I think that's --

4           **MR. DONATO:** -- no, definitely not, but we've been

5  together for a long time, so -- I have to think that one

6  through.  The -- you're saying the Attorney General wants an

7  accounting and, therefore, we should just agree to it and the

8  D and O will pay for it?

9           **THE COURT:** Well, I mean, obviously the Bishops

10 would not want that, but that's why they're being separately

11 represented I assume.  But, I mean, if there were damages

12 chargeable to them by way of an accounting, I would presume

13 that that would come back to the Diocese for distribution to

14 creditors.

15          **MR. DONATO:** It sounds logical, Your Honor.  I don't

16 know the answer.

17          **THE COURT:** I'm looking at your indemnification

18 provisions in the bylaws of the Diocese, Article 11, and it

19 clearly is an indemnification provision.  It could have been a

20 provision that says that the Diocese will hire attorneys for

21 them, but it doesn't do that.  It's an indemnification for

22 their expenses.

23          And is that a difference that has significance?

24          **MR. DONATO:** Your Honor, I don't think so.  I think

25 indemnification stands for the proposition that we need to

1  step in.

2       Again, forget the bankruptcy piece, assuming we're

3  out of bankruptcy.  If there's a pre-petition obligation

4  through bylaws or corporate charter that requires

5  indemnification, I think that indemnification means we need to

6  protect the indemn -- indemnified person.  So protection means

7  if they're in a lawsuit, we need to defray their legal fees,

8  things like that.

9       I think that indemnification is used in a broad

10 fashion to alleviate, frankly, the impact on the insured.

11 That's the reason for the coverage.

12      **THE COURT:** I'm looking at Section 11, U.S.C.

13 327(a), which recites and I'm quoting -- I'm paraphrasing

14 because I'm not gonna read the whole thing.

15      **MR. DONATO:** Sure.

16      **THE COURT:** It says except as otherwise provided,

17 the trustee, with the Court's approval, may employ one or more

18 attorney to represent or assist the trustee in carrying out

19 the trustee's duties under this title.

20      If looking to approve the appointment or employment

21 of someone who will represent the trustee, you're looking to

22 represent not the trustee, but two former employees.  Where do

23 I have the authority under 327(a) to effect that employment?

24 Because 327(a) by its text is limited to employment of someone

25 direct (indiscernible) trustee, namely, the

1  debtor-in-possession.

2          **MR. DONATO:** Sure, I understand your point.  327(a)

3  does say to represent or assist the trustee, or Diocese in our

4  case, or assist the Diocese in carrying out its duties.

5          And so what we believe is is that 327(a) as written

6  authorizes the retention of counsel for Bishops Malone and

7  Gross because we believe that having them -- having counsel

8  for them will assist the Diocese in resolving the Attorney

9  General matter.

10          I think Your Honor knows that we also did cite the

11  *Enron* case and the *Bethlehem Steel* case.  That if this became

12  a problem so that you were hesitant to appoint them under

13  327(a), although I think that language is there and I think

14  that retaining counsel for the Bishops will assist the

15  Diocese in resolving this issue, there is alternative

16  authority under the *Enron* and *Bethlehem Steel* case that

17  talks about Section 363 and Section 105.

18          So that if the Court was uncomfortable utilizing

19  327(a), I think it is appropriate to utilize 105(a) and

20  363(b), the thought being that in both of those cases -- for

21  *Enron*, for example, there was a retention request for

22  employees.  So the argument was wait a minute, if you're

23  retaining a lawyer for employees, that's not *Enron*, that's not

24  the debtor, and there could be a problem with 327(a).

25          And the resolution in that case -- and, frankly, I

1    don't think that they argued the assist the trustee piece

2    that's in the statute, was simply that the Bankruptcy Court

3    simply said under 105 and 363 I can authorize the retention

4    and that's the way they went.

5           So I would respectfully submit that 327(a) as

6    written does provide the authority because the retention of

7    the Bishops Malone and Gross will assist the Diocese in

8    resolving the A.G. matter.

