# EXHIBIT A

| Paragraphs in the Complaint Expressly Alleging That a Defendant Violated Catholic Church Rules, Norms, Procedures, and Guidance, Including the *Charter* and *Essential Norms* (Emphasis Added) | |
|---|---|
| **No.** | **Complaint Paragraph and Allegation** |
| 1. | 1.  The Attorney General brings this lawsuit to obtain remedial and injunctive relief for the persistent violation of New York nonprofit law by the Diocese of Buffalo (the "Diocesan Corporation" or the "Diocese"). For nearly two decades, the Diocesan Corporation ignored standards established by the U.S. Conference of Catholic Bishops ("USCCB") in June 2002 to address and prevent the sexual abuse of minors by U.S. clergy. **In direct defiance of the USCCB's public commitment to reform, the Diocesan Corporation, through the conduct of its senior leadership, evaded key provisions of these standards, ignoring requirements for the investigation and review of alleged clergy sexual abuse.** |
| 2. | 2.  Complaints of sexual abuse against priests continued unabated at the Diocesan Corporation from 2002 forward. Rather than adequately investigate and formally review the allegations to determine if priests were qualified to maintain their clerical status, the Diocesan Corporation privately designated priests that it considered to have abused minors as "unassignable." Some of these unassignable priests were removed from ministry or allowed to retire in anticipation or shortly after the adoption of the USCCB's 2002 standards. The Diocese permitted these unassignable priests to remain incardinated without any meaningful supervision or monitoring. **These tactics together amounted to a practice of non-compliance with the USCCB's principles and procedures, and they operated to conceal the actual nature and scope of sexual abuse allegations in the Diocesan Corporation.** When the Diocesan Corporation's mishandling of specific cases was exposed, the Diocesan Corporation misled its beneficiaries about its response to sexual abuse allegations and the measures that its leaders had taken to  protect the public. The Diocesan Corporation now seeks bankruptcy protection principally because it faces hundreds of private claims arising out of its sexual abuse crisis and the inadequacy of its response. |
| 3. | 3.  As set forth below, through their actions and inactions in response to the sexual abuse crisis, the Diocesan Corporation and its two most senior leaders, Defendants former Bishop Richard J. Malone and former Auxiliary Bishop Edward M. Grosz, violated multiple provisions of the Not-for-Profit Corporation Law ("N-PCL") and Estates, Powers and Trusts Law ("EPTL"). These provisions expressly require the Diocesan Corporation to operate in a manner consistent with the public policy of the State of New York and to properly administer itself. **Malone and Grosz also failed to meet basic fiduciary duties of care and loyalty by ignoring the Diocesan Corporation's own stated standards for addressing abuse allegations and preventing future abuse.** |
| 4. | 8.  The Investigation corroborated the failure that Bishop Malone admits. In extensive business records and sworn witness testimony from Malone and Auxiliary Bishop Grosz, the Investigation found that the Diocesan Corporation repeatedly evaded its responsibility to the Church, the Church's mission, and its beneficiaries by failing to follow its own publicly |

|     | |
| --- | --- |
|     | stated policies and procedures for addressing sexual abuse allegations. **While the Diocesan Corporation claimed to have adopted and followed the *Charter* and the *Essential Norms*, the Investigation determined that the Diocesan Corporation did not do so and that it failed to take reasonable measures to respond to sexual abuse allegations.** In particular, the Diocesan Corporation, Malone, and Grosz, in accordance with their respective roles, failed to: <br>• investigate or conduct timely, independent, sufficient, or reasonable internal investigations into allegations of the sexual abuse of minors; <br>• seek or reasonably document the assessments of allegations by an advisory board established to assist the bishop's evaluation of sexual abuse claims; <br>• refer or timely refer unassignable priests to the Vatican authority with oversight of the adjudication of claims of clergy sexual abuse of minors; <br>• inquire into violations of the *Charter* and the *Essential Norms*; <br>• adequately monitor priests they believed had sexually abused minors; <br>• consider the risk that such priests could commit acts of abuse; <br>• prepare accurate business records regarding accused priests; and <br>• train personnel who had violated the *Charter*, the *Essential Norms*, or applicable standards of care. |
| 5.  | 9.  The documents and testimony obtained during the Investigation confirm that Bishop Malone and Auxiliary Bishop Grosz repeatedly breached their fiduciary duties of care, loyalty, and fidelity to the Diocese's mission through their individual actions and omissions. In numerous cases, **Malone and Grosz failed to properly examine or address individual complaints and disregarded the risks created by their decisions to avoid procedures required under Church law and the Diocesan Corporation's policies and procedures**. |
| 6.  | 10.  The Diocesan Corporation's compliance with the *Charter*, the *Essential Norms*, and its own policies and procedures is vital to ensuring the accountability and transparency that the Diocese owes its beneficiaries. The conduct discussed throughout this Complaint denied beneficiaries the promise of these critical, institutional reforms and violated clear standards of care and fiduciary loyalty required by New York law. For example, the Diocesan Corporation sheltered accused priests from adjudication and public disclosure by not referring them to the Vatican. The Diocesan Corporation also misused or wasted its charitable assets by supporting priests, who it considered to have committed sexual abuse. **For these reasons, Court intervention is justified and necessary to ensure that the Diocesan Corporation and its leadership comply with their own mandates and governing law to address the tragic and longstanding crisis of sexual abuse and to ensure that the Diocesan Corporation properly addresses future allegations of abuse.** |
| 7.  | 62.  The Defendants repeatedly violated New York law by breaching their fiduciary duties; improperly administering the Diocesan Corporation and the temporalities and property belonging to the corporation; and engaging in unauthorized |

| | |
|---|---|
| | activities. **These claims are supported by the Diocesan Corporation's violations of the *Charter* and the *Essential Norms*. Specifically, the Defendants failed to (a) conduct sufficient, timely, or independent internal investigations into sexual abuse allegations; (b) seek or reasonably document the DRB's assessments of sexual abuse allegations; and (c) refer or timely refer accused priests to the CDF, as required by the discipline, rules, and usages of the corporation and ecclesiastical governing body.** |
| 8. | 63.  **The Defendants engaged in additional misconduct and separately breached their fiduciary duties or improperly administered the Diocesan Corporation by:** <br> • **failing to inquire into the Diocesan Corporation's violations of the *Charter* and the *Essential Norms*;** <br> • failing to reasonably monitor priests accused of the sexual abuse of minors; <br> • disregarding the risk of sexual abuse by allowing certain priests to remain in ministry; <br> • preparing false or misleading business records regarding priests accused of the sexual abuse of minors; <br> • failing to train personnel, who had violated the *Charter*, the *Essential Norms*, or applicable standards of care; and <br> • in a few instances of alleged adult abuse reviewed by the Attorney General, failing to reasonably document or sufficiently investigate the allegations and disregarding the risks that certain priests could sexually abuse adults. |
| 9. | 67.  **The Diocesan Corporation failed to meet the requirement in the *Essential Norms* that internal investigations be conducted independently.** In his testimony, Auxiliary Bishop Grosz could not identify who conducted investigations by the Diocesan Corporation between 2002 and 2010. But Grosz testified that the Diocesan Corporation's longtime, defense counsel conducted the internal investigations into allegations of sexual abuse from about 2011 to 2019. |
| 10. | 68.  **Diocesan counsel lacked the independence required by the *Essential Norms* because of their established role, advising and defending the Diocesan Corporation on its handling of the clergy sexual abuse crisis in various respects, including**: <br> • representing the Diocesan Corporation in its defense to sexual abuse allegations for over two decades, including at least two joint-defense arrangements with attorneys representing priests accused of sexually abusing minors; <br> • assisting with public announcements regarding priests alleged to have sexually abused minors; <br> • acting as a diocesan spokesperson during press conferences regarding the sexual abuse of minors; <br> • assisting in drafting disclosures, which publicly identified priests as having sexually abused minors; and <br> • communicating with families of deceased priests, who were publicly identified by the Diocesan Corporation as having sexually abused minors. |
| 11. | 72.  The DRB maintains no written minutes of its meetings. **This practice departs from the procedure of other dioceses across the United States, which, on information and belief, maintain DRB meeting minutes.** |

| | |
|---|---|
| 12. | 75.  It is undisputed that, for the fifteen-year period between 2002 and July 2017, the **Diocesan Corporation failed to comply with the requirement that it refer alleged incidents of clergy sexual abuse of minors to the CDF.** Auxiliary Bishop Grosz admitted in his testimony to the Attorney General that, before 2017, the Diocesan Corporation had not referred a single priest to the CDF. Bishop Malone separately confirmed that, before his installation, his predecessor bishops in the Diocesan Corporation had failed to refer priests to the CDF pursuant to governing policies. Malone further admitted that he had not made his first CDF referral until 2017—five years after his installation as bishop. |
| 13. | 76.  **The Diocesan Corporation's internal records similarly confirm that it had not complied with its own procedures concerning the CDF**. A draft of a submission to the CDF— prepared in 2017 in support of the Diocesan Corporation's first referral to the CDF—remarks on the Diocesan Corporation's historical non-compliance and expresses concern about the Diocesan Corporation's legal exposure if New York were to extend the civil statute of limitations for sex abuse victims: [T]he issue that is pending in New York State is the possibility of removing all civil statue [sic] of limitation requirements, which could open up a window for many of these cases to be reopened and it is my goal to assure you and the state that we followed our procedures accordingly so [sic] limit any liability if it were to come to that. I share this because this case in particular has caused me to review many cases like this that I have discovered sine [sic] I arrived here in Buffalo nearly 5 years ago, and were [sic] not handled properly. |
| 14. | 78.  Bishop Malone and Auxiliary Bishop Grosz well knew that Fr. Zilliox's statement was accurate, but at a press conference on November 5, 2018, the Diocesan Corporation, through its representative, **sought to deflect attention from its failure to comply with the *Charter*** and take steps to permanently remove credibly accused priests. The Diocesan Corporation gave the false impression that removing a priest from the clerical state was a lengthy and technical process with no substantive effect: |
| 15. | 86.  The Diocesan Corporation's failure to refer accused priests to the CDF meant that many of them remained incardinated priests of the Diocese subject only to a removal from ministry by the bishop. Their conduct remained hidden from the public and some continued to receive salaries and benefits for as long as fifteen years, even though the Diocesan Corporation itself was on notice of a substantial likelihood that these accused priests had sexually abused minors. Eight priests publicly identified by the Diocesan Corporation in its September 2019 list, for example, are identified as removed from ministry in the early 2000s but were not referred or scheduled to be referred to the CDF until after June 2017. The benefits available to these priests included health, dental, and car insurance as well as room and board, a salary, or retirement benefits. **Had the Diocesan Corporation followed its policies and procedures and referred accused priests to the CDF for canonical trials and potential laicizations, laicized priests would not have been entitled to financial support from the Diocesan Corporation.** |

