

STATE OF NEW YORK
OFFICE OF THE ATTORNEY GENERAL

LETITIA JAMES
ATTORNEY GENERAL

DIVISION OF SOCIAL JUSTICE
CHARITIES BUREAU

212.416.6172
Catherine.Suvari@ag.ny.gov

May 13, 2021

**Via Electronic Filing**

Hon. Ronnie Abrams
United States District Court
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007

    Re:  *People* v. *Diocese of Buffalo et al.*, No. 21-cv-189

Dear Judge Abrams:

   Plaintiff, the Attorney General of the State of New York, has moved to remand this action to state court on several grounds, including that the action is exempt from removal as "related to" the defendant Diocese of Buffalo's pending bankruptcy because the Attorney General's claims represent an exercise of police and regulatory power that is expressly carved out of the Bankruptcy Code's mechanism for "relation to" removal. Briefing of the Attorney General's motion was completed on March 25, 2021.

   I write to inform the Court of two recent decisions that identify enforcement actions like this one as materially different from the type of matter eligible for consolidation in bankruptcy. The decisions review many of the same issues raised by the Attorney General's pending remand motion and are submitted as new, non-binding authority for the Court's consideration.

   Both decisions relate to a bankruptcy filing by the National Rifle Association of America, Inc. (the "NRA"), a New York chartered not-for-profit corporation. The NRA filed for bankruptcy on January 15, 2021 after being sued in separate civil regulatory enforcement actions by the Attorneys General of New York and the District of Columbia. (The D.C. enforcement action also asserts claims against the NRA Foundation, an NRA-affiliated charity chartered in the District of Columbia.) Both state enforcement actions allege violations of state law standards for the governance and operation of the defendant entities as non-profits and charitable institutions.

   On April 14, 2021, the Superior Court for the District of Columbia applied the police and regulatory power exception in 11 U.S.C. § 362(b) to the D.C. enforcement action to exempt that action from the automatic stay provision triggered by the NRA's bankruptcy filing. *See* Exhibit A (Order dated April 14, 2021, *District of Columbia* v. *NRA Foundation, Inc.*, No. 2020 CA 003454 B (Sup. Ct. D.C.)). The Court's analysis focused directly on the question of whether an

enforcement action seeking injunctive relief to preserve charitable assets could properly qualify as an exercise of "police and regulatory power."

The D.C. Superior Court considered and rejected many of the same arguments that Defendants assert here, including that the action does not represent an exercise of "police power" because it does not seek to vindicate any public policy or purpose and that the equitable relief sought will necessarily intrude on the Diocese's pending reorganization.  *See* Mem. of Law in Opposition, Docket No. 22, at 18-19 & 24.  Refusing to stay the D.C. Attorney General's action in response to such arguments, the D.C. Court explained the nature and purpose of the "police and regulatory power" test as follows:

> Regardless of the name of the test, the Court agrees with the District [that] the relevant inquiry is whether the government's enforcement action is being pursued "solely to advance a pecuniary interest of the governmental unit," in which case the stay will be imposed, or whether its purpose is to "promote public safety and welfare or to effectuate public policy," and the [police and regulatory powers] exception to the automatic stay applies.  This suit is to promote the public welfare by ensuring that the Foundation is properly governed and to maintain the integrity of nonprofits in the District of Columbia.  Furthermore, the purpose of the [equitable relief] sought in this case is to prevent unjust enrichment, recover proceeds wrongfully held by a party for the benefit of the nonprofit, and deter future violations of nonprofit laws. "The authority to protect the public welfare would be largely meaningless without the power to punish and prevent. Such steps violate neither the pecuniary purpose test nor the public policy test." *In re Charter First Mortg., Inc.*, 42 B.R. [380,] 384 [(Bankr. D. Or. 1984)].

Exhibit A, at 11-12.

On May 11, 2021, the U.S. Bankruptcy Court for the Northern District of Texas dismissed the NRA's bankruptcy petition on the ground that the NRA had pursued its petition in bad faith to evade the New York Attorney General's regulatory enforcement action, which asserts claims for dissolution. *See* Exhibit B (Order Granting Motion to Dismiss, *In re National Rifle Association of America and Sea Girt, LLC*, Case No. 21-30085 (HDH), Docket No. 740 (N.D. Tex. May 11, 2021)). The NRA argued that it was seeking to reorganize in bankruptcy to, among other reasons, escape an allegedly hostile regulatory environment in New York, which it claims infringes on its First Amendment rights.[1] *Id.* at 21-22.

The Bankruptcy Court's analysis distinguished the Attorney General's claims against the NRA from the type of claim for monetary relief that may be properly incorporated into a financial reorganization:

---

[1]    The NRA also filed a federal lawsuit in response to the New York enforcement action alleging that the New York Attorney General has violated the organization's First Amendment rights. *See* Amended Complaint, *National Rifle Association of America, Inc. v. James*, Index No. 1:20-cv-00889-MAD-TWD (N.D.N.Y.), Docket No. 13.

> There is a difference . . . between a lawsuit in which a party seeks a monetary judgment that would pose an existential threat to a debtor and one where the attorney general of a state is specifically seeking [equitable relief] under the state's laws and therefore required to satisfy standards and requirements that specifically justify [that result].

Exhibit B, at 27-28. Permitting the NRA to avoid the equitable remedies available to the Attorney General under New York law by seeking reorganization in a federal bankruptcy proceeding would, the Bankruptcy Court explained, "deprive the State of New York of the ability to regulate not-for-profit corporations in accordance with its laws." *Id.* at 30. The Bankruptcy Court specifically noted that the police and regulatory power carve-out from bankruptcy jurisdiction exists in part to insulate the operation of such regulatory functions from any tactical use of a bankruptcy process. *See id.* (citing *Halo Wireless, Inc.* v. *Alenco Commc'ns Inc.*, 684 F.3d 581, 587-88 (5th Cir. 2012)) ("[S]ection 362(a)(4) assists with the goal of discouraging debtors from submitting bankruptcy petitions either primarily or solely for the purpose of evading impending governmental efforts to invoke the governmental police powers to enjoin or deter ongoing debtor conduct that would seriously threaten the public safety and welfare[.]").

The Attorney General's claims in this action seek to apply well-established regulatory standards in New York non-profit law to advance a recognized public interest in the effective regulation of charities and to protect the public from the risk of clergy sexual abuse. *See* Mem. of Law in Support of the Attorney General's Motion to Remand, Docket No. 16, at 10-11; Reply Mem., Docket No. 26, at 2-4. These claims are precisely the type of governmental function, in service of a clear public safety benefit, that the Bankruptcy Code exempts from "relation to" removal, and they warrant the same protection that the D.C. Superior Court and U.S. Bankruptcy Court for the Northern District of Texas have recently recognized as central to an effective exercise of non-profit enforcement authority. For all of the reasons highlighted in those Orders and in the Attorney General's prior briefing, we respectfully request that the Court find that this action is exempt from removal under 28 U.S.C. § 1452(a) and should be remanded to New York State Court for further proceedings.

Respectfully submitted,

*/s/ Catherine Suvari*

Assistant Attorney General

Attachments

cc:     Counsel of Record (via ECF)

# EXHIBIT A

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

**DISTRICT OF COLUMBIA,**

**Plaintiff,**

**v.**

**NRA FOUNDATION INC,** *et al.*,

**Defendants.**

**Case No.: 2020 CA 003454 B**

**Judge José M. López**
**Civil Calendar 14**

**ORDER**

Before the Court is Plaintiff District of Columbia's Motion for Reconsideration of the Court's February 1, 2021 Order (the "Motion"), filed February 8, 2021; Defendant National Rifle Association of America, Inc.'s Points and Authorities in Opposition to the District's Motion for Reconsideration ("NRA Opposition"), filed February 22, 2021; Defendant NRA Foundation, Inc.'s Points and Authorities in Opposition to the Motion for Reconsideration ("Foundation Opposition"), filed February 22, 2021; and the District of Columbia's Reply to Defendants' Opposition to the Motion, filed March 8, 2021. Also before the Court is Plaintiff's Consent Motion for Leave to Exceed Page Limits, which is granted. The Court has considered the pleadings, the relevant law, and the entire record. For the following reasons, the Motion is granted.

**BACKGROUND**

On August 6, 2020, the District of Columbia (the "District") filed its Complaint against Defendants National Rifle Association of America, Inc. ("NRA") and the NRA Foundation, Inc.

1

("Foundation") alleging statutory and common law violations and seeking various forms of equitable relief: a modification of the Foundation's governance policies to ensure the Foundation's proper independence from the NRA, a receiver to monitor the Foundation's financial decisions and the modification of the Foundation's governance policies, an order directing the Foundation's board to participate in nonprofit governance training, and a constructive trust for the benefit of the Foundation's nonprofit purpose over Foundation funds allegedly improperly diverted to the NRA. Compl. at 23.

On December 21, 2020, this Court granted in part Defendants' motions to dismiss, dismissing Counts IV and V of the Complaint while denying the motions as to Counts I-III. Less than one month later, on January 18, 2021, the NRA notified the Court that it had filed for Chapter 11 bankruptcy.

On February 1, 2021, the Court issued an order staying the matter (the "Order"), finding that because this action may result in a constructive trust over funds currently held by the NRA, those funds would not be available for distribution in bankruptcy. Order at 2-3. The District now moves for reconsideration of this Court's February 1, 2021 Order staying this action until the Chapter 11 proceedings are concluded.

## STANDARD OF REVIEW

Super. Ct. Civ. R. Rule 54(b), governs requests for reconsideration of interlocutory orders. Rule 54(b) states,

> [A]ny order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time

2

before the entry of a judgment adjudicating all the claims and all the parties'
rights and liabilities.

A court may reconsider an interlocutory decision "as justice requires." *Capitol Sprinkler
Inspection, Inc. v. Guest Servs., Inc.*, 630 F.3d 217, 227, 394 U.S. App. D.C. 73 (D.C. Cir. 2011)
(internal citation and quotation marks omitted). Under this standard, reconsideration may be
warranted where the court has "'patently misunderstood the parties, made a decision beyond the
adversarial issues presented, made an error in failing to consider controlling decisions or data, or
[where] a controlling or significant change in the law has occurred.'" *Arias v. DynCorp*, 856 F.
Supp. 2d 46, 52 (D.D.C. 2012) (quoting *Negley v. F.B.I.*, 825 F. Supp. 2d 58, 60 (D.D.C. 2011)).
The burden is on the moving party to show that reconsideration is appropriate and that harm or
injustice would result if reconsideration were denied. *Husayn v. Gates*, 588 F. Supp. 2d 7, 10
(D.D.C. 2008).  A court may deny a motion for reconsideration when it raises "'arguments for
reconsideration the court ha[s] . . . already rejected on the merits.'" *McLaughlin v. Holder*, Civil
Action No. 11-1868 (RWR), 864 F. Supp. 2d 134, 2012 U.S. Dist. LEXIS 72911, 2012 WL
1893627, at *6 (D.D.C. May 25, 2012) (quoting *Capitol Sprinkler Inspection, Inc.*, 630 F.3d at
227). Though the Court retains broad discretion to hear a motion for reconsideration brought
under Rule 54(b), "the efficient administration of justice requires that a court at the very least
have good reason to reconsider an issue which has already been litigated by the parties. . ." *In
Def. of Animals v. Nat. Inst. of Health*, 543 F.Supp.2d 70, 76 (D.D.C. 2008).


## ANALYSIS

The District argues that the Court should reconsider the Order and lift the stay for four
reasons: 1) the test proffered by the NRA has not been accepted in this jurisdiction while case
law supports the finding that the District's civil enforcement actions are not subject to the

3

automatic stay, 2) the police and regulatory powers exception applies to enforcement actions even if the government seeks equitable monetary relief, 3) 11 U.S.C. § 362(b)(4) allows a governmental unit to use its police and regulatory power to litigate a matter seeking a money judgment, even if it must eventually enforce that judgment in the bankruptcy court; and 4) extending the automatic stay to the Foundation is only warranted in "unusual circumstances," which the District argues are not present here. Mot. at 2-3.

The NRA opposes the Motion arguing that it should be denied for two reasons: 1) the District has failed to demonstrate that it will be harmed if reconsideration is not granted, and 2) the legal arguments set forth by the District are without merit. NRA Opp'n at 4. Similarly, the Foundation argues that the District has failed to provide grounds for relief, as it simply uses the Motion to advance an argument it could have raised earlier, and that the District's statements that this matter is "entering discovery" and that "witness lists are due in two weeks" are false. Foundation Opp'n at 4-5.

