**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| THE PEOPLE OF THE STATE OF NEW YORK by LETITIA JAMES, Attorney General of the State of New York, <br><br>          Plaintiff, <br><br>    v. <br><br> DIOCESE OF BUFFALO, RICHARD J. MALONE, EDWARD M. GROSZ, and MICHAEL WILLIAM FISHER, in his capacity as Bishop for the Diocese of Buffalo, <br><br>        Defendants. | No. 1:21-cv-00189-RA |

## STIPULATED FINAL ORDER

This stipulation of settlement is entered into by and between Plaintiff, the People of the State of New York, by Letitia James, Attorney General of the State of New York, and Defendants Diocese of Buffalo; Michael W. Fisher, in his capacity as the Bishop of the Diocese of Buffalo (the "Diocese"); Bishop Richard J. Malone; and Bishop Edward M. Grosz (Bishop Malone and Bishop Grosz, collectively, the "Individual Defendants").

WHEREAS, pursuant to the provisions of New York's Not-for-Profit Corporation Law ("N-PCL"); Estates, Powers and Trusts Law ("EPTL"); and Religious Corporations Law ("RCL"), the Attorney General conducted an investigation concerning the Diocese's response to allegations of clergy sexual abuse of minors and vulnerable adults that focused on the Diocese's compliance with standards to address and prevent the sexual abuse of minors by clergy that were established by the U.S. Conference of Catholic Bishops ("USCCB") and the Diocese and embodied in the *Charter*, the *Essential Norms*, and the *Policy & Procedures* (as those terms are defined below);

WHEREAS, such investigation of the Diocese included the sworn testimony of Bishop Malone and Bishop Grosz as well as the Attorney General's review of Diocesan records produced in response to the Attorney General's subpoena, including priest assignment histories, personnel files, letters of good standing, documents in the *archivum secretum*, public announcements, communications to and from the Congregation for the Doctrine of the Faith, internal memoranda personally prepared and/or reviewed by Bishop Malone and Bishop Grosz, and investigative records;

WHEREAS, based on findings from the investigation, the Attorney General commenced, through the filing of a complaint on November 23, 2020, the above-captioned lawsuit in the Supreme Court of the State of New York, New York County (the "Action"), asserting claims against the Diocese pursuant to section 112(a)(1) of the N-PCL and section 8-1.4 of the EPTL and against Bishop Malone and Bishop Grosz pursuant to section 8-1.4 of the EPTL and sections 717 and 720 of the N-PCL;

WHEREAS, the Individual Defendants have been retired since before the time that the Attorney General's complaint was filed;

WHEREAS, the Attorney General's complaint sought, among other remedies, injunctive relief relating to allegations in the complaint concerning the *Charter*, the *Essential Norms*, the *Policy & Procedures* (as those terms are defined below), and the N-PCL, EPTL, and RCL;

WHEREAS, the Attorney General's complaint also sought the appointment of an independent compliance auditor, which would be selected by the Diocese with the approval of the Attorney General, to monitor and audit the Diocese's compliance with the injunctive relief sought by the Attorney General in the complaint;

WHEREAS, on January 9, 2021, the Diocese and the Individual Defendants removed the Action to the U.S. District Court for the Southern District of New York;

WHEREAS, on February 22, 2021, the Attorney General filed a motion to remand the Action to the Supreme Court of the State of New York, New York County; the Diocese has opposed that motion and, in its opposition, objected to and contested the Attorney General's jurisdiction and authority to assert the claims and seek the relief it has sought in this action pursuant to the provisions of the N-PCL, EPTL, and RCL; and the Attorney General's motion to remand remains pending before the U.S. District Court for the Southern District of New York;

WHEREAS, after the Office of the Attorney General commenced its investigation, the Diocese developed a *Priest Supervision Program* (as defined below) that addresses monitoring of individual priests identified as having substantiated claims of abuse against them;

WHEREAS, the Diocese's *Policy & Procedures*, *Code of Conduct*, and *Priest Supervision Program* (as those terms are defined below) incorporate and apply key terms and obligations of the *Charter* and the *Essential Norms* regarding the response to allegations of clergy sexual abuse;

WHEREAS, Bishop Fisher was installed as the Bishop of the Diocese on January 15, 2021, and has prioritized and continued to strengthen the Diocese's institutional governance to protect children and vulnerable adults;

WHEREAS, the Diocese's College of Consultors has reviewed and approved the Diocese's operative *Policy & Procedures* and *Code of Conduct*, and the adoption of the *Priest Supervision Program* and this Stipulated Final Order;

WHEREAS, the Parties have determined that avoiding protracted litigation and resolving this dispute through execution and entry of this Stipulated Final Order is in their respective best interests; and

WHEREAS, in consideration of the covenants and understandings set forth herein and intending to be legally bound thereby, the Parties have agreed to the terms of this Stipulated Final Order as so-ordered by the Court;

NOW THEREFORE, it is hereby ORDERED, ADJUDGED, AND DECREED as follows:

## I.      DEFINITIONS

Unless otherwise specified, the below terms are defined as follows for purposes of this Stipulated Final Order:

1.      Audit Cycle.  The time period beginning with commencement of the Audit Period (as that term is defined herein) and concluding with the Auditor's issuance of the final Compliance Audit Report (as that term is defined in this Stipulated Final Order) for the particular Audit Period.

2.      Auditor.  The person or entity selected by the Diocese and agreed to by the OAG to perform the Compliance Audits.  The Auditor shall have personnel, including a certified public accountant, engaged on the Compliance Audit who have knowledge and experience in conducting performance audits in accordance with the U.S. Government Accountability Office's *Government Auditing Standards* (the "GAO's Yellow Book"), GAO-21-368G.

3.      Audit Period.  The twelve-month period covered by each Compliance Audit conducted by the Auditor, as set forth in Part II(B) of this Stipulated Final Order.  The twelve-month period begins on the Effective Date for the initial Compliance Audit, and on the anniversary of the Effective Date for each subsequent Compliance Audit.

4

4.      Bishop.  The Bishop of the Diocese of Buffalo, Bishop Michael W. Fisher, and his successors as the ordinary of the Diocese.

5.      DDF.  The Dicastery for the Doctrine of the Faith, previously known as the Congregation for the Doctrine of the Faith.

6.      *Charter*.  The *Charter for the Protection of Children and Young People*, adopted by the USCCB, as revised June 2018 and any subsequent versions.

7.      Cleric.  A person ordained for service in the Roman Catholic Church.

8.      *Code of Conduct*.  The Diocese's *Code of Conduct for Priests, Deacons, Pastoral Ministers, Administrators, Staff, and Volunteers*, as revised January 19, 2017 (attached as Exhibit A hereto), and any subsequent versions.

9.      Commitments.  The commitments by the Diocese as set forth in Part II of this Stipulated Final Order.

10.     Complaint.  An allegation of sexual abuse of a child or vulnerable adult by Personnel that is received by the Diocese and contains sufficient detail to identify the alleged abuse and the alleged abuser(s).  A Complaint may include allegations of a violation of the *Code of Conduct*'s prohibition on behavior by Personnel that constitutes grooming.

11.     Defendants.  The Diocese; Michael W. Fisher, in his capacity as the Bishop of the Diocese; and the Individual Defendants in the Action, Bishop Richard J. Malone and Bishop Edward M. Grosz.

12.     Diocese.  The Diocese of Buffalo.

13.     Effective Date.  The date that the U.S. Bankruptcy Court in *In re Diocese of Buffalo, N.Y.*, No. 20-10322 (Bankr. W.D.N.Y.), approves the Diocese's retention of the Auditor.

14.    *Essential Norms.*  The *Essential Norms for Diocesan / Eparchial Policies Dealing with Allegations of Sexual Abuse of Minors by Priests or Deacons*, prepared by the Ad Hoc Committee on Bishops' Life and Ministry of the USCCB, promulgated as revised June 17, 2005, and in all subsequent versions.

15.    Former Cleric.  A Cleric who is deceased or an individual who is included in the list of *Priests With Substantiated Claims of Abuse* published on the Diocese's website.

16.    Governing Policies.  The *Charter*, the *Essential Norms*, the *Policy & Procedures*, *Code of Conduct*, and *Priest Supervision Program*, as those documents and/or terms apply to alleged clergy sexual abuse or grooming and the Diocese's response thereto.

17.    IRB.  The Independent Diocesan Review Board, as described in Part V of the *Policy & Procedures*.

18.    OAG.  The Office of the Attorney General of the State of New York.

19.    Parties.  The Plaintiff, the People of the State of New York, by Letitia James, Attorney General of the State of New York and Defendants.

20.    Personnel.  Individuals who, at the time a Complaint is made, are (a) employees of the Diocese at any of its parishes or parish schools; (b) volunteers for the Diocese at any of its parishes or parish schools but not including a one-time or occasional worker; (c) Clerics; (d) living women and men who belong to religious orders and work for the Diocese at any of its parishes or parish schools; or (e) Former Clerics.

21.    *Priest Supervision Program.  The Plan to Supervise Priests Who Are Deemed Credibly Accused of Sexual Misconduct Toward a Minor or Vulnerable Adult by the Independent Review Board and Bishop*, dated March 22, 2021 (attached as Exhibit B hereto) and any subsequent versions of the same.

22.     *Policy & Procedures*.  The Diocese's *Policy & Procedures for the Protection of Children, Young People & Vulnerable Adults*, revised October 2022 (attached as Exhibit C hereto) and any subsequent versions of the same.

23.     Religious Order Allegation.  An allegation of sexual abuse of a child or vulnerable adult by a member of a religious order who, at the time of the alleged abuse or at the time the allegation is made, works, teaches, ministers, or resides within the Diocese.  The allegation may assert a violation of the *Code of Conduct*'s prohibition on behavior by a member of a religious order that constitutes grooming.

## II.     COMMITMENTS BY THE DIOCESE

The Diocese agrees to the following Commitments in settlement of the claims asserted by the OAG in its complaint and to avoid the time, expense, and distraction of further litigation.  The OAG finds the Commitments in this Stipulated Final Order appropriate and in the public interest.

A.      Commitments Regarding Policies, Procedures, and Practices

1.      The Diocese confirms that each of the Commitments in this Stipulated Final Order has been incorporated into the *Policy & Procedures*, *Code of Conduct*, or *Priest Supervision Program*.

2.      The Diocese agrees that, during the term of this Stipulated Final Order, it will not modify any of the Commitments that have been incorporated into the *Policy & Procedures*, *Code of Conduct*, and/or *Priest Supervision Program* without a corresponding modification to the terms of this Stipulated Final Order.

3.      To aid the Diocese in exercising reasonable oversight of the implementation of the Governing Policies, Bishop Fisher shall appoint a senior Diocesan official, the "Child Protection Policy Coordinator," who shall report directly to the Bishop.  This appointed senior

Diocesan official may be the Vicar for Clergy and, in addition to any other roles assigned to him or her by the Diocese, shall be responsible for:

(a)     ensuring that the Governing Policies are followed;

(b)     notifying the Bishop when the Governing Policies are not followed;

(c)     providing advice to the Bishop concerning the Diocese's compliance with the Governing Policies;

(d)     providing advice to the Bishop on updates or modifications to improve the effectiveness of the Governing Policies; and

(e)     overseeing the *Priest Supervision Program*.

<u>Process for Reporting Complaints</u>

4.     As outlined on the Diocese's website, the Diocese agrees that it will continue to offer the following ways in which to receive Complaints: (a) the Victim Assistance Coordinator's telephone and e-mail; (b) the Diocese's confidential, online portal available through complaintregister@buffalodiocese.org (or equivalent confidential service); and (c) for alleged abuse by a bishop or alleged mishandling of allegations of sexual abuse by a bishop, the Catholic Bishop Abuse Reporting Service, www.ReportBishopAbuse.org (or equivalent confidential service by an alternate provider).

5.     Where the Diocese receives an allegation of abuse that does not contain sufficient detail to permit a review or investigation of the alleged event(s), the Diocese shall make reasonable efforts to contact the complainant or his or her counsel to request additional information about the allegation so that it may be assessed and investigated pursuant to the Governing Policies.  The Diocese shall document its efforts to contact the complainant and file such documentation in the accused's personnel file.

6.     The Diocese agrees to continue to (a) report Complaints to law enforcement except if the report would violate the priest-penitent relationship of the Sacrament of Reconciliation; (b) cooperate with law enforcement, including the OAG, regarding Complaints, even when the alleged victim is no longer a minor; and (c) advise alleged victims of their rights to make a report to law enforcement.

7.     Upon receipt of a Complaint, if a written report has not been previously prepared, the Victim Assistance Coordinator shall interview the complainant, if the Complaint identifies the complainant, within ten days of the Complaint's receipt, subject to complainant cooperation and availability.  The Victim Assistance Coordinator shall then prepare a written report of the Complaint and will provide this written report to the Bishop and Vicar for Clergy within ten days of completing the complainant interview.

Process for Handling Initial Inquiries

8.     The Diocese has appointed a Vicar for Clergy who will conduct, or appoint a specific individual to conduct, an initial inquiry of any Complaint other than (a) a Religious Order Allegation or (b) a Complaint made against a Former Cleric.  The initial inquiry will determine whether a Complaint has a semblance of truth, that is, it is not "manifestly false or frivolous."  When an initial inquiry results in a determination that the Complaint is manifestly false or frivolous, the Vicar for Clergy or his designee will generate a written memorandum to document the basis for that conclusion.  That memorandum will be provided to the Bishop and the IRB for review and will be added to the personnel record for all Personnel identified in the Complaint.  *See* OAG Complaint, Prayer for Relief ¶ 1(i).  The initial inquiry shall be completed within no more than ten business days from when the Vicar for Clergy or his designee receives a

written report of the Complaint, unless there are extenuating circumstances, which will be documented.