9           But in the alternative, we believe you could also

10   get there under 11, U.S.C. 105(a) and 363(b).

11          **THE COURT:** Let me hear from the Committee.  What's

12   your position now?

13          **MR. SCHARF:** Thank you, Your Honor.  Ilan Scharf,

14   Pachulski Stang Ziehl & Jones, for the Committee.

15          Your Honor, I'm hearing the same echo Mr. Donato

16   was hearing a while back and I don't know if people still have

17   their phones open.

18          **THE COURT:** Yeah, if anyone has their phone open,

19   please go on mute and then unmute it when you want to speak.

20   That may help.  So go ahead.

21          **MR. SCHARF:** Sure.  Your Honor, I'll frame this

22   discussion in the context of the questions you asked at the

23   last hearing regarding this retention application.

24          What is the meaning of the word "indemnify" under

25   the bylaws and does Section 327 apply to that.  And, again,

1    Your Honor, with respect to the Lippes Mathias application,

2    the answer is clearly that this retention application should

3    be denied.

4                   First, Your Honor, Lippes Mathias is being

5    retained -- the reasoning to retain Lippes Mathias by the

6    Diocese and the reason they are being retained not to

7    represent the Diocese, but to represent two former officers

8    and directors, and the justification for that is an

9    indemnification provision.

10                   And Your Honor had asked if there's a duty to hire

11   counsel to defend under the bylaws, and very clearly under the

12   plain language of the bylaws there is no obligation to retain

13   counsel for former officers.  There is an obligation to

14   indemnify, and based on that it's to repay costs advanced or

15   repay expenses that have been incurred, not to -- not to put

16   the money upfront.

17                   And that type of indemnification provision,

18   especially with respect to a former officer -- former officers

19   in this case, is clearly an unsecured claim based on all the

20   cases that we cited in our opposition and, frankly, that was

21   cited by the U.S. Trustee in his opposition.

22                   And clearly Section 327 doesn't apply.  Lippes

23   Mathias would be retained to represent the Bishops, not the

24   Diocese, not to assist the Diocese in any way, shape or form.

25                   And as Mr. Donato pointed out, there are distinct

1   causes of actions and claims against the former Bishops that

2   do not apply to the Diocese.  Therefore, this is not a

3   retention of the Diocese.

4            In addition, Your Honor, these cases are

5   distinguishable from the cases cited by the Diocese such as

6   *Enron* where I believe in that case they were looking to retain

7   counsel to represent current employees.  The Diocese has also

8   cited some cases to retain current -- counsel to represent

9   current officers in connection with the case, or current

10  directors.

11           These are former officers and directors entitled to

12  a general unsecured claim with respect to any fees incurred.

13           And then, Your Honor, we get to the all-important

14  question of insurance and insurance being available here.  It

15  is routine for former officers and directors of debtor

16  corporations who are facing lawsuits or actions by government

17  to seek -- to seek coverage under D and O policies.

18           And here -- and in most of those instances the

19  insureds, the former officers, go out and tender their

20  coverage and have a direct dealing with the -- with the

21  insurance company.

22           We haven't seen the insurance policy at issue here.

23  But the Diocese does note there's side A and side B coverage.

24  The insurance lawyers on the phone will correct me, but I

25  believe side A coverage covers the individuals directly; side

1    B coverage typically covers the -- the company for any

2    expenditures with respect to investigation.  And if I mixed up

3    A and B, I apologize.

4            But the point is that there's direct coverage for

5    Bishops Malone and Gross and, therefore, they can go and

6    tender that to the insurance company.

7            Typically the way this is presented to a court is a

8    request to use the proceeds of the policy to reimburse legal

9    expenses or other expenses incurred by officers and directors

10   in connection with an investigation, not for the Diocese

11   itself to retain them.

12           And again here, Your Honor, to the extent coverage

13   is denied, to the extent coverage is not pursued, to the

14   extent coverage isn't available, the Diocese here is not

15   asking to retain for the purpose of just hitting the insurance

16   policy for these fees.  The Diocese will be on the hook for

17   these fees if -- on an administrative basis if the retention

18   application is approved.