| 16. | 87.  **By failing to refer priests to the CDF as required by the *Charter* and the Essential Norms**, the Diocesan Corporation also forestalled any determination of the merits of the allegations against the accused priests. This deprived the accused and victims of an opportunity to be heard. |
|---|---|
| 17. | 88.  The absence of any formal review or finding against an accused priest also allowed the Diocesan Corporation to avoid damaging disclosures and public scrutiny. According to Bishop Malone's testimony, the Diocesan Corporation would have publicly disclosed laicizations ordered as a consequence of a CDF referral. Such a disclosure would have provided the transparency promised in the *Charter*, giving the public and the Diocesan Corporation's beneficiaries notice of past abuse and potentially allowing abuse victims some validation, relief, or closure. **By treating accused priests as "unassignable" and placing them in retirement or on medical leave, the Diocesan Corporation offered none of the transparency promised in the *Charter*, and instead operated to prevent any public consideration of the Diocesan Corporation's ongoing response to widespread allegations of abuse.** |
| 18. | 89.  The Diocesan Corporation's treatment of abuse allegations was well-known to Bishop Malone and Auxiliary Bishop Grosz throughout their tenures. In about 2013, early on in his tenure as bishop, **Malone learned that the Diocesan Corporation had failed to refer priests to the CDF during the decade since the *Charter* was adopted**. Additionally, Grosz continuously handled the Diocesan Corporation's response to allegations of clergy sexual abuse prior to and after the implementation of the *Charter*. Thus, Grosz knew or should have known that none of Malone's predecessor bishops had referred any priests to the CDF. |
| 19. | 90.  **The Diocesan Corporation's failures to perform other specific steps under the *Charter* and the *Essential Norms* were apparent in diocesan records for accused priests**. For example, in approximately 2015, when Bishop Malone directed Fr. Zilliox to begin personally reviewing priest files for accused priests that had been removed from pastoral positions on the basis of abuse allegations, Zilliox identified basic procedural gaps, writing in his review notes: "Where is the decree of suspension" and "What about the [internal] Investigation." |
| 20. | 106.  In 2018 and 2019 the Diocesan Corporation faced intense scrutiny from the public and the media for its alleged handling of sexual abuse complaints. The Diocesan Corporation, through Bishop Malone, Auxiliary Bishop Grosz, and authorized spokespersons responded by making repeated misleading statements to the public about the Diocesan Corporation's adherence to its own policies and procedures, particularly as set forth in the *Charter* and the *Essential Norms*. **Those false or misleading statements were inconsistent with the *Charter*'s policy of transparency and were an improper administration and operation of the Diocesan Corporation**. These statements also aided the Diocesan Corporation's concealment of the true scope of the sexual abuse scandal and the Diocesan Corporation's failure to properly investigate and address sexual abuse allegations. |

| | |
|---|---|
| 21. | 107.  For example, in February 2018, a Buffalo-area newspaper reported that Fr. R purportedly admitted that he had sexually abused dozens of minors in the late 1970s and early 1980s. In response, the Diocesan Corporation released a statement that read, in part: "'Since 1990, the Diocese of Buffalo has had policies to address sexual abuse,' . . . . 'Every complaint that we receive is addressed pursuant to a protocol that is designed both to protect children and to respond to victims. . . .'" **The "protocol" is a term used by the Diocesan Corporation to refer to the *Charter* and the *Essential Norms*. As demonstrated below, at the time of this statement, the Diocesan Corporation had consistently failed to follow material aspects of its policies when responding to allegations against priests, including Fr. R** |
| 22. | 114.  **Specific actions or inactions that demonstrate the Defendants' failures to meet their legal obligations in responding to sexual abuse allegations—including their continued evasion of the Diocesan Corporation's publicly-identified policies and procedures—are illustrated below by case studies.** These studies concern twenty-five priests and are drawn from diocesan business records and the testimony of Bishop Malone and Auxiliary Bishop Grosz. Some, but not all, of the priests were publicly identified by the Diocesan Corporation in September 2019 as warranting referral to the CDF. Only one among their twenty-five respective files contains any evidence of such a referral. With the exception of Fr. E and Fr. N (who died in 2010 and 2011, respectively), Bishop Malone, upon his installation in August 2012, held exclusive responsibility for the status and assignments of the following priests discussed below: |
| 23. | 115.  The twenty-five priest files, verified as a complete record of reported allegations and related determinations by the Diocesan Corporation, **demonstrate that the Defendants, contrary to their secular obligations, the *Charter*, and the *Essential Norms*:** <br><br> • designated many of these priests as unassignable, thereby placing in suspension both the accused priests and their accusers; <br><br> • removed many of these priests from ministry or allowed them to retire in anticipation or shortly after the adoption of the *Charter* and the *Essential Norms*, demonstrating a systematic approach to circumvent the policies and procedures intended to protect children; <br><br> • took inadequate steps—in some cases, no steps at all—to conduct an independent investigation of the factual allegations they received, see, e.g., infra ¶¶ 130-31, 267, 311, 403; <br><br> • repeatedly failed to seek or, alternatively, reasonably document the DRB's assessments of allegations of sexual abuse of minors, see, e.g., infra ¶¶ 150, 269, 279; <br><br> • failed to refer or timely refer accused priests to the CDF; <br><br> • routinely misrepresented the nature of their responses to allegations of abuse in public statements, contacts with beneficiaries, and diocesan files that recorded the accused priests' status, see, e.g., supra § IV (Bishop Malone's statements to media in March 2018); see, e.g., infra ¶ 128 (accused priest's announcement of his sabbatical for "health problems"); ¶ 151 (accused priest's announcement of "sabbatical"); ¶¶ 177-78 (accused priest's |

| | |
|---|---|
| | "resignation" to take time for "renewal" following the deaths of his brother and mother); ¶¶ 204-05 (records showing accused priest took a "medical leave of absence" and "retired"); <br>• conducted little or unreasonable monitoring of the unassignable priests' activities, see, e.g., infra ¶¶ 253, 341, 392; <br>• disregarded the risk of future sexual abuse by allowing certain priests to minister or remain in parishes, and by ensuring that members of the diocesan community would have no notice of the Diocesan Corporation's routine 44 departure from stated standards for investigation and canonical review; and <br>• in specific instances of alleged adult abuse reviewed by the Attorney General, failed to reasonably document or sufficiently investigate the allegations and disregarded the risks that certain priests could sexually abuse adults. See, e.g., infra ¶¶ 616-45, 718-22. |
| 24. | 116.  Fr. A was ordained in 1967.20 As early as 1983, the Diocesan Corporation was on notice of a substantial likelihood that he had sexually abused minors. **Yet, instead of applying the *Charter* and the *Essential Norms*, the Diocesan Corporation placed him on medical leave and then permitted him to retire.** The Diocesan Corporation continued to receive complaints of sexual abuse about Fr. A for years after his "retirement," but (a) took no steps to follow the procedures mandated by the *Charter* and the *Essential Norms* and (b) used its charitable resources to support Fr. A and conceal his alleged conduct from the public. |
| 25. | 130.  In June 2002, the USCCB formally adopted the *Charter*. **The Diocesan Corporation failed to conduct an appropriate, independent investigation into Complainant 4's and 5's recent claims. Nor did it amend or modify its public statement that Fr. A had voluntarily stepped down from ministry for health reasons.** Indeed, more than a year after the *Charter's* adoption, internal diocesan records, maintained to document a priest's status, reflect that Fr. A "[r]etired" on September 1, 2003; Fr. A was about sixty-one years old at that time. |
| 26. | 131.  Complaints continued after Fr. A's retirement. On November 11, 2003, according to a memo of the same date, Vicar General Cunningham met with Complainant 6, who told Cunningham about an "incident," which had occurred when he was thirteen-years old. Fr. A's file indicates that he was the unnamed, accused priest referenced in Cunningham's memo. Fr. A's file does not contain any decrees opening or closing an investigation by the Diocesan Corporation into Complainant 6's claims. **Nor is there any evidence that the Diocesan Corporation sufficiently investigated Complainant 6's allegations pursuant to the *Charter* and the *Essential Norms*.** Instead, Cunningham's memo reflects that the Diocesan Corporation's inquiry |
| 27. | 132.  In February 2004, Complainant 1, whose mother had written to the Diocesan Corporation in 1983, filed a complaint with the Diocesan Corporation, alleging that, between 1976 and 1979, Fr. A had sexually abused him when he was a minor. Fr. A's file does not contain any decrees opening or closing an investigation by the Diocesan Corporation into Complainant |