### I.     The District Has Plead Grounds for Relief Under Rule 54(b).

As a preliminary matter, the Court will address the NRA and Foundation's argument that the District has failed to provide grounds for relief under Rule 54(b).  The NRA argues that the District has failed to show that it will be harmed if reconsideration is not granted and the Foundation argues that the District has not shown that the Court "patently misunderstood" the District's arguments, made a decision "outside the adversarial issues presented" to it, made and "error … of apprehension," or that a controlling or significant change in the law or facts has occurred. *See* Foundation Opp'n at 3; NRA Opp'n at 4.

4

First, the NRA argues that in order for reconsideration to be granted, "it must be the case that, some sort of 'injustice' will result if reconsideration is refused" and that "the movant must demonstrate that some harm, legal or at least tangible, would flow from a denial of reconsideration." NRA Opp'n at 4-5 (quoting *Cobell v. Norton*, 355 F. Supp. 2d 531, 540 (D.D.C. 2005)). As the District has failed to identify any harm that would result from this Court's refusal to reconsider the Order, the NRA argues the Motion should be denied. NRA Opp'n at 5.

Second, the Foundation argues that the District has failed to show that "justice requires" this Court to reconsider the Order. As noted above, a court may reconsider an interlocutory decision "as justice requires" and that, under this standard, reconsideration may be warranted where the court has "'patently misunderstood the parties, made a decision beyond the adversarial issues presented, made an error in failing to consider controlling decisions or data, or [where] a controlling or significant change in the law has occurred.'" *Arias v. DynCorp*, 856 F. Supp. 2d 46, 52 (D.D.C. 2012) (quoting *Negley v. F.B.I.*, 825 F. Supp. 2d 58, 60 (D.D.C. 2011)).

The Court is unpersuaded by these arguments. The Court has broad discretion to hear a motion for reconsideration brought under Rule 54(b). *See, e.g., Bernal v. United States*, 162 A.3d 128, 133 (D.C. 2017) (rejecting the "argument that a motion for reconsideration can only be granted when the party seeking reconsideration presents newly discovered evidence, [shows that] there has been an intervening change in the law, or . . . demonstrate[s] that the original decision was based on a manifest error of law or was clearly unjust") (internal quotation marks and citations omitted). Indeed, one basis for reconsideration under Rule 54(b) is when it becomes clear that "the original decision was based on a manifest error of law or was clearly unjust." *Hackman v. One Brands*, LLC, 2019 D.C. Super. LEXIS 11 at *4 (quoting *Bernal*, 162 A.3d at

133). This is precisely what the District is arguing here, and therefore this Court will not deny the Motion for failing to meet the standard for reconsideration.

## II.     The Court Applied the Wrong Test When Determining Whether the Exception to the Automatic Stay Applies.

The District first argues that this Court should allow its enforcement action to proceed under 11 U.S.C § 362(b)(4) as an exercise of the District's police and regulatory power. To reach this conclusion, the District argues that the Court should apply the "pecuniary interest test" and the "public policy test," rather than the NRA-recommended "pecuniary advantage" test.

In the Order, this Court determined that the automatic stay imposed by Section 362(a) of the Bankruptcy Code, 11 U.S.C. §§ 101-1532, was applicable after looking to "what specific acts the government wishes to carry out and determin[ing] [that] such execution would result in an economic advantage to the government or its citizens over third parties in relation to the debtor's estate." Order at 2 (quoting *In re Charter First Mortg., Inc.*, 42 B.R. 380, 382 (Bankr. D. Or. 1984)). The Court further noted that only "when a governmental proceeding will not conflict with the bankruptcy court's control of the property of the debtor and will not otherwise create a pecuniary advantage for the government, the proceeding will be excepted from the automatic stay[.]" Order at 2 (quoting *In re Psychotherapy & Counseling Ctr., Inc.*, 195 B.R. 522, 527-28 (Bankr. D.D.C. 1996) (internal citations omitted)). The Court found that imposition of the constructive trust sought by the District would place the District at an economic advantage over third-party creditors. Order at 3. This test applied by the Court was introduced by the NRA as the "pecuniary advantage" test. *See* NRA's Reply Regarding the District's Response to Notice and Suggestion of Bankruptcy at 2, Jan. 26, 2021. Further review of the underlying case law reveals

that the Court improperly analysed whether the § 362(b)(4) exception to the automatic stay applied to the instant matter.

The court in *In re Charter First Mortg., Inc.*, 42 B.R. 380 (Bankr. D. Or. 1984) describes what it calls the "pecuniary purpose" test. In this case, the State of Washington, despite knowledge of the debtor's bankruptcy, decided to proceed with its consumer protection action against the debtor. 42 B.R. at 381. The court noted that bankruptcy courts have applied two tests in deciding which governmental proceedings are exempted by section 362(b)(4): "the pecuniary purpose and the public policy test." In applying the pecuniary purpose test, a court "must look to what specific acts the government wishes to carry out and determine if such execution would result in an economic advantage to the government or its citizens over third parties in relation to the debtor's estate." *Id.* at 382. The court noted that the "pecuniary purpose" test is derived from language in the legislative history of the Bankruptcy Code, that § 362(b)(4) "is intended to be given a narrow construction in order to permit governmental units to pursue action to protect the public health and safety and not to apply to actions by a governmental unit to protect a pecuniary interest in property of the debtor or property of the estate." *Id.* at 382 (internal citations omitted). Meanwhile, the "public policy" test "attempts to distinguish between those proceedings which fulfill a public policy and those which adjudicate private rights." *Id.* at 383. The court ultimately found that,

> it is totally appropriate for [the State of] Washington to proceed in the state court to attempt to obtain an injunction, civil penalties and attorney fees and costs against debtor for alleged violation of its Consumer Protection Act. Such state powers are a necessary and important adjunct to its responsibility to protect its whole citizenry from deceptive consumer practices. The authority to protect the public welfare would be largely meaningless without the power to punish and prevent. Such steps violate neither the pecuniary purpose test nor the public policy test.

*Id.* at 384.

The case of *In re Psychotherapy & Counseling Ctr., Inc.*, 195 B.R. 522 (Bankr. D.D.C. 1996) provides more clarity on what it calls the "pecuniary advantage" test. This case arose out of the United States Department of Health and Human Services' investigation of a debtor for alleged violations of the False Claims Act in connection with the Medicare and Medicaid provider reimbursement program. 95 B.R. at 524. The court noted that, in determining whether § 362(b)(4), the exception to the automatic stay, applies to a certain governmental proceeding, the United States District Court for the District of Columbia has applied "what could be called the 'pecuniary advantage' test." *Id*. The relevant inquiry under this test is as follows:

> [W]hen a governmental proceeding will not conflict with the bankruptcy court's control of the property of the debtor and will not otherwise create a pecuniary advantage for the government, the proceeding will be excepted from the automatic stay provision of the Bankruptcy Code, 11 U.S.C. § 362(a), by means of § 362(b)(4) of the Code, provided the proceeding is pursuant to the police or regulatory powers of that governmental unit.

*Id.* at 527-28 (quoting *United States ex rel. Marcus v. NBI, Inc.*, 142 Bankr. 1, 3 (D.D.C. 1992).

The court noted that a "more narrow approach," based on comments during the floor debates recorded in the legislative history, is referred to as the "pecuniary interest" test. *Id.* at 528. As opposed to the "pecuniary advantage" test, the "pecuniary interest" test holds that actions by a governmental unit will only be excepted from the automatic stay if the government is seeking through its action to protect public health, safety, and welfare and not seeking to protect a pecuniary interest. *Id*. The Eight Circuit has rejected this narrower "pecuniary interest" test, stating that:

> [S]uch a reading of section § 362(b)(4) and of that provision's legislative history would render the exception unworkable. It is generally the case that the government regulates private conduct by establishing penalties for certain

> violations of rules it prescribes. This does not mean that when it seeks to
> enforce the regulatory scheme in question, it is merely seeking to protect some
> "pecuniary interest" in the monies represented by the penalties or damages
> levied . . . Under the "pecuniary interest" test as it seems to be applied, a
> money judgment could never be entered against a debtor, for it would
> necessarily represent only a "pecuniary interest" in the property of the debtor
> thus triggering the automatic stay.

*In re Psychotherapy & Counseling Ctr., Inc.*, 195 B.R. at 528 (quoting *In re Commonwealth*

*Companies,* 913 F.2d 518, 524-25 (8th Cir. 1990)).

It may seem confusing because the District asserts in its Motion that, under the

"*pecuniary interest"* test, the court determines "whether the government action related primarily

to the protection of the government's pecuniary interest in the debtor's property or to matters of

public safety and welfare." Mot. at 5 (citing *District of Columbia v. Town Sports International,*

*LLC*, No. 2019 CA 000126 B (D.C. Super. Ct. Oct. 5, 2020) at 7 (quoting *Commonwealth of*

*Mass v. First Alliance Mortg. Co.,* 263 B.R. 99, 114 (B.A.P. 9th Cir. 2001))). However, upon

examination of *First Alliance Mortg. Co.*, the court refers to the test it applies as the "*pecuniary*

*purpose*" test, under which the relevant inquiry is whether the action is being pursued "*solely* to

advance a pecuniary interest of the governmental unit," in which case the stay will be imposed.

*First Alliance Mortg. Co.,* 263 B.R. at 107 (internal citations omitted). In other words, it appears

to this Court that the District intends to argue that the "pecuniary purpose" test should be

applied. This assumption is also supported by the fact that the District refers to the two

commonly accepted tests as the "*pecuniary purpose/interest*" test and the "public policy" test in

its Reply. Reply at 3 (emphasis added).

In *Lockyer v. Mirant Corp.*, 398 F.3d 1098 (9th Cir. 2005), the 9th Circuit Court of

Appeals noted that a suit comes within the § 362(b)(4) exception if it satisfies either the

"pecuniary purpose" or "public purpose" test. Under the "pecuniary purpose" test, "the court

determines whether the [government] action relates primarily to the protection of the government's pecuniary interest in the debtors' property or to matters of public safety and health." 398 F.3d at 1108 (quoting *NLRB v. Continental Hagen Corp.,* 932 F.2d 828, 828 (9th Cir. 1991)). Under the "public purpose" test, which is referred to elsewhere as the "public policy" test, the court determines whether the government seeks to "effectuate public policy" or to adjudicate "private rights." *Id.* at 1109. "A suit does not satisfy the 'public purpose' test if it is brought primarily to advantage discrete and identifiable individuals or entities rather than some broader segment of the public." *Id.* Finding that the government's Clayton Act suit satisfies both tests, the *Mirant* court held that the exception to the automatic stay applies. *Id.*

The NRA notes that, to support its finding that the governmental action satisfied the "pecuniary purpose" test, the *Mirant* court found that "[t]here [was] nothing in [the requested] relief that would allow the Attorney General to gain an advantage over creditors in the bankruptcy proceeding." *Mirant Corp.*, 398 F.3d at 1109. In contrast, the NRA argues that the District would have a significant advantage over other creditors. NRA Opp'n at 10. This however, was not the only reason the court found that the suit satisfied the "pecuniary purpose" test: "[f]urhter, it is clear that the suit seeks to protect the welfare of electricity consumers in northern California by protecting them from the excessive changes that might result from an undue concentration of market power." *Mirant Corp.*, 398 F.3d at 1109.

Here, the District argues that the exception to the automatic stay applies because the District does not have a pecuniary interest in the constructive trust, which is for the benefit of the Foundations' nonprofit purpose. Mot. at 5. Therefore, under the "pecuniary purpose/interest" test, the exception to the automatic stay applies because the District does not receive any money if it prevails; rather, the requested constructive trust serves the public interest, not the pecuniary

interest of the District. Mot. at 5. Similarly, under the public policy test, the District argues that the exception to the automatic stay applies because the purpose of the Nonprofit Corporation Act of 2010 ("NCA") and the Attorney General's relevant common law authority is to protect the public interest in ensuring that nonprofits operate in furtherance of their public, charitable purposes. Mot. at 6.