<u>Process for Investigating Referred Complaints</u>

9.      If a Complaint, other than (a) a Religious Order Allegation or (b) a Complaint made against a Former Cleric, proceeds past the initial inquiry, the Complaint shall be referred expeditiously to the IRB, which will then appoint an independent investigator to investigate the Complaint.  The appointment of an independent investigator will be made in no more than ten business days after the Complaint is referred to the IRB.  The investigator will be directed to complete the investigation within forty-five days of his or her appointment, unless circumstances dictate the need for more time to complete the investigation; these circumstances shall be documented in the investigator's report.  The independent investigator shall (a) be a person with experience conducting investigations and (b) certify, before each investigation, that, other than his or her investigative role, he or she lacks any material familial, personal, financial, or employment relationship with the Diocese, the accused Cleric, or the complainant.  At the conclusion of the investigation, the investigator shall prepare a written report of the findings of the independent investigation—including the process and sources of information for the investigation—and submit the written report to the IRB.  *See* OAG Complaint, Prayer for Relief ¶ 1(ii).

10.      A Complaint against a Former Cleric shall be referred expeditiously to the IRB, which shall then determine whether to appoint an independent investigator to investigate the Complaint.  In making that determination, the IRB shall consider whether (a) the allegations in the Complaint implicate Personnel in addition to the Former Cleric, including by alleging that such Personnel failed to monitor the Former Cleric or failed to adequately respond to allegations

of abuse by that Former Cleric or (b) the investigation is likely to provide material information that would improve the Governing Policies.  The IRB may also, in its discretion, consider other factors in making this determination.  In the event that the IRB determines that an investigator should be appointed, the provisions set forth in Part II(A), Paragraph 9 of this Stipulated Final Order concerning the conduct of the investigation shall apply, but the provisions in that Paragraph for the timing of the appointment of an investigator shall not apply.  In such an instance, the investigator need not be appointed within ten business days of when a Complaint is referred to the IRB but shall instead be appointed by the IRB within a reasonable time after the IRB determines that an investigator should be appointed.

11.     For a Complaint against a Cleric, who is not a Former Cleric or a member of a religious order, that is deemed by the Bishop or the Vicar for Clergy to be serious in accordance with Part III, "Initial Inquiry," of the *Policy & Procedures*, attached hereto as Exhibit C, the accused will be relieved of responsibilities and placed on administrative leave, pending the outcome of the investigation.  The relief from administrative responsibilities shall be recorded in a decree issued by the Bishop, which shall include restrictions that, during the pendency of the investigation, the accused Cleric cannot present himself as a priest or deacon or, in the case of a priest, reside in the parish he serves at the time the Complaint is made or where the alleged abuse is alleged to have occurred.  The Vicar for Clergy shall supervise the Cleric's compliance with this decree.  *See* OAG Complaint, Prayer for Relief ¶ 1(iii).  In accordance with the Diocese's current practice, the Diocese shall report on its website the determination to place the Cleric on administrative leave pending the investigation, without any implication as to the truth or falsity of the Complaint.  Notwithstanding this Paragraph 11, the Bishop shall have the discretion not to place a Cleric on administrative leave if the Complaint is submitted anonymously and does not

reference at least one person (whether it be the alleged victim, a non-victim complainant, or someone else) who can corroborate the alleged abuse; in such cases, the Bishop shall document his decision not to place the accused on administrative leave pending investigation of the Complaint and his reason(s) for that decision.  A copy of that record shall be placed in the personnel file for all Personnel identified in the Complaint.

<u>The IRB Process</u>

12.     The IRB shall consist of at least five members appointed by the Bishop, a majority of whom must be lay persons who are not employed by the Diocese, and at least one member of the IRB must be a person with expertise in the treatment of sexual abuse of a child. Each IRB member is appointed by the Bishop for a five-year term.

13.     All Complaints shall be reported to the IRB.  When a Complaint is investigated, in accordance with the process set out in Paragraphs 9 and 10, above, the IRB shall make an independent assessment of the Complaint, including the results of the independent investigations presented to the IRB.  The IRB shall submit a written recommendation to the Bishop, which shall set out the basis for the IRB's recommendation as to whether a Complaint brought before it should be found substantiated or unsubstantiated; that written recommendation may refer to or rely upon the independent investigator's written report.  The IRB shall recommend that the Bishop find a Complaint substantiated when the IRB determines, on the basis of the totality of facts, circumstances, documents, and any testimony or in-person statements presented to the IRB, that it is more likely than not that the alleged abuse occurred.  The IRB's written recommendation to the Bishop shall indicate whether the IRB members are unanimous in support of the IRB's recommendation.  *See* OAG Complaint, Prayer for Relief ¶ 1(iv).

14.     As required by the *Policy & Procedures*, any recommendation by the IRB that a Complaint should be found substantiated shall be publicized on the Diocese's website.  When the Bishop accepts that recommendation, the accused's name will be added to the list of *Priests With Substantiated Claims of Abuse* and, when the accused is a Cleric in ministry within the Diocese, announced in the parish where the Cleric is assigned and any other institution where the Cleric was assigned.  The Diocese shall similarly publicize on its website all disciplinary actions taken as a result of an investigation, a subsequent canonical trial, or a DDF referral and, where applicable, announce such disciplinary action in the parish and any other institution where the accused Cleric was assigned.  *See* OAG Complaint, Prayer for Relief ¶ 1(v), (vii).

The Process for Referral to the DDF

15.     Within four weeks after reviewing a recommendation from the IRB, the Bishop shall determine whether to refer a Complaint to the DDF and, when the Bishop has determined that such a referral is warranted, the DDF shall be notified within ten weeks of the Bishop's determination to refer a Complaint to the DDF, unless circumstances dictate the need for more time to complete the referral; these circumstances shall be documented.  *See* OAG Complaint, Prayer for Relief ¶ 1(vi).

16.     In the event that the Bishop disagrees with the IRB's recommendations, the Bishop shall issue a written response to the IRB that states the basis for his determination.  In such cases, (a) the Bishop shall also consider whether to request that additional investigation should be conducted and, if so, whether any decree of administrative leave imposed on the accused should remain in place pending the completion of any such additional investigation and (b) copies of the Bishop's written response to the IRB shall be provided to (i) the Vicar for

Clergy and (ii) the Auditor, during the Auditor's term as set out in *The Audit of the Diocese's Compliance with the Commitments* below.

<u>Monitoring</u>

17.     If the Bishop determines that a referral to the DDF is warranted because an individual Complaint has been substantiated, the Bishop shall apply precautionary measures to ensure that the public will be protected from abuse pending review by the DDF or the outcome of any subsequent canonical trial.  These measures are recorded in the *Priest Supervision Program*, attached hereto as Exhibit B.  Pursuant to the *Priest Supervision Program*, the Diocese shall appoint an independent individual with experience in the field of law enforcement (the "Monitor") to develop the individual monitoring plans for Clerics against whom a Complaint has been deemed substantiated.  The Monitor shall certify, before monitoring a Cleric, that, other than his or her monitoring role, he or she lacks any material familial, personal, financial, or employment relationship with the Diocese or accused Cleric.  For those Clerics who fail to cooperate or comply with the monitoring program after receiving a written warning, the Bishop shall consider withholding applicable pension payments pursuant to the terms of the Diocese's pension plan.  The Diocese has amended the terms of its pension plan to give the Bishop the discretion to take such action.  *See* OAG Complaint, Prayer for Relief ¶ 1(viii).

18.     According to the *Priest Supervision Program*, in all cases where the Bishop has determined that a Complaint against a Cleric has been substantiated, that Cleric shall agree to the following mandatory prohibitions as part of his individual monitoring plan, pending review by the DDF or the outcome of any subsequent canonical trial:

>          (a)     the Cleric shall be prohibited from exercising priestly ministry in all forms, including public celebration of the mass and hearing confession;

(b)     the Cleric shall be prohibited from publicly holding himself out as a Cleric by, for example, wearing the Roman collar or clerical garb or being referred to as "Father," "Reverend," "Monsignor," "Deacon," or other ecclesiastical title;

(c)     the Cleric shall be prohibited from providing spiritual direction, pastoral care, counseling, and all other forms of ministry that may be provided by lay persons;

(d)     the Cleric shall be prohibited from viewing, downloading, or otherwise possessing pornography or sexually explicit materials of any kind;

(e)     the Cleric shall be prohibited from attending any place that features sexual performance such as a strip club or "adult bookstore"; and

(f)     the Cleric shall be prohibited from maintaining a personal post office box.[1]

19.     In all cases where the Bishop has determined that a Complaint against a Cleric has been substantiated, the Diocese agrees to continue to offer the Cleric therapeutic professional assistance.

Transfers or New Assignments of Accused Clerics

20.     In accordance with section IV of the *Policy & Procedures* concerning "Transfers and New Assignments," the Diocese agrees that it will continue to abide by (a) the prohibition against the transfer of Clerics as to whom a Complaint has been substantiated to another diocese, eparchy, or religious province for a ministerial assignment or to a new assignment within the Diocese and (b) the requirement that, for Clerics visiting the Diocese, it obtain all relevant information regarding the background of the Cleric, including any past acts of sexual abuse by

---

[1]     *See Priest Supervision Program*, Exhibit B, at 1.

the visiting Cleric.  In addition, when changing the residence of a Cleric as to whom a Complaint has been substantiated to another diocese, the Diocese shall send to the bishop of the proposed place of residence any and all information concerning the Complaint and its resolution and any other information indicating that the Cleric has been or may be a danger to minors.

21.     When a Cleric is proposed for a (a) new assignment or transfer; (b) residence in another diocese or residence in a country other than the United States; or (c) residence in a community of a religious institute, the Bishop shall forward to the bishop or religious superior of the proposed new assignment or residence: an accurate and complete report of information about any act of sexual abuse concerning the Cleric, including information about any Complaint and its status or any other information indicating that the Cleric has been or may be a danger to minors.

22.     In letters of suitability or of good standing for a Cleric incardinated in the Diocese, the Diocese will continue to state whether the Cleric is in compliance with the Diocese's Safe Environment Program and whether there is anything in the Cleric's background that makes him unsuitable to work with minors or vulnerable adults.

<u>Religious Orders</u>

23.     All members of a religious order who work, teach, minister, or reside within the Diocese shall be required to agree to the *Code of Conduct*.  The Victim Assistance Coordinator of the Diocese and other means available to victims to report a Complaint against Personnel shall be available to report Religious Order Allegations.  The Diocese shall proceed as follows with respect to such Religious Order Allegations:

        (a)     The Diocese shall report the Religious Order Allegation to the appropriate

        district attorney and to the applicable religious order when the religious order is

not otherwise on notice of the allegation (through the filing of a civil lawsuit or otherwise).

(b)      The Vicar for Clergy will conduct or appoint a specific individual to conduct an initial inquiry into any Religious Order Allegation against a person who works, ministers, teaches, or resides within the Diocese at the time the allegation is made, in accordance with the procedure set out in Part II(A), Paragraph 8 of this Stipulated Final Order.

(c)      If an initial inquiry by the Vicar for Clergy or his designee of a Religious Order Allegation finds that the allegation is not manifestly false or frivolous, the Bishop shall, pending any investigation of the Religious Order Allegation by the pertinent religious order or district attorney, (i) suspend the priestly faculties of the accused within the Diocese; (ii) revoke all permission for the accused to provide or participate in any form of ministry within the Diocese, including teaching; (iii) not allow the accused to live in a Diocesan parish; and (iv) report on the Diocese's website that the accused's faculties have been suspended within the Diocese pending investigation by the pertinent religious order or district attorney without any implication as to the truth or falsity of the allegation. Notwithstanding this Paragraph 23(c), the Bishop shall have the discretion not to take the steps recited in (i) through (iv), above, if the Complaint is submitted anonymously and does not reference at least one person (whether it be the alleged victim, a non-victim complainant, or someone else) who can corroborate the alleged abuse; in such cases, the Bishop shall document his decision not to place the accused on administrative leave pending investigation of the Complaint and

his reason(s) for that decision.  A copy of that record shall be placed in the

personnel file for all Personnel identified in the Complaint

Recordkeeping and Other Commitments

24.     The Diocese will maintain written records of the following steps taken in

connection with the assessment and investigation of Complaints: any initial inquiry into whether

the Complaint is manifestly false or frivolous, any determination by the Bishop regarding

whether to place a Cleric on administrative leave pending an investigation of the Complaint, any

ensuing investigation of the Complaint, any recommendation from the IRB as to whether the

Complaint is substantiated or unsubstantiated, any determination by the Bishop or his designee

concerning the IRB's recommendation, any referral to the DDF by the Bishop and the DDF's

response, and the monitoring of Clerics in accordance with the *Priest Supervision Program*.

Complete copies of these records shall be provided for the Bishop's and the IRB's consideration

in the event any new Complaint is later made regarding the same individual.[2]  *See* OAG

Complaint, Prayer for Relief ¶ 1(ix).

25.     The Diocese has adopted and will adhere to a whistleblower policy, in compliance

with N-PCL section 715-b, which prohibits any intimidation, harassment, discrimination,

retaliation, or adverse employment consequence against Personnel that, in good faith, reports any

action or suspected action that is illegal or violates the Governing Policies.  This policy, attached

hereto as Exhibit D, shall remain on the Diocese's website.  *See* OAG Complaint, Prayer for

Relief ¶ 1(x).

---

[2]     *See* Policy and Procedures for the Protection of Children, Young People and Vulnerable Adults, as
revised October 2022 (Exhibit C), at 28.

26.     The Diocese shall continue to institute all training programs provided for in the *Charter*, the *Essential Norms*, and the *Policy & Procedures* and shall maintain records of such programs.  *See* OAG Complaint, Prayer for Relief ¶ 1(xi).

27.     All Personnel shall continue to be made aware of the *Code of Conduct*, attached hereto as Exhibit A, and be required to agree to it.  The Diocese shall continue to publish the *Code of Conduct* on its website.

28.     The Diocese shall continue to fund the Victim Assistance Coordinator.  Victims shall be able to continue to make a Complaint or a Religious Order Allegation to the Victim Assistance Coordinator or through the Diocese's website as discussed in Part II(A), Paragraph  4, above.  The Diocese agrees that the Victim Assistance Coordinator will continue to offer outreach to every person who has been the victim of sexual abuse by any Cleric.  The outreach may include counseling, support groups, and other social services agreed upon by the victim and the Diocese.  The Diocese agrees that settlement agreements entered into between the Diocese and alleged victims shall not bind the parties to confidentiality unless the alleged victims request confidentiality and those requests are expressly stated in the settlement agreements.