19           So, Your Honor, Section 3 -- so, Your Honor, this

20   is not something that should be approved under Section 327(a),

21   under Section 363, or under Section 503(b) which the Diocese

22   also moved under because this is not an action that will -- an

23   expense that will preserve the value of the estate.  It will,

24   in fact, deplete the estate.

25           **THE COURT:** Let me ask the same question I started

1  to suggest to Mr. Donato.  Let's assume that the Diocese

2  itself is very successful and gets the action against the

3  Diocese dismissed.

4          Let's assume for the moment that there's still the

5  action against the two Bishops.

6          **MR. SCHARF:** Mm-hmm.

7          **THE COURT:** And among other things, the Attorney

8  General is seeking damages.

9          **MR. SCHARF:** Mm-hmm.

10         **THE COURT:** Substantial damages.

11         **MR. SCHARF:** Mm-hmm.

12         **THE COURT:** Isn't it in the best interest of the

13 Diocese to make sure that -- that the conditions of the

14 director and officer liability policy are in place because

15 those damages are, indeed, determined -- presumably those

16 damages would flow to the benefit of creditors.

17         And so shouldn't we make sure that there's full

18 compliance and adequate defense?

19         **MR. SCHARF:** Sure, Your Honor.  Again, with respect

20 to whether this ultimately becomes a benefit of the estate

21 because the insurance policy would be available to cover this

22 kind of damage, I think that's a question that is up in the

23 air, and I think that's ultimately a question of entitlement

24 of the proceeds.

25         And, again, typically speaking, we would see this

1   kind of application by a former officer to obtain -- to use

2   the proceeds of the policy to pay their insurance coverage and

3   ultimately these issues -- and this is litigated heavily.  The

4   Diocese cited an *Enron* decision.

5           There's another decision in *Enron* dealing with the

6   use of insurance proceeds that notes that officers are

7   entitled to some relief from insurance policies to cover legal

8   fees for contingent claims even if the company itself may have

9   a claim to them, there's this competing set of interest with

10  respect to the proceeds where the Court in *Enron* and I think

11  the decision has been followed fairly care -- fairly uniformly

12  by many bankruptcy courts, has noted and acknowledged the

13  officers' ability to obtain policy proceeds subject to

14  coverage defenses, and at the same time put a meter of that

15  expenses so that -- allowing the use of those proceeds in

16  steps rather than all at once in order to assure that policy

17  proceeds aren't depleted.

18          But, again, the question before Your Honor today is

19  not whether Mr. Vacco or the Lippes Mathias firm can represent

20  Bishops Malone and Gross.  That is the Bishops' choice.  The

21  issues regarding conflicts are not before your court, and they

22  are entitled to have counsel.  The question is who is going to

23  pay for that counsel and there is no --

24          **THE COURT:** Let me --

25          **MR. SCHARF:** -- mechanism under the --

1    **THE COURT:** -- let me break in here for a moment.

2    Your written opposition did raise an issue of conflict.

3    **MR. SCHARF:** Your Honor, we raised it more as an

4    issue of disclosure.  We felt that's something that under the

5    bankruptcy rules should have been disclosed, and the conflict

6    issue is not before Your Honor.  That was, in our opinion, an

7    issue of disclosure with respect to a retention application.

8    **THE COURT:** All right. So you -- in your view then,

9    you view the appointment of counsel as one to be made by the

10   Bishops without requiring the imprimatur of this Court?

11   **MR. SCHARF:** Exactly, Your Honor.  The Bishops can

12   hire Mr. Vacco and the Lippes Mathias firm and they will

13   have -- they will assert an indemnification claim against

14   (indiscernible).  I guess everybody's rights on those -- that

15   part is reserved.

16   And they will have the right to assert that those

17   fees should be covered by the insurance policies and

18   everybody's rights on that question is reserved.

19   The only issue before Your Honor is whether the

20   Diocese as a debtor-in-possession should be retaining counsel

21   for its former officers under an indemnification provision

22   where that indemnification right is, at best, a general

23   unsecured claim.