| | |
|---|---|
| | 1's claims. **The Diocesan Corporation did not properly investigate these allegations pursuant to the *Charter* and the *Essential Norms*.** |
| 28. | 133.  In September 2007, Complainant 7 filed a complaint with the Diocesan Corporation, alleging that in 1974, when he was about fourteen-years old, Fr. A had provided him alcohol when he stayed overnight at Fr. A's cabin and that he had awoken to find Fr. A performing oral sex on him. Fr. A's file does not contain any decrees opening or closing an investigation by the Diocesan Corporation into Complainant 7's claims. **The Diocesan Corporation failed to independently investigate Complainant 7's allegations pursuant to the *Charter* and the *Essential Norms*.** |
| 29. | 136.  In about 2015, twelve years after the *Charter* and three years after Bishop Malone's installation at the Diocese, Fr. Zilliox—Malone's advisor on compliance with the *Charter* and the *Essential Norms*—**prepared a summary of Fr. A's file that highlights the Diocesan Corporation's failure to comply with procedures mandated by these policies**. Zilliox documented the following concerns: (a) "Where is the decree of suspension . . . ?"; (b) "What about the [internal] Investigation?"; and (c) "Where was the Promoter of Justice in this case?" Still, the Diocesan Corporation failed to take any steps to conduct an independent investigation into the allegations. |
| 30. | 140.  **The Diocesan Corporation repeatedly violated the *Charter* and the Essential Norms by failing to conduct independent internal investigations of the allegations against Fr. A and failing to seek a DRB assessment and refer or timely refer Fr. A to the CDF.** Instead, it made misrepresentations to the public; created false or misleading internal documents; and failed to adequately monitor Fr. A's activities. The Diocesan Corporation's actions concealed Fr. A's conduct from the public and placed its beneficiaries at risk. |
| 31. | 141.  Fr. B was ordained in 1988.22 As early as 1995, the Diocesan Corporation was on notice of a substantial likelihood that Fr. B had engaged in inappropriate behavior with minors. **Instead of applying the *Charter* and the *Essential Norms*, the Diocesan Corporation**: (a) failed to properly investigate sexual abuse allegations; (b) misled its beneficiaries about the true reasons for Fr. B's removal from ministry; and (c) falsely attested to a third party that it had no information that would render Fr. B unsuitable to work with minors when it approved Fr. B's ministry outside the Diocese. The Diocesan Corporation's actions protected Fr. B from an adjudication of his alleged actions and wasted charitable resources. |
| 32. | 144.  In June 2002, after the *Charter* was adopted, **the Diocesan Corporation failed to investigate or, alternatively, sufficiently investigate the above allegations pursuant to the *Charter* and the *Essential Norms*.** Fr. B remained in ministry. |
| 33. | 145.  On September 4, 2009, Auxiliary Bishop Grosz and Fr. B met to discuss a complaint that Fr. B had taken a minor, about fourteen-years old, to a Sabres game followed by a tour of the church, without the approval of the boy's parents. Fr. B acknowledged that about twice a year, he would take the teen out and that he was encouraging the teen to consider the priesthood. Fr. B denied any wrongdoing and agreed "to refrain from any kind of relationship  one on one with [the boy] or |

|   | any young person." **Despite Fr. B's history of alleged improper relationships with young boys, the Diocesan Corporation again failed to adequately investigate these allegations pursuant to the *Charter* and the *Essential Norms*.** |
|---|---|
| 34. | 168.  **The Diocesan Corporation repeatedly violated the *Charter* and the Essential Norms by failing to conduct sufficient, independent internal investigations of the allegations against Fr. B; failing to properly document the DRB's assessments; and failing to refer Fr. B to the CDF.** Instead, it prepared false or misleading business records and made misrepresentations to the public and third parties, concealing Fr. B's conduct. The Diocesan Corporation's actions placed its beneficiaries at risk. |
| 35. | 169.  Fr. C was ordained in 1966. As early as 1994, the Diocesan Corporation was on notice of a substantial likelihood that Fr. C had sexually abused a minor. **Years later, instead of applying the *Charter* and the *Essential Norms*, the Diocesan Corporation allowed him to retire. The Diocesan Corporation also failed to sufficiently conduct a timely internal investigation into allegations that Fr. C had sexually abused a minor; failed to seek the DRB's assessment or, alternatively, reasonably document the DRB's assessment of sexual abuse allegations against Fr. C; and failed to refer Fr. C to the CDF.** Further, the Diocesan Corporation engaged in other improper conduct by (a) allowing Fr. C to publicly and misleadingly suggest in 2002 that he was resigning because of the deaths of his mother and brother; (b) creating false or misleading business records to establish a purported, legitimate basis for his retirement and eligibility for associated benefits; (c) providing these benefits and other compensation to Fr. C even though his laicization would have relieved the Diocesan Corporation of its duty to financially support him; and (d) failing to reasonably monitor Fr. C, exposing itself and minors to unnecessary risks |
| 36. | 187.  In February 2015, Complainant 3 filed a complaint with the Diocesan Corporation to allege that, in approximately 1983 or 1984, when he was about seven-years old, Fr. C had sexually abused him, including by fondling his penis through his clothing. **The Diocesan Corporation failed to conduct a sufficient investigation of Complainant 3's allegations pursuant to the *Charter* and the *Essential Norms*.** |
| 37. | 200.  **The Diocesan Corporation repeatedly violated the *Charter* and the Essential Norms by failing to sufficiently conduct a timely internal investigation into allegations that Fr. C had sexually abused a minor; failing to seek the DRB's assessment or, alternatively, reasonably document the DRB's assessment of sexual abuse allegations against Fr. C; and failing to refer Fr. C to the CDF.** Instead, it made false or misleading statements to its beneficiaries; prepared false or misleading business records; and failed to reasonably monitor Fr. C. The Diocesan Corporation's actions concealed Fr. C's conduct from the public and placed its beneficiaries at risk. |
| 38. | 201.  Fr. D was ordained in 1969. His file contains no complaints of alleged sexual abuse of minors until May 2002. **Instead of applying the *Charter* and the *Essential Norms*,** the Diocesan Corporation allowed him to retire. The Diocesan Corporation also failed to sufficiently conduct a timely, independent investigation into allegations that Fr. D had sexually |

| | |
|---|---|
| | abused minors; failed to seek the DRB's assessment or, alternatively, reasonably document the DRB's assessment of sexual abuse allegations against Fr. D; and failed to refer or timely refer Fr. D to the CDF. Further, the Diocesan Corporation engaged in other misconduct by (a) creating false or misleading records to establish a purported, legitimate basis for Fr. D's retirement and eligibility for associated benefits; (b) providing these benefits and other compensation to Fr. D even though his laicization would have relieved the Diocesan Corporation of its duty to financially support him; and (c) failing to reasonably monitor Fr. D, exposing itself and minors to unnecessary risks. |
| 39. | 213.  On September 26, 2016, a diocesan attorney sent Auxiliary Bishop Grosz a report of his internal investigation into Complainant 1's and 2's allegations; **as discussed above, diocesan attorneys lacked the required independence to investigate sexual abuse allegations pursuant to the *Essential Norms*.** The attorney's report recounts his interviews of Fr. D and Complainants 1 and 2, conducted more than a decade after they had lodged their complaints. The report's conclusion consists of two paragraphs and does not contain any express findings. The conclusion section does relate that Complainant 1 "made a credible appearance" and that Fr. D did not deny the allegations, noting that "it seemed clear to [the diocesan attorney] that [Fr. D's] actions are weighing heavily on his conscience." The report also notes that the DRB would discuss the matter in three days. No documentation of the planned DRB discussion is found in Fr. D's file. |
| 40. | 214.  In May 2017, diocesan attorneys sent a letter to Fr. Zilliox, which states, in part, that "[a]t the last [DRB] meeting, Bishop Malone indicated that he wanted you to prepare a votum on this matter and that he would recommend that Fr. [D] be directed to lead a life of prayer and penance." **There are no other records of the DRB's and Malone's assessments or anything to explain why Malone did not refer Fr. D to the CDF as required by the *Charter* and the *Essential Norms*.** |
| 41. | 219.  **The Diocesan Corporation repeatedly violated the *Charter* and the Essential Norms by failing to conduct timely and sufficient independent investigations into allegations that Fr. D had sexually abused minors; failing to seek or, alternatively, reasonably document the DRB's assessment of sexual abuse allegations against Fr. D; and failing to refer or timely refer Fr. D to the CDF.** Instead, it prepared false or misleading business records and failed to reasonably monitor Fr. D. The Diocesan Corporation's actions concealed Fr. D's conduct from the public and placed its beneficiaries at risk. |
| 42. | 220.  Fr. E was ordained in 1972. As early as 1984, the Diocesan Corporation was on notice of a substantial likelihood that Fr. E had sexually abused minors. In 1989, the Diocesan Corporation placed Fr. E on administrative leave, and, by 1993, he had found a secular job, while still retaining his status as a priest. **Years later, instead of applying the *Charter* and the *Essential Norms*, the Diocesan Corporation failed to seek or, alternatively, reasonably document the DRB's assessment of sexual abuse allegations against Fr. E, and the Diocesan Corporation failed to refer Fr. E to the CDF.** Further, the Diocesan Corporation engaged in other misconduct by (a) making false or misleading statements to its beneficiaries and (b) failing to reasonably monitor Fr. E, exposing itself and minors to unnecessary risks. |