The NRA argues that the Court applied the proper test, as the "pecuniary advantage" test is consistent with the legislative history of § 362(b)(4). The NRA notes that the Eight Circuit has opined:

> This limitation on the scope of § 362(b)(4) is consistent with Congress' rationale for not extending the exception to permit the enforcement of a money judgment: 'Since the assets of the debtor are in the possession and control of the bankruptcy court, and since they constitute a fund out of which all creditors are entitled to share, enforcement by a governmental unit of a money judgment would give it preferential treatment to the detriment of all other creditors.'

*In re Commonwealth Companies, Inc.*, 913 F.2d 518, 523 (8th Cir. 1990) (internal citations omitted) (calling this test the "pecuniary purpose" or "pecuniary interest" test). However, the Court finds that despite referring to the test applied by the bankruptcy court, the court in *In re Commonwealth Companies, Inc.* held that the exception to the automatic stay applied because enforcement of police or regulatory laws are "expressly exempt from the automatic stay." *Id.* at 525-26 (citing *EEOC v. Rath Packing Co., 787 F.2d 318, 325* (8th Cir. 1986).

Regardless of the name of the test, the Court agrees with the District in that the relevant inquiry is whether the government's enforcement action is being pursued "solely to advance a pecuniary interest of the governmental unit," in which case the stay will be imposed, or whether its purpose is to "promote public safety and welfare or to effectuate public policy," and the exception to the automatic stay applies. This suit is to promote the public welfare by ensuring

11

that the Foundation is properly governed and to maintain the integrity of nonprofits in the District of Columbia. Furthermore, the purpose of the constructive trust sought in this case is to prevent unjust enrichment, recover proceeds wrongfully held by a party for the benefit of the nonprofit, and deter future violations of nonprofit laws. "The authority to protect the public welfare would be largely meaningless without the power to punish and prevent. Such steps violate neither the pecuniary purpose test nor the public policy test." *In re Charter First Mortg., Inc.*, 42 B.R. at 384.


## CONCLUSION

The Court has found that this matter is exempt, under 11 U.S.C. § 362(b)(4), from the automatic stay imposed by § 362(a). As such, the Court need not address the District's remaining arguments. Accordingly, it is this 14th day of April 2021, hereby

**ORDERED** that the Motion is **GRANTED**; and it is further;

**ORDERED** that Plaintiff's Motion for Leave to Exceed Page Limits is **GRANTED**; and it is further

**ORDERED** that the stay the Court imposed on February 1, 2021 is **LIFTED**.


José M. López, Judge
*(Signed in Chambers)*

**Copies to:**

Cara Spencer, Esq.
Alacoque Nevitt, Esq.
Lenor Elisa Miranda, Esq.
Catherine Jackson, Esq.
*Counsel for Plaintiff*

Robert Cox, Esq.
Elizabeth Wolstein, Esq.
*Counsel for Defendants*

EXHIBIT B



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET



**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed May 11, 2021**

_Harlin DeWayne Hale_
**United States Bankruptcy Judge**

---

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | **Chapter 11** |
| | § | |
| **National Rifle Association of America** | § | **Case No. 21-30085 (HDH)** |
| **and Sea Girt LLC,** | § | |
| | § | **(Jointly Administered)** |
| Debtors. | § | |

**ORDER GRANTING MOTIONS TO DISMISS**

The National Rifle Association of America (the "NRA") is a 150-year-old organization with approximately five million members that is dedicated to the rights of Americans to own and safely use firearms for their personal protection and recreational use. The mission and function of the NRA is focused on gun safety, and the NRA asserts it is "the nation's foremost defender" of the Second Amendment of the United States Constitution. In recent years, however, it has become apparent that the NRA was suffering from inadequate governance and internal controls.

The attorney general for the state of New York conducted a fifteen-month-long investigation of the NRA that revealed, the New York attorney general claims, widespread misuse of assets by the NRA's executive vice president and his circle of insiders for their personal benefit. Nine months ago, the New York attorney general filed a lawsuit seeking dissolution of the NRA

based on allegations that (1) the NRA has exceeded the authority conferred upon it by New York law and has conducted its business in a persistently illegal manner and abused its powers contrary to the public policy of the state of New York by operating without effective oversight or control by its officers and directors, and (2) the directors or members in control of the NRA have looted or wasted the corporate assets, have perpetuated the corporation solely for their personal benefit, or have otherwise acted in an illegal, oppressive, or fraudulent manner.

The NRA filed this case seeking the protection of the Bankruptcy Code to preserve itself as a going concern in the face of litigation that, it argues, poses an existential threat. Debtors commonly file bankruptcy when faced with a judgment that has, or will, render them insolvent, but the threat against the NRA differs from the classic scenario in that dissolution would not be a collateral effect of litigation but rather the intended relief sought in a state's regulatory action. And in this instance, dissolution could only occur after judicial consideration of whether dissolution is in the best interest of the public.

The question the Court is faced with is whether the existential threat facing the NRA is the type of threat that the Bankruptcy Code is meant to protect against. The Court believes it is not. For the reasons stated herein, the Court finds there is cause to dismiss this bankruptcy case as not having been filed in good faith both because it was filed to gain an unfair litigation advantage and because it was filed to avoid a state regulatory scheme. The Court further finds the appointment of a trustee or examiner would, at this time, not be in the best interests of creditors and the estate.

## I. <u>Jurisdiction and Venue</u>

This Court has jurisdiction to consider this matter under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A). Venue is proper in this District under 28 U.S.C. §§ 1408 and 1409.

## II. **Relevant Background**

The NRA is a charitable not-for-profit corporation chartered by special act of the New York State Legislature on November 17, 1871. The NRA has approximately five million members, almost 500 employees, and annual revenue of approximately $300 million. The NRA is primarily supported by dues from members and private contributions from donors.

Around the middle of 2017, NRA Board Member Tom King received a phone call from Eric Schneiderman, who at the time was the New York attorney general.[1] According to Mr. King, Mr. Schneiderman told him that investigations into the NRA were being opened and they should "prepare for the worst."[2] Mr. King shared this message with Wayne LaPierre,[3] the NRA's executive vice president.[4] In response to this warning, Mr. LaPierre testified that he decided the "NRA ought to take a look at everything, a 360-degree look to make sure we were in total compliance with New York State not-for-profit law, and if we weren't, we needed to fix things."[5] This was the beginning of what the NRA now refers to as its course correction.[6]

As part of its course correction, the NRA hired the law firm Morgan, Lewis & Bockius LLP to provide advice regarding tax and nonprofit governance matters.[7] The NRA also hired Brewer, Attorneys & Counselors (the "Brewer Firm") in early 2018 to aid with the course

---

[1] *Transcript of Hearing Held April 21, 2021* [Docket No. 670] at 79:3-80:7; *Transcript of Hearing Held April 6, 2021* [Docket No. 499] at 62:12-16.

[2] *Transcript of Hearing Held April 21, 2021* [Docket No. 670] at 79:18-80:1.

[3] *Transcript of Hearing Held April 21, 2021* [Docket No. 670] at 80:19-81:2.

[4] In the NRA's organizational structure, the executive vice president is the functional equivalent of a chief executive officer. *See* Ackerman Exhibit 10 (NRA Bylaws, Article V, section 2(c)).

[5] *Transcript of Hearing Held April 8, 2021* [Docket No. 654] at 41:25-42:14.

[6] *Transcript of Hearing Held April 6, 2021* [Docket No. 499] at 62:8-11.

[7] *Transcript of Hearing Held April 8, 2021* [Docket No. 654] at 43:17-44:1; *Transcript of Hearing Held April 6, 2021* [Docket No. 499] at 62:19-63:12.

correction process and potential upcoming litigation.[8]  Since that time, in addition to becoming the NRA's primary litigation counsel, the Brewer Firm appears to have become involved in many aspects of the NRA.

In March 2018, the NRA hired Craig Spray as its new chief financial officer.[9]  Before joining the NRA, Mr. Spray served as the chief financial officer for two different companies, one of which was a publicly traded company valued at over $1 billion.

On April 19, 2018, the New York Department of Financial Services sent letters to insurers and financial institutions encouraging them to review their relationships with the NRA and consider whether such relationships harm their corporate reputations and jeopardize public safety (the "NY DFS Letter").  Less than a month later, the NRA, with the assistance of the Brewer Firm, filed a complaint in federal court in the Northern District of New York against the governor of New York and the New York Department of Financial Services regarding their alleged attempts "to deprive the NRA and its constituents of their First Amendment rights to speak freely about gun-related issues and defend their Second Amendment freedoms against encroachment."[10]

In July 2018, several whistleblowers came forward with the encouragement of Mr. Spray and presented a memo to the NRA Audit Committee regarding their top concerns (the "Whistleblower Memo").[11]  That list included concerns related to (1) financial conflicts of interest of senior management and board members, (2) senior management override of internal controls relating to, among other things, accounts payable procedures, travel and expense reporting, and procurement/contracts policy, (3) management making decisions in the best interests of vendors

---

[8] *Transcript of Hearing Held April 6, 2021* [Docket No. 499] at 67:13-16; *Transcript of Hearing Held April 21, 2021* [Docket No. 670] at 81:3-9; *Transcript of Hearing Held April 23, 2021* [Docket No. 697] at 148:16-19.

[9] The board of directors also elected Mr. Spray as the treasurer of the NRA in September 2018.

[10] NRA Exhibit 663.

[11] *Transcript of Hearing Held April 8, 2021* [Docket No. 654] at 95:1-21; NYAG Exhibit 72.

instead of the NRA, (4) vague and deceptive billing practices of vendors, (5) improper reimbursement for apartments and living expenses of certain employees, and (6) lack of control over vehicle leases obtained by senior management.[12]

Following the presentation of the Whistleblower Memo to the Audit Committee, the NRA took several actions, including examining related party transactions and reviewing vendor contracts.[13]  As a result of this review process, the NRA required the inclusion of specific metrics in all contracts[14] and improved documentation and recordkeeping.[15]  One of the more significant actions taken in response to the Whistleblower Memo was to send letters to the NRA's vendors notifying them of the rules regarding proper invoicing.[16]  While most vendors complied with these new measures, some did not.[17]  As a result, some contracts with vendors were re-negotiated, and some were terminated.[18]

This process caused a rift between the NRA and one of its most significant vendors, Ackerman McQueen, Inc. ("Ackerman").  Ackerman had very close ties with the NRA and had been the NRA's marketing and public relations firm for decades, but several of the concerns expressed in the Whistleblower Memo related to the NRA's relationship with Ackerman.[19]  The disagreements that came from discussions regarding billing practices and their business

---

[12] NYAG Exhibit 72.

[13] *Transcript of Hearing Held April 23, 2021* [Docket No. 697] at 90:4-19.

[14] *Transcript of Hearing Held April 13, 2021* [Docket No. 578] at 69:22-70:2.

[15] *Transcript of Hearing Held April 7, 2021* [Docket No. 700] at 24:24-25:9; *Transcript of Hearing Held April 13, 2021* [Docket No. 578] at 157:6-20.

[16] *Transcript of Hearing Held April 23, 2021* [Docket No. 697] at 90:4-19; *Transcript of Hearing Held April 7, 2021* [Docket No. 700] at 25:10-25; *Transcript of Hearing Held April 6, 2021* [Docket No. 499] at 91:8-17.

[17] *Transcript of Hearing Held April 6, 2021* [Docket No. 499] at 91:8-92:4.

[18] *Transcript of Hearing Held April 23, 2021* [Docket No. 697] at 91:2-9.

[19] NYAG Exhibit 72.

relationship escalated and have spawned four overlapping lawsuits—three in Virginia state court and one in federal court in the Northern District of Texas.

On August 6, 2020, following a fifteen-month investigation, the New York attorney general (the "NYAG") filed a complaint in New York state court against the NRA seeking, among other relief, dissolution of the NRA (the "NYAG Complaint" commencing the "NYAG Enforcement Action").[20]  The NYAG Complaint also named four individual defendants: (1) Mr. LaPierre; (2) John Frazer, the NRA's general counsel; (3) the NRA's former treasurer and chief financial officer; and (4) the NRA's former chief of staff.  The allegations in the 163-page NYAG Complaint are extensive but, in very general terms, accuse Mr. LaPierre of (i) exploiting the NRA for his financial benefit and the benefit of a close circle of NRA staff, board members, and vendors, (ii) intimidating, punishing, and expelling anyone at a senior level who raised concerns about his conduct, (iii) hiring and retaining individuals in senior positions at the NRA, or as NRA contractors, whom he believed would aid and enable him to control the organization, regardless of their skills, experience, integrity, or contribution to the charitable mission, and (iv) entering into post-employment agreements with departing officers and employees that provided excessive payments in exchange for little, if any, services and non-disclosure/non-disparagement agreements.  Other of the individual defendants were accused of (i) ignoring, overriding, or otherwise violating the bylaws and internal policies and procedures they were charged with enforcing, resulting in charitable assets being diverted to benefit NRA insiders and favored vendors, (ii) instituting a practice whereby millions of dollars in entertainment and travel expenses incurred by NRA executives were billed to the NRA as disbursements by the NRA's largest vendor, and (iii) circumventing internal controls, condoning or partaking in expenditures that were

---

[20] NYAG Exhibit 107.