<u>Process for Investigating Pending Complaints</u>

29.     If not already undertaken in substance, the following process applies to the investigation of all Complaints pending as of the Effective Date that have proceeded past the "Initial Inquiry" set out in Part III of the *Policy & Procedures*, other than (a) a Religious Order Allegation or (b) a Complaint made against a Former Cleric: (i) the IRB will, within a reasonable time after the Effective Date, appoint an independent ("independent" as described in Part II(A), Paragraph 9) investigator to investigate; (ii) the investigator will be directed to complete the investigation within forty-five days of the Effective Date, unless the investigator documents the

need for a reasonable extension of time to complete the investigation; and (iii) at the conclusion of the investigation, the investigator shall prepare a written report of the findings of the independent investigation—including the process and sources of information for the investigation—and submit the written report to the IRB; and (iv) the Diocese shall adhere to Part II(A), Paragraphs 13 through 18.

B.        The Audit of the Diocese's Compliance with the Commitments

1.        The Diocese shall submit to an annual, independent audit of its compliance with the Commitments in this Stipulated Final Order (the "Compliance Audit").  *See supra* Part II(A).

2.        The Compliance Audit shall be conducted by the Auditor.  The Auditor agrees to conduct the Compliance Audits in accordance with (a) this Stipulated Final Order; (b) as applicable to the Compliance Audit, Chapter 8: Fieldwork Standards for Performance Audits of the GAO's Yellow Book; and (c) the Auditor's engagement or retention letter with the Diocese, which the OAG will review.

3.        For each Audit Period for which the Auditor is engaged, the Auditor shall obtain sufficient, appropriate evidence to provide a reasonable basis for addressing the objectives of the Compliance Audit and supporting the Auditor's findings and conclusions as to whether the Diocese complied in all material respects with the Commitments as set forth in this Stipulated Final Order.  The Auditor shall describe in the Compliance Audit Report (*see infra* Part II(B), Paragraphs 9-12) any significant limitations or uncertainties with the Auditor's findings and conclusions based on the Auditor's overall assessment of the sufficiency and appropriateness of the evidence in the aggregate, in accordance with Chapter 9 of the GAO's Yellow Book.

4.         The Auditor shall comply with and certify that it has complied with the independence requirements set forth in the GAO's Yellow Book.  In addition, the Auditor shall

have no material familial, personal, financial, or prior business relationship with the Diocese or with any accused Cleric associated with the Diocese. The Auditor is not an agent of the Diocese, its counsel, or other representatives of the Diocese. The Auditor will be provided with a copy of this Stipulated Final Order and shall acknowledge receipt of it in writing.

  5. The Auditor shall have access to all documents, communications, information and to all persons that the Auditor deems necessary to fulfill the Auditor's role under this Stipulated Final Order and to conduct the Compliance Audit in accordance with Chapter 8: Fieldwork Standards for Performance Audits and Chapter 9: Reporting Standards for Performance Audits of the GAO's Yellow Book, and the Diocese shall ensure that the Auditor has access to such documents, communications, information, and persons. This includes, among other things, all written records created or required to be maintained in connection with the Commitments and the Governing Policies. The Auditor shall have the right to request any additional evidence from the Diocese, and to speak with the Diocese and any of its personnel, as the Auditor, in its professional judgment, deems necessary to fulfill the Auditor's role under this Stipulated Final Order. The Auditor may request that the Bishop or other senior Diocesan official provide written representations as to the accuracy and completeness of any information provided to the Auditor, in accordance with the guidance set forth in Paragraph 8.97 of the GAO's Yellow Book.

  6. The Auditor shall retain its work papers for eight years after the Effective Date and shall retain all materials and information provided to it by the Diocese for the entire time that this Stipulated Final Order remains in effect, as determined in accordance with Part IV, "Duration," below.

  7. The scope of the Auditor's review shall be recorded in an audit plan, consistent with Chapter 8 and Chapter 9 of the GAO's Yellow Book, that includes specific steps to obtain

sufficient, appropriate evidence that provides a reasonable basis for findings and conclusions as to whether the Diocese has complied with the Commitments in this Stipulated Final Order and includes consideration of the matters discussed in Yellow Book Paragraph 8.39 to 8.65. The Auditor shall provide the proposed audit plan to the OAG and the Diocese for their agreement in advance of each Compliance Audit, but by no later than sixty days after the Effective Date, for the first Audit Period, or sixty days after the anniversary of the Effective Date, for successive Audit Periods. If the OAG and the Diocese are unable to agree on the audit plan or any aspect of it, the Auditor shall resolve the dispute and finalize the audit plan by no later than thirty days after the Auditor has provided the proposed audit plan to the OAG and the Diocese.

8.      In order to assist the Auditor in evaluating the Diocese's compliance with the Commitments, within thirty days of the Effective Date, the Diocese shall provide the following information to the Auditor as of the Effective Date of this Stipulated Final Order:

> (a)      a list of all Complaints, pending or currently under investigation by the Diocese as of the Effective Date, including the name of the accused Cleric, the status of the investigation, and the current monitoring plan (if any) for the accused Cleric;

> (b)      a list of all Complaints referred to the DDF and awaiting a decision, including the name of the accused Cleric, the date of referral, and the current monitoring plan (if any) for the accused Cleric;

> (c)      a list of all Complaints awaiting further action from the Diocese after receipt of DDF directives, including the name of the accused Cleric, the date and substance of the DDF directive, and the current monitoring plan (if any) for the accused Cleric; and

(d)     a list of all Clerics and living Former Clerics who have been directed to live a life of prayer and penance, the date of that directive, and the current monitoring plan (if any) for each such Cleric.

The Auditor's Compliance Audit Report

9.     The Auditor shall report separately its professional opinion, in writing and on an annual basis, in accordance with the terms set forth herein and Chapter 9 of the GAO's Yellow Book, on whether the Diocese has complied with the Commitments during the Audit Period, *see supra* Part II(A), (the "Compliance Audit Report").  If the Audit determines that the Diocese has not complied with the Commitments during the Audit Period, the Compliance Audit Report shall identify each instance of non-compliance.  The Auditor shall separately report to the OAG and the Diocese by letter, at the same time as it issues the final Compliance Audit Report, any deficiency in internal controls that the Auditor deems significant to the objectives of the Compliance Audit.

10.     The Auditor shall provide a draft of the Compliance Audit Report to the Diocese, with a copy to the OAG, by no later than ninety days after the end of the Audit Period.  The Diocese and the OAG shall each have thirty days from receipt of the draft of the Compliance Audit Report to provide written comments, if any, to the Auditor, with a copy to the other party.

11.     The Auditor shall review any written comments of the Diocese and the OAG in its preparation of a final Compliance Audit Report.  The Auditor shall issue a final Compliance Audit Report by no later than sixty days after receipt of any written comments from the Diocese or the OAG.  The Auditor may elect to attach to the final Compliance Audit Report any written comments from the Diocese and the OAG and to respond to specific matters raised by either party.

12.     The final Compliance Audit Report shall be made available to the public on the Diocese's website within ten business days of the Diocese's receipt of the final Compliance Audit Report.  The Auditor shall make reasonable efforts to maintain the confidentiality of any sensitive information when drafting the report, consistent with relevant professional standards. Specifically, the report shall not include, *inter alia*, personal identifying information about individual complainants or other specific details from which the identity of an individual complainant could be ascertained.

### III.     COMMITMENTS BY THE INDIVIDUAL DEFENDANTS

The Individual Defendants in this action, Richard J. Malone and Edward M. Grosz, agree that they will not serve as a director, trustee, officer, or equivalent fiduciary position with any charitable entity registered in the State of New York.  This agreement by the Individual Defendants shall not bar them from serving in a ministerial, pastoral, or spiritual role, within any Diocese in New York State, or as a volunteer to any charitable entity registered in the State of New York.

### IV.     DURATION

Other than Part II(B), this Stipulated Final Order shall remain in effect until five years following the Effective Date, unless the Parties agree in writing to modify the term.  Part II(B), addressing the *The Audit of the Diocese's Compliance with the Commitments*, shall remain in effect for three Audit Cycles unless the OAG reasonably determines the independent audit provisions should continue for up to an additional two Audit Cycles.  The OAG shall present the basis for any such extension of the independent audit provisions to the Diocese in writing within forty-five days of the Auditor's submission of the final Compliance Audit Report for the third Audit Cycle.  In the event that the Diocese disagrees with the OAG that there is a basis for extending the independent audit provisions in Part II(B), the Diocese and the OAG shall meet

and confer.  If, after this meet-and-confer process, the Diocese and the OAG cannot agree, the Diocese may seek a resolution of the dispute from the Court and the Court shall then determine after receiving submissions from the Diocese and the OAG, whether the independent audit provisions shall continue for up to an additional two Audit Cycles.

## V.   DISPUTE RESOLUTION AND ENFORCEMENT

1.       For the purposes of resolving disputes with respect to compliance with this Stipulated Final Order, should the OAG have a reasonable basis to assert that the Diocese has violated a provision of this Stipulated Final Order subsequent to the Effective Date, then the OAG shall notify the Diocese in writing of the specific objection, identify with particularity the provision of this Stipulated Final Order that appears to be in violation and facts supporting the OAG's assertion, and give the Diocese twenty-one days from receipt to respond to the notification.

2.       Within the twenty-one-day response period provided for in Part V, Paragraph 1, above, the Diocese shall provide a good faith written response to the notification, containing either a statement explaining why the Diocese believes it is in compliance with the Stipulated Final Order, or a detailed explanation of how the alleged violation occurred and a statement explaining how the Diocese intends to remedy the alleged violation.  The OAG may agree, in writing, to provide the Diocese with additional time beyond the twenty-one-day response period without Court approval.

3.       This Court will retain jurisdiction over this matter for purposes of enforcing the Stipulated Final Order and granting such additional relief as necessary or appropriate.  The OAG may seek to enforce compliance with this Stipulated Final Order with this Court, but only after providing the Diocese the opportunity to respond to a notice of violation of this Stipulated Final Order, as set forth in Part V, Paragraphs 1 and 2, above.

## VI.     NOTICE AND SUBMISSIONS

Unless otherwise specified in this Stipulated Final Order, whenever, under the terms of

this Stipulated Final Order, notice is required to be given or a document is required to be sent, it

shall be directed to the individuals at the addresses below, by e-mail and overnight mail, unless

those individuals or their successors give notice, in writing, of a change:

If to the Diocese to:

John D. Goetz, Esq.
JONES DAY
500 Grant Street, Suite 4500
Pittsburgh, Pennsylvania 15219
jdgoetz@jonesday.com

Todd R. Geremia, Esq.
250 Vesey Street
New York, New York 10281-1047
trgeremia@jonesday.com

If to the Individual Defendants to:

Dennis C. Vacco, Esq.
Scott S. Allen, Jr., Esq.
LippesMathias LLP
50 Fountain Plaza, Suite 1700
Buffalo, NY 14202-2216
dvacco@lippes.com
sallen@lippes.com

If to the OAG, to:

James Sheehan, Esq., Bureau Chief of the Charities Bureau
Emily Stern, Esq.
Office of the Attorney General
Charities Bureau
28 Liberty Street, 19th Floor
New York, NY 10005
james.sheehan@ag.ny.gov
emily.stern@ag.ny.gov

or in their absence, to the person holding the title of Bureau Chief of the Charities Bureau
in the Office of the Attorney General.

## VII.   ADDITIONAL PROVISIONS

1.      This Stipulated Final Order fully and finally resolves all of the causes of action asserted by the Plaintiff against the Defendants in this Action.

2.      The terms of this Stipulated Final Order shall be governed by the laws of the State of New York.

3.      The terms of this Stipulated Final Order shall become effective immediately upon the Effective Date and shall apply to all Complaints and Religious Order Allegations received by the Diocese after the Effective Date and as provided in Part II(A), Paragraph 29 above.

4.      The Parties represent and acknowledge that this Stipulated Final Order is the result of extensive, thorough, and good faith negotiations.  The Parties further represent and acknowledge that the terms of this Stipulated Final Order have been voluntarily accepted, after consultation with counsel, for the purpose of making a full and final compromise and settlement of any and all claims arising out of the unique allegations set forth in the complaint in this Action.  This Stipulated Final Order shall have no precedential effect on, and shall not be binding on, any person or entity other than the Parties in this Action.

5.      No representation, inducement, promise, understanding, condition, or warranty not set forth in this Stipulated Final Order has been made to or relied upon by the Parties in agreeing to this Stipulated Final Order.  This Stipulated Final Order shall be binding on and inure to the benefit of the Plaintiff and the Defendants and their respective successors and assigns, provided that no party, may assign, delegate, or otherwise transfer any of its rights or obligations under this Stipulated Final Order without the prior written consent of the Plaintiff and Defendants.

6.     This Stipulated Final Order is not intended to be used or submitted by any third party in any other proceeding.

7.     This Stipulated Final Order is not, is not intended to be, and should not be deemed or construed as, an admission to any of the allegations in the complaint filed in this matter.  The Diocese and the Individual Defendants expressly agree and acknowledge that the Attorney General may introduce this Stipulated Final Order as evidence in any proceeding to enforce the terms of this Stipulated Final Order, in accordance with the Dispute Resolution provisions outlined at Part V above.

8.     This Stipulated Final Order may be modified by a stipulation of the Parties as approved by the Court, or by proceedings before the Court resulting in a modified Stipulated Final Order.

9.     This Stipulated Final Order represents the full and complete terms of the settlement entered into by the Plaintiff and Defendants.  In any action or proceeding undertaken in connection with this Stipulated Final Order, no prior or contemporaneous communications, oral or written, or prior drafts of this Stipulated Final Order shall be relevant or admissible for any purpose whatsoever.

10.     This Stipulated Final Order shall not become effective unless and until it is so ordered by the Court.  If any provision of this Stipulated Final Order shall be held unenforceable, the Stipulated Final Order shall be construed as if such provision did not exist.