24   **THE COURT:** Well, I don't have a motion in front of

25   me right now for an indemnification.

1              **MR. SCHARF:** Exactly.  You have a motion to retain

2 counsel, but the only justification to retain counsel is the

3 indemnification.

4              **THE COURT:** All right, all right. Anything else?

5              **MR. SCHARF:** Your Honor --

6              **MR. DONATO:** Your Honor --

7              **MR. SCHARF:** -- that's it from the Committee.  Thank

8 you, Your Honor, subject to any questions or rebuttal that may

9 be necessary.

10              **THE COURT:** That's fine.  Let me hear from the

11 U.S. Trustee to see if they have a position on this --

12 anything they want to say on this aspect or this motion.

13              **MR. ALLEN:** Your Honor, this is Joseph Allen for the

14 U.S. Trustee.  I won't hold the Court and everyone on the

15 phone up repeating Mr. Scharf's arguments, but we concur with

16 those.

17              I would just add that to the extent the Court is

18 looking at this under 363, which the Diocese urges as an

19 alternative take from 327(a), Mr. Scharf did point out one

20 dispositive distinction in the *Enron* case from our case, which

21 is that it was -- they were seeking counsel to represent

22 current employees.

23              I would also point out one other distinction in

24 that case, which was specific note is made in the opinion that

25 the proposed counsel was not going to represent any employee

1  who became a target of the investigation.

2        And here we have two individuals, the former Bishop

3  and the former auxiliary Bishop, who are defendants in the

4  current lawsuit, the A.G.'s lawsuit.  So I think that's

5  another dispositive distinction between the facts here and the

6  facts in *Enron*.

7        And, otherwise, we concur with the comments Mr.

8  Scharf made.

9        **THE COURT:** All right.  Anyone else want to speak in

10  opposition to this motion?

11        **MR. WEISBECK:** Yes, Your Honor, Richard Weisbeck

12  from Lipsitz Green on behalf of our client.

13        We agree with everything that the Creditors

14  Committee and the U.S. Trustee said.

15        We'd like to add the following, and I think it's

16  along the lines of what the Court was also looking at.  The

17  Diocese --

18        **THE COURT:** I like sometimes to play with counsel.

19  I don't mean that in a bad way, but what I mean is to ask

20  questions that -- looking for responses before I decide the

21  merits of the matter.  So I'm making no decision right now.

22  I'm trying not to --

23        **MR. WEISBECK:** Understood, Judge.

24        **THE COURT:** -- but that's all right, go ahead.

25        **MR. WEISBECK:** Understood, Judge.

1          The Diocese is in Bankruptcy Court because its

2    Church officials sexually assaulted young children.  Then

3    Church officials covered up those crimes, and in many

4    instances allowed the child molesters to continue to commit

5    sexual crimes against young children.

6          These two former officials who have been sued by

7    the People of the State of New York through the Attorney

8    General breached their fiduciary obligations as set forth in

9    the complaint by the Attorney General.

10         Now the bankrupt Diocese wants to help those former

11   officials who committed misconduct and who breached their

12   fiduciary obligation under the law, and according to the

13   Attorney General's complaint violated the penal law, now the

14   bankrupt Diocese wants to them help defend themselves for

15   those alleged crimes and the breach of their fiduciary

16   obligation by paying for their attorneys.

17         If anything -- and all the Attorney General wants

18   to do is to keep these two individuals from serving on the

19   boards of other not-for-profit organizations, and to make

20   restitution for their alleged criminal conduct and their

21   breach of fiduciary obligation.