| 43. | 238. **The Diocesan Corporation repeatedly violated the *Charter* and the Essential Norms by failing to seek or, alternatively, reasonably document the DRB's assessment of sexual abuse allegations against Fr. E and by failing to refer Fr. E to the CDF.** Instead, it made false or misleading statements to its beneficiaries and failed to reasonably monitor Fr. E. The Diocesan Corporation's actions concealed Fr. E's conduct from the public and placed its beneficiaries at risk. |
|---|---|
| 44. | 239. Fr. F was ordained in 1963. As early as 1986, the Diocesan Corporation was on notice of a substantial likelihood that Fr. F had sexually abused minors. Years later, **instead of applying the *Charter* and the *Essential Norms*, the Diocesan Corporation allowed him to retire. The Diocesan Corporation also failed to refer or timely refer Fr. F to the CDF.** Further, the Diocesan Corporation engaged in other improper conduct by (a) preparing false or misleading records to establish a purported, legitimate basis for Fr. F's retirement and eligibility for associated benefits; (b) providing these benefits and other compensation to Fr. F even though his laicization would have relieved the Diocesan Corporation of its duty to financially support him; and (c) failing to reasonably monitor Fr. F, exposing itself and minors to unnecessary risks. |
| 45. | 257. **The Diocesan Corporation violated the *Charter* and the *Essential Norms* by failing to refer or timely refer Fr. F to the CDF.** Instead, it prepared false or misleading business records and failed to reasonably monitor Fr. F. The Diocesan Corporation's actions concealed Fr. F's conduct from the public and placed its beneficiaries at risk. |
| 46. | 258. Fr. G was ordained in 1975. As early as 1991, the Diocesan Corporation was on notice of a substantial likelihood that Fr. G had inappropriately touched young girls. Years later, **instead of applying the *Charter* and the *Essential Norms*, the Diocesan Corporation failed to conduct internal investigations into allegations that Fr. G had sexually abused minors; failed to seek or, alternatively, reasonably document the DRB's assessment of allegations against Fr. G; and failed to refer or timely refer Fr. G to the CDF.** Further, the Diocesan Corporation engaged in other improper conduct by (a) disregarding the risk of sexual abuse; (b) preparing false or misleading records that approved Fr. G's out-of-state ministry despite the Diocesan Corporation's knowledge of "8 reported incidents of sexually inappropriate behavior with female children"; (c) making false or misleading statements regarding its response to allegations against Fr. G; and (d) providing benefits and compensation to Fr. G even though his laicization would have relieved the Diocesan Corporation of its duty to financially support him. |
| 47. | 267. In April 2003, less than a year after the *Charter*'s adoption, Complainant 1 sent a letter to Bishop Mansell, alleging inappropriate behavior by Fr. G and requesting an inquiry into Fr. G's behavior with young girls.29 Fr. G's file does not contain any decrees opening or closing a diocesan investigation into Complainant 1's claims. **The Diocesan Corporation failed to conduct an independent investigation into Complainant 1's allegations pursuant to the *Charter* and the *Essential Norms*.** |
| 48. | 289. **The Diocesan Corporation repeatedly violated the *Charter* and the Essential Norms by failing to conduct internal investigations into allegations that Fr. G had sexually abused minors; failing to seek or, alternatively,** |

| | |
|---|---|
| | **reasonably document the DRB's assessment of sexual abuse allegations against Fr. G; and failing to refer or timely refer Fr. G to the CDF.** Instead, it prepared false or misleading business records; made false or misleading statements regarding its response to allegations against Fr. G; and disregarded the risk that Fr. G could sexually abuse minors. The Diocesan Corporation's actions concealed Fr. G's conduct from the public and placed its beneficiaries at risk. |
| 49. | 290.  Fr. H was ordained in 1985. As early as 1993, when the Diocese removed Fr. H from ministry, the Diocesan Corporation was on notice of a substantial likelihood that Fr. H had sexually abused minors. Years later, **instead of applying the *Charter* and the *Essential Norms*, the Diocesan Corporation allowed him to retire**. The Diocesan Corporation also failed to sufficiently conduct internal investigations into allegations that Fr. H had sexually abused minors; failed to seek or, alternatively, reasonably document the DRB's assessment of sexual abuse allegations against Fr. H; and failed to refer Fr. H to the CDF. Further, the Diocesan Corporation engaged in other improper conduct by (a) allowing Fr. H—after his removal from ministry—to hold a position on site at a parish; (b) preparing false or misleading records to establish a purported, legitimate basis for his retirement and eligibility for associated benefits; (c) providing these benefits and other compensation to Fr. H even though his laicization would have relieved the Diocesan Corporation of its duty to financially support him; and (d) failing to reasonably monitor Fr. H, exposing itself and minors to unnecessary risks |
| 50. | 311.  On July 11, 2002, Vicar General Cunningham met with Fr. H to discuss Complainant 3's allegations. Fr. H indicated that he had met Complainant 3 when the Complainant was fourteen years old. Fr. H denied touching Complainant 3. **The Diocesan Corporation failed to sufficiently investigate Complainant 3's allegations pursuant to the *Charter* and the *Essential Norms*.** |
| 51. | 317.  **Further internal diocesan documents reflect concern that Fr. H's work in the Diocesan Corporation was not appropriate in light of the sexual abuse allegations and the  mandates of the *Charter*.** Yet at the same time, the Diocesan Corporation sought to preserve Fr. H's access to continued compensation and benefits. On February 28, 2008, Bishop Kmiec decided that the Diocesan Corporation would terminate Fr. H but provide him with "full benefits as a retired priest." |
| 52. | 322.  Among other things, the absence of documentation indicating the Diocesan Corporation's regular supervision of Fr. H, shows that the Diocesan Corporation failed to reasonably monitor him. |
| 53. | 325.  **The Diocesan Corporation repeatedly violated the *Charter* and the Essential Norms by failing to sufficiently conduct internal investigations into allegations that Fr. H had sexually abused minors; failing to seek or, alternatively, reasonably document the DRB's assessment of sexual abuse allegations against Fr. H; and failing to refer Fr. H to the CDF.** Instead, it prepared false or misleading business records; failed to reasonably monitor Fr. H; and disregarded the risk that Fr. H could sexually abuse minors. The Diocesan Corporation's actions concealed Fr. H's conduct from the public and placed its beneficiaries at risk |

| 54. | 326.  Fr. I, ordained in 1976, served in ministry until his removal in 1994. His file records serious concerns about Fr. I albeit without any description of the conduct prior to his removal and mental health treatment. The Diocesan Corporation recorded receiving complaints about Fr. I in 2005 and 2018. **But instead of applying the *Charter* and the *Essential Norms*, the Diocesan Corporation failed to conduct an internal investigation into allegations that Fr. I had sexually abused a minor; failed to seek the DRB's assessment of sexual abuse allegations against Fr. I; and failed to refer Fr. I to the CDF.** Further, the Diocesan Corporation engaged in other improper conduct by (a) providing him benefits and other compensation even though his laicization would have relieved the Diocesan Corporation of its duty to financially support him and (b) failing to reasonably monitor Fr. I, exposing itself and minors to unnecessary risks. |
|---|---|
| 55. | 344.  **The Diocesan Corporation repeatedly violated the *Charter* and the Essential Norms by failing to conduct an internal investigation into allegations that Fr. I had sexually abused a minor; failing to seek the DRB's assessment of sexual abuse allegations against Fr. I; and failing to refer Fr. I to the CDF.** The Diocesan Corporation also failed to reasonably monitor Fr. I. The Diocesan Corporation's actions concealed Fr. I's conduct from the public and placed its beneficiaries at risk. |
| 56. | 345.  Fr. J was ordained in 1979.32 Fr. J's file records concerns about his conduct early in his tenure, but not until March 2004, did the Diocesan Corporation record receiving complaints of his alleged sexual abuse of minors. **Instead of applying the *Charter* and the *Essential Norms*, the Diocesan Corporation allowed him to retire.** The Diocesan Corporation also failed to sufficiently conduct an internal investigation into allegations that Fr. J had sexually abused a minor; failed to seek or, alternatively, reasonably document the DRB's assessment of sexual abuse allegations against Fr. J; and failed to refer or timely refer Fr. J to the CDF. Further, the Diocesan Corporation engaged in other improper conduct by (a) preparing false or misleading records to establish a purported, legitimate basis for Fr. J's retirement and eligibility for associated benefits; (b) providing these benefits and other compensation to Fr. J even though his laicization would have relieved the Diocesan Corporation of its duty to financially support him; and (c) failing to reasonably monitor Fr. J, exposing itself and minors to unnecessary risk |
| 57. | 365.  **The Diocesan Corporation repeatedly violated the *Charter* and the Essential Norms by failing to sufficiently conduct an internal investigation into allegations that Fr. J had sexually abused a minor; failing to seek or, alternatively, reasonably document the DRB's assessment of sexual abuse allegations against Fr. J; and failing to refer or timely refer Fr. J to the CDF.** Instead, it prepared false or misleading business records and failed to reasonably monitor Fr. J. The Diocesan Corporation's actions concealed Fr. J's conduct from the public and placed its beneficiaries at risk. |
| 58. | 366.  Fr. K was ordained in 1974.33 In 2004, he was arrested for and pled guilty to possession of child pornography. **Instead of applying the *Charter* and the *Essential Norms*, the Diocesan Corporation allowed him to retire.** The |