6

an inappropriate and wasteful use of charitable assets, and concealing or misreporting relevant information, rendering the NRA's annual reports filed with the NYAG materially false and misleading.  The NYAG Complaint, in addition to dissolution of the NRA, seeks (i) restitution of certain funds paid to current and former officers, which would be returned to the NRA, (ii) a ban on certain former and current officers, including Mr. LaPierre and Mr. Frazer, from serving as fiduciaries of any New York charity, and (iii) voiding of certain transactions.[21]

On September 10, 2020, Carolyn Meadows (the NRA's President) created a Special Litigation Committee to oversee (i) the NYAG Enforcement Action, (ii) a lawsuit filed against the NRA and the NRA Foundation by the District of Columbia attorney general, (iii) the NRA's pending lawsuit against the NYAG, and (iv) any future proceedings that arise out of or relate to the previously-identified matters.  In an e-mail sent to the board of directors, Ms. Meadows explained that the creation of the Special Litigation Committee was done on the advice of counsel to avoid the appearance of any conflict because Mr. LaPierre and Mr. Frazer were named as individual defendants in the NYAG Enforcement Action.[22]  The Special Litigation Committee's members were Ms. Meadows, Charles Cotton (the NRA's First Vice President), and Colonel Willes Lee (the NRA's Second Vice President).

On November 18, 2020, the NRA filed its IRS Form 990 signed by Mr. LaPierre.[23]  This form is an annual informational tax return filed by a nonprofit to justify maintaining its tax-exempt status.  In the Form 990, the NRA disclosed several excess benefit transactions entered into by individuals at the NRA, including Mr. LaPierre.

---

[21] *Id.*

[22] NYAG Exhibit 1.

[23] NYAG Exhibit 8.

On November 23, 2020, the NRA hired the Neligan Law Firm to advise on bankruptcy and restructuring options.[24]  The next day, Sea Girt, LLC was formed as a transition vehicle to facilitate the NRA's relocation to Texas.[25]

On January 7, 2021, the NRA held a board meeting.  At this meeting, the board of directors adopted a resolution formalizing the Special Litigation Committee.[26]  The board of directors also passed a resolution approving an employment agreement for Mr. LaPierre.[27]  Significantly, Mr. LaPierre's employment agreement contained language permitting Mr. LaPierre to "exercise corporate authority in furtherance of the mission and interests of the NRA, including without limitation to reorganize or restructure the affairs of the Association for the purposes of cost-minimization, regulatory compliance or otherwise."[28]  Throughout the entirety of the board meeting, both in the general and executive sessions, no discussion of bankruptcy, Chapter 11, or the possible reorganization of the NRA occurred.[29]  The board of directors was not informed that the language cited above could authorize Mr. LaPierre to unilaterally authorize a petition for bankruptcy relief for the NRA.  In fact, the board of directors was not informed that the NRA was considering filing for bankruptcy at all.[30]

On January 15, 2021, the NRA and Sea Girt, LLC filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  The cases are being jointly administered.[31]  On February 8,

---

[24] *Transcript of Hearing Held April 7, 2021* [Docket No. 700] at 98:9-99:25; NYAG Exhibit 298.

[25] *Transcript of Hearing Held April 7, 2021* [Docket No. 700] at 89:3-10; NYAG Exhibit 347.

[26] NYAG Exhibits 2, 3.

[27] NYAG Exhibit 3.

[28] NYAG Exhibit 50.

[29] *Transcript of Hearing Held April 13, 2021* [Docket No. 584] at 92:1-93:10; *Transcript of Hearing Held April 6, 2021* [Docket No. 692] at 76:15-21; *Transcript of Hearing Held April 8, 2021* [Docket No. 544] at 92:24-93:4.

[30] *Transcript of Hearing Held April 5, 2021* [Docket No. 497] at 118:8-16; *Transcript of Hearing Held April 8, 2021* [Docket No. 654] at 47:7-10; *Transcript of Hearing Held April 6, 2021* [Docket No. 692] at 85:24-86:16.

[31] *Order Granting Debtors' Emergency Motion for Joint Administration of Chapter 11 Cases* [Docket No. 36].

2021, Judge Phillip Journey,[32] a longtime member, donor, and director of the NRA, filed a motion seeking the appointment of an examiner with special duties and powers under section 1104(c) of the Bankruptcy Code to investigate the governance of the NRA and the actions of its management (the "Examiner Motion").[33]  The Examiner Motion was originally set for hearing on March 9, 2021.[34]

On February 10, 2021, Ackerman, now a former vendor and current litigation adversary of the NRA, filed a motion to dismiss the Chapter 11 case or, in the alternative, appoint a Chapter 11 trustee pursuant to section 1104(a) of the Bankruptcy Code.[35]  The motion to dismiss filed by Ackerman was quickly followed by similar motions filed by the NYAG[36] and the District of Columbia attorney general[37] (the "Motions to Dismiss") and a joinder filed by Christopher W. Cox, a former executive director of the NRA Institute for Legislative Action.[38]  Because of the overlapping facts and interrelated relief being requested in the Examiner Motion and the Motions to Dismiss, the Court chose to set them for trial together after a brief period of time for expedited discovery.

---

[32] Judge Phillip Journey currently serves as the Division 1 Judge of the 18th Judicial District Court of Kansas.

[33] *Motion for Appointment of Examiner* [Docket No. 114].

[34] *See Notice of Hearing* [Docket No. 130].

[35] *Ackerman McQueen, Inc.'s Motion to Dismiss the Chapter 11 Bankruptcy Petition, or, in the Alternative, Motion for the Appointment of a Chapter 11 Trustee, and Brief in Support* [Docket No. 131].

[36] *The State of New York's Motion to Dismiss, or, in the Alternative, to Appoint a Chapter 11 Trustee* [Docket No. 155]; *The State of New York's Motion to Dismiss, or, in the Alternative, to Appoint a Chapter 11 Trustee* [Docket No. 163].

[37] *The District of Columbia's Motion in Support in the State of New York's Motion to Appoint Chapter 11 Trustee* [Docket No. 214]; *The District of Columbia's Motion in Support of the State of New York's Motion to Dismiss* [Docket No. 429].

[38] *Christopher W. Cox's Joinder to (I) the Motions to Dismiss or, in the Alternative, to Appoint a Chapter 11 Trustee Filed by Ackerman McQueen, Inc. and the State of New York, or (II) the Motion of Phillip Journey for Appointment of an Examiner* [Docket No. 172].

In the following weeks, the many parties involved in this case—each with different interests, perspectives, and goals—engaged in discovery and began to take positions on the motions filed and the various relief requested therein. Judge Journey filed an objection to the Motions to Dismiss but amended his previous request for an examiner to include an expanded role for the proposed examiner.[39] The Official Committee of Unsecured Creditors (the "Committee") took the position that while the NRA is in need of major changes to its governance, current management should not be displaced by a Chapter 11 trustee, but if a trustee is appointed, they should have limited powers. The Committee also took the position that the NRA should retain a chief restructuring officer and that the appointment of an examiner was not necessary because the Committee was already fulfilling that role.[40]

The NRA opposed all of the motions but did eventually consent to the appointment of a chief restructuring officer.[41]

David Dell'Aquila, a member of the Committee and the plaintiff in a purported class action against the NRA, filed a partial joinder opposing dismissal but supporting the appointment of a Chapter 11 trustee with limited authority.[42]

---

[39] *Limited Objection to the Motions to Dismiss or the Appointment of Trustee* [Docket No. 306].

[40] *The Official Committee of Unsecured Creditors' Objection to the Motion for Appointment of an Examiner* [Docket No. 354]; *The Official Committee of Unsecured Creditors' Omnibus Response to (I) Ackerman McQueen, Inc.'s Motion to Dismiss the Chapter 11 Bankruptcy Petition, or, in the Alternative, Motion for the Appointment of a Chapter 11 Trustee, and Brief in Support, (II) the State of New York's Motion to Dismiss, or, in the Alternative, to Appoint a Chapter 11 Trustee, and (II) the District of Columbia's Motion in Support in the State of New York's Motion to Appoint Chapter 11 Trustee* [Docket No. 368].

[41] *Omnibus Opposition to (1) Ackerman McQueen, Inc.'s Motion to Dismiss the Chapter 11 Bankruptcy Petition, or, in the Alternative, Motion for the Appointment of a Chapter 11 Trustee, (2) the State of New York's Motion to Dismiss or, in the Alternative, to Appoint Chapter 11 Trustee, and (3) the District of Columbia's Motion to Appoint Chapter 11 Trustee* [Docket No. 307]; *Debtor's Response in Opposition to the Motion for Appointment of an Examiner Filed by Phillip Journey* [Docket No. 358].

[42] *David Dell'Aquila's Partial Joinder to (I) Ackerman McQueen, Inc.'s Motion to Dismiss the Chapter 11 Bankruptcy Petition, or, in the Alternative, Motion for the Appointment of a Chapter 11 Trustee, and Brief in Support, (II) the State of New York's Motion to Dismiss, or, in the Alternative, to Appoint a Chapter 11 Trustee, (III) the District of Columbia's Motion in Support in the State of New York's Motion to Appoint Chapter 11 Trustee, and (IV) the Official Committee of Unsecured Creditors Motion in Response to (I), (II), and (III)* [Docket No. 415].

The United States Trustee did not initially express an opinion regarding the underlying motions but did express views on several of the options the parties had discussed.[43]  Specifically, the United States Trustee took the position that there is no such entity as a limited purpose trustee under the Bankruptcy Code, and if the Court orders the appointment of a Chapter 11 trustee, the trustee must have full statutory powers.  The United States Trustee also took the position that while an examiner may be granted expanded powers, the Bankruptcy Code does not permit a chief restructuring officer to usurp the powers of a Chapter 11 trustee.[44]

Sixteen states, as *amici curiae*, filed a brief in support of the NRA,[45] and the state of Texas submitted its own brief in support of the NRA.[46]

Trial commenced on April 5, 2021 and continued over twelve days with twenty-three witnesses.  On April 7, 2021, the NRA filed an application to employ a chief restructuring officer,[47] which the Court heard concurrently with the ongoing trial.  Closing arguments took place on May 3, 2021, after which the Court took the matters under advisement.

---

[43] In closing arguments following trial, the United States Trustee took the position that the evidence supports dismissal, the appointment of a trustee, or the appointment of an examiner.

[44] *United States Trustee's Statement Regarding Motions Seeking Appointment of Examiner, Trustee, or Case Dismissal* [Docket No. 405].

[45] *Brief of the States of Arkansas, Alabama, Alaska, Georgia, Idaho, Kentucky, Louisiana, Mississippi, Missouri, Montana, Ohio, Oklahoma, South Carolina, South Dakota, Utah, and West Virginia as Amici Curiae in Support of Debtors; and in Opposition to the State of New York's Motion to Dismiss, or in the Alternative to Appoint a Chapter 11 Trustee* [Docket No. 445].

[46] *Brief of the State of Texas as Amicus Curiae in Support of Debtors; and in Opposition to the State of New York's Motion to Dismiss, or in the Alternative to Appoint a Chapter 11 Trustee* [Docket No. 465].

[47] *Application of the Debtors for an Order Authorizing the Retention and Employment of Ankura Consulting Group, LLC and Appointment of Louis E. Robichaux IV as the Debtors' Chief Restructuring Officer* [Docket No. 519] (the "CRO Motion").

### III. Applicable Legal Standard

The movants generally seek three forms of relief: dismissal of the bankruptcy cases, the appointment of a Chapter 11 trustee, or the appointment of an examiner.  Pursuant to section 1112(b) of the Bankruptcy Code, the court shall dismiss a case under this chapter for cause unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate.[48]  Section 1112(b)(4) contains a non-exclusive list of what constitutes "cause" for purposes of dismissal, but the Fifth Circuit Court of Appeals has held that the term "cause" affords flexibility to the bankruptcy courts and can include a finding that the debtor's filing for relief is not in good faith.  *In re Little Creek Dev. Co.*, 779 F.2d 1068, 1072-73 (5th Cir. 1986); *In re Humble Place Joint Venture*, 936 F.2d 814, 816-17 (5th Cir. 1991).