11.     The Plaintiff and Defendants agree that this Stipulated Final Order may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same document.  Execution and delivery of this Stipulated Final Order by electronic means shall constitute execution and delivery of this Stipulated Final Order

for all purposes, with the same force and effect as execution and delivery of an original manually

signed copy hereof.

12.     The Attorney General's motion to remand this action (ECF No. 15) and motion to

determine whether the names of individuals referred to anonymously in the complaint in this

Action may be publicly disclosed in this action, and for other procedures in connection with that

request, (ECF No. 1) are hereby withdrawn without prejudice.  Neither Party concedes any of the

issues in dispute in these motions.

APPROVED:

Dated:   New York, New York
              October 24, 2022

*For Defendants*
*Diocese of Buffalo and*
*Bishop Michael W. Fisher:*

_____

Leon F. DeJulius, Jr.
Todd R. Geremia
JONES DAY
250 Vesey Street
New York, New York  10281-1047
Tel: (212) 326-3939
Fax: (212) 755-7306
lfdejulius@jonesday.com
trgeremia@jonesday.com


John D. Goetz (*pro hac vice*)
JONES DAY
500 Grant Street, Suite 4500
Pittsburgh, Pennsylvania 15219
Tel: (412) 394-7911
Fax: (412) 394-7959
jdgoetz@jonesday.com

*Attorneys for Defendants*
*Diocese of Buffalo and*
*Bishop Michael W. Fisher*

APPROVED:

Dated:   Buffalo, New York
         October 24, 2022

*For Defendants*
*Richard J. Malone and Edward M. Grosz:*

_____

Dennis C. Vacco
Scott S. Allen, Jr.
LIPPES MATTHIAS LLP
50 Fountain Plaza, Suite 1700
Buffalo, New York 14202-2216
Tel: (716) 853-5100
Fax: (716) 853-5199
dvacco@lippes.com
sallen@lippes.com

*Attorneys for Defendants*
*Richard J. Malone and Edward M. Grosz*

APPROVED:

Dated:   New York, New York
         October 24, 2022

*For Plaintiff, Letitia James, Attorney General*
*of the State of New York:*

James Sheehan, Charities Bureau Chief
Emily Stern, Co-Chief of Enforcement
      Section, Charities Bureau
Daniel Roque, Assistant Attorney General
Catherine Suvari, Assistant Attorney General
28 Liberty Street
New York, New York  10005
(212) 416-8401

SO ORDERED:

Dated:  10/25/2022

Hon. Ronnie Abrams,
U.S. District Judge

# EXHIBIT A

**Diocese of Buffalo**

## Code of Conduct
**For Priests, Deacons, Pastoral Ministers,
Administrators, Staff, and Volunteers**

## Code of Conduct

Adults who work with young people or vulnerable adults through the Diocese of Buffalo or any of its parishes or schools have the legal, moral, and religious responsibility to perform their duties in a way that educates and assists – and does not harm -- the young people and vulnerable adults with whom they work. In keeping with that obligation, the Diocese of Buffalo has established the following Code of Conduct for all who minister to young people or vulnerable adults in the parishes of the Diocese, teach young people in the schools of the Diocese, coach young people on sports teams connected with the Diocese or any of its parishes or schools, or in any other way work with young people or vulnerable adults through the Diocese of Buffalo. For purposes of this policy, the term "young people" or "young person" means anyone under the age of 18, and the term "vulnerable adult" means a person who is impaired by reason of mental illness, mental deficiency, physical illness, or disability to the extent that he or she lacks sufficient understanding or capacity to make or communicate responsible decisions concerning his or her person or to manage his or her affairs effectively.

**As one of the priests and religious, teachers and coaches, employees and /or volunteers, who work with children and young adults in or through the Diocese of Buffalo, I solemnly pledge that:**

1) I will to the best of my ability, perform my work in a manner consistent with the mission of the Catholic Church and the Diocese of Buffalo;

2) I will always remember that I am not a peer of the young people with whom I work and I will perform my duties accordingly;

3) I will maintain appropriate physical and emotional boundaries from the young people and vulnerable adults with whom I work;

4) I will avoid situations where I am alone with a young person at Church activities;

5) I will refrain from any and all physical conduct, conversations and other communications with young people or vulnerable adults that have a sexual purpose or result;

6) I will not touch a young person and/or vulnerable adult in a sexual or other inappropriate manner;

7) If I learn of an allegation of abuse or if I suspect abuse, I will report that allegation or suspicion to the Victim Assistance Coordinator (716-895-3010) and to the appropriate district attorney's office;

8) I will cooperate fully in any investigation of abuse of young people and/or vulnerable adults;

9) I will treat everyone with respect, loyalty, patience, integrity, courtesy, dignity, and consideration;

10) I will use positive reinforcement rather than criticism, competition, or comparison when working with young people and/or vulnerable adults;

11) I will neither accept expensive gifts from young people and/or vulnerable adults nor give expensive gifts to them without prior written approval from the parents or guardians and from the pastor or administrator;

12) I will not smoke or use tobacco products in the presence of young people;

13) I will not use, possess, or be under the influence of alcohol while working with young people;

14) I will not use, possess, or be under the influence of illegal drugs at any time;

15) I will not pose any health risk to young people and/or vulnerable adults (i.e., no fevers or other contagious situations);

16) I will not strike, spank, shake, or slap young people and/or vulnerable adults;

17) I will not humiliate, ridicule, threaten, or degrade young people and/or vulnerable adults;

18) I will not use any discipline that frightens or humiliates young people and/or vulnerable adults;

19) I will not use profanity in the presence of young people and/or vulnerable adults;

20) I will not acquire, possess, or distribute a pornographic image of a young person, nor will I show a pornographic image of an adult to a young person.

*I understand that this code is to be applied fairly and equitably on a case by case basis.*

**I understand that whenever I am working with children and/or youth, as a volunteer or employee, I am subject to a thorough background check including criminal history.**

**I further understand that this criminal background check will be conducted prior to beginning my employment/assignment and thereafter at such times and frequencies as determined by the agency, department, and/or organization by which I am employed and/or to which I am assigned.**

**I understand that criminal background and character reference information may be requested from public and private sources.**

**I understand that any action inconsistent with this Code of Conduct, or actions inconsistent with Diocesan policies for the protection of children and young adults, or failure to take action mandated by this Code of Conduct may result in removal from my position.**

**I also understand that this code of conduct does not abrogate or replace any other obligations that I have under any applicable law, guideline, policy or regulation.**

**I hereby authorize, without reservation, any law enforcement agency, institution, information service bureau, school, employer, reference, or insurance company contacted by the Diocese of Buffalo or its agent to furnish the information described herein. I hereby release the employer and agents and all persons, agencies, and entities providing information or reports about me from any liability arising out of the requests for or release of any of the information or reports herein.**

_____
Printed Name


_____          _____
Signature                                         Date

Rev. January 19, 2017

# EXHIBIT B

**PLAN TO SUPERVISE PRIESTS WHO ARE DEEMED CREDIBLY ACCUSED
OF SEXUAL MISCONDUCT TOWARD A MINOR OR VULNERABLE ADULT
BY THE INDEPENDENT REVIEW BOARD AND BISHOP**

**Introduction**:  The Diocese of Buffalo is committed to the protection of children and vulnerable adults. One part of that commitment is the monitoring of priests who have been credibly accused of sexual misconduct of a minor or a vulnerable adult.  The Diocese shall appoint an independent individual with experience in the field of law enforcement (the "Monitor") to develop individual monitoring plans for priests against whom a Complaint has been deemed substantiated.  The Monitor shall certify, before monitoring any priest, that, other than his or her monitoring role, he or she lacks any material familial, personal, financial, or employment relationship with the Diocese or the accused priest.

For each priest who has been judged credibly accused by the Independent Diocesan Review Board and Bishop, the diocese will create and supervise an individualized monitoring plan that reflects the following:

> **Priest's biographical data and background**.

> **Allegations and interventions (information on offenses so risk factors can be clear).**

> **Canonical status of this case.**

> **Health, mobility and cognitive status.**

**Restrictions**. Every credibly accused priest agrees to certain prohibitions:

1.      He is prohibited from exercising priestly ministry in all forms, including public celebration of the mass, hearing confession wearing the Roman collar or clerical garb and being introduced as "Father."
2.      He is prohibited from providing spiritual direction, pastoral care counseling and all other forms of ministry that may be provided by lay persons.
3.      He is prohibited from viewing, downloading or otherwise possessing pornography or sexually explicit materials of any kind.
4.      He is prohibited from attending any place that features sexual performance such as a strip club or "adult book store."
5.      He is prohibited from having a personal post office box.

Other prohibitions may be made based on an individual's history of offence.

**Each individualized plan will address the following elements for risk assessment and containment purposes.  As a result, the plan is dynamic and may change during the course of supervision:**

1.      Housing.  The credibly accused pedophile must not live in close proximity to youth, not within 1,000 feet of a school, park or other place where children gather. The credibly accused priest may be required to live in communal housing if such supervision is needed.  Wherever he lives, the Monitor can visit at any time unscheduled and unannounced.   The Monitor may search, without a warrant, the

1

individual's property and any property under his control if credible information exists that some violation of this plan has been broached. (Property includes the subject's person, vehicle, papers, computer, or other electronic communication or data storage devices or media and effects.)

2.      Internet Use.  The credibly accused priest shall use only computers, cell phones, or other internet connected devices authorized by the Monitor.  The internet activity of the credibly accused priest is available to the Monitor at any time. The Monitor is authorized to install a third-party application on authorized connected devices to facilitate monitoring the priest's compliance with this plan.

3.      The credibly accused priest is prohibited from viewing pornography in any format.  Downloading or otherwise possessing pornography or sexually explicit materials of any kind is forbidden.

3.      Counseling.  The priest may be required to attend individual or group counseling sessions.  If so, the priest must get a signed note from the counselor testifying to the priest's participation in each session.  This verification will be given to the Monitor.

4.      Support groups.  The priest may be required to participate in a 12 STEP group (AA, OA, NA) or other support group.  If so, he must request a signed verification that he attended a session.  This verification is given to the Monitor at the next session.

5.      Spiritual direction.  The priest may be required to attend individual or group spiritual direction sessions.  If so, the priest must get a signed note from the spiritual director testifying to the priest's participation in each session.  This verification will be given to the Monitor.

6.      Travel. Travel overnight is to be done only after discussion with and advance approval of the Monitor.  Ordinarily, travel will be done with a companion aware of the priest's sexual offending history and approved by the Monitor. An itinerary must be submitted in advance and adhered to. Travel will not include trips to child orientated places.

7.      Frequency of monitoring meetings. The plan delineates how often the priest will meet individually with the Monitor, though this will not to be less than monthly. Additional meetings may be unscheduled and/or spontaneous at the Monitor's discretion as required to monitor compliance with the plan.

8.      Family events. If the person is attending a family event where children are present, some responsible adult, aware of the priest's sexual offense history and authorized by the Monitor, must be identified to provide appropriate supervision.  The Monitor must be allowed to speak with that person in regard to this event.

**Supervision.**  Content of the monitoring meeting:  In preparation of the monitoring meeting, the priest will prepare a written summary of his accountability during the past month in each area of his plan.  At the monitoring meeting each aspect of the plan will be reviewed and the priest will be held accountable for following the plan.   Both the priest and the Monitor will date and sign the accountability report and this will be filed in the priest's personnel file.

**Collaboration.** The priest shall grant the Monitor authorization to communicate with all treatment providers and collateral resources as necessary for verification purposes, continuity of care, and risk management.

**Accountability**.   If a priest is not adhering to his plan, a more restrictive living environment can be required.   If a priest is not adhering to his plan, his pension may be revoked entirely, following the "Plan Document of the Secular Priests' Retirement Plan of Diocese of Buffalo."

# EXHIBIT C

# DIOCESE OF BUFFALO

## POLICY AND PROCEDURES
## FOR THE PROTECTION OF CHILDREN, YOUNG PEOPLE
## AND VULNERABLE ADULTS
## REVISED October 2022

### INTRODUCTION: PASTORAL STATEMENT

An essential part of the mission of the Church is the promotion and protection of the rights and dignity of all people.  Christian principles dictate that we have a special concern for those who are most vulnerable and those who cannot fully care for themselves.

The abuse of children, young people, and vulnerable adults by some members of the clergy and the ways in which those crimes and sins were addressed have caused enormous pain, anger, and confusion. The damage caused by that sexual abuse is devastating and long lasting and is felt not only by the direct victims but also by their families and communities.

At the same time, the problem of unethical sexual or physical conduct, a form of exploitation, is one that compromises the credibility of the Church's ministers and volunteers and adversely affects the image and effectiveness of the entire Church.  People place in their Church leaders a trust that must never be violated by any person employed by or volunteering services to the Church.

With a firm determination to promote and honor that trust, the Diocese of Buffalo renews its resolve to provide safety and protection for children and vulnerable adults in Church ministries and institutions.

Well before the issue of sexual misconduct by Church personnel received widespread national attention, the Diocese of Buffalo prepared a written policy to address abuse.  This policy was distributed to all our clergy in 1990.  In June 2002, the United States Conference of Catholic Bishops (USCCB) took steps to ensure the Church's vigilance in guarding against violations of trust.  In November 2002, the USCCB approved a revised Charter for the Protection of Children and Young People (Charter) and revised Essential Norms for Diocesan/Eparchial Policies Dealing with Allegations of Sexual Abuse of Minors by Priests or Deacons (Essential Norms).  The Charter and Essential Norms are revised periodically. See Charter for the Protection of Children and Young People, Essential Norms, and Statement of Episcopal Commitment (Promise to Protect - Pledge to Heal)(USCCB 2018). https://www.usccb.org/test/upload/Charter-for-the-Protection-of-Children-and-Young-People-2018-final(1).pdf

This policy of the Diocese of Buffalo is also revised periodically.  The "Commitments by the Diocese" set out in the Stipulated Final Order in *New York v. Diocese of Buffalo*, No. 1:21-cv-00189 (S.D.N.Y.), are hereby incorporated into these Policy and Procedures. The Diocese agrees that, during the term of the Stipulated Final Order, it will not modify any of the Commitments that have been incorporated into these Policy & Procedures without a corresponding modification to the terms of the Stipulated Final Order.