22         The bankrupt Diocese should be trying to get money

23   from them and bring it back into the Diocese so it can be

24   distributed to the child victims.  Instead, they want to pull

25   money out of the Church pockets and defend these former

1  officials who clearly under this lawsuit committed crimes and
2  breached their fiduciary obligation.  It makes no sense.
3         They've made motions against our clients to stop my
4  clients from moving forward in state court against the
5  non-bankrupt officials and spent a lot of money fighting us.
6  And now instead they want to pull out money from the Diocese
7  and pay to defend these officials who clearly committed
8  wrongs.
9         So since they're in bankruptcy and the goal is to
10 maximize the assets for the creditors, they should never be
11 paid for these ex-Church officials to be defended in any
12 lawsuits.  And, in fact, they should be joining in the lawsuit
13 by the State and make a claim against those ex-officials to
14 make restitution so that the Church can be made whole and
15 distribute the money to the child victims.
16        So we think that the Court should deny their
17 application, let these two ex-officials do whatever they have
18 to do on their own, and move on from there.
19        Thank you, Your Honor.
20        **THE COURT:** All right. Anyone else want to speak?
21         All right, Mr. Donato, did you have any further
22 reply?
23        **MR. DONATO:** I do, Your Honor.  I observed that the
24 bylaws -- there were questions about does indemnification
25 require retaining an attorney, things like that.

1           What it does require is an advancement of expenses

2      for indemnification.  Advancement of expenses clearly in

3      Section 3 on page 11 are focused on litigation, you know,

4      ramifications as a result of whatever claim is made.

5           So I think that the indemnification provision under

6      Article 11, Section 3 does effectively provide that the

7      indemnification includes retaining counsel.

8           I listened to a lot of different arguments, I hear

9      Mr. Weisbeck every day.  The bottom line is that if I could

10     follow the arguments of the Creditors Committee, if I

11     understood it correctly, I believe the Creditors Committee is

12     acknowledging that in accordance with your insurance order,

13     docket entry 253, we have the ability to retain, we clearly

14     have the ability to pay the -- to pay the SIR as well.

15          So if that is the way we proceed and everybody's

16     clear about that, you know, I guess we can do that.  We set

17     forth right in our memorandum of law we could have done that.

18     That's not what we do.

19          The Creditors Committee had expressed a request on

20     prior occasions and we felt we should bring it to the Court's

21     attention.  Obviously, this is only on Lippes Mathias.

22     Jones Day you've already heard all the arguments on that.

23          But if the solution is to retain Lippes Mathias in

24     accordance with the insurance order and comply with the terms

25     of the insurance order, if the Court is hesitant to enter a

1  327 order or authorize a 363, 105 order, then I think the

2  Bishops would be covered, and I believe that the Diocese could

3  live with that result.  So I want to put that on the record as

4  you consider the different alternatives.

5          I believe that it is extremely important to focus

6  on what Mr. Vacco's law firm is doing.  The hourly rates are

7  unbelievably modest.  Everybody knows what rates are in

8  Buffalo.  Forget about New York.  And to have somebody with

9  Mr. Vacco's skill and expertise, especially having been a

10  former A.G., these are minor, minor costs.

11          I know everybody wants to blow the whistle and

12  light the fire and talk about hundreds of millions of dollars

13  and all sort of stuff, okay?  Our goal is to settle.  That's

14  the way we're gonna proceed.

15          Respectfully submit that there's enough before you,

16  Your Honor, to authorize a retention under 327(a).  In the

17  alternative, under 363.

18          And as a final note, I would respectfully submit if

19  that doesn't work, then we'll rely on the insurance order at

20  docket 253 and we'll move forward under those terms.

21          **THE COURT:** The motion that I have in front of me is

22  just one under 327; is it not?

23          **MR. DONATO:** Yes, it is, Your Honor.  In order to

24  resolve this, I think you have the authority if you -- if you

25  felt that it was better to authorize retention under 105 and

1  363, you obviously clearly have the authority to do that right

2  now.

3           But we made an application under 327(a) and then,

4  of course, once the objections came in we started to

5  address -- tried to figure out a resolution.

6           **THE COURT:** But clearly the Lippes Mathias firm is

7  not going to be representing the Diocese.  They're going to be

8  representing two Bishops.

9           **MR. DONATO:** Absolutely.

10          **THE COURT:** What say should I have in terms of who

11  may select counsel?