| | |
|---|---|
| | Diocesan Corporation also failed to seek or, alternatively, reasonably document the DRB's assessment of Fr. K and failed to refer or timely refer Fr. K to the CDF. Further, the Diocesan Corporation engaged in other improper conduct by (a) disregarding the risk of sexual abuse by urging and allowing Fr. K to do volunteer work; (b) providing benefits and other compensation to Fr. K even though his laicization would have relieved the Diocesan Corporation of its duty to financially support him; and (c) failing to reasonably monitor Fr. K, exposing itself and minors to unnecessary risks. |
| 59. | 395. **The Diocesan Corporation repeatedly violated the *Charter* and the Essential Norms by failing to seek or, alternatively, reasonably document the DRB's assessment of Fr. K and failing to refer or timely refer Fr. K to the CDF.** Instead, it failed to reasonably monitor Fr. K, a registered sex offender, and disregarded the risk that Fr. K could sexually abuse a minor. The Diocesan Corporation's actions placed its beneficiaries at risk. |
| 60. | 396. Fr. L was ordained in 1978, served in a parish shortly thereafter, and then transferred to a Florida diocese in 1983. Documents in Fr. L's file show that, while in Florida, he voluntarily left the priesthood for about sixteen years, from 1986 to 2002. When he returned to ministry in Florida, two sexual abuse complaints were made against him. The complaints involved Buffalo minors or concerned his conduct at the time he served as a priest in the Buffalo Diocese. After Fr. L's resignation in 2003, the Diocesan Corporation received an additional complaint related to his conduct during his tenure in the Buffalo Diocese. **Instead of applying the *Charter* and the *Essential Norms*, the Diocesan Corporation failed to sufficiently conduct internal investigations into allegations that Fr. L had sexually abused minors; failed to seek the DRB's assessment of sexual abuse allegations against Fr. L; and failed to refer Fr. L to the CDF**. Further, the Diocesan Corporation engaged in other improper conduct by failing to reasonably monitor Fr. L, exposing itself and minors to unnecessary risks. |
| 61. | 403. In July 2003, the St. Petersburg Diocese notified the Diocesan Corporation of Complainant 1's claim. The Diocesan Corporation was also advised that Fr. L had denied the allegations. **The Diocesan Corporation failed to sufficiently investigate Complainant 1's allegations pursuant to the *Charter* and the *Essential Norms*.** |
| 62. | 406. In October 2003, the Diocesan Corporation received another complaint of sexual abuse against Fr. L. Complainant 2 alleged, among other things, that in the late 1970s when he was about age thirteen, Fr. L engaged in oral sex with him. The Complainant also alleged that Fr. L had pushed him onto a bed in the rectory and touched and kissed him. Fr. L's file does not contain any decrees opening or closing a diocesan investigation into Complainant 2's claims. **The Diocesan Corporation failed to sufficiently investigate Complainant 2's allegations pursuant to the *Charter* and the *Essential Norms*.** |
| 63. | 408. In November 2003, the Diocesan Corporation received an anonymous complaint against Fr. L. The complaint alleges that in the late 1970s, when the complainant was in the eighth grade, Fr. L and another priest took him to a cabin and |

| | | |
|---|---|---|
| | | attempted to persuade the boy to walk, swim, and eat in the nude. **The Diocesan Corporation failed to conduct a sufficient, independent investigation of this allegation pursuant to the *Charter* and the *Essential Norms*.** |
| 64. | | 413. **The Diocesan Corporation repeatedly violated the *Charter* and the Essential Norms by failing to sufficiently conduct internal investigations into allegations that Fr. L had sexually abused minors; failing to seek the DRB's assessment of sexual abuse allegations against Fr. L; and failing to refer Fr. L to the CDF.** The Diocesan Corporation also failed to reasonably monitor Fr. L. The Diocesan Corporation's actions concealed Fr. L's conduct from the public and placed its beneficiaries at risk. |
| 65. | | 414. Fr. M was ordained in 1952.35 In 2003 and 2004, the Diocesan Corporation received three complaints that Fr. M had sexually abused minors. **Instead of applying the *Charter* and the *Essential Norms*, the Diocesan Corporation allowed him to retire.** The Diocesan Corporation also failed to sufficiently conduct internal investigations into allegations that Fr. M had sexually abused a minor; failed to seek or, alternatively, reasonably document the DRB's assessment of sexual abuse allegations against Fr. M; and failed to refer Fr. M to the CDF. Further, the Diocesan Corporation engaged in other misconduct by (a) misleading beneficiaries; (b) preparing false or misleading records to establish a purported, legitimate basis for Fr. M's retirement and eligibility for associated benefits; (c) providing these benefits and other compensation to Fr. M even though his laicization would have relieved the Diocesan Corporation of its duty to financially support him; and (d) failing to reasonably monitor Fr. M, exposing itself and minors to unnecessary risks. |
| 66. | | 416. In December 2003, Complainant 1 filed a complaint with the Diocesan Corporation, alleging that in the 1960s, Fr. M had molested her when she was between six and nine years old. Fr. M's file does not contain any decrees opening or closing a diocesan investigation into Complainant 1's claims. **The Diocesan Corporation failed to sufficiently investigate Complainant 1's allegations pursuant to the *Charter* and the *Essential Norms*.** |
| 67. | | 418. On or about March 1, 2004, the Diocesan Corporation received Complainant 2's complaint. Complainant 2 alleged that in the 1950s, when she was about seven years old, Fr. M had laid on his back, had her sit on his face, and licked her genitals. Fr. M's file does not contain any decrees opening or closing a diocesan investigation into Complainant 2's claims. **The Diocesan Corporation failed to sufficiently investigate Complainant 2's allegations pursuant to the *Charter* and the *Essential Norms*.** |
| 68. | | 419. On or about March 3, 2004, Complainant 3 filed a complaint with the Diocesan Corporation, alleging that in the 1960s, when she was about six or seven years old, Fr. M had placed her in his lap, rubbed himself against her, kissed her, and forced her to kiss him. Complainant 3 told the Diocesan Corporation that she had confronted Fr. M, and he did not deny the abuse. Fr. M's file does not contain any decrees opening or closing a diocesan investigation into Complainant 3's claims. **The Diocesan Corporation failed to sufficiently investigate Complainant 3's allegations pursuant to the *Charter* and the *Essential Norms*.** |

| 69. | 425.  In July 2004, Complainant 4 filed a complaint with the Diocesan Corporation, alleging that in the 1950s, when she was in grammar school, she recalled playing with Fr. M, receiving an injury in the pelvic area, and feeling pain in the genitals. Fr. M's file does not contain any decrees opening or closing a diocesan investigation into Complainant 4's claims. **The Diocesan Corporation failed to sufficiently investigate Complainant 4's allegations pursuant to the *Charter* and the *Essential Norms*.** |
|---|---|
| 70. | 437.  **The Diocesan Corporation repeatedly violated the *Charter* and the Essential Norms by failing to sufficiently conduct internal investigations into allegations that Fr. M had sexually abused minors; failing to seek the DRB's assessment of sexual abuse allegations against Fr. M; and failing to refer Fr. M to the CDF.** Instead, it made false or misleading statements to its beneficiaries; prepared false or misleading business records; and failed to reasonably monitor Fr. M. The Diocesan Corporation's actions concealed Fr. M's conduct from the public and placed its beneficiaries at risk. |
| 71. | 438.  Fr. N was ordained in 1954. In June 2003, the Diocesan Corporation received a complaint that Fr. N had sexually abused a minor. **Instead of applying the *Charter* and the *Essential Norms*, the Diocesan Corporation allowed him to resign.** The Diocesan Corporation also failed to seek the DRB's assessment of sexual abuse allegations against Fr. N and failed to refer Fr. N to the CDF. Further, the Diocesan Corporation engaged in other improper conduct by (a) creating false or misleading records to establish a purported, legitimate basis for Fr. N's retirement and eligibility for associated benefits and (b) failing to reasonably monitor Fr. N, exposing itself and minors to unnecessary risks. |
| 72. | 446.  Fr. N's file contains an August 2003 printout of Internet postings by alleged victims of clergy abuse. One posting alleges that Fr. N sexually abused minors. **The Diocesan Corporation also failed to conduct an independent investigation of the allegations against Fr. N pursuant to the *Charter* and the *Essential Norms*.** |
| 73. | 450.  **The Diocesan Corporation repeatedly violated the *Charter* and the Essential Norms by failing to seek the DRB's assessment of sexual abuse allegations against Fr. N and failing to refer Fr. N to the CDF.** Instead, it prepared false or misleading business records and failed to reasonably monitor Fr. N. The Diocesan Corporation's actions concealed Fr. N's conduct from the public and placed its beneficiaries at risk. |
| 74. | 451.  Fr. O was ordained in 1971.37 His file contains a complaint of sexual abuse received by the Diocesan Corporation in 1995, which was treated as alleged abuse of an adult victim despite repeated, reasonably reliable representations that the alleged victim was a minor. **This complaint remained pending after the passage of the *Charter* and the *Essential Norms*. Instead of applying these policies, the Diocesan Corporation failed to sufficiently conduct a timely investigation of the allegations; failed to seek or, alternatively, reasonably document the DRB's assessment of allegations against Fr. O; and failed to refer Fr. O to the CDF.** Further, the Diocesan Corporation engaged in other improper conduct by (a) disregarding the risk of sexual abuse and preparing false or misleading records when it wrote to another diocese to approve Fr. O's out-of-state ministry; (b) misleading beneficiaries by publicly claiming that the |