After the movant satisfies the initial burden of making a prima facie showing of a lack of good faith in filing, the burden shifts to the debtor to demonstrate good faith.  *In re Mirant Corp.*, 2005 Bankr. LEXIS 1686, at *27 n.20 (Bankr. N.D. Tex. Jan. 26, 2005) (noting that some courts hold that the burden of showing good faith is on the debtor while other courts hold that the movant has an initial burden to present a prima facie case of a lack of good faith before the burden shifts to the debtor to show good faith); *In re Sherwood Enters., Inc.*, 112 B.R. 165, 170-71 (Bankr. S.D. Tex. 1989).  Furthermore, courts have held that a Chapter 11 petition is not filed in good faith unless it serves a valid bankruptcy purpose.  *Off. Comm. of Unsecured Creditors v. Nucor Corp. (In re SGL Carbon Corp.)*, 200 F.3d 154, 165 (3d Cir. 1999).

If a court finds cause for dismissal, it must dismiss the case unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of

---

[48] Section 1112(b) also requires consideration of whether conversion to a case under chapter 7 would be in the best interests of creditors and the estate, but pursuant to section 1112(c), in cases where the debtor is a nonprofit, the court may not convert a case under chapter 11 to a case under chapter 7 unless the debtor requests such a conversion.  The NRA has not requested such a conversion, so the Court need not consider it in this case.

creditors and the estate. Pursuant to section 1104(a), at any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States Trustee, and after notice and a hearing, the court shall order the appointment of a trustee (1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or (2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

Pursuant to section 1104(c), if the court does not order the appointment of a trustee, then at any time before the confirmation of a plan, on request of a party in interest or the United States Trustee, and after notice and a hearing, the court shall order the appointment of an examiner to conduct such an investigation of the debtor as is appropriate, including an investigation of any allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor of or by current or former management of the debtor, if (1) such appointment is in the interests of creditors, any equity security holders, and other interests of the estate or (2) the debtor's fixed, liquidated, unsecured debts, other than debts for goods, services, or taxes, or owing to an insider, exceed $5,000,000.

## IV. <u>Discussion</u>

Because of the structure of the relevant provisions of the Bankruptcy Code, the Court will first determine whether there is cause for dismissal and, specifically, whether the NRA filed for bankruptcy in good faith.

### *The NRA's Stated Reasons for Filing Bankruptcy*

At various times in this case, the NRA has provided the Court with several—and at times slightly different—reasons for why this bankruptcy case was filed.[49] In an informational brief filed on January 20, 2021, the NRA explained that it "instituted this chapter 11 reorganization proceeding to establish a centralized, neutral forum in which it can streamline, resolve, and address all outstanding claims and preserve its ability to pursue its constitutionally protected mission as a going concern" and that it "intends to restructure through a plan of reorganization that provides for the reorganized NRA to emerge from these chapter 11 cases as a Texas nonprofit entity."[50] The NRA went on to explain that "separate and apart from the on-going disputes with the NYAG, the NRA seeks to avail itself of the protections of the Bankruptcy Code in order to continue its efforts to reduce operating costs and to address the ever-increasing litigation being filed against the NRA" and that "[c]ontrary to the NYAG's press releases, the NRA is not seeking to evade regulatory oversight; rather it seeks, and is entitled, to being treated fairly by regulators providing that oversight."[51] Finally, the NRA announced its intention to propose a plan of reorganization that will (1) pay all of the allowed claims of the NRA's creditors in full, (2) provide a mechanism for adjudicating and/or resolving the claims of the NYAG and any other creditor with contingent,

---

[49] In its discussion, the Court will focus on the NRA rather than Sea Girt, LLC. Sea Girt, LLC has no employees or operations and was formed to accomplish a shared bankruptcy purpose with the NRA.

[50] *Debtors' Informational Brief in Connection with Voluntary Chapter 11 Petitions* [Docket No. 31] at ¶¶ 3, 6.

[51] *Id.* at ¶ 26.

unliquidated, and disputed claims, and (3) allow the NRA to exit Chapter 11 as a Texas nonprofit organization.[52]

Counsel for the NRA reiterated these reasons at the hearing held on January 20, 2021, with a particular emphasis on (1) the cost of ongoing litigation and the time and effort of the NRA management team being spent on litigation, (2) the need for a breathing spell and an opportunity to centralize litigation, and (3) the NRA's desire to emerge from bankruptcy as a company domiciled in Texas.[53] Counsel for the NRA went so far as to say that "absent being able to streamline discovery and have all of this litigation, or much of it, handled in a centralized forum, the NRA was indeed facing the adage, death by a thousand cuts."[54]

In the Examiner Motion and the Motions to Dismiss, the other parties offered different opinions on the true purpose of the NRA's bankruptcy. Judge Journey took the position that if the NRA was able to successfully terminate its corporate existence in New York and reconstitute the organization under Texas law, the NRA wishes to "avoid the ongoing challenges to its corporate charter brought by the State of New York and other ongoing litigation."[55] Ackerman accused the NRA of primarily using the bankruptcy filing to escape civil prosecution and avoid regulatory oversight from the NYAG, but also to stall litigation.[56] The NYAG agreed with Ackerman that the NRA's purpose in filing bankruptcy was to evade regulatory oversight.[57]

---

[52] *Id.* at ¶ 27.

[53] *Transcript of Hearing Held January 20, 2021* [Docket No. 55] at 11:8-17, 12:1-14:9, 15:2-6.

[54] *Id.* at 12:19-23.

[55] *Motion for Appointment of Examiner* [Docket No. 114] at 2.

[56] *Ackerman McQueen, Inc.'s Motion to Dismiss the Chapter 11 Bankruptcy Petition, or, in the Alternative, Motion for the Appointment of a Chapter 11 Trustee, and Brief in Support* [Docket No. 131] at ¶¶ 2, 29-31.

[57] *The State of New York's Memorandum of Law and Brief in Support of Motion to Dismiss, or, in the Alternative, to Appoint a Chapter 11 Trustee* [Docket No. 156] at ¶¶ 3, 20, 24.

In its brief in opposition to the Examiner Motion and the Motions to Dismiss, the NRA again summarized its reasons for filing bankruptcy, but in a slightly more expansive way:

On January 15, 2021, the Debtors filed their chapter 11 petitions with a series of goals:

a. The Debtors seek to streamline the barrage of litigation they are facing. Although the Debtors expect to ultimately prevail on the merits in many pending cases, the disruption and expense of such litigation creates significant burdens for the NRA.

b. The organizational structure of the NRA is based on a 150-year-old charter that has not been updated in over a century. Given the size and impact that the NRA now has, the organization would benefit from the modernization to ensure its continued existence as a going concern for the benefit of the NRA's creditors and members.

c. While this case is certainly unique, ultimately, the NRA is not unlike a typical chapter 11 debtor grappling with the typical operational strains with which chapter 11 is designed to assist. The NRA seeks to reduce operating expenses, address burdensome executory contracts and unexpired leases, maintain its employees and operations, and institute and effectuate a streamlined claims process to address the multitude of claims and repayment through a confirmed plan of reorganization.

d. The NRA seeks to move its corporate domicile and its principal place of business to Texas which, as has been widely reported, welcomes the NRA with open arms.[58]

Later in the brief, the NRA acknowledged that there is no judgment against it and no impending trial but expressed the belief that it faces existential threats:

The NRA filed for protection under chapter 11 in good faith, not to circumvent judgments in other courts (in fact, no judgments have been rendered), nor to escape an impending trial (because there is none), but because it is in a situation where it must be able to continue its operations in the face of existential threats, in order to maximize the value of its estate and to protect the interests of its members, employees, vendors, and legitimate creditors.[59]

---

[58] *Omnibus Opposition to (1) Ackerman McQueen, Inc.'s Motion to Dismiss the Chapter 11 Bankruptcy Petition, or, in the Alternative, Motion for the Appointment of a Chapter 11 Trustee, (2) the State of New York's Motion to Dismiss or, in the Alternative, to Appoint Chapter 11 Trustee, and (3) the District of Columbia's Motion to Appoint Chapter 11 Trustee* [Docket No. 307] at p. 13, ¶ 40.

[59] *Id.* at p. 25, ¶ 38.

In its briefing, the Committee seemed to agree that the NRA's primary goal was to avoid dissolution in the NYAG Enforcement Action but did not find this to be an improper motive and also saw other benefits for the NRA in bankruptcy:

> In seeking the dismissal of these Chapter 11 Cases, the Moving Parties conflate the concept of litigation gamesmanship with prudent liability management. The Debtors filed these bankruptcy cases not to gain a tactical litigation advantage, but to implement a strategy ***to survive*** in the event of a potential adverse ruling in the NYAG Action. As described below, there could not be a more fundamental and proper use of the federal bankruptcy laws than preservation of and as a going-concern.
>
> . . . .
>
> In addition to protecting the NRA from dissolution, these Chapter 11 Cases also offer the NRA an opportunity to implement corporate governance changes that will promote transparency and increase public confidence in the way the NRA handles its finances, conducts business with vendors and customers, and safeguards against future mismanagement.[60]

In the NRA's opening statement at trial, the stated reasons for filing bankruptcy were significantly narrower than in the NRA's briefing and appeared to focus heavily on the NYAG Enforcement Action:

> The exclusive testimony as to good faith will be we had three goals in mind. First, avoid the death penalty. Avoid dissolution. Two, avoid a receiver in a New York state court that would deny us the ability to file. And third, we wholly embrace our third goal. Our third goal is to [ . . . ] remove ourselves from New York and relocate ourselves to Texas.[61]

It is against this backdrop that the Court evaluates the evidence presented at trial regarding the NRA's reasons for filing bankruptcy.

---

[60] *The Official Committee of Unsecured Creditors' Omnibus Response to (I) Ackerman McQueen, Inc.'s Motion to Dismiss the Chapter 11 Bankruptcy Petition, or, in the Alternative, Motion for the Appointment of a Chapter 11 Trustee, and Brief in Support, (II) the State of New York's Motion to Dismiss, or, in the Alternative, to Appoint a Chapter 11 Trustee, and (III) the District of Columbia's Motion in Support in the State of New York's Motion to Appoint Chapter 11 Trustee* [Docket No. 368] at ¶¶ 24, 31 (emphasis in original).

[61] *Transcript of Hearing Held April 5, 2021* [Docket No. 497] at 40:25-41:7.

### *Evidence of the NRA's Reasons for Filing Bankruptcy*

The parties elicited testimony from several witnesses regarding the NRA's reasons for filing bankruptcy, but the way in which the Court has weighed that evidence is based on the somewhat unusual way in which this case was filed. There was no vote on whether the NRA should file for bankruptcy, and therefore there is no need to resolve inconsistent or conflicting reasoning and motivations of individuals who all had an equal say in the decision. Rather, the ultimate decision to file for bankruptcy was made solely by Mr. LaPierre.[62] As a result, Mr. LaPierre's testimony is the most direct, and, since the Court finds it credible on this topic, the most compelling evidence for why the NRA filed for bankruptcy, but it is not the only evidence to consider.[63] Mr. LaPierre consulted the three members of the Special Litigation Committee about the decision to file bankruptcy before it was made,[64] so their knowledge of the decision-making process is also relevant. The only other person within the NRA who appears to have known about the decision to file bankruptcy prior to the actual filing was the NRA spokesman,[65] but he did not testify. Neither the NRA's treasurer and then-CFO nor the NRA's current acting CFO were consulted about the decision to file bankruptcy, and they only learned of the decision after bankruptcy was filed.[66] Nevertheless, they were both able to offer helpful testimony regarding

---

[62] *Transcript of Hearing Held April 5, 2021* [Docket No. 497] at 84:8-19; *Transcript of Hearing Held April 7, 2021* [Docket No. 700] at 68:1-8, 70:12-72:23.