# I.   GENERAL POLICY AND DEFINITIONS

## A.   General Policy

Sexual and physical misconduct is contrary to Christian principles and inconsistent with the mission of the Church. All personnel of the Diocese of Buffalo must comply not only with applicable state and local laws regarding incidents of actual or suspected misconduct but also with the procedures included in this document, and they must exercise heightened vigilance as required.

## B.   Definition of Terms

**Child**: Any person under 18 years of age.

**Vulnerable Adult**:  A person who is impaired by reason of mental illness, mental deficiency, physical illness, or disability to the extent that he or she lacks sufficient understanding or capacity to make or communicate responsible decisions concerning his or her person or to manage his or her affairs effectively.

**Child or Vulnerable Adult Abuse**:  Causing or attempting or threatening to cause harm to a **child**'s or **vulnerable adult**'s health or welfare, to include damage to the physical or emotional/psychological health and welfare of a

– 3 –

**child** or **vulnerable adult**, resulting from non-accidental physical or mental injury, incest, sexual abuse, sexual exploitation, molestation, or repeated negligent treatment or maltreatment.

**<u>Sexual Abuse of a Child or Vulnerable Adult</u>**:
Actual or attempted sexual molestation or sexual exploitation of a **child** or **vulnerable adult** or other behavior by which an adult uses a **child** or **vulnerable adult** as an object of sexual gratification.

Sexual abuse has been defined by different civil authorities in various ways, and this policy, like the Charter, does not adopt any particular definition provided in civil law. Rather, the transgressions in question relate to obligations arising from divine commands regarding human sexual interaction as conveyed to us by the Sixth Commandment of the Decalogue.

Thus, the norm to be considered in assessing an allegation of **sexual abuse of a child or vulnerable adult** is whether conduct or interaction with a **child** or **vulnerable adult** qualifies as an external, objectively grave violation of the Sixth Commandment.[1]  A canonical

---

[1]    USCCB, *Canonical Delicts Involving Sexual Misconduct and Dismissal from the Clerical State*, 1995, p. 6.

offense against the Sixth Commandment[2] need not be a complete act of intercourse; nor, to be objectively grave, does an act need to involve force, physical contact, or a discernible harmful outcome.  Moreover, "imputability [moral responsibility] for a canonical offense is presumed upon external violation . . . unless it is otherwise apparent."[3]

The acquisition, possession, or distribution of pornographic images of a **child** shall be considered **sexual abuse of a child**.  The showing of pornographic images of an adult to a **child** shall be considered **sexual abuse of a child**.

If there is any doubt whether a specific act qualifies as an external, objectively grave violation, the writings of recognized moral theologians will be consulted and the opinions of recognized experts will be obtained when appropriate.[4]  Ultimately, the Bishop, with the assistance and advice of the Independent Diocesan Review Board (see below), will determine the gravity of the alleged act.

---

[2]   CIC, c. 1395 § 2; CCEO, c. 1453 § 1.

[3]   CIC, c. 1321 § 3; CCEO, c. 1414 § 2.  Cf. CIC, canons 1322-27 and CCEO, canons 1413, 1415 and 1416.

[4]   *Canonical Delicts*, p. 6.

**Allegation**: An accusation of **child** or **vulnerable adult abuse** or **sexual abuse of a child** or **vulnerable adult** regardless of whether the person to whom the accusation is made believes it to be true.

**Chancery**:  The Bishop, Vicar General, and Chancellor of the **Diocese,** and their staffs.

**Cleric**:  A person ordained for service in the Roman Catholic Church.

**Complaint**: An **allegation** of **child** or **vulnerable adult abuse** or **sexual abuse of a child** or **vulnerable adult** by **personnel** that is received by the **Diocese** and contains sufficient detail to identify the alleged abuse and the alleged abuser(s).  A **complaint** may include allegations of a violation of the Code of Conduct's prohibition on behavior by **personnel** that constitutes grooming.  A form for written **complaints** is attached as Appendix A.

**Diocese**:  The **Diocese** of Buffalo.

**Employee**:  A person who is compensated for work performed for the **Diocese,** or for any of its parishes or parish schools.

**Former Cleric**: A cleric who is deceased or an individual who is included in the list of *Priests With Substantiated Claims of Abuse* published on the Diocese's website.

**Governing Policies**:  These *Policy & Procedures*, the *Charter for the Protection of Children and Young People*, adopted by the USCCB, as revised June 2018 and any subsequent versions; The Diocese's *Code of Conduct for Priests, Deacons, Pastoral Ministers, Administrators, Staff, and Volunteers*, as revised January 19, 2017, and any subsequent versions; The *Essential Norms for Diocesan / Eparchial Policies Dealing with Allegations of Sexual Abuse of Minors by Priests or Deacons*, prepared by the Ad Hoc Committee on Bishops' Life and Ministry of the USCCB, promulgated as revised June 17, 2005, and in all subsequent versions; and *The Plan to Supervise Priests Who Are Deemed Credibly Accused of Sexual Misconduct Toward a Minor or Vulnerable Adult by the Independent Review Board and Bishop*, dated March 22, 2021 and any subsequent versions of the same.

**Independent Review Board**:  The Panel described in this document (Part V, below).

**Personnel**: Individuals who, at the time a complaint is made, are (a) **employees**; (b) **volunteers**; (c) a **Cleric** or **Former Cleric**; or (d)

working for the **Diocese** or at any of its parishes
or parish schools and belong to a religious
order.

**Religious Order Allegation**:  An allegation of
sexual abuse of a child or vulnerable adult by a
member of a religious order who, at the time of
the alleged abuse or at the time the allegation
is made, works, teaches, ministers, or resides
within the Diocese.  The allegation may assert a
violation of the *Code of Conduct*'s prohibition on
behavior by a member of a religious order that
constitutes grooming.

**Stipulated Final Order**:  The Stipulated Final
Order in *New York v. Diocese of Buffalo*, No.
1:21-cv-00189 (S.D.N.Y.)

**Victim Assistance Coordinator**: An office
described in this document (Part V, below).

**Volunteer**: A person who works without
compensation on a regular basis for the **Diocese**,
or for any of its parishes or parish schools.  A
**volunteer** is more than a one-time or occasional
worker.

C.    **Types of Abuse**

This policy is intended to address **child** or **vulnerable adult abuse** and **sexual abuse of a child** or **vulnerable adult**.

II. **PROCEDURES FOR REPORTING SUSPECTED ABUSE AND LEGAL REQUIREMENT**

A. <u>For Victims of Child or Vulnerable Adult Abuse or Sexual Abuse of a Child or Vulnerable Adult and Persons Who Become Aware of Such Abuse</u>

The **Diocese** strongly urges all victims and families of victims to report any instance of **child** or **vulnerable adult abuse** or **sexual abuse of a child** or **vulnerable adult** to the appropriate district attorney. Additionally, anyone desiring to report allegations of **child** or **vulnerable adult abuse** or **sexual abuse of a child** or **vulnerable adult** to the Diocese of Buffalo should (a) contact the Diocesan Victim Assistance Coordinator at 716-895-3010 or Jacqueline.joy@ccwny.org; (b) go to the "Report Misconduct" page on the Diocese's website (https://www.buffalodiocese.org/report-misconduct/) for the Diocese's online, confidential portal and a link to report alleged abuse by a bishop or alleged mishandling of allegations of sexual abuse by a bishop. More information regarding **complaints** and how to report a **complaint** can be found at the link on the Diocesan website titled "Report Misconduct."

The **Victim Assistance Coordinator** will explain to the person reporting the abuse or suspected abuse that the **Diocese** cannot promise absolute confidentiality to a complainant because of the responsibility of the **Diocese** to report allegations of abuse to the civil authorities and diocesan representatives as described in this policy and because, if the accused is still living, the **Diocese** will make the accused aware of the report.  The **Victim Assistance Coordinator** will also explain, however, that the investigation of the **complaint** will be kept as confidential as the circumstances of an individual **complaint** will allow in order that the reputations of both the complainant and the accused are protected during the investigation.

B.   <u>**For All Personnel**</u>

Any **personnel** who learns of an **allegation** of or suspects

> **sexual abuse of a child** or **vulnerable adult** -- <u>i.e.,</u> a person who is a **child** or **vulnerable adult** at the time of the suspicion or when the **allegation** becomes known to the **personnel,**
>
> sexual abuse of a person who was a **child** at the time of the abuse but is no longer a **child,** or
>
> **child** or **vulnerable adult abuse**

must report that allegation or suspicion to the **Victim Assistance Coordinator** (716-895-3010), and is strongly urged to report to the appropriate district attorney.  The only exception is if to do so would violate the priest/penitent relationship of the Sacrament of Reconciliation.

- A written or oral report of the incident must be made as soon as possible to the **Victim Assistance Coordinator**.  The **Victim Assistance Coordinator** will advise the following of the report as soon as practicable:  the Bishop, the Vicar for Clergy, the Child Protection Policy Coordinator, and the Diocesan attorney. If a written report has not been made previously, the **Victim Assistance Coordinator** shall interview the complainant, within ten days of a **complaint's** report, subject to complainant cooperation and availability. The **Victim Assistance Coordinator** shall then prepare a written report of the **complaint**;

- The **Victim Assistance Coordinator** will provide a copy of the written **complaint** to the Bishop, the Vicar for Clergy, the **Child Protection Policy Coordinator**, and the Diocesan attorney within ten days of

completing the complainant interview.  The **Chancery** will notify the diocesan insurance administrator.  The substance of all **complaints** and the results of any initial inquiries and investigations will be presented to the **Independent Review Board.**

- A sample reporting form is attached to this policy statement (Appendix A) and is available on the diocesan website.

- Where the **Diocese** receives an allegation of abuse that does not contain sufficient detail to permit a review or investigation of the alleged event(s), the **Diocese** shall make reasonable efforts to contact the complainant or his or her counsel to request additional information about the allegation so that it may be assessed and investigated pursuant to this policy.  The **Diocese** shall document its efforts to contact the complainant and such documentation shall be included in the accused's personnel file.

The foregoing reporting requirements are not intended to supplant whatever reporting obligations may be imposed by state or local laws.

All **personnel** will cooperate in any investigation by civil authorities in accordance with the law of the jurisdiction in question.

– 12 –

**B.**   <u>**For The Chancery**</u>

The **Chancery,** through counsel, will report to the appropriate district attorney any **allegation** of **child abuse** or **sexual abuse of a child.**

The only other exception is if to report would violate the priest/penitent relationship of the Sacrament of Reconciliation.

The **Chancery** will cooperate with civil authorities by reporting **allegations** of **child abuse** and **sexual abuse of a child** even when the victim of the abuse is no longer a **child** at the time when the **allegations** are received by the **Chancery.**

The **Chancery** also will comply with any applicable civil laws with respect to the reporting of **allegations** of **child abuse** and **sexual abuse of a child** to civil authorities and will cooperate in any investigation by civil authorities in accordance with the law of the jurisdiction in question.  In every instance, the **Chancery** will advise any person making an **allegation** or **complaint** of that person's right to make a report to civil authorities, and the **Diocese** will support that right and encourage its exercise.

## III. <u>INSTITUTIONAL RESPONSE TO COMPLAINTS AND ALLEGATIONS</u>

When a **complaint** is made, it is understood that the rights of all must be protected and that prompt and incisive action is important in responding. Care will be taken not to interfere with any investigation by civil authorities and to be sensitive to the pastoral care of the victim, the well being of the community, and the fair treatment of the accused. Every effort will be made to ensure that all persons involved will be ministered to in a manner that is consistent with the gospel values of dignity, compassion, understanding, and justice.

<u>Outreach</u>: The **Diocese** will reach out to all victims of abuse and make itself available to their families -- whether the abuse was recent or occurred many years ago -- to promote their spiritual and emotional well-being, their healing, and their reconciliation. The Diocesan Bishop or his designee will offer to meet with victims of abuse and their families to listen with patience and compassion to their experiences and concerns. The **Diocese** will provide counseling, spiritual assistance, support groups, and other social services as agreed by the **Diocese** and the victim. Local parishes are encouraged to foster support groups for victims and others affected by abuse. The **Diocese** and its parishes will cooperate with social services agencies and other churches to provide support for victims and their families.

**Initial Inquiry**:  Upon receiving a written complaint from the **Victim Assistance Coordinator,** the Vicar for Clergy will conduct or appoint an individual to conduct a prompt initial inquiry regarding any **complaint** other than (a) a **Religious Order Allegation** or (b) a complaint against a **Former Cleric.**  The initial inquiry shall be completed within no more than ten business days from when the Vicar for Clergy or his designee receives a written report of the **complaint,** unless there are extenuating circumstances, in which case the circumstances will be documented.  As part of that initial inquiry, if the identity of the accused can be determined and that person is a member of the diocesan **personnel,** the accused individual will be notified of the particulars of the allegations and advised of the right to be represented by civil and/or canonical counsel.

If the initial inquiry results in a determination that the **complaint** is manifestly false or frivolous, the Vicar for Clergy or his designee will generate a written memorandum for the file to document the basis for that conclusion. That memorandum will be provided to the Bishop and the Independent Review Board for review and will be added to the personnel record for all personnel identified in the complaint.

If a **complaint,** other than (a) a **Religious Order Allegation** or (b) a **complaint** against a **Former Cleric,** is not manifestly false or frivolous and is deemed by the Bishop or Vicar General or his designee to be serious, the accused will be relieved of responsibilities and placed on administrative leave, pending the outcome of the

– 15 –

**investigation** (discussed below).  The leader of the employing entity, in consultation with the Bishop or Vicar General, shall decide whether such leave is with or without pay or benefits.

This relief from administrative responsibilities is for investigation purposes only and is not intended to, nor shall it, imply any determination as to the truth or falsity of the **complaint** or the innocence or guilt of the individual involved.