12          **MR. DONATO:** Well, we can go that way.  We're

13  relying on the insurance order in 253, and that's okay.

14          You know, again, I thought it made more sense to

15  have the professionals before Your Honor, you know, to make

16  sure that everybody knew what was going on, things like that,

17  and that's why we went with the 327(a) approach.

18          But if we can get there utilizing the insurance

19  program, I guess we can do that.

20          **THE COURT:** Does anyone else want to speak -- be

21  heard on any of these motions?  All right.

22          Mr. Donato, I have one other question.  I know

23  there's a proceeding in -- a response date later in the month

24  of February.  When do you as a practical matter need my

25  decision on this appointment in order to be able to respond or

1  have a response for the Attorney General?

2          **MR. DONATO:** Your Honor, I'd like to ask Mr. Goetz

3  if he's still with us, I think he is -- just kidding -- if he

4  can address the Court, he's had the direct interface with the

5  Attorney General.  I think it's better to have Mr. Goetz

6  advise the Court concerning that question.

7          **MR. GETZ:** Good afternoon, Your Honor.  Thank you

8  very much for considering our retention and hearing from

9  Mr. Donato.  Along with the Bishop and I, we appreciate your

10 time.

11         Currently the response to the complaint is still

12 February the 26th.  We have asked the Attorney General to move

13 that date back because of Your Honor's consideration of our

14 retention application.

15         So far the Attorney General has not been receptive

16 to moving that date back saying that we've given everyone long

17 enough to respond to the complaint, which was filed in

18 November.  I think the date was inaccurately stated January.

19 The complaint was filed in November.  We accepted service in

20 December.

21         So right now it's due on the 26th of February.

22 Obviously depending on the timetable Your Honor takes to rule

23 on the retention, we would definitely ask the Court for more

24 time, but the answer to your question, it's still on the 26th

25 right now.

1          **THE COURT:** Let's assume that you had to prepare an

2   answer.  I presume you have not answered -- no one's answered

3   the complaint yet?

4          **MR. GETZ:** Correct, we haven't responded to the

5   motion to dismiss or answer.

6          **THE COURT:** Okay, an appropriate response, either

7   way.  That's not something you prepare overnight.  Practically

8   speaking, when do you need to know one way or the other

9   whether it's going to be you or previously appointed counsel?

10          **MR. GETZ:** We would like to move that date back -- I

11   don't know, at least 14 days, 30 days.  It's heavy work to

12   prepare a response for a complaint, as Your Honor knows.  So,

13   you know, we hope the Attorney General would agree to our

14   request for more time, at least 14 days or maybe -- maybe

15   longer.

16          I think also, Your Honor, I wanted to note that the

17   Attorney General is going to attempt to remand the case to

18   state court.  So the Attorney General's proposed to file a

19   brief by February the 22nd.

20          So we have those two pieces at play here.  But most

21   directly to the Diocese, it's the 26th day of February so...

22          **THE COURT:** All right.  This matter is of sufficient

23   importance that I probably will write at least a brief

24   decision on it, but I hear what you're saying, you're under a

25   time squeeze here.

1          I'll take the matter under advisement and I'll

2   issue a written decision as soon as I practically can.

3          **MR. DONATO:** Thank you, Your Honor.

4          **THE COURT:** Any other questions?  All right, very

5   well.  Thank you all.

6          **MR. DONATO:** Thank you.

7          (**WHEREUPON,** proceedings adjourned at 4:00 p.m.)

8                          *   *   *

9                  <u>**CERTIFICATE OF TRANSCRIBER**</u>

10

11         In accordance with 28, U.S.C., 753(b), I certify that

12  this is a true and correct record of proceedings from the

13  official electronic sound recording of the proceedings in the

14  United States District Court for the Western District of New

15  York before the Honorable Carl L. Bucki on February 10, 2021.

16

17  <u>S/ Christi A. Macri</u>

18  Christi A. Macri, FAPR-RMR-CRR-CSR(CA/NY)
    Official Court Reporter
19

20

21

22

23

24

25