| | |
|---|---|
| | Complainant's age at the time of the alleged abuse was unclear or in dispute; (c) providing benefits and other compensation to Fr. O even though laicization would have relieved the Diocesan Corporation of its duty to financially support him; and (d) failing to reasonably monitor Fr. O, exposing itself and minors to unnecessary risks |
| 75. | 467.  **After the *Charter*'s adoption in June 2002, the Diocesan Corporation failed to conduct an independent investigation into the Complainant's pending allegations pursuant to the *Charter* and the *Essential Norms*. Fr. O remained in active ministry.** |
| 76. | … Despite the Diocesan Corporation's claims to the Pope's ambassador and the public that the Complainant provided contradictory information regarding her age at the time of the alleged abuse, records in Fr. O's file demonstrate that her attorney repeatedly confirmed that the complaint alleged that she was a minor at the time of the alleged abuse. **Thus, the complaint should have been subject to the strict requirements of the *Charter* and the *Essential Norms*.** |
| 77. | 483.  Three months later, a diocesan investigator submitted a written report to diocesan attorneys. The report found that the Complainant was credible based on (a) the investigator's training and experience as a former prosecutor of sex crimes; (b) his interview of the Complainant; (c) the Complainant's 1995 complaint to the Diocesan Corporation; (d) a 2018 letter from the Complainant's father to Bishop Malone, which corroborated the Complainant's claim that she had reported the abuse before 2018; and (e) Fr. O's alleged admissions that corroborated some of the Complainant's assertions, including that he and the Complainant had had sexual intercourse several times. **All of this information was available or likely could have been obtained at the time of the complaint or in 2002, when the *Essential Norms* expressly required an internal investigation.** |
| 78. | 486.  **The Diocesan Corporation repeatedly violated the *Charter* and the *Essential Norms* by failing to conduct a timely, independent and sufficient investigation into allegations that Fr. O had sexually abused a minor; failing to seek or, alternatively, reasonably document the DRB's assessment of sexual abuse allegations against Fr. O; and failing to refer Fr. O to the CDF.** Instead, it made false or misleading statements to its beneficiaries; prepared false or misleading business records; failed to reasonably monitor Fr. O; and disregarded the risk that Fr. O could sexually abuse minors. The Diocesan Corporation's actions concealed Fr. O's conduct from the public and placed its beneficiaries at risk. |
| 79. | 487.  Fr. P was ordained in 1980. As early as 1994, the Diocesan Corporation was on notice of a substantial likelihood of Fr. P's sexual misconduct with minors. **Years later, instead of following the *Charter* and the *Essential Norms*, the Diocesan Corporation allowed him to retire**. The Diocesan Corporation also failed to seek the DRB's assessment of sexual abuse allegations against Fr. P and failed to refer or timely refer Fr. P to the CDF. Further, the Diocesan Corporation engaged in other improper conduct by (a) making false or misleading statements to beneficiaries by, among other things, suggesting in 2003 that Fr. P had not been removed from ministry for sexual misconduct; (b) creating false or misleading records to establish a purported, legitimate basis for Fr. P's retirement and eligibility for related benefits; (c) providing these |

|    | benefits and other compensation to Fr. P even though his laicization would have relieved the Diocesan Corporation of its duty to financially support him; and (d) failing to reasonably monitor Fr. P, exposing itself and minors to unnecessary risks. |
|----|---|
| 80. | 494.  **The Diocesan Corporation did not conduct an independent investigation into the allegations above pursuant to the *Charter* and the *Essential Norms*.** |
| 81. | 503.  **The Diocesan Corporation repeatedly violated the *Charter* and the *Essential Norms* by failing to seek the DRB's assessment of sexual abuse allegations against Fr. P and failing to refer or timely refer Fr. P to the CDF.** Instead, it made false or misleading statements to its beneficiaries; prepared false or misleading business records; and failed to reasonably monitor Fr. P. The Diocesan Corporation's actions concealed Fr. P's conduct from the public and placed its beneficiaries at risk. |
| 82. | 504.  Fr. Q was ordained in 1969. As early as 1999, the Diocesan Corporation was on notice of a substantial likelihood that Fr. Q had engaged in sexual misconduct with minors and young adults. **Years later, instead of applying the *Charter* and the *Essential Norms*, the Diocesan Corporation placed Fr. Q on medical leave**. The Diocesan Corporation also failed to sufficiently conduct internal investigations into allegations that Fr. Q had sexually abused minors; failed to seek the DRB's assessment of sexual abuse allegations against Fr. Q; and failed to refer Fr. Q to the CDF. Further, the Diocesan Corporation engaged in other improper conduct by (a) disregarding the risk of sexual abuse by allowing Fr. Q to remain in ministry; (b) providing benefits and other compensation to Fr. Q even though laicization would have relieved the Diocesan Corporation of its duty to financially support him; and (c) failing to reasonably monitor Fr. Q, exposing itself and minors to unnecessary risks. |
| 83. | 517.  **After the *Charter*'s adoption in 2002, the Diocesan Corporation failed to sufficiently investigate Fr. Q's sexual misconduct with minors.** |
| 84. | 532.  **The Diocesan Corporation repeatedly violated the *Charter* and the Essential Norms by failing to sufficiently conduct internal investigations into allegations that Fr. Q had sexually abused minors; failing to seek the DRB's assessment of sexual abuse allegations against Fr. Q; and failing to refer Fr. Q to the CDF.** Instead, it failed to reasonably monitor Fr. Q and disregarded the risk that Fr. Q could sexually abuse minors or young adults. The Diocesan Corporation's actions concealed Fr. Q's conduct from the public and placed its beneficiaries at risk. |
| 85. | 533.  Fr. R was ordained in 1965.41 As early as 1978, the Diocesan Corporation was on notice of a substantial likelihood that Fr. R had sexually abused minors. **Years later, instead of applying the *Charter* and the *Essential Norms*, the Diocesan Corporation allowed him to retire.** The Diocesan Corporation also failed to sufficiently conduct investigations into allegations that Fr. R had sexually abused minors; failed to seek the DRB's assessment of sexual abuse allegations against Fr. R; and failed to refer Fr. R to the CDF. Further, the Diocesan Corporation engaged in other improper conduct by (a) disregarding the risk of sexual abuse; (b) making false or misleading statements to its beneficiaries; (c) preparing false |

|   | |
|---|---|
|   | or misleading records to establish a purported, legitimate basis for Fr. R's retirement and eligibility for associated benefits; (d) providing these benefits and other compensation to Fr. R even though his laicization would have relieved the Diocesan Corporation of its duty to financially support him; and (e) failing to reasonably monitor Fr. R, exposing itself and minors to unnecessary risks. |
| 86. | 545.  Complaints continued after Fr. R's retirement. In June 2008, Complainant 5 filed a complaint with the Diocesan Corporation, alleging that in 1963, Fr. R had sexually abused him when he was thirteen or fourteen years old. Complainant 5 also alleged that Fr. R had sexually abused his brother. Fr. R's file does not contain any decrees opening or closing a diocesan investigation into Complainant 5's claims. **The Diocesan Corporation failed to sufficiently investigate Complainant 5's allegations pursuant to the *Charter* and the *Essential Norms*.** |
| 87. | 546.  In June 2010, Complainant 6 filed a complaint with the Diocesan Corporation, alleging that between 1965 and 1966, Fr. R had raped him when he was approximately sixteen or seventeen years old. Fr. R's file does not contain any decrees opening or closing a diocesan investigation into Complainant 6's claims. **The Diocesan Corporation failed to sufficiently investigate Complainant 6's allegations pursuant to the *Charter* and the *Essential Norms*.** |
| 88. | 549.  In May 2017, Complainant 8 filed a complaint with the Diocesan Corporation, alleging that in approximately 1979 or 1980, Fr. R groped him when he was fourteen or fifteen years old. The Complainant also asserted that Fr. R had molested his friend. Fr. R's file does not contain any decrees opening or closing a diocesan investigation into Complainant 8's claims. **The Diocesan Corporation failed to sufficiently investigate Complainant 8's allegations pursuant to the *Charter* and the *Essential Norms*.** |
| 89. | 554.  **The Diocesan Corporation repeatedly violated the *Charter* and the Essential Norms by failing to sufficiently conduct investigations into allegations that Fr. R had sexually abused minors; failing to seek the DRB's assessment of sexual abuse allegations against Fr. R; and failing to refer Fr. R to the CDF.** Instead, it made false or misleading statements to its beneficiaries; prepared false or misleading business records; failed to reasonably monitor Fr. R; and disregarded the risk that Fr. R could sexually abuse minors. The Diocesan Corporation's actions concealed Fr. R's conduct from the public and placed its beneficiaries at risk. |
| 90. | 555.  Fr. S was ordained in 1966.42 As early as 1986, the Diocesan Corporation was on notice of a substantial likelihood that Fr. S had sexually abused a minor. **Years later, instead of applying the *Charter* and the *Essential Norms*, the Diocesan Corporation allowed him to retire.** The Diocesan Corporation also failed to refer Fr. S to the CDF. Further, the Diocesan Corporation engaged in other improper conduct by (a) failing to maintain any record of Fr. S's alleged sexual abuse of a minor; (b) disregarding the risk of sexual abuse; (c) making false statements to its beneficiaries by allowing Fr. S to publicly announce that his resignation was due to health issues; (d) preparing false records to establish a purported, legitimate basis for Fr. S's retirement and eligibility for associated benefits; (e) providing these benefits and other |