[63] *See Elmwood Dev. Co. v. Gen. Elec. Pension Tr. (In re Elmwood Dev. Co.)*, 964 F.2d 508, 512 (5th Cir. 1992) ("Because the good faith standard is an objective one, the court was not constrained to entertain and give dispositive weight to testimony of the subjective state of mind of [the debtor's] manager."); *In re Little Creek Dev. Co.*, 779 F.2d 1068, 1072-73 (5th Cir. 1986) (stating that in determining whether a debtor's filing for relief is in good faith, courts must consider a conglomerate of factors, including motives).

[64] *Transcript of Hearing Held April 5, 2021* [Docket No. 497] at 84:8-85:11; *Transcript of Hearing Held April 6, 2021* [Docket No. 499] at 36:18-23; NYAG Exhibit 4 at 5-10.

[65] *Transcript of Hearing Held April 7, 2021* [Docket No. 700] at 72:11-23.

[66] *Transcript of Hearing Held April 7, 2021* [Docket No. 700] at 70:12-17; *Transcript of Hearing Held April 5, 2021* [Docket No. 497] at 119:23-120:1; *Transcript of Hearing Held April 6, 2021* [Docket No. 692] at 49:7-11; *Transcript of Hearing Held April 13, 2021* [Docket No. 578] at 54:12-21; *Transcript of Hearing Held April 8, 2021* [Docket No. 654] at 85:19-22.

potential reasons for the bankruptcy, including the cost of litigation and the financial condition of the NRA. The NRA's general counsel also offered testimony regarding reasons for the NRA to file for bankruptcy, but he did not participate in the actual decision-making process and did not know about the decision to file bankruptcy until bankruptcy had already been filed.[67]

There was a general consensus among the witnesses that, as the NRA has consistently represented to the Court and to its members, the NRA is in its strongest financial condition in years[68] and intends to pay creditors all allowed claims in full.[69] The CFO at the time of the bankruptcy filing, Mr. Spray, testified that there was no financial reason for the NRA to file bankruptcy,[70] but he later qualified that testimony by noting that he did not have any information about potential litigation outcomes.[71] The current acting CFO, Ms. Rowling, gave supporting testimony regarding the financial strength of the NRA and its ongoing ability to pay its creditors[72] and testified that the NRA has sufficient funds to prosecute and defend its current litigation.[73] Ms. Rowling also testified, however, that it was her opinion that the NRA was in bankruptcy because of potential litigation losses that could severely impact the organization's financial position.[74]

---

[67] *Transcript of Hearing Held April 5, 2021* [Docket No. 497] at 118:17-119:21; *Transcript of Hearing Held April 6, 2021* [Docket No. 692] at 43:19-44:8.

[68] *Transcript of Hearing Held April 7, 2021* [Docket No. 700] at 78:16-81:2; *Transcript of Hearing Held April 8, 2021* [Docket No. 654] at 32:24-33:2; *Transcript of Hearing Held April 6, 2021* [Docket No. 692] at 160:24-161:2; *Transcript of Hearing Held April 13, 2021* [Docket No. 584] at 33:12-14, 34:13-21; *Transcript of Hearing Held April 13, 2021* [Docket No. 578] at 51:21-53:13; NYAG Exhibit 151.

[69] *Transcript of Hearing Held April 6, 2021* [Docket No. 692] at 32:9-17; *Transcript of Hearing Held April 8, 2021* [Docket No. 654] at 52:22-53:5.

[70] *Transcript of Hearing Held April 13, 2021* [Docket No. 578] at 53:11-13, 129:17-130:20, 132:22-133:4.

[71] *Transcript of Hearing Held April 16, 2021* [Docket No. 620] at 19:10-16.

[72] *Transcript of Hearing Held April 13, 2021* [Docket No. 584] at 33:12-14, 34:13-21, 36:17-38:14.

[73] *Transcript of Hearing Held April 13, 2021* [Docket No. 584] at 39:17-23.

[74] *Transcript of Hearing Held April 13, 2021* [Docket No. 584] at 34:22-35:1.

The testimony of the NRA's general counsel, Mr. Frazer, on the reasons for filing bankruptcy was, in some respects, a bit difficult to reconcile. Despite not being involved in the decision to file for bankruptcy and not knowing about the decision until after bankruptcy was filed,[75] Mr. Frazer was designated as the corporate representative of the NRA as to the reasons, both financial and non-financial, for the NRA seeking protection under Chapter 11 of the Bankruptcy Code.[76] During his deposition, the only reasons for filing bankruptcy that Mr. Frazer identified were to streamline litigation, consolidate the claims against the NRA, and reorganize in Texas.[77] Mr. Frazer did not identify avoiding dissolution or avoiding receivership as reasons for the NRA filing bankruptcy at that time.[78] Nevertheless, Mr. Frazer testified at trial that he agreed the bankruptcy filing allowed the NRA to seek protection from regulators in New York.[79]

With regard to the threats of dissolution or a receiver being appointed, it is clear that the NYAG was seeking dissolution of the NRA.[80] Nevertheless, Mr. Frazer was not sure if a trial date is currently set in the NYAG Enforcement Action but anticipated a trial early next year and acknowledged that dissolution is not imminent.[81] Mr. Frazer also acknowledged having no personal knowledge of an imminent threat of a receiver being appointed over the NRA.[82] With regard to streamlining litigation, Mr. Frazer reaffirmed that it is one of the NRA's reasons for filing

---

[75] *Transcript of Hearing Held April 6, 2021* [Docket No. 692] at 43:19-44:8, 109:22-24.

[76] *Transcript of Hearing Held April 7, 2021* [Docket No. 559] at 17:5-14.

[77] *Transcript of Hearing Held April 7, 2021* [Docket No. 559] at 17:15-20, 57:8-25.

[78] *Transcript of Hearing Held April 7, 2021* [Docket No. 559] at 20:20-21:1.

[79] *Transcript of Hearing Held April 6, 2021* [Docket No. 692] at 107:22-108:6; *Transcript of Hearing Held April 7, 2021* [Docket No. 559] at 21:12-19.

[80] *See* NYAG Exhibit 107 (NYAG Complaint in which the first two causes of action are labeled "Dissolution of the NRA").

[81] *Transcript of Hearing Held April 7, 2021* [Docket No. 559] at 29:10-30:6, 30:19-22.

[82] *Transcript of Hearing Held April 7, 2021* [Docket No. 559] at 33:18-34:11.

bankruptcy[83] but acknowledged that he has not conducted an analysis, and was not aware of anyone else conducting an analysis, of the cost of proceeding with litigation outside of bankruptcy versus the cost of the bankruptcy and proceeding with the litigation in the bankruptcy case.[84] Mr. Frazer also testified that the NRA previously filed a motion for centralization of four pending actions that was denied by the United States Judicial Panel on Multidistrict Litigation on the basis that they were not persuaded that centralization was necessary for the convenience of the parties and witnesses or to further the just and efficient conduct of the litigation.[85]

The Court received testimony from all three members of the Special Litigation Committee, but their testimony did not explore the reasons for filing bankruptcy in much depth. The parties offered excerpts of the deposition of Ms. Meadows, but those excerpts did not include a discussion of why the NRA filed for bankruptcy. Colonel Lee testified that he understood the NYAG had sought the appointment of a receiver to seize the NRA's assets and that if a receiver were appointed over the NRA, it would be disastrous.[86] Mr. Cotton testified that he believed there was a risk that the NYAG could attempt to put the NRA into receivership because the first cause of action in the NYAG Complaint was for dissolution.[87] Mr. Cotton further testified that dissolution in the NYAG Enforcement Action was a legitimate risk that the NRA was concerned about.[88]

During trial, Mr. LaPierre was questioned several times regarding why the NRA filed for bankruptcy. In response to a question of whether the NRA filed bankruptcy to leave New York, Mr. LaPierre testified that the NRA filed bankruptcy to look for a fair legal playing field where

---

[83] *Transcript of Hearing Held April 6, 2021* [Docket No. 692] at 109:2-11.

[84] *Transcript of Hearing Held April 6, 2021* [Docket No. 692] at 112:19-113:1.

[85] *Transcript of Hearing Held April 7, 2021* [Docket No. 559] at 36:20-38:12; Ackerman Exhibit 121.

[86] *Transcript of Hearing Held April 21, 2021* [Docket No. 673] at 45:10-46:2.

[87] *Transcript of Hearing Held April 6, 2021* [Docket No. 499] at 37:3-7.

[88] *Transcript of Hearing Held April 6, 2021* [Docket No. 499] at 38:15-39:10.

the NRA could prosper and grow in a fair legal environment[89] and later testified that the NRA needs the approval of a federal court to move to a new state.[90] At one point, Mr. LaPierre was presented with a series of communications informing the NRA's members, the NRA's board of directors, and the general public that the NRA had filed for bankruptcy and asked if the contents of those communications were accurate, which Mr. LaPierre testified they were.[91] The communications, which were prepared by the NRA's Managing Director of Public Affairs working with a member of the Brewer Firm,[92] described a variety of reasons for why the NRA filed bankruptcy, including leaving New York and reincorporating in Texas, seeking protection from New York officials, streamlining legal and financial affairs, organizing pending litigation in a coordinated and structured manner, and realizing other financial and strategic advantages. In one of the communications, a question and answer page posted on the NRA's website, the NRA states: "This action is necessitated primarily by one thing: the unhinged and political attack against the NRA by the New York Attorney General."[93] With regard to the risk of a receiver being appointed, Mr. LaPierre testified that the NRA has not been put on notice that the NYAG intends to seek a receivership and he does not have any facts to suggest that there is an imminent threat of a receiver being appointed.[94]

The most helpful testimony from Mr. LaPierre came during an exchange when counsel for one of the movants was attempting to discern which of the many reasons for filing for bankruptcy

---

[89] *Transcript of Hearing Held April 7, 2021* [Docket No. 700] at 66:11-23.

[90] *Transcript of Hearing Held April 8, 2021* [Docket No. 654] at 42:23-43:4.

[91] *Transcript of Hearing Held April 7, 2021* [Docket No. 700] at 67:14-25 (affirming the accuracy of NYAG Exhibit 153); *id.* at 86:18-21 (affirming the accuracy of NYAG Exhibit 55); *id.* at 87:5-18 (affirming the accuracy of NYAG Exhibit 151); *id.* at 87:22-88:8 (affirming the accuracy of NYAG Exhibit 208).

[92] *Transcript of Hearing Held April 7, 2021* [Docket No. 700] at 88:1-4.

[93] NYAG Exhibit 208.

[94] *Transcript of Hearing Held April 8, 2021* [Docket No. 654] at 21:8-22:1.

that have been discussed was the real driving force behind Mr. LaPierre's decision. A few very valuable pieces of information came from that exchange. After establishing that the bankruptcy filing was not related to the NRA's financial condition,[95] Mr. LaPierre acknowledged that although the cost of defending the NYAG Enforcement Action was significant, the cost of bankruptcy is high as well.[96] Mr. LaPierre then confirmed that if the NRA's bankruptcy case is dismissed, the NRA would be able to pay its debts in full and meet its obligations.[97] The exchange continued:

> Q: Okay. So it comes down to the reason you filed Chapter 11 is because you have this New York attorney general enforcement action which is asking for dissolution of the NRA; is that correct?
>
> [Counsel for the NRA]: Objection; misstates his testimony.
>
> [Counsel for the Movant]: Well --
>
> THE COURT: Well, I'm going to go ahead and let him answer that. Try to give an answer to that, Mr. LaPierre.
>
> THE WITNESS: Yes, Your Honor. Yes, we filed the Chapter 11 to -- because the New York State attorney general is seeking dissolution of the NRA and [seizure of] its assets, and we believe it's not a fair, level playing field.
>
> . . . .
>
> Q: So really what we're down to is that it's -- the New York attorney general action is the reason you believe you need to be in bankruptcy, and, really, solvency and all your other litigation, those are not issues that would require you to be in bankruptcy; is that correct?
>
> A: That's correct.

*Transcript of Hearing Held April 8, 2021* [Docket No. 654] at 33:19-34:20.

---

[95] *Transcript of Hearing Held April 8, 2021* [Docket No. 654] at 32:9-20.

[96] *Transcript of Hearing Held April 8, 2021* [Docket No. 654] at 32:15-23.

[97] *Transcript of Hearing Held April 8, 2021* [Docket No. 654] at 32:24-33:2.

### *The Court's Determination of the NRA's Primary Reason for Filing Bankruptcy*

The evidence does not support a finding that the purpose of the NRA's bankruptcy filing was to reduce operating costs, to address burdensome executory contracts and unexpired leases, to modernize the NRA's charter and organization structure, or to obtain a breathing spell. While some of these could be added benefits of going through a bankruptcy process, they do not appear to have been significant considerations for the NRA.