In the case of a cleric, the relief from administrative responsibilities shall be recorded in a decree, which shall include restrictions that, during the pendency of the investigation, the accused cleric cannot present himself as a priest or deacon or, in the case of a priest, reside in the parish he serves at the time the Complaint is made or where the alleged abuse is alleged to have occurred.  The **Vicar for Clergy** shall supervise the cleric's compliance with this decree.

The diocesan communications office shall report on the Diocese's website on the determination to place a cleric on administrative leave pending the investigation, without any implication as to the truth or falsity of the complaint.

For a Complaint against a cleric that is submitted anonymously and does not reference at least one person who can corroborate the alleged abuse (whether it be the alleged victim, a non-victim complainant, or someone else), the Bishop shall have the discretion not to place the

cleric on administrative leave pending the investigation. In such cases, the Bishop shall document his decision not to place the accused on administrative leave pending the investigation and his reason(s) for that decision.  A copy of that record shall be placed in the personnel file for all Personnel identified in the anonymous Complaint.

**Investigation**:  For a **complaint** that is referred to the **Independent Review Board** for investigation, the accused individual will be informed that the alleged incident is being investigated and will be given every opportunity to respond to the **complaint.**  The accused may be requested to seek, and may be urged voluntarily to comply with, an appropriate medical and psychological evaluation at a facility mutually acceptable to the **Diocese** and the accused.

Within no more than ten business days after the **complaint** is referred to the **Independent Review Board,** the Board will appoint an investigator.  The investigator shall be a person of integrity and skill with significant experience conducting investigations and shall not be a member of the **Chancery**, a priest or employee of the **Diocese.**  The independent investigator shall certify before each investigation that, other than his or her investigative role, he or she lacks any material familial, personal, financial, or employment relationship with the **Diocese**, the accused cleric, or the complainant.  The investigator will be directed to complete the **investigation** within 45 days of his or her appointment, unless circumstances

dictate the need for more time, in which case the circumstances shall be documented in the investigator's report.  The appointed investigator will obtain legal advice, both civil and canonical, as necessary.

When a **complaint** of **child** or **vulnerable adult abuse** or **sexual abuse of a child** or **vulnerable adult** involves a priest or deacon, the **investigation** will be initiated and conducted promptly and objectively in harmony with Canon Law.[5]  All appropriate steps shall be taken to protect the reputation of the accused during the **investigation**.

The accused shall have the right

■    to present evidence to the investigator,

■    to be represented by civil and/or canonical counsel,

■    to be notified of the particulars of the **allegations**, and

■    to due process of law in accordance with canon law.

---

[5]    CIC, c. 1717; CCEO, c. 1468.

The accused will be encouraged to retain the assistance of civil and canonical counsel and will be notified promptly of the results of the **investigation**.

At the conclusion of the **investigation**, the investigator shall submit a written report of the findings of the independent investigation, including the process and sources of information for the investigation, and submit the written report to the **Independent Diocesan Review Board**. After such additional inquiries as it may deem necessary and after deliberation, the **Independent Diocesan Review Board** shall submit a written recommendation to the Bishop about whether the **allegations** of the **complaint** should be found substantiated or unsubstantiated. The written recommendation shall set out the basis for the recommendation and may refer to or rely upon the investigator's written report. The **Independent Review Board** shall recommend that the Bishop find that a **complaint** substantiated where the **Independent Diocesan Review Board** determines, on the basis of the totality of facts, circumstances, documents, and any testimony or in-person statements presented to the **Independent Review Board** that it is more likely than not that the alleged abuse occurred. The written recommendation shall indicate whether the **Independent Review Board** members are unanimous in support of the recommendation. Where the **Independent Review Board** has recommended that that **allegations** of the **complaint** should be found substantiated, the fact of that

recommendation by the **Independent Review Board** shall be placed on the diocesan website.

A **Complaint** against a **Former Cleric** shall be referred expeditiously to the **Independent Review Board**, which shall then determine whether to appoint an independent investigator to investigate the **Complaint.** In making that determination, the **Independent Review Board** shall consider whether (a) the allegations in the **Complaint** implicate **personnel** in addition to the **Former Cleric**, including by alleging that such **personnel** failed to monitor the **Former Cleric** or failed to adequately respond to allegations of abuse by that **Former Cleric** or (b) the investigation is likely to provide material information that would improve the **Governing Policies**. The **Independent Review Board** may also, in its discretion, consider other factors in making this determination. In the event that the **Independent Review Board** determines that an investigator should be appointed, the provisions set forth herein concerning the conduct of the investigation shall apply, but the provisions for the timing of the appointment of an investigator shall not apply. In such an instance, the investigator need not be appointed within ten business days of when a **complaint** is referred to the **Independent Review Board** but shall instead be appointed by the **Independent Review Board** within a reasonable time after the **Independent Review Board** determines that an investigator should be appointed.

When the Bishop determines that a **complaint** against a **Cleric** is substantiated, the accused's name will be added to the list of *Priests With Substantiated Claims of Abuse* and, when the accused is a **Cleric** in ministry within the Diocese, announced in the parish where the Cleric is assigned and any other institution where the Cleric was assigned.  The Diocese shall similarly publicize on its website all disciplinary actions taken as a result of an investigation, a subsequent canonical trial, or a referral to the Dicastery for the Doctrine of the Faith and, where applicable, announce such disciplinary action in the parish and any other institution where the accused Cleric was assigned.  The Bishop shall then apply the precautionary measures mentioned in CIC, canon 1722, or CCEO, canon 1473: i.e., he shall

■   continue the administrative leave or remove the accused from sacred ministry or from any ecclesiastical office or function,

■   impose or prohibit residence in a given place or territory,

■   prohibit public celebration of the Most Holy Eucharist pending the outcome of the process, and

■   where feasible, create a safety plan around the priest in an effort to protect children from abuse.

**<u>Legal Rights and Duties</u>**:  Any **personnel** of the **Diocese** who

>  admits or is determined by the Bishop or Vicar General to have committed

>  even a single act of **child** or **vulnerable adult abuse** or **sexual abuse of a child** or **vulnerable adult**

>  shall immediately be terminated from employment or **volunteer** service and from any position of responsibility with the **Diocese** and any of its parishes, schools, and institutions.

When even a single act of **child** or **vulnerable adult abuse** or **sexual abuse of a child** or **vulnerable adult** by a priest or deacon is admitted or is established after an appropriate process in accord with canon law, the offending priest or deacon will be removed permanently from ecclesiastical ministry, not excluding dismissal from the clerical state if the case so warrants.[6]  The cleric will be removed from ministry whether or not the cleric is diagnosed by qualified experts as a pedophile or as suffering from a related sexual disorder that requires professional treatment.  Any cleric removed from ministry will be offered professional assistance for his own healing

---

[6]    CIC, c. 1395 § 2; CCEO, c. 1453 § 1.

and well-being, as well as for the purpose of
prevention.

In every case involving canonical penalties, the
processes provided for in canon law must be observed,
and the various provisions of canon law must be
considered.[7]  The Dicastery for the Doctrine of the
Faith shall be notified, as appropriate.  Unless the
Dicastery for the Doctrine of the Faith calls the case
to itself because of special circumstances, the Bishop
will proceed as directed.[8]

Because **sexual abuse of a child** or **vulnerable adult** is
a grave offense, if the case would otherwise be barred
by prescription, the Bishop shall apply to the
Dicastery for the Doctrine of the Faith for a
dispensation from the prescription (time limits),
while indicating appropriate pastoral reasons.  For the
sake of due process, the accused will be encouraged to
retain the assistance of civil and canonical counsel.
When necessary, the **Diocese** will supply canonical
counsel to a priest or deacon.

Strict observance of canon and civil law will assist
in the protection of all parties involved and will

---

[7]     Cf. *Canonical Delicts Involving Sexual Misconduct and
Dismissal from the Clerical State*, 1995; Letter from
the Congregation for the Doctrine of the Faith, May
18, 2001.

[8]     Article 13, "Procedural Norms" for *Motu proprio
Sacramentorum Sanctitatis tutela*, AAS, 93, 2001, p.
787.

demonstrate that each individual's rights were fully respected and all privileges provided by law maintained.

If the penalty of dismissal from the clerical state has not been imposed (e.g., for reasons of advanced age or infirmity), the offender ought to lead a life of prayer and penance.  He will not be permitted to celebrate Mass publicly, to administer the sacraments, to wear clerical garb, or to present himself publicly as a priest.

At all times, the Bishop has the executive power of governance, through an administrative act, to remove the offending cleric from office, to remove or restrict his faculties, or to limit his exercise of priestly ministry.

The Bishop may exercise his executive power of governance to take one or more of the following administrative actions:[9]

> (a)  He may request that the accused freely resign from any currently held ecclesiastical office;[10]

> (b)  If the accused declines to resign, and if the Bishop judges the accused to be

---

[9]    CIC, cc. 381, 129, ff.; CCEO, cc. 178, 979, ff.

[10]    CIC, cc. 187-189; CCEO, cc. 967-971.

truly not suitable[11] at that time for holding an office previously freely conferred,[12] then the Bishop may remove the accused from office, observing the required canonical procedures;[13]

(c) For a cleric who holds no office in the **Diocese**, the Bishop may administratively remove any previously delegated faculties,[14] while any *de jure* faculties may be removed or restricted by the competent authority as provided in law;[15]

(d) The Bishop may also determine that the circumstances surrounding a particular case constitute the just and reasonable cause for a priest to celebrate the Eucharist only privately (that is, with no member of the faithful present),[16] and the Bishop then shall forbid the

---

[11] CIC, c. 149 § 1; CCEO, c. 940.

[12] CIC, c. 157.

[13] CIC, cc. 192-195, 1740-1747; CCEO, cc. 974-977, 1389-1396.

[14] CIC, cc. 391 § 1 and 142 § 1; CCEO, cc. 191 § 1 and 992 § 1.

[15] E.g., CIC, c. 764; CCEO, c. 610 §§ 2-3.

[16] CIC, c. 906.

priest to celebrate the Eucharist other
than privately and to administer the
sacraments, for the good of both the
Church and the priest's own good;[17]

(e)   Depending upon the gravity of the case,
the Bishop may also dispense[18] the
cleric from the obligation of wearing
clerical attire,[19] and may urge the
cleric not to wear clerical attire, for
the good of both the Church and the
cleric.

These administrative actions shall be taken in writing
and by means of decrees[20] so that the cleric affected
is afforded the opportunity of recourse in accord with
canon law.[21]

The priest or deacon may at any time request a
dispensation from the obligations of the clerical
state.  In exceptional cases, the Bishop may request of
the Holy Father the dismissal of the priest or deacon

---

[17]   The priest shall be permitted to administer the sacraments in the
case of a true emergency.

[18]   CIC, cc. 85-88; CCEO, cc. 1536 § 1 - 1538.

[19]   CIC, c. 284; CCEO, c. 387.

[20]   CIC, cc. 47-58; CCEO, cc. 1510 § 2, 1°-2°, 1511, 1513
§§ 2-3 and 5, 1514, 1517 § 1, 1518, 1519 § 2, 1520.

[21]   CIC, cc. 1734 ff.; CCEO, cc. 999 ff.

from the clerical state *ex officio*, even without the consent of the priest or deacon.

**Referral to the Dicastery for the Doctrine of the Faith**: Within four weeks after reviewing a recommendation from the **Independent Review Board**, the Bishop shall determine whether to refer a **complaint** to the Dicastery for the Doctrine for the Faith and, when the Bishop has determined that such a referral is warranted, the Dicastery for the Doctrine of the Faith shall be notified within ten weeks of the Bishop's determination to refer a **complaint** to the Dicastery for the Doctrine of the Faith, unless circumstances dictate the need for more time to complete the referral, in which case the circumstances shall be documented. In the event that the Bishop disagrees with the **Independent Review Board's** recommendation, the Bishop shall issue a written response to the **Independent Review Board** that states the basis for his determination.  In such cases, (a) the Bishop shall also consider whether to request that additional investigation should be conducted and, if so, whether any decree of administrative leave imposed on the accused should remain in place pending the completion of any such additional investigation and (b) copies of the Bishop's written response to the **Independent Review Board** shall be provided to (i) the Vicar for Clergy and (ii) the Auditor appointed pursuant to the **Stipulated Final Order**, during the Auditor's term in accordance with the **Stipulated Final Order**.

**Records and Reports**: Appropriate records will be kept of each **complaint** and investigation and the Diocese's training programs.  Records will include the **complaint**, the result of any **initial inquiry**, any determination by the Bishop regarding whether to place a cleric on administrative leave pending an investigation, the report of the investigator to the **Independent Review Board**, its recommendation to the Bishop.  In the case of a cleric, the records will include any determination by the Bishop or his designee concerning the recommendation of the **Independent Review Board**, the decrees and any materials sent to the Dicastery for the Doctrine of the Faith and its response, and the monitoring of clerics in accordance with the Priest Supervision Program.  Records shall be confidential and be kept securely at the Bishop's office, with access limited to the Bishop, the Vicar General, the Chancellor, the assigned investigator, the **Independent Review Board**, and counsel for the **Diocese**.  Complete copies of these records shall be provided for the Bishop's and the Independent Review Board's consideration in the event any new complaint is made regarding the same individual.

The **Independent Review Board** will be notified of any **complaint**, suspicion, or incident.

In accordance with the terms of applicable insurance policies, insurers also will be notified of any **complaint** or incident.

<u>**Unfounded Complaints**</u>:  The **Diocese** will take every reasonable step to ensure that care is taken to protect the rights of all parties involved, particularly those of the person alleged to have been sexually abused and the person against whom the **complaint** has been made.  When a **complaint** has been determined to be unfounded, the **Diocese** will take every reasonable step to restore the good name of the person falsely accused.

<u>**Supplementary Review**</u>: When a new complaint is made regarding a person who was previously accused of abuse, or when new and previously unavailable information comes to light about a determination previously made, the Bishop and the **Independent Review Board** shall consider that information in exercising their responsibilities under these *Policy & Procedures* as they consider the new complaint or reopen a previously determined complaint.