| | |
|---|---|
| | compensation to Fr. S even though laicization would have relieved the Diocesan Corporation of its duty to financially support him; and (f) failing to reasonably monitor Fr. S, exposing itself and minors to unnecessary risks. |
| 91. | 573. **The Diocesan Corporation violated the *Charter* and the *Essential Norms* by failing to refer Fr. S to the CDF.** Instead, it failed to maintain any record of Fr. S's sexual abuse of a minor; allowed Fr. S to make false or misleading statements to its beneficiaries; prepared false or misleading business records; failed to reasonably monitor Fr. S; and disregarded the risk that Fr. S could sexually abuse minors. The Diocesan Corporation's actions concealed Fr. S's conduct from the public and placed its beneficiaries at risk. |
| 92. | 574. Fr. T was ordained in 1960.43 In 1995, the Diocesan Corporation received a complaint that Fr. T had sexually abused five siblings. Fr. T's file shows that the complaint was never resolved, but the Diocesan Corporation placed him on sick leave in 1995, allowed him to retire in 1998, and suspended him in 2004. **Instead of applying the *Charter* and the Essential Norms, the Diocesan Corporation failed to conduct an internal investigation into allegations that Fr. T had committed sexual abuse; failed to seek the DRB's assessment of sexual abuse allegations against Fr. T; and failed to refer Fr. T to the CDF.** Further, the Diocesan Corporation engaged in other improper conduct by (a) providing benefits and other compensation to Fr. T even though laicization would have relieved the Diocesan Corporation of its duty to financially support him and (b) failing to reasonably monitor Fr. T, exposing itself and minors to unnecessary risks. |
| 93. | 588. On March 13, 2018, in a brief memo from a diocesan staff member to the Diocesan Corporation's Victim Assistance Coordinator, Auxiliary Bishop Grosz, and a diocesan attorney, the staff member summarized that a caller to a diocesan hotline reported that: (a) in the late 1970s, a parent had related to the caller that Fr. T had sexually abused his, the parent's, son; (b) the parent and Fr. T had led a youth organization together; and (c) Fr. T had been transferred after the abuse. On March 20, 2018, the Diocesan Corporation identified Fr. T on a list of "diocesan priests who were removed from ministry, were retired, or left ministry after allegations of sexual abuse of a minor[, or . . . were] deceased priests with more than one allegation made against them." Shortly thereafter, Grosz typed the following note onto the March 13, 2018 memo: "Third hand report . . . Since not a first hand report, decision to place in the Chancery file of Fr. [T] as a reference." **The Diocesan Corporation failed to conduct an investigation as required by the *Charter* and the *Essential Norms*. Indeed, the Diocesan Corporation has publicly stated that it does in fact inquire into allegations, which are not considered firsthand.** |
| 94. | 589. **The Diocesan Corporation repeatedly violated the *Charter* and the Essential Norms by failing to conduct internal investigations into allegations that Fr. T had sexually abused minors; failing to seek the DRB's assessment of sexual abuse allegations against Fr. T; and failing to refer Fr. T to the CDF.** The Diocesan Corporation also failed to reasonably monitor Fr. T. The Diocesan Corporation's actions concealed Fr. T's conduct from the public and placed its beneficiaries at risk. |

| | |
|---|---|
| 95. | 590.  Fr. U was ordained in May 2000. His file contains a complaint of sexual abuse, which was submitted to the Diocesan Corporation in 2012. In 2013, Bishop Malone designated Fr. U as an unassignable priest. **Instead of applying the *Charter* and the *Essential Norms*, the Diocesan Corporation failed to sufficiently conduct a timely investigation into allegations that Fr. U had committed sexual abuse; failed to seek or, alternatively, reasonably document the DRB's assessment of sexual abuse allegations against Fr. U; and failed to refer Fr. U to the CDF.** Further, the Diocesan Corporation engaged in other misconduct by (a) providing benefits and other compensation to Fr. U even though his laicization would have relieved the Diocesan Corporation of its duty to financially support him and (b) failing to reasonably monitor Fr. U, exposing itself and minors to unnecessary risks. |
| 96. | 613.  **The Diocesan Corporation repeatedly violated the *Charter* and the Essential Norms by failing to sufficiently conduct a timely investigation into allegations that Fr. U had committed sexual abuse; failing to seek or, alternatively, reasonably document the DRB's assessment of sexual abuse allegations against Fr. U; and failing to refer Fr. U to the CDF.** The Diocesan Corporation also failed to reasonably monitor Fr. U. The Diocesan Corporation's actions concealed Fr. U's conduct from the public and placed its beneficiaries at risk |
| 97. | 614.  Fr. V was ordained in 1971. As early as 2004, the Diocesan Corporation was on notice of a substantial likelihood that Fr. V had sexually abused a vulnerable adult. In 2011, the Diocesan Corporation received a complaint alleging that Fr. V had groomed a minor. **Instead of applying the *Charter* and the *Essential Norms*, the Diocesan Corporation failed to seek or, alternatively, reasonably document the DRB's assessment of sexual abuse allegations against Fr. V and failed to refer Fr. V to the CDF.** Further, the Diocesan Corporation engaged in other improper conduct by (a) disregarding the risk of sexual abuse and preparing false records when it approved Fr. V's out-of-state ministry; (b) making false statements to its beneficiaries about why Fr. V left his ministry; (c) providing benefits and other compensation to Fr. V even though his laicization would have relieved the Diocesan Corporation of its duty to financially support him; and (d) failing to reasonably monitor Fr. V, exposing itself and minors to unnecessary risks. |
| 98. | 664.  **The Diocesan Corporation repeatedly violated the *Charter* and the Essential Norms by failing to seek or, alternatively, reasonably document the DRB's assessments of sexual abuse allegations against Fr. V and failing to refer Fr. V to the CDF.** Instead, it failed to sufficiently document the allegations made by Complainant 1 against Fr. V; made false or misleading statements to its beneficiaries; prepared false or misleading business records; failed to reasonably monitor Fr. V; and disregarded the risk that Fr. V could sexually abuse minors or adults. The Diocesan Corporation's actions concealed Fr. V's conduct from the public and placed its beneficiaries at risk. |
| 99. | 665.  Fr. W was ordained in 1970. As early as 1993, the Diocesan Corporation was on notice of a substantial likelihood that Fr. W had sexually abused a minor yet allowed him to retire and leave ministry. **Years later, instead of applying the *Charter* and the *Essential Norms*, the Diocesan Corporation failed to conduct internal investigations into allegations** |

|   | |
|---|---|
|   | that Fr. W had sexually abused minors; failed to seek or, alternatively, reasonably document the DRB's assessment of sexual abuse allegations against Fr. W; and failed to refer Fr. W to the CDF. Further, the Diocesan Corporation engaged in other improper conduct by (a) failing to maintain any record of Fr. W's alleged sexual abuse of a minor and (b) failing to reasonably monitor Fr. W, exposing itself and minors to unnecessary risks. |
| 100. | 679.  In March 2012, Complainant 2 filed a complaint with the Diocesan Corporation, alleging that in about 1978 or 1979, Fr. W had groomed and repeatedly sexually abused him, when he was fifteen or sixteen years old. Fr. W's file does not contain any decrees opening or closing a diocesan investigation into Complainant 2's claims. **The Diocesan Corporation failed to investigate Complainant 2's allegations pursuant to the *Charter* and the *Essential Norms*.** |
| 101. | 680.  In June 2012, Complainant 3 filed a complaint with the Diocesan Corporation, alleging that in 1971, when he was twelve or thirteen years old, Fr. W took him to his bedroom in the rectory, undressed him, and touched his genitals until he defended himself. The Complainant also alleged that when he was seventeen or eighteen years old, Fr. W fondled him. Fr. W's file does not contain any decrees opening or closing a diocesan investigation into Complainant 3's claims. **The Diocesan Corporation failed to investigate Complainant 3's allegations pursuant to the *Charter* and the *Essential Norms*.** |
| 102. | 692.  **The Diocesan Corporation repeatedly violated the *Charter* and the Essential Norms by failing to conduct internal investigations into allegations that Fr. W had sexually abused minors; failing to seek or, alternatively, reasonably document the DRB's assessment of sexual abuse allegations against Fr. W; and failing to refer Fr. W to the CDF**. Instead, it failed to maintain any record of Fr. W's sexual abuse of a minor and failed to reasonably monitor Fr. W. The Diocesan Corporation's actions concealed Fr. W's conduct from the public and placed its beneficiaries at risk. |
| 103. | 693.  Fr. X was ordained in 1974.47 As early as 1988, the Diocesan Corporation was on notice of a substantial likelihood that Fr. X had sexually abused a minor. **Years later, instead of applying the *Charter* and the *Essential Norms*, the Diocesan Corporation allowed Fr. X to resign his pastorate**. The Diocesan Corporation also failed to conduct an internal investigation into allegations that Fr. X had sexually abused a minor; failed to seek or, alternatively, reasonably document the DRB's assessment of sexual abuse allegations against Fr. X; and failed to refer or timely refer Fr. X to the CDF. Further, the Diocesan Corporation engaged in other improper conduct by (a) failing to maintain any record of Fr. X's sexual abuse of a minor; (b) creating false or misleading records to establish a purported, legitimate basis for Fr. X's resignation and eligibility for associated benefits; (c) providing these benefits and other compensation to Fr. X even though his laicization would have relieved the Diocesan Corporation of its duty to financially support him; and (d) failing to reasonably monitor Fr. X, exposing itself and minors to unnecessary risks. |