There was some evidence that the NRA wants to streamline litigation and control litigation costs, but this does not appear to have been the real purpose behind filing for bankruptcy. Ms. Rowling testified that she believes the NRA is in bankruptcy because of potential litigation losses, but this concern did not appear to be shared by Mr. LaPierre or supported by other evidence. The testimony regarding the ongoing cost of litigation was that the NRA is currently able to afford to pay its legal fees and that there has not been an analysis of the cost of proceeding with litigation outside of bankruptcy versus the cost of the bankruptcy and proceeding with the litigation in the bankruptcy case. Furthermore, Mr. LaPierre testified that but for the NYAG Enforcement Action, it would not have been necessary to file for bankruptcy.

Whether the NRA's desire to leave New York and reincorporate in Texas was a true reason for filing bankruptcy is a closer call, but the evidence weighs in favor of a finding that it was not the real purpose for filing for bankruptcy. Several witnesses testified that New York is a hostile environment for the NRA,[98] but the testimony was that individuals within the organization had been interested in leaving New York and reincorporating in Texas for a long time.[99] The choice

---

[98] *Transcript of Hearing Held April 7, 2021* [Docket No. 700] at 16:23-25; *Transcript of Hearing Held April 21, 2021* [Docket No. 670] at 7:25-8:12; *Transcript of Hearing Held April 6, 2021* [Docket No. 499] at 37:14-38:9; *Transcript of Hearing Held April 13, 2021* [Docket No. 584] at 146:1-8; *Transcript of Hearing Held April 7, 2021* [Docket No. 559] at 22:10-13; *Transcript of Hearing Held April 7, 2021* [Docket No. 700] at 66:11-20.

[99] *Transcript of Hearing Held April 6, 2021* [Docket No. 499] at 37:8-38:14.

to attempt to do so now—and to do so through a bankruptcy reorganization—appears to have been a means of achieving the more specific purpose of avoiding dissolution in the NYAG Enforcement Action.

In closing arguments at the conclusion of trial, there was a suggestion that part of the desire to move to Texas, and therefore part of the reason for filing bankruptcy, was due to the NRA having increasing difficulty with its relationships with financial institutions because of the NY DFS Letter.[100] The specific evidence on this topic came from Mr. Spray, who testified that he "didn't know exactly what the catalyst was for their angst," but that the NRA's relationships with banks when Mr. Spray joined the NRA were tenuous and he had to find more enthusiastic banking support.[101] Mr. Spray also testified that it was becoming difficult to get insurance when he joined the NRA and that problem has only gotten worse.[102] Counsel for the NRA characterized this as an existential threat that the NRA was facing before the NYAG Enforcement Action was pending and a reason for filing bankruptcy to move to Texas. There are a few reasons the Court is skeptical of this argument. The first is one of timing. The NY DFS Letter was sent in April 2018, and the NRA filed its lawsuit over alleged interference with its banking and insurance relationships in May 2018. The speed with which the NRA sought relief by filing a complaint in the Northern District of New York and the delay in filing bankruptcy, over two years later, suggests the purpose of the bankruptcy was related to something else. Moreover, the general testimony was that financial reasons did not drive the bankruptcy filing. The Court understands how this might not fall into the category of current financial health when asking most people at the NRA, but even Mr. Spray, who was fully aware of the banking and insurance relationships, testified that he was not aware of any

---

[100] The NY DFS Letter is attached to NRA Exhibit 663.

[101] *Transcript of Hearing Held April 13, 2021* [Docket No. 578] at 153:18-154:20.

[102] *Transcript of Hearing Held April 13, 2021* [Docket No. 578] at 154:21-155:9.

reasons to file for bankruptcy.  If the deterioration of banking and insurance relationships is an existential threat and an important reason for filing bankruptcy, one would think Mr. Spray would have been consulted, but he was not consulted on—or even informed of—the decision to file for bankruptcy.

With regard to receivership, there was no evidence to suggest that it was an imminent threat, and the witnesses only appear to have been concerned about receivership in the context of dissolution being granted.  In other words, the witnesses appeared to be conflating the appointment of a receiver and dissolution when dissolution was the real concern.  As far as the Court can tell, the appointment of a receiver was never requested by the NYAG in the NYAG Complaint or elsewhere.  There was a statement in a press conference held by the NYAG that she may attempt to freeze assets,[103] but this comment appeared to relate to finding hidden assets and, in any event, none of the witnesses testified that this caused them concern that a receiver would be appointed. It is possible that if the NYAG had become aware that the NRA was preparing to file for bankruptcy, the NYAG could have attempted to have a receiver appointed on an expedited basis, but that would only be a reason for the NRA to go to extreme lengths to avoid leaks about its intention to file bankruptcy and not a reason for the bankruptcy filing itself.

Though articulated slightly differently, the remaining reasons for filing bankruptcy, such as preserving the NRA as a going concern, can be grouped under the general reason of avoiding dissolution in the NYAG Enforcement Action.  Based on the statements of counsel and the evidence in the record, the Court finds that the primary purpose of the bankruptcy filing was to avoid potential dissolution in the NYAG Enforcement Action.

---

[103] NRA Exhibit 675.

*Analysis of Whether the NRA Filed Bankruptcy to Achieve a Valid Bankruptcy Purpose*

Having identified the purpose of the NRA's bankruptcy filing, the Court must now decide whether it was a valid purpose for bankruptcy such that the bankruptcy was filed in good faith. The Fifth Circuit Court of Appeals has offered guidance on how courts should approach the good faith inquiry:

> Determining whether the debtor's filing for relief is in good faith depends largely upon the bankruptcy court's on-the-spot evaluation of the debtor's financial condition, motives, and the local financial realities. Findings of lack of good faith in proceedings based on §§ 362(d) or 1112(b) have been predicated on certain recurring but non-exclusive patterns, and they are based on a conglomerate of factors rather than on any single datum.

*In re Little Creek Dev. Co.*, 779 F.2d 1068, 1072 (5th Cir. 1986).[104]  The Third Circuit Court of Appeals has stated that almost every federal Court of Appeals follows some variation of this "totality of the circumstances" approach to the good faith filing requirement for Chapter 11 petitions.  *In re 15375 Mem'l Corp.*, 589 F.3d 605, 618 n.7 (3d Cir. 2009).  In that same case, the Third Circuit went on to note that they focus on two inquiries that are particularly relevant to the question of good faith: (1) whether the petition serves a valid bankruptcy purpose and (2) whether the petition is filed merely to obtain a tactical litigation advantage.  *Id.* at 618.

The Court has great concern about this case because its purpose is to avoid dissolution that is being sought as a remedy in a state regulatory action.  It has been asserted that this case is about preserving the NRA as a going concern, which is a very common good faith reason for filing bankruptcy.  There is a difference, however, between a lawsuit in which a party seeks a monetary judgment that would pose an existential threat to a debtor and one where the attorney general of a

---

[104] The Fifth Circuit also identified several conditions that usually exist in filings that are not made in good faith. *Id.* at 1072-73.  Because of the unusual circumstances of this case, the Court considered the *Little Creek* factors but did not structure its discussion around them.

state is specifically seeking dissolution of a debtor under the state's laws and therefore required to satisfy standards and requirements that specifically justify dissolution.

The New York Legislature constructed a regulatory system under which charities would be dissolved under certain circumstances. In this situation, the NRA is financially healthy, and the only way that the NRA will be dissolved is if it is determined in the New York court system that the requirements in Article 11 of the New York Not-For-Profit Corporation Law have been met. The NYAG has requested dissolution of the NRA under two different statutory provisions and acknowledged the high burden that it must meet:

> But New York law does not allow the NYAG to summarily dissolve a charity, but rather place[s] a burden upon the NYAG to prove to a court that dissolution is called for under the law in a given circumstance.
>
> With respect to N-PCL § 1101, the Attorney General must show a regulated entity's misconduct "has produced, or tends to produce, injury to the public. The transgression must not be merely formal or incidental, but material and serious, and such as to harm or menace the public welfare." *People v. Oliver Schools, Inc.*, 206 A.D.2d 143, 145 (4th Dep't 1994) (interpreting BCL § 1101, from which N-PCL § 1101 is derived) (quoting *People v. North River Sugar Refining Co.*, 121 N.Y. 582, 609 (1890)). . . .
>
> With respect to Dissolution under N-PCL § 1102, the Attorney General stands in the shoes of the NRA's members and, as relevant here, must prove that the "directors or members in control of [the NRA] have looted or wasted the corporate assets, have perpetuated the corporation solely for their personal benefit, or have otherwise acted in an illegal, oppressive or fraudulent manner." N-PCL § 1102(a)(2)(D); 112(a)(7).

*The State of New York's Omnibus Reply to Debtors' Opposition and the Committee's Response to Motion to Dismiss or Appoint a Trustee* [Docket No. 459] at ¶ 17. A dissolution that requires this showing is not the type of dissolution that the Bankruptcy Code is meant to protect against. The Court is not in any way saying it believes the NYAG can or cannot make the required showing to obtain dissolution of the NRA, but the Court is saying that the Bankruptcy Code does not provide sanctuary from this kind of a threat.

For this reason, the Court believes the NRA's purpose in filing bankruptcy is less like a traditional bankruptcy case in which a debtor is faced with financial difficulties or a judgment that it cannot satisfy and more like cases in which courts have found bankruptcy was filed to gain an unfair advantage in litigation or to avoid a regulatory scheme. The purpose of this bankruptcy filing may not have been to end the NYAG Enforcement Action immediately, but it was to deprive the NYAG of the remedy of dissolution, which is a distinct litigation advantage. This differs materially from the prescribed parallel proceedings structure for regulatory actions where regulators can obtain monetary judgments in one forum and then are required to have any claims treated through a bankruptcy process in that it is the NRA's goal to avoid dissolution and subvert the remedy provided for under New York law entirely through this Chapter 11 case. The Court does not know what specific mechanism the NRA plans to use,[105] but its intention is clearly to "take dissolution off the table."[106]

Courts have consistently held that a bankruptcy case filed for the purpose of obtaining an unfair litigation advantage is not filed in good faith and should be dismissed. *See Antelope Techs., Inc. v. Lowe (In re Antelope Techs, Inc.)*, 431 F. App'x. 272 (5th Cir. 2011) (affirming dismissal for cause based on finding that "the purpose of the petition was not primarily to reorganize or respond to financial crisis but instead was to gain unfair advantage in the shareholder derivative action"); *Investors Group, LLC v. Pottorff*, 518 B.R. 380, 383-84 (N.D. Tex. 2014) (affirming dismissal of a bankruptcy case for being filed in bad faith based on a finding that the primary

---

[105] *Transcript of Hearing Held April 5, 2021* [Docket No. 497] at 41:22-42:5 (Counsel for the NRA describing different ways in which a plan could be structured to achieve the NRA's goal in this case).

[106] *Transcript of Hearing Held April 5, 2021* [Docket No. 497] at 49:23-25 (Counsel for the NRA: "We filed, again, for three reasons that constitute good faith. We needed to take dissolution, the equivalent of foreclosure, off the table. . . .").

purpose for filing the bankruptcy petition was to gain an advantage in pending litigation); *In re Alexandra Trust*, 526 B.R. 668, 679-680 (Bankr. N.D. Tex. 2015) (citing cases).

Using the bankruptcy process to avoid dissolution in the NYAG Enforcement Action is also problematic because it deprives the state of New York of the ability to regulate not-for-profit corporations in accordance with its laws. There is a regulatory scheme for evaluating whether a New York charity should continue in existence under Article 11 of the New York Not-For-Profit Corporation Law. While bankruptcy courts can, in some circumstances, apply state regulatory law,[107] a bankruptcy case filed for the purpose of avoiding a regulatory scheme is not filed in good faith and should be dismissed. *See In re First Plus Fin. Enters., Inc.*, 99 B.R. 751, 755-56 (Bankr. W.D. Tex. 1989) (finding cause for dismissal under section 1112(b) because the case was filed in bad faith where "the obvious purpose in this case is to use the Chapter 11 filing as a litigation strategy and leverage in order to defeat the Texas regulatory scheme for the receivership and conservatorship of insolvent life insurance companies"); *In re Forest Hill Funeral Home & Mem'l Park-East, LLC*, 364 B.R. 808, 822-23 (Bankr. E.D. Okla. 2007) (finding cause for dismissal under section 1112(b) because the case was not filed in good faith for several reasons, including that it was filed to evade the regulatory authority of the state of Tennessee); *cf. Halo Wireless, Inc. v. Alenco Commc'ns Inc. (In re Halo Wireless, Inc.)*, 684 F.3d 581, 587-88 (5th Cir. 2012) (noting that section 362(a)(4) assists with the goal of discouraging debtors from submitting bankruptcy petitions either primarily or solely for the purpose of evading impending governmental efforts to invoke the governmental police powers to enjoin or deter ongoing debtor conduct that would seriously threaten the public safety and welfare).