**IV.**   <u>**TRANSFERS AND NEW ASSIGNMENTS**</u>

When a cleric is proposed for a new assignment or transfer within the **Diocese**, the Chancellor or Vice Chancellor will check the personnel file of the cleric before transfer.

In letters of suitability or good standing for a cleric incardinated in the Diocese, the Diocese will state whether the cleric is in compliance with the Diocese's Safe Environment Program and whether there

is anything in the cleric's background that makes him
unsuitable to work with minors or vulnerable adults.

The **Diocese** will not transfer any priest or deacon who
has committed an act of **child** or **vulnerable adult
abuse** or **sexual abuse of a child** or **vulnerable adult**
to a new assignment within the **Diocese** or to another
diocese/eparchy or religious province.

When a cleric is proposed

    for a new assignment or transfer,

    for residence in another diocese or eparchy,
    or residence in a country other than the
    United States, or

    for residence in a local community of a
    religious institute,

    the Bishop (for Diocesan priests) or

    religious superior (for religious order priests)

    will forward to the Bishop or religious superior
    of the proposed new assignment or residence

    an accurate and complete report of  information about
    any act of sexual abuse concerning the cleric,
    information about any Complaint and its status, and

any other information indicating that the cleric has
been or may be a danger to minors.

Before a diocesan priest or deacon can be transferred
for residence to another diocese/eparchy or religious
province, or before a diocesan priest or deacon can --
with the Bishop's knowledge -- be present for an
extended period of time in another diocese/eparchy or
religious province,

the Bishop will forward,

in a confidential manner

to the local bishop/eparch or religious
ordinary (if applicable) of the proposed
place of residence,

any and all information concerning any act of
**child** or **vulnerable adult abuse** or **sexual abuse
of a child** or **vulnerable adult,** including
information concerning any Complaint and its
resolution, and

any and all information indicating that the
priest or deacon has been or may be a danger
to **children** or **vulnerable adults.**

This will apply even if the priest or deacon will
reside in the local community of an institute of
consecrated life or society of apostolic life (or, in

— 31 —

the Eastern Churches, as a monk or other religious, in a society of common life according to the manner of religious, in a secular institute, or in another form of consecrated life or society of apostolic life).

Whenever the Bishop receives a priest or deacon from outside the **Diocese**,

> the Bishop will obtain
>
> all relevant information regarding the background of that priest or deacon, including any information regarding any past act of **child** or **vulnerable adult abuse** or **sexual abuse of a child** or **vulnerable adult** by that priest or deacon.

The **Diocese** will cooperate with the Apostolic Visitation of any seminary or religious house of formation recommended in the Interdicasterial Meeting with the Cardinals of the United States and the Conference Officers in April 2002. The **Diocese** will develop systematic ongoing formation programs, in keeping with the Conference document *Basic Plan for the Ongoing Formation of Priests* (2001), so as to assist priests in living out their vocation.

V.   <u>**OFFICES TO ASSIST THE DIOCESE**</u>

**Auditor:**  The person or entity appointed pursuant to the **Stipulated Final Order** to conduct an annual, independent audit of the Diocese's compliance with its Commitments in the **Stipulated Final Order** for the period and under the terms as set forth in the **Stipulated Final Order**.  Part II.B of the **Stipulated Final Order,** addressing "The Audit of the Diocese's Compliance with the Commitments" is hereby incorporated into these *Policies & Procedures*.

**Child Protection Policy Coordinator:**  A senior Diocese official who shall report directly to the Bishop.  The **Child Protection Policy Coordinator** shall be responsible for:

(a)  ensuring that the **Governing Policies** are followed;

(b)  notifying the Bishop when the **Governing Policies** are not followed;

(c)  providing advice to the Bishop concerning the Diocese's compliance with the **Governing Policies**;

(d)  providing advice to the Bishop on updates or modifications to improve the effectiveness of the **Governing Policies**; and

(e)  overseeing the *Priest Supervision Program*.

**Victim Assistance Coordinator:**  The Diocese has established and will continue to support the Diocesan **Victim Assistance Coordinator**.  The **Victim Assistance Coordinator** will offer assistance and immediate pastoral care to any person who claims to have been the victim of **sexual abuse of a child** by priests,

– 33 –

deacons, or other Diocesan **personnel**, and, within the
discretion of the **Chancery**, to anyone else needing
similar assistance or care.  The **Victim Assistance
Coordinator** will also be responsible for preparing a
written complaint if one has not been prepared already
by the complainant.

<u>**Independent Review Board**</u>:  The **Independent Review Board**
functions as a confidential consultative body to the
Bishop in discharging his responsibilities.  The
**Independent Review Board** advises the Bishop in his
assessment of **allegations** or suspicions of **child** or
**vulnerable adult abuse** and **sexual abuse of a child** or
**vulnerable adult,** and in evaluating suitability for
ministry or employment.  The **Independent Review Board**
will review and, if appropriate, revise this policy no
less often than once every five years.  The **Independent
Review Board** will meet periodically and offer advice
on all aspects of **allegations** or suspicions of **child**
or **vulnerable adult abuse** and **sexual abuse of a child**
or **vulnerable adult,** whether retrospectively or
prospectively.

The **Independent Review Board** must be composed of at
least five (5) persons of outstanding integrity and
good judgment in full communion with the Church and
such additional members as may be approved by the
Bishop.  The majority of the **Independent Review Board**
members must be lay persons who are not employed by
the **Diocese,** but at least one member must be a priest
who is an experienced and respected pastor in the

**Diocese** and at least one member must be a person with particular expertise in the treatment of **sexual abuse of a child.** Each member is appointed by the Bishop for a term of five (5) years, which can be renewed at the sole discretion of the Bishop.

## VI.   SAFE ENVIRONMENT PROGRAM

The **Diocese** has established a Safe Environment Program. All diocesan offices, parishes, schools, and other organizations must participate in this program by:

> ensuring that all **personnel** agree to and execute the Code of Conduct;

> participating in the **Diocese**-wide education program designed to educate parents, **children,** and all **personnel** who have regular contact with **children** and young adults.

The Code of Conduct shall be available on the Diocese's website.

## VII.   EDUCATIONAL EFFORTS

The **Diocese** of Buffalo recognizes that to fully address the problem of sexual or physical misconduct by church **personnel,** the **Diocese** must continue its comprehensive program of education designed to create an atmosphere of understanding that will help maintain the integrity of ministry in the church.

The educational efforts of this policy will continue
to focus on:

- ■   Working definitions of sexual abuse within
      pastoral and ministerial relationships;

- ■   Characteristics of coercive and exploitive
      sexual behavior;

- ■   Strategies for maintaining the integrity of
      ministerial relationships; and

- ■   Reporting responsibilities for those aware
      of possible sexual misconduct or harassment.

The educational component of this policy has
prevention of sexual misconduct as its goal and will
provide intervention strategies when sexual misconduct
has already taken place.

The following **personnel** (lay, religious, and clerical)
of the **Diocese** and its parishes, schools, and other
institutions, and such other **personnel** as the Bishop
or Vicar General may require from time to time, must
attend designated educational programs on methods of
recognizing, reporting, and preventing sexual
misconduct involving **children** or others:

- ❑   All priests and deacons engaged in
      ministry in the **Diocese** of Buffalo;

❑   Pastoral associates;

❑   Administrators (schools and religious education);

❑   Teachers and teachers aides;

❑   Coaches and scout leaders;

❑   And any other person whose status as an **employee** or **volunteer** involves regular contact with **children**, young adults, or other vulnerable populations.

## VIII.   <u>**STANDARDS OF BEHAVIOR**</u>

All clergy, Diocesan and parish **employees, volunteers**, and other church **personnel** -- including and especially those who have regular contact with **children** and young adults -- must maintain the following boundaries and standards of behavior:

❑   They must refrain from **child** or **vulnerable adult abuse** and **sexual abuse of a child** or **vulnerable adult,** as defined under I(A) above;

❑   They must avoid any physical or verbal contact of any kind with a **child** or **vulnerable adult** that has the purpose of, or results in, their sexual excitement or gratification;

❑   They must never use their role as a
member of the clergy, an **employee**, a
**volunteer**, or any other Church position
to enter into a sexual relationship or
encounter with a **child** or **vulnerable adult**;

❑   They must execute and abide by the terms
of the Code of Conduct, attached as Appendix B.

## IX.  RELIGIOUS ORDERS

All members of a religious order who work, teach, minister,
or reside within the Diocese shall be required to agree to
the *Code of Conduct*.  The **Victim Assistance Coordinator** and
other means available to victims to report a Complaint
against Personnel shall be available to report **Religious
Order Allegations**.  The Diocese shall proceed as follows
with respect to such **Religious Order Allegations**:

(a)  The Diocese shall report the **Religious Order
Allegation** to the appropriate district attorney and to
the applicable religious order when the religious
order is not otherwise on notice of the allegation
(through the filing of a civil lawsuit or otherwise).

(b)  The Vicar for Clergy will conduct or appoint a
specific individual to conduct an initial inquiry into
any **Religious Order Allegation** against a person who
works, ministers, teaches, or resides within the
Diocese at the time the allegation is made, in
accordance with the procedure set out above.

(c)   If an initial inquiry by the Vicar for Clergy or his designee of a **Religious Order Allegation** finds that the allegation is not manifestly false or frivolous, the Bishop shall, pending any investigation of the **Religious Order Allegation** by the pertinent religious order or district attorney, (i) suspend the priestly faculties of the accused within the Diocese; (ii) revoke all permission for the accused to provide or participate in any form of ministry within the Diocese, including teaching; (iii) not allow the accused to live in a Diocesan parish; and (iv) report on the Diocese's website that the accused's faculties have been suspended within the Diocese pending investigation by the pertinent religious order or district attorney without any implication as to the truth or falsity of the allegation.  Notwithstanding the foregoing, the Bishop shall have the discretion not to take the steps recited in (i) through (iv), above, if the **complaint** is submitted anonymously and does not reference at least one person (whether it be the alleged victim, a non-victim complainant, or someone else) who can corroborate the alleged abuse; in such cases, the Bishop shall document his decision not to place the accused on administrative leave pending investigation of the **complaint** and his reason(s) for that decision.  A copy of that record shall be placed in the personnel file for all **personnel** identified in the **complaint.**

## X.   PROCEDURES FOR SCREENING

**<u>Applicants/Employees/Volunteers</u>**

Screening is required of all applicants for a position as an **employee** or **volunteer** ("applicants").

The form attached to this policy as <u>Appendix C</u> is provided to assist with the screening of applicants who seek to serve the Church in the **Diocese** and is required for all applicants for **personnel** positions.

In addition, this form must be completed by all current members of the clergy, **employees**, and **volunteers**.  The **Diocese** will review the **personnel** file of each member of the clergy, diocesan **employee**, diocesan **volunteer**, and other diocesan **personnel** to ensure that this form is in each file.  All parishes in the **Diocese** will likewise review the **personnel** file of each parish **employee** and **volunteer**.  The Vicar General (for the **Diocese**), or the pastor (for each parish and parish school), will have the responsibility of approving each applicant, or current **employee** or **volunteer**.  If the Vicar General or pastor has any question about a given applicant, or about a diocesan or parish **employee** or **volunteer**, he will forward that person's **personnel** file to the **Independent Review Board** for its review and recommendation.  These files will be maintained as a permanent record by the parish or institution.  In addition, the **Diocese** and its parishes, schools, and institutions will evaluate the background of all of their respective **personnel** who have regular contact with **children**.

– 40 –

**<u>Priests and Deacons</u>**

The **Diocese** will employ careful screening and evaluative techniques in deciding the fitness of candidates for ordination.[22]

## XI.   <u>COMMUNICATION</u>

The **Diocese** is committed to open and transparent communication.

Any settlement agreement entered into between the **Diocese** with respect to a **complaint** shall not bind the parties to confidentiality unless the claimant requests confidentiality and that request is expressly stated in the settlement agreement.

In order to coordinate the response of the **Diocese** to the media, any media inquiries regarding an incident of reported sexual misconduct by **personnel** of the **Diocese** must be directed to the Diocesan Director of Communications.  Likewise, any inquiries directed to members of the **Independent Review Board** or to any **personnel** of the **Diocese** regarding this policy must be directed to the Diocesan Director of Communications. Unless the Bishop directs otherwise, the Diocesan Director of Communications will be the sole

---

[22]     *Cf.* National Conference of Catholic Bishops, *Program of Priestly Formation*, 1993, no. 513.

spokesperson for the **Diocese** for matters addressed in this policy.

Within the confines of respect for the privacy and the reputation of the individuals involved, the **Diocese** will communicate as openly as possible with the community.  This is especially so with regard to assisting and supporting parishes, schools, and other diocesan institutions directly affected by ministerial misconduct involving **children**.  Recognizing the harm that **child** or **vulnerable adult abuse** or **sexual abuse of a child** or **vulnerable adult** can do to a faith community, the **Chancery** will offer a pastoral response to the affected parish, school, or institution.

The **Diocese** has adopted and will adhere to a whistleblower policy, in compliance with New York law, which prohibits any intimidation, harassment, discrimination, retaliation, or adverse employment consequence against **Personnel** that, in good faith, reports any action or suspected action that is illegal or violates the Governing Policies.  This whistleblower policy is posted on the **Diocese's** website.

**I HEREBY AUTHORIZE THIS POLICY RELATING TO CHILD AND VULNERABLE ADULT ABUSE AND SEXUAL ABUSE OF A CHILD OR VULNERABLE ADULT AS THE OFFICIAL POLICY OF THE DIOCESE OF BUFFALO.  THIS POLICY IS EFFECTIVE IMMEDIATELY AND I AUTHORIZE ITS IMPLEMENTATION IN THE DIOCESE OF BUFFALO.**


_____

Most Rev. Michael W. Fisher
 Bishop of Buffalo
 October 2022

Chancellor:


_____


October 2022

## APPENDIX A

## COMPLAINT OF ABUSE TO THE DIOCESE OF BUFFALO

[DATE]

**What is your name, address and telephone number?**

Name: _____

Address: _____

_____

Phone: _____

**What is your relationship to the person whom you believe to be the victim of abuse?**

☐    Self
☐    Parent
☐    Grandparent
☐    Other relative
☐    Friend
☐    Other     Please specify: _____

**Tell us about the person whom you believe to be the victim of abuse:**

Name: _____

Address: _____

_____

Phone: _____

— 1 —

Age: _____ Date of Birth: _____

School: _____ (If applicable)

Parish: _____ (If applicable)

**Tell us about the person whom you believe to be responsible for the abuse:**

Name: _____

Position/Title: _____

Parish: _____

Address: _____

_____

Phone: _____

**Tell us the date(s) of the incident(s) reported (approximate, if necessary):**

**Tell us the location of the incident(s) reported (approximate, if necessary):**

**Please describe the incident(s):**

**How do you know about this?**

**You have the right, and are encouraged, to report this incident to the civil authorities, including the appropriate police agency and/or office of the District Attorney.**

**Have you reported this incident to any investigator or civil authority?**

**If so, to whom?**

**Is there any other relevant information that you would like to provide?  For example, would you like to meet with a representative of the diocese to provide information that you would prefer not to provide in writing?  If so, please provide any such request(s) or additional information here:**

**Thank you for providing this report.  You will be contacted soon by a representative of the Diocese of Buffalo.**

# Appendix B: Code of Conduct

**Diocese of Buffalo**

**Code of Conduct**
**For Priests, Deacons, Pastoral Ministers,**
**Administrators, Staff, and Volunteers**

<u>**Code of Conduct**</u>

Adults who work with young people or vulnerable adults through the Diocese of Buffalo or any of its parishes or schools have the legal, moral, and religious responsibility to perform their duties in a way that educates and assists – and does not harm -- the young people and vulnerable adults with whom they work. In keeping with that obligation, the Diocese of Buffalo has established the following Code of Conduct for all who minister to young people or vulnerable adults in the parishes of the Diocese, teach young people in the schools of the Diocese, coach young people on sports teams connected with the Diocese or any of its parishes or schools, or in any other way work with young people or vulnerable adults through the Diocese of Buffalo.  For purposes of this policy, the term "young people" or "young person" means anyone under the age of 18, and the term "vulnerable adult" means a person who is impaired by reason of mental illness, mental deficiency, physical illness, or disability to the extent that he or she lacks sufficient understanding or capacity to make or communicate responsible decisions concerning his or her person or to manage his or her affairs effectively.

**As one of the priests and religious, teachers and coaches, employees and /or volunteers, who work with children and young adults in or through the Diocese of Buffalo, I solemnly pledge that:**

1) I will to the best of my ability, perform my work in a manner consistent with the mission of the Catholic Church and the Diocese of Buffalo;

2) I will always remember that I am not a peer of the young people with whom I work and I will perform my duties accordingly;

3) I will maintain appropriate physical and emotional boundaries from the young people and vulnerable adults with whom I work;

4) I will avoid situations where I am alone with a young person at Church activities;

5) I will refrain from any and all physical conduct, conversations and other communications with young people or vulnerable adults that have a sexual purpose or result;

6) I will not touch a young person and/or vulnerable adult in a sexual or other inappropriate manner;

7) If I learn of an allegation of abuse or if I suspect abuse, I will report that allegation or suspicion to the Victim Assistance Coordinator (716-895-3010) and to the appropriate district attorney's office;

8) I will cooperate fully in any investigation of abuse of young people and/or vulnerable adults;

9) I will treat everyone with respect, loyalty, patience, integrity, courtesy, dignity, and consideration;

10) I will use positive reinforcement rather than criticism, competition, or comparison when working with young people and/or vulnerable adults;

11) I will neither accept expensive gifts from young people and/or vulnerable adults nor give expensive gifts to them without prior written approval from the parents or guardians and from the pastor or administrator;

12) I will not smoke or use tobacco products in the presence of young people;

13) I will not use, possess, or be under the influence of alcohol while working with young people;

14) I will not use, possess, or be under the influence of illegal drugs at any time;

15) I will not pose any health risk to young people and/or vulnerable adults (i.e., no fevers or other contagious situations);

16) I will not strike, spank, shake, or slap young people and/or vulnerable adults;

17) I will not humiliate, ridicule, threaten, or degrade young people and/or vulnerable adults;

18) I will not use any discipline that frightens or humiliates young people and/or vulnerable adults;

19) I will not use profanity in the presence of young people and/or vulnerable adults;

20) I will not acquire, possess, or distribute a pornographic image of a young person, nor will I show a pornographic image of an adult to a young person.

***I understand that this code is to be applied fairly and equitably on a case by case basis.***

I understand that whenever I am working with children and/or youth, as a volunteer or employee, I am subject to a thorough background check including criminal history.

I further understand that this criminal background check will be conducted prior to beginning my employment/assignment and thereafter at such times and frequencies as determined by the agency, department, and/or organization by which I am employed and/or to which I am assigned.

I understand that criminal background and character reference information may be requested from public and private sources.

I understand that any action inconsistent with this Code of Conduct, or actions inconsistent with Diocesan policies for the protection of children and young adults, or failure to take action mandated by this Code of Conduct may result in removal from my position.

I also understand that this code of conduct does not abrogate or replace any other obligations that I have under any applicable law, guideline, policy or regulation.

I hereby authorize, without reservation, any law enforcement agency, institution, information service bureau, school, employer, reference, or insurance company contacted by the Diocese of Buffalo or its agent to furnish the information described herein. I hereby release the employer and agents and all persons, agencies, and entities providing information or reports about me from any liability arising out of the requests for or release of any of the information or reports herein.

_____
Printed Name

_____         _____
Signature                                                                                  Date

THIS IS A SAMPLE ONLY. PLEASE COMPLETE THE CODE OF CONDUCT PROVIDED BY YOUR PARISH, SCHOOL, OR AGENCY TO MAINTAIN IN THEIR FILES

Rev. January 19, 2017

**Appendix C: Uniform Volunteer Questionnaire**

We do not discriminate in our selection of volunteers on the basis of race, color, age, sex or national origin.  We may consider a candidate's religious affiliation in our decision to accept them as a volunteer because of our status as a religious entity, consistent with state and federal law.

Last Name:_____ First: _____ Middle Init: _____
　　　　　　(Print Clearly Full Legal Name)

Preferred Name:_____ Parish or Institution:_____

Social Security Number:_____-_____-_____ Date of Birth: _____/_____/_____
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　(Month)　　(Day)　　(Year)

Address: _____
　　　　　(Street Address)　　　　　　　(Apt)　　　(City)　　　　　　(State)　　(ZIP code)

Telephone # (Home): _____

Nature of volunteer assignment: ___

Date volunteer assignment will begin

```
THIS IS A SAMPLE ONLY.  PLEASE COMPLETE
THE APPLICATION PROVIDED BY YOUR PARISH,
SCHOOL, OR AGENCY TO MAINTAIN IN THEIR
FILES.
```

**EMPLOYMENT RECORD**

CURRENT OR MOST RECENT EMPLOYMENT:
Employed by: _____

Address: _____
　　　　　(Street Address)　　　　　　　　　　(City)　　　　　　(State)　　(ZIP code)

Your Supervisor: _____Telephone # _____

Supervisor's title: _____

Employed from: _____ to_____
　　　　　　　　(month/year)　　　　　　　　　　(month/year)

Why did you leave? _____

_____

**IF EMPLOYED LESS THAN TWO (2) YEARS, PREVIOUS EMPLOYMENT:**

Employed by: _____

Address: _____
　　　　　(Street Address)　　　　　　　　　　(City)　　　　　　(State)　　(ZIP code)

Your Supervisor: _____Telephone # _____

Supervisor's title: _____

Employed from: _____ to_____
　　　　　　　　(month/year)　　　　　　　　　　(month/year)

Why did you leave? _____

Office Use:
References Checked
Yes_____ No_____

**VOLUNTEER SERVICE OR PERSONAL REFERENCES WITHIN THE PAST THREE (3) YEARS:**
   or list other references

Organization Name / Address / Supervisor          Position                    Dates          Tele.#

_____     _____     _____     _____

_____     _____     _____     _____

_____     _____     _____     _____

Religious affiliation: _____

Have you ever been discharged or asked to resign by your employer or a volunteer organization?

☐ Yes        ☐ No      If yes, please state circumstances: _____

_____

Have you ever been convicted of, or are you currently under indictment for a crime with the exception of a traffic offense?      ☐ Yes        ☐ No     Date: _____   Please explain.

State charge and disposition: _____

Are you now or have you ever been the subject of an indicated report of child abuse, neglect or mal-treatment?
                      ☐ Yes        ☐ No     Date: _____    If yes, please explain. _____

_____

Your answer is looked upon only as one of the factors considered in our decision and is evaluated in terms of nature, severity and date of the offense.  No applicant will be excluded from consideration due to prior arrests.

**APPLICANT'S AGREEMENT:**

I hereby represent that each answer to a question herein and all other information or personal references furnished is true and correct. I further represent that such answers and information constitute a full and complete disclosure of my knowledge with respect to the question or subject which the answer or information relates. I understand that any incorrect or false statements or information furnished by me will subject me to discharge at any time. I hereby authorize my former employers and organizations to which I volunteered my services or personal references to give any information regarding my employment or volunteer services with them and, in addition, to furnish any other information they may have concerning me including, but not limited to, character, general reputation and personal characteristics.

I also understand I am subject to a thorough background check including criminal history.

I understand that my volunteer services are for no definite period and may be terminated at any time without previous notice.

Signature of Applicant _____ Date _____
Rev. 24-Feb-2017

# EXHIBIT D

**DIOCESE OF BUFFALO - WHISTLEBLOWER POLICY**

The Whistleblower Policy is intended to encourage Trustees, officers (including administrative officers), committee members, employees, and volunteers to report, without the fear of intimidation, harassment, discrimination, retaliation, or adverse employment consequences, any action or suspected action that is potentially illegal, fraudulent, or is in violation of any adopted policy of the Corporation. This policy also applies to the Diocese's Code of Conduct and the Diocesan Policy and Procedure for the Protection of Children, Young People and Vulnerable Adults, but any complaint regarding abuse in violation of those policies should be directed to the Diocesan Victim Assistance Coordinator at 716-895-3010.

The Diocese has implemented a fraud reporting system which includes a toll-free hotline and a web-site through the independent, third-party company EthicsPoint. This confidential reporting system, available in both English and Spanish, allows employees, volunteers, parishioners, vendors and other interested parties to report concerns regarding a range of suspected unethical behavior by trustees, officers, directors, employees, volunteers, staff, agents or contractors of the Diocese. Reports may be filed confidentially through EthicsPoint by choosing the "Report Fraud" link on the left-hand column of www.buffalodiocese.org , or via one of EthicsPoint's trained specialists at 1-844-573-4177. All reports will be taken seriously, promptly investigated, and when requested, anonymity is provided.

Alternatively, an employee or volunteer should promptly report the suspected or actual violation to his/her supervisor who, in turn, must notify the Vicar General or the Moderator of the Curia. If the employee or volunteer is uncomfortable or otherwise reluctant to report to his/her supervisor, then the suspected or actual violation can be reported to the next highest level of management who, in turn, must notify the Vicar General or the Moderator of the Curia. The individual can always notify the Vicar General or the Moderator of the Curia directly. Trustees and officers should promptly report the suspected or actual violation directly to the Vicar General or the Moderator of the Curia. The individual must report the suspected or actual violation in writing on the Whistleblower Reporting Form. (Appendix D) and should include his/her identity to facilitate proper and prompt investigation allowing the Diocese to obtain any additional information or clarification needed. Alternatively, an individual can elect to submit an anonymous complaint delineating the facts of a suspected violation including the name of the alleged offender(s), date of the incident(s), description of the incident(s), and names of witnesses to the incident(s). Anonymous complaints may not permit as thorough an investigation as would otherwise be permitted by additional follow up.

Appropriate resolution of the complaints and effective remedial action oftentimes is possible only when suspected violations are promptly filed.

In consultation with the chairperson of the Audit and Compliance Committee of the Board of Trustees ("Audit and Compliance Committee"), the Vicar General or the Moderator of the Curia shall promptly conduct an appropriate investigation

of any report. If the investigation establishes that a violation of law, external regulation, or any adopted policy of the Corporation has occurred, then the Audit and Compliance Committee shall determine the appropriate action based upon law and corporate policy, up to and including civil or criminal prosecution. Directors who are employees may not participate in any committee deliberations or voting related to administration of this whistleblower policy.

The subject of a whistleblower complaint shall not be present at or participate in committee deliberations relating to such a complaint. The subject of a whistleblower complaint shall not vote on the matter relating to such complaint. Nothing in this paragraph shall prohibit the committee from requesting that the person who is the subject of the complaint present information as background, or answer questions at a committee or board meeting prior to the commencement of deliberations or voting relating thereto.

Reports will be kept confidential to the extent possible consistent with the need to conduct an adequate investigation and prevent or correct suspected violation(s). The Vicar General or the Moderator of the Curia shall disclose information relating to a report with those who have a need to know so that he can conduct an effective investigation and determine what action to take based on the results of any such investigation. Complaints will be kept as confidential as possible as is consistent with a thorough investigation and applicable laws. To the extent complaints made under this policy implicate criminal conduct the Diocese may be required to contact and cooperate with appropriate law enforcement authorities.

No Trustee, officer (including administrative officers), committee member, employee, or volunteer of the Corporation who in good faith reports any action or suspected action that is illegal, fraudulent, or in violation of any adopted policy of the Corporation shall suffer intimidation, harassment, discrimination, retaliation, or, in the case of employees, adverse employment consequence.

Any individual who files a report concerning a suspected or actual violation must do so in good faith. The Corporation will impose appropriate discipline against any person found to have knowingly made a report in bad faith, up to and including termination of employment, or other legal means, in order to protect the reputation of the Corporation and members of its staff.

Anyone who retaliates against any individual who has made a report in good faith will be subject to disciplinary action up to and including termination of employment or in the case of a non-employee up to and including termination of the existing relationship.

A copy of this policy shall be posted on the Diocese's website or at the Catholic Center in a conspicuous location accessible to employees and volunteers.