| | |
|---|---|
| 104. | 702.  **After the *Charter* was adopted, the Diocesan Corporation failed to investigate or, alternatively, document its investigation of at least one complaint of sexual abuse against Fr. X, which the Diocesan Corporation must have received before 2002.** |
| 105. | 713.  **The Diocesan Corporation repeatedly violated the *Charter* and the Essential Norms by failing to conduct an internal investigation into allegations that Fr. X had sexually abused a minor; failing to seek or, alternatively, reasonably document the DRB's assessment of sexual abuse allegations against Fr. X; and failing to refer or timely refer Fr. X to the CDF.** Instead, it failed to maintain any record of Fr. X's sexual abuse of a minor; prepared false or misleading business records; and failed to reasonably monitor Fr. X. The Diocesan Corporation's actions concealed Fr. X's conduct from the public and placed its beneficiaries at risk. |
| 106. | 734.  **The Diocesan Corporation violated the *Charter* and the *Essential Norms* by failing to reasonably document the DRB's assessment of sexual misconduct allegations against Fr. Y.** Instead, it failed to reasonably document allegations that Fr. Y had sexually abused a minor; failed to sufficiently investigate allegations that Fr. Y had sexually abused an adult; prepared false or misleading business records; failed to reasonably monitor Fr. Y; and disregarded the risk that Fr. Y could sexually abuse another person. The Diocesan Corporation's actions concealed Fr. Y's conduct from the public and placed its beneficiaries at risk. |
| 107. | 739.  The Diocesan Corporation, acting through its fiduciaries, trustees, officers, de facto directors and officers, employees, staff, or agents, failed to properly administer its affairs because, among other things, it**: (a) failed to comply with material provisions of the *Charter*, the *Essential Norms*, or the Diocesan Policies and Procedures, namely, the requirements that it (i) conduct or, alternatively, sufficiently conduct timely and independent internal investigations into allegations that priests had sexually abused minors; (ii) seek or, alternatively, reasonably document the DRB's assessments of allegations that priests had sexually abused minors; and (iii) refer or, alternatively, timely refer priests accused of the sexual abuse of minors to the CDF;** (b) failed to reasonably document allegations that priests had sexually abused minors or adults; (c) failed to sufficiently investigate allegations that certain priests had sexually abused adults; (d) failed to inquire into the Diocesan Corporation's failures to adhere to its material policies and procedures and to attempt, in good faith, to develop remedial measures to avoid these failures in the future; (e) failed to reasonably monitor priests accused of sexually abusing minors or adults; (f) disregarded the risks that certain priests could sexually abuse minors or adults; (g) prepared false or misleading business records related to priests accused of sexually abusing minors or adults; (h) made false or misleading statements to the public and its beneficiaries regarding the status of priests accused of sexually abusing minors or adults; (i) failed to provide appropriate or additional training to diocesan officials, who violated the *Charter*, the *Essential Norms*, the Diocesan Policies and Procedures, or applicable standards of care; (j) misled the public and its beneficiaries about its adherence to its policies and practices governing the response to allegations that priests |

| | |
|---|---|
| | had sexually abused minors; and (k) improperly administered its assets or funds by, for example, providing compensation and benefits to certain priests accused of the sexual abuse of minors |
| 108. | 740.  **The Diocesan Corporation was harmed through its improper administration because, among other things, it: (a) exposed beneficiaries to unnecessary risks of sexual abuse; (b) provided improper compensation and benefits to priests accused of sexually abusing minors; and (c) suffered damages from its failure to follow the *Charter* and the *Essential Norms*.** |
| 109. | 745.  The Diocesan Corporation, acting through its fiduciaries, trustees, de facto directors and officers, employees, staff, and agents, engaged in unauthorized activities by, among other things: **(a) failing to comply with material provisions of the *Charter*, the *Essential Norms*, or the Diocesan Policies and Procedures, namely, the requirements that it (i) conduct or, alternatively, sufficiently conduct timely and independent internal investigations into allegations that priests had sexually abused minors; (ii) seek or, alternatively, reasonably document the DRB's assessments of allegations that priests had sexually abused minors; and (iii) refer or, alternatively, timely refer priests accused of the sexual abuse of minors to the CDF**; (b) failing to reasonably document allegations that priests had sexually abused minors or adults; (c) failing to sufficiently investigate allegations that certain priests had sexually abused adults; (d) failing to inquire into the Diocesan Corporation's failures to adhere to its material policies and procedures and to attempt, in good faith, to develop remedial measures to avoid these failures in the future; (e) failing to reasonably monitor priests accused of sexually abusing minors or adults; (f) disregarding the risks that certain priests could sexually abuse minors or adults; (g) preparing false or misleading business records related to priests accused of sexually abusing minors or adults; (h) making false or misleading statements to the public and its beneficiaries regarding the status of priests accused of sexually abusing minors or adults; (i) failing to provide appropriate or additional training to diocesan officials, who violated the *Charter*, the *Essential Norms*, the Diocesan Policies and Procedures, or applicable standards of care; (j) misleading the public and its beneficiaries about its adherence to its policies and practices governing the response to allegations that priests had sexually abused minors; and (k) improperly administering its assets or funds by, for example, providing compensation and benefits to certain priests accused of the sexual abuse of minors. |
| 110. | 746.  The Diocesan Corporation was harmed by its unauthorized activities because, among other things, it: (a) exposed beneficiaries to unnecessary risks of sexual abuse; (b) provided improper compensation and benefits to priests accused of sexually abusing minors; and (c) suffered damages **from its failure to follow the *Charter* and the *Essential Norms*.** |
| 111. | 751.  Bishop Malone and Auxiliary Bishop Grosz failed to discharge their duties as fiduciaries, trustees, or de facto directors and officers in good faith and with the required degree of care, skill, prudence, diligence, and undivided loyalty because they, among other things: **(a) failed to comply with material provisions of the *Charter*, the *Essential Norms*, or the Diocesan Policies and Procedures, namely, the requirements that the Diocesan Corporation: (i) conduct or,** |

| | |
|---|---|
| | **alternatively, sufficiently conduct timely and independent internal investigations into allegations that priests had sexually abused minors; (ii) seek or, alternatively, reasonably document the DRB's assessments of allegations that priests had sexually abused minors; and (iii) refer or, alternatively, timely refer priests accused of the sexual abuse of minors to the CDF**; (b) failed to sufficiently investigate allegations that certain priests had sexually abused adults; (c) failed to inquire into the Diocesan Corporation's failures to adhere to its material policies and procedures and to attempt, in good faith, to develop remedial measures to avoid these failures in the future; (d) failed to reasonably monitor priests accused of sexually abusing minors or adults; (e) disregarded the risks that certain priests could sexually abuse minors or adults; (g) prepared false or misleading business records related to priests accused of sexually abusing minors or adults; (h) made false or misleading statements to the public and the Diocesan Corporation's beneficiaries regarding the status of priests accused of sexually abusing minors or adults; (i) failed to provide appropriate or additional training to diocesan officials, who violated the *Charter*, the *Essential Norms*, the Diocesan Policies and Procedures, or applicable standards of care; (j) misled the public and the Diocesan Corporation's beneficiaries about the Diocesan Corporation's adherence to its policies and practices governing the response to allegations that priests had sexually abused minors; or (k) improperly administered the Diocesan Corporation's assets or funds by, for example, providing compensation and benefits to certain priests accused of the sexual abuse of minors. |
| 112. | 752.  The Diocesan Corporation was harmed through Bishop Malone's and Auxiliary Bishop Grosz's breaches of fiduciary duties because, among other things, they caused the Diocesan Corporation to (a) expose its beneficiaries to unnecessary risks of sexual abuse; (b) provide improper compensation and benefits to priests accused of sexually abusing minors; and (c) suffer damages **from its failure to follow the *Charter* and the *Essential Norms*** |
| 113. | 756.  Bishop Malone and Auxiliary Bishop Grosz failed to properly administer the Diocesan Corporation because they, among other things: **(a) failed to comply with material provisions of the *Charter*, the *Essential Norms*, or the Diocesan Policies and Procedures, namely, the requirements that the Diocesan Corporation: (i) conduct or, alternatively, sufficiently conduct timely and independent internal investigations into allegations that priests had sexually abused minors; (ii) seek or, alternatively, reasonably document the DRB's assessments of allegations that priests had sexually abused minors; and (iii) refer or, alternatively, timely refer priests accused of the sexual abuse of minors to the CDF;** (b) failed to sufficiently investigate allegations that certain priests had sexually abused adults; (c) failed to inquire into the Diocesan Corporation's failures to adhere to its material policies and procedures and to attempt, in good faith, to develop remedial measures to avoid these failures in the future; (d) failed to reasonably monitor priests accused of sexually abusing minors or adults; (e) disregarded the risks that certain priests could sexually abuse minors or adults; (g) prepared false or misleading business records related to priests accused of sexually abusing minors or adults; (h) made false or misleading statements to the public and the Diocesan Corporation's beneficiaries regarding the status of priests accused of sexually abusing minors or adults; (i) failed to provide appropriate or additional training to diocesan officials, who violated |

| | |
|---|---|
| | the *Charter*, the *Essential Norms*, the Diocesan Policies and Procedures, or applicable standards of care; (j) misled the public and the Diocesan Corporation's beneficiaries about the Diocesan Corporation's adherence to its policies and practices governing the response to allegations that priests had sexually abused minors; or (k) improperly administered the Diocesan Corporation's assets or funds by, for example, providing compensation and benefits to certain priests accused of the sexual abuse of minors. |
| 114. | 758.  The Diocesan Corporation was harmed through Bishop Malone's and Auxiliary Bishop Grosz's improper administration of the Diocesan Corporation because, among other things, they caused the Diocesan Corporation to (a) expose its beneficiaries to unnecessary risks of sexual abuse; (b) provide improper compensation and benefits to priests accused of sexually abusing minors; and (c) **suffer damages from its failure to follow the *Charter* and the *Essential Norms*.** |
| 115. | Prayer for Relief …. 1. Ordering the Diocesan Corporation and Bishop Scharfenberger, as Apostolic Administrator for the Diocesan Corporation, to comply with, and enjoining them from further violating: (a) their legal obligations under the EPTL, RCL, and N-PCL to ensure that the Diocesan Corporation and its charitable assets are properly administered and that the Diocesan Corporation's charitable beneficiaries are protected **by, among other things, requiring the Diocesan Corporation and those that administer it to comply with the *Charter*, the *Essential Norms*, and the Diocesan Policies and Procedures and** (b) their obligations referred to in subsection (a) of this paragraph that require the Diocesan Corporation to: … |