---

[107] *See, e.g., In re HHH Choices Health Plan, LLC*, 554 B.R. 697 (Bankr. S.D.N.Y. 2016).

The Court would also like to discuss some of the NRA's other stated reasons for filing bankruptcy. The Court understands that the NRA wants to leave New York for a variety of reasons, not least of which being what it perceives to be a generally hostile environment. While the Court does not find that reincorporating in Texas was the true purpose of the bankruptcy filing, the Court would have concerns even if it were. Reincorporating in Texas could be accomplished outside of bankruptcy pursuant to applicable regulations for New York not-for-profit organizations,[108] which begs the question of what the Bankruptcy Code is being used for. If the goal is moving to Texas, the purpose of the bankruptcy would still appear to be avoidance of the regulatory scheme in New York that would be required for such a transition outside of bankruptcy, or at least avoidance of the New York regulators.

While the Court also does not find potential adverse judgments in litigation other than the NYAG Enforcement Action to have been a purpose for filing bankruptcy, the Court notes that based on the evidence, the NRA is financially healthy and potentially adverse litigation outcomes are too attenuated to justify a good faith bankruptcy filing. *See Off. Comm. of Unsecured Creditors v. Nucor Corp. (In re SGL Carbon Corp.)*, 200 F.3d 154, 163 (3d Cir. 1999) (holding that dismissal was appropriate where bankruptcy filing was based on litigation because the record was replete with evidence of the debtor's financial strength, there was no evidence that a judgment was imminent, and an assessment that pending litigation might result in a judgment causing financial and operational ruin was premature).

In closing arguments, counsel for the NRA raised several additional arguments that the Court would like to address. One of those arguments was that if avoiding dissolution is found to

---

[108] *See* Article 9 of the New York Not-For-Profit Corporation Law (governing merger or consolidation); Article 10 of the New York Not-For-Profit Corporation Law (governing non-judicial dissolution).

be an inappropriate bankruptcy purpose, this would allow a state to block a debtor's right to file for bankruptcy simply by filing an action seeking dissolution, and this would be tantamount to allowing a state to preempt federal law. This argument is based on the misconception that the state of New York has blocked access to bankruptcy relief just by filing a complaint with the word dissolution in it. The Court has not announced a *per se* rule that a pending dissolution action renders an entity ineligible for bankruptcy. Rather, the Court is evaluating the debtor's good faith or lack thereof in filing bankruptcy based on the totality of the circumstances of this specific case. The NRA is a solvent and growing organization using this bankruptcy as a tool to win its dissolution lawsuit, and that is not an appropriate use of bankruptcy.

Counsel for the NRA also, as the Court understands it, made the following argument. Section 1129(d) of the Bankruptcy Code states that the court may not confirm a plan over the objection of a governmental unit if the principal purpose of the plan is the avoidance of the application of section 5 of the Securities Act of 1933. Section 5 of the Securities Act of 1933 is an exercise of police power. Therefore, counsel argues, Congress has implicitly instructed that it is acceptable to file a bankruptcy petition for the purpose of avoiding any exercise of police power other than section 5 of the Securities Act of 1933. The Court does not understand this provision of the Bankruptcy Code to make such a sweeping endorsement of using bankruptcy for the principal purpose of avoiding the exercise of police power. Just because Congress has provided a guard rail for confirmation does not relieve the Court of its duty to conduct a fact-intensive inquiry to determine where a particular petition for bankruptcy relief falls along the spectrum ranging from the clearly acceptable to the patently abusive. *See In re 15375 Mem'l Corp.*, 589 F.3d 605, 618 (3d Cir. 2009) (discussing the duties of courts in examining whether bankruptcy petitions are filed in good faith).

Finally, the Court notes that even if it agreed with one or more of the NRA's arguments regarding eligibility or confirmation standards, the Fifth Circuit Court of Appeals has already given clear instruction to examine cases to determine whether they were filed in good faith and to dismiss those that were not. *See In re Humble Place Joint Venture*, 936 F.2d 814, 817 (5th Cir. 1991) ("Because *Little Creek* explicitly treated the question of good faith dismissals under § 1112, the case settles any statutory or constitutional question about that procedure.").

The Court finds, based on the totality of the circumstances, that the NRA's bankruptcy petition was not filed in good faith but instead was filed as an effort to gain an unfair litigation advantage in the NYAG Enforcement Action and as an effort to avoid a regulatory scheme. This constitutes cause for dismissal under section 1112(b)(1) of the Bankruptcy Code.

### Consideration of the Appointment of a Trustee or Examiner

Having found cause for dismissal, section 1112(b)(1) requires that the Court now consider whether appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate. The appointment of a Chapter 11 trustee is an extraordinary remedy that requires a movant to meet their burden of proof by clear and convincing evidence. *In re Patman Drilling Int'l, Inc.*, 2008 Bankr. LEXIS 715, at *15-16 (Bankr. N.D. Tex. Mar. 14, 2008). As mentioned previously, there is nothing approaching a consensus from the parties on what should be done.

As counsel for the NRA acknowledged on the record, there were cringeworthy facts during this trial. The movants have presented evidence of the NRA's past misconduct. Some facts regarding the NRA's past conduct were not available to this Court because the NRA's former treasurer asserted his rights under the Fifth Amendment during large swaths of his deposition.

Some of the conduct that gives the Court concern is still ongoing. The NRA appears to have very recently violated its approval procedures for contracts in excess of $100,000. Mr. LaPierre is still making additional financial disclosures. There are also lingering issues of secrecy and a lack of transparency. For example, even after hearing testimony from several witnesses, it is still very unclear why Mr. Spray, an officer everyone seemed to hold in high regard for his talent and integrity, parted ways with the NRA two weeks into this bankruptcy case. What is clear is that Mr. Spray's departure was precipitated by a call from Mr. LaPierre without involvement of the board of directors.

What concerns the Court most though is the surreptitious manner in which Mr. LaPierre obtained and exercised authority to file bankruptcy for the NRA. Excluding so many people from the process of deciding to file for bankruptcy, including the vast majority of the board of directors, the chief financial officer, and the general counsel, is nothing less than shocking.

The determination of whether appointment of a trustee or an examiner is in the best interests of creditors and the estate in this case, however, is complicated for a variety of reasons. The NRA has a mission that is, at times, political and polarizing. The NRA does not sell goods or services, and it would not be easy to find a suitable individual to serve in the role of trustee or examiner with expanded powers.[109]

In an odd twist for a bankruptcy case, the NRA is financially healthy, and undisputed creditors are likely to be paid sooner in the ordinary course outside of bankruptcy than they would if they must wait for confirmation of a plan of reorganization. On the other hand, if a trustee or an

---

[109] The examiner that has been requested is one with expanded powers, including the power to "independently examine, and the extent necessary, remove management for cause."

examiner with expanded powers were appointed, the Court believes the members and other donors who provide financial support to the NRA may not continue to support the organization.

While there is evidence of the NRA's past and present misconduct, the NRA has made progress since 2017 with its course correction. Whether it is yet complete or not, there has been more disclosure and self-reporting since 2017. Both Ms. Rowling and Mr. Erstling, the NRA's Director of Budget and Financial Analysis, testified that the concerns they expressed in the 2017 Whistleblower Memo are no longer concerns.[110] Mr. Frazer testified regarding the compliance training program that the NRA now has for employees.[111] Mr. Spray testified credibly that the change that has occurred within the NRA over the past few years could not have occurred without the active support of Mr. LaPierre.[112] It is also an encouraging fact that Ms. Rowling has risen in the ranks of the NRA to become the acting chief financial officer, both because of her former status as a whistleblower and because of the Court's impression of her from her testimony as a champion of compliance.

In short, the testimony of Ms. Rowling and several others suggests that the NRA now understands the importance of compliance. Outside of bankruptcy, the NRA can pay its creditors, continue to fulfill its mission, continue to improve its governance and internal controls, contest dissolution in the NYAG Enforcement Action, and pursue the legal steps necessary to leave New York. While the Court appreciates the way in which some of the parties have presented the appointment of an examiner as a compromise that could provide some benefits without taking too much control from the NRA, the Court finds that the reasons discussed above weigh against keeping this case in bankruptcy with the appointment of a trustee or an examiner. For these

---

[110] *Transcript of Hearing Held April 23, 2021* [Docket No. 697] at 94:24-95:4.

[111] *Transcript of Hearing Held April 7, 2021* [Docket No. 700] at 26:15-28:1.

[112] *Transcript of Hearing Held April 13, 2021* [Docket No. 578] at 156:17-157:5.

reasons, the Court finds appointment of a trustee or an examiner would not be in the best interests of creditors and the estate.

### *Analysis of the Unusual Circumstances Exception Under Section 1112(b)(2)*

The NRA did not allege unusual circumstances under section 1112(b)(2) of the Bankruptcy Code in their briefing but did discuss them during closing arguments at the conclusion of trial. Section 1112(b)(2) states:

> The court may not convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter if the court finds and specifically identifies unusual circumstances establishing that converting or dismissing the case is not in the best interests of creditors and the estate, and the debtor or any other party in interest establishes that—
>
> (A) there is a reasonable likelihood that a plan will be confirmed within the timeframes established in sections 1121(e) and 1129(e) of this title, or if such sections do not apply, within a reasonable period of time; and
>
> (B) the grounds for converting or dismissing the case include an act or omission of the debtor other than under paragraph (4)(A)—
>
>> (i) for which there exists a reasonable justification for the act or omission; and
>>
>> (ii) that will be cured within a reasonable period of time fixed by the court.

While there are certainly unusual circumstances in this case, the Court does not find that they establish that dismissing the case is not in the best interests of creditors and the estate. This is true for many of the reasons discussed above. In addition, no party has established the requirement of section 1112(b)(2)(A). At trial, the Court was aware that the NRA intended to file a plan that would pay creditors in full, but the plan was not filed before the close of evidence. It was also clear from the evidence that the NRA could face substantial challenges in confirming a plan depending on how the NRA would be willing to structure it. The Court is aware that the NRA has now filed a plan of reorganization, but that plan was not offered into evidence and is not properly before the Court.

## V. **Conclusion**

There are several aspects of this case that still trouble the Court, including the manner and secrecy in which authority to file the case was obtained in the first place, the related lack of express disclosure of the intended Chapter 11 case to the board of directors and most of the elected officers, the ability of the debtor to pay its debts, and the primary legal problem of the debtor being a state regulatory action. The Court agrees with the NYAG that the NRA is using this bankruptcy case to address a regulatory enforcement problem, not a financial one.

The Court finds that the NRA did not file the bankruptcy petition in good faith because this filing was not for a purpose intended or sanctioned by the Bankruptcy Code. Therefore, cause exists under section 1112(b) to dismiss this case, which the Court finds is in the best interests of creditors and the estate.

The Court is not dismissing this case with prejudice,[113] but should the NRA file a new bankruptcy case, this Court would immediately take up some of its concerns about disclosure, transparency, secrecy, conflicts of interest of officers and litigation counsel, and the unusual involvement of litigation counsel in the affairs of the NRA, which could cause the appointment of a trustee out of a concern that the NRA could not fulfill the fiduciary duty required by the Bankruptcy Code for a debtor in possession.

**IT IS THEREFORE ORDERED** that the Motions to Dismiss are **GRANTED** and the above-captioned cases are dismissed without prejudice;

**IT IS FURTHER ORDERED** that the Examiner Motion is **DENIED** as moot; and

**IT IS FURTHER ORDERED** that the CRO Motion is **DENIED** as moot.

---

[113] The movants did not request a prejudice period in their original Motions to Dismiss. While the NYAG did request dismissal with prejudice in a reply brief, it was not discussed in the body of the reply, and the NRA did not have an opportunity to provide responsive briefing to that request.

37

###End of